# EXHIBIT A

1    but the truth in my patent applications.  That is
2    correct.
3    BY MR. RAMSEY:
4         Q.    Okay.  What led to your thinking about
5    using signal abstracts to compare against a database
6    to identify content?
7         A.    Again, I think I answered that earlier.
8         Q.    Did something particular happen in your
9    business that you were -- you said, ah, this is a
10   good idea to look up content based on signal
11   abstracts to identify it?
12              MR. GARTEISER:  Objection, form.
13        A.    Again, I think I've already answered
14   that question.
15   BY MR. RAMSEY:
16        Q.    Well, I just want to know -- I just want
17   to understand the background how -- how you came up
18   with the idea of -- what was your business rationale
19   for using signal abstracts to identify content?
20        A.    Signal fingerprints didn't work
21   properly.
22        Q.    What are signal fingerprints?
23        A.    I really couldn't tell you.  It's a
24   poorly defined term.
25        Q.    But your signal abstracts are not the

1  same as signal fingerprints?
2        A.    They were not the same.
3        Q.    Okay.  And why are your signal abstracts
4  different from signal fingerprints?
5        A.    Again, I think that was already
6  discussed during the claim construction, so I stand
7  by whatever the ruling in the claim construction
8  was.
9        Q.    Well, I'm entitled to your factual
10 understanding as the inventor in this important case
11 what is the difference -- what is your understanding
12 as the inventor between signal abstracts and signal
13 fingerprints?
14              MR. GARTEISER:  Objection, form.
15       A.    Signal fingerprints cannot differentiate
16 between versions of the same data object.  Signal
17 fingerprints cannot anticipate unknown works that
18 are introduced into the system.  And signal
19 fingerprints allow you to replicate the original
20 signal without penalty.  Those are the three key
21 points, and those are unchanged, and those will be
22 unchanged in what I'm -- in what you're asking me.
23 BY MR. RAMSEY:
24       Q.    All right.  So it's your position that
25 the prior art prior to your signal --

1     abstract as defined in the specification, the
2     prosecution history, as well as the claim
3     construction is what a signal abstract is.
4          Q.    Okay.  But is it, in your view, MFCCs in
5     the prior art are not signal abstracts?
6                MR. BRASHER:  Objection, form.
7          A.    I don't understand the term "prior art"
8     as you're using it, but an MFCC, as I understand, is
9     not equivalent to a signal abstract based on the
10    description, the specification, the prosecution
11    history, as well as the claim construction.
12                In addition, I'll add that all of
13    the patents and/or documents that I was aware of
14    that came from Muscle Fish and/or Audible Magic
15    and/or the other entities involved were all
16    presented under my duty to disclose as well as the
17    duty to disclose by my representatives at the patent
18    office, were all considered by the office, and not a
19    single one of them was actually used by any examiner
20    as an example that would be considered prior art.
21    BY MR. RAMSEY:
22         Q.    So tell me, how does your invention
23    actually create an abstract from an original audio
24    signal?  Describe for me that process, please.
25                MR. BRASHER:  Objection, form.

1      A.     ==As to my own words, since I wrote the==
2   ==specification and participated heavily in the==
3   ==prosecution of the patent as well as assisting with==
4   ==the claim construction, the patent specification,==
5   ==the prosecution history, as well as the claim==
6   ==construction all suffice to answer the question you==
7   ==just asked.==
8   BY MR. RAMSEY:
9      Q.     All right.  I'd like to read --
10     A.     And by the way, the description in a
11  patent, as I understand it, is to, the legal term, a
12  person having ordinary skill in the art.  So when
13  you ask me what I would say to someone who has less
14  technical knowledge, I'm not quite sure that that's
15  the same thing as what the requirements of getting a
16  patent are, but I could not extrapolate from your
17  question exactly what you're talking about.
18     Q.     All right.  So, for example, at trial in
19  this case, when either counsel for a defendant or
20  your own counsel asks -- asks you, describe the
21  process of creating an abstract from an original
22  audio signal, your answer will be I refer you to the
23  prosecution history, the specification, and the
24  claim construction in this case.  That will be your
25  answer at trial, correct?

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)
Electronically signed by Daniel J. Skur (101-371-192-7869)                                    ab9f348c-3c7d-4bba-9821-fa50c865fe83

1    terms in your own words, how does that process work.
2                MR. BRASHER:  Object to the form.
3         A.     Once again, my own words were written in
4    this document which I wrote.  My own words exist in
5    the prosecution history and the claim construction
6    as well.  So I can refer you to the specification
7    once again.  We can start with column 6, line 55,
8    and I will read you.
9                My words, by way of improving
10   methods for efficient monitoring as well as
11   effective confirmation of the identity of a
12   digitally sampled signal, the present invention
13   describes useful methods for using digital signal
14   processing for benchmarking a novel basis for
15   differencing signals with binary data comparisons.
16   These techniques may be complemented with perceptual
17   techniques, but are intended to leverage the
18   generally decreasing cost of bandwidth and signal
19   processing power in an age of increasing
20   availability and exchange of digitized binary data.
21   So long as there exists computationally inexpensive
22   ways of identifying an entire signal with some
23   fractional representation or relationship with the
24   original signal or its perceptually observable
25   representation, we envision methods for faster and

1   transpired, what is going on between our exchange,
2   questions, answers, clarifications.  Each time you
3   have a discrete question, a discrete data object,
4   there are elements that you're talking about and
5   we're referring to as features and characteristics
6   which may be common to those set of questions that
7   are essentially the same question.  So what's common
8   is put aside.  What's different is what's used to
9   differentiate between each of the instances of the
10  question that you've asked and thus differentiating.
11                I can't predict each time you change
12  the question, but I can still rely on the common
13  features or characteristics of the original set of
14  questions that you asked that are still related.
15  How that comparison goes between the new question
16  that you ask and each subsequent time you ask it, it
17  depends on the context of when it happens.  And,
18  again, this is not limited to what I feel or what I
19  think I know.  It's what's in the specification.
20  It's in the prosecution history, which you can
21  certainly go over as well, and it's in the claim
22  construction in which the term "signal abstract" was
23  defined and also the term "comparing device" was
24  defined.  So if you would like to again refer to the
25  claim construction document and go over what those

1  definitions are, I'll stick by those definitions.
2       Q.    I actually just want to understand, not
3  an analogy, I want to understand in the real world
4  what -- what aspects of an unknown abstract would be
5  compared to a, for example, stored known abstract.
6  Is it some sort of bits?
7       A.    Now I'm very confused.
8       Q.    I would like --
9       A.    You don't want an analogy, but you want
10 a recipe or a blueprint, right?  Is that what you're
11 asking for?
12      Q.    I would like one example in software of
13 what aspects of an unknown abstract are compared to
14 a known abstract.  Just give me a real life
15 technical example, nonlimiting example, of what
16 aspects of an unknown abstract would be compared to
17 a known abstract.
18      A.    Counselor, I just did.  The stenographer
19 is not using a traditional analog device which
20 prints out paper from indentations that he can then
21 later read and translate into whatever language he's
22 translating into.  He's using software here.  The
23 machine that's staring at me right now, the video
24 machine, is a digital base machine which I presume
25 has firmware and software running it in the digital

 1   It's digital watermarking technology that he wanted
 2   to integrate and other parties that he did not name
 3   into his monitoring service.
 4                With regards to Broadcast Data
 5   Systems, I continue to maintain I don't recall
 6   exactly what they do, and I don't recall ever being
 7   given any technical detail about what they do.
 8   BY MR. RAMSEY:
 9       Q.    Okay.  Well, in terms of RCS and BDS and
10   Muscle Fish, did you go back and do any review of
11   documents to prepare and refresh your recollection
12   about what it is these companies did prior to
13   September 2000, or did you not go and look at
14   documents to help yourself remember?
15                MR. GARTEISER:  Objection, form.
16       A.    Well --
17   BY MR. RAMSEY:
18       Q.    I'm asking about your preparation
19   process again.  What did you do, if anything, to
20   refresh your recollection about what RCS and BDS did
21   in the past?
22       A.    ==The process, without limitation again,==
23   ==because we still have a specification which I wrote,==
24   ==prosecution history which I participated in, and a==
25   ==claim construction which I was involved in, my==

Page 1094

```
 1   with that idea.
 2                MR. GARTEISER:  Objection, form.
 3   BY MR. RAMSEY:
 4        Q.    What is your belief?
 5        A.    This is a patent infringement case.  I
 6   believe that your clients infringed my patents, and
 7   you can say you don't care about the patent office
 8   and you can say whatever you want about it, but this
 9   is a patent infringement case and the patent is
10   presumed valid.  You have a burden that's clear and
11   convincing evidence, and by saying you only want to
12   know what my belief is or my thought is, my beliefs
13   and thoughts are written in the specification which
14   I wrote, written in the prosecution history which I
15   participated in, and also in the claim construction
16   which I also participated in.  So sitting here and
17   saying you don't care about the patent office as
18   you've reiterated several times and you're trying to
19   say what I think, what I feel has nothing to do with
20   it.  People who think and feel are a certain type of
21   person.  I'm an inventor.  I went out and I sought
22   an invention by reducing the invention through a
23   constructive reduction of practice with my patent
24   attorney, and on the first action on the merits of
25   the patent, allowable subject matter was -- was met
```

Page 1141

```
 1   account with the exception that the bluespike.com
 2   account does not have any shopping cart or any type
 3   of functionality to carry out transactions, and in
 4   fact, informs people if they want to talk about
 5   sales or interest in consulting engagements, to
 6   email the company so that we can engage in those
 7   discussions which is how we conducted business.
 8       Q.    Email which company, Blue Spike, Inc. or
 9   Blue Spike LLC?  Which company -- you just mentioned
10   that there's -- one can email the company through
11   the website bluespike.com.  If they sent such an
12   email, would they be emailing Blue Spike, Inc., Blue
13   Spike LLC, or both?
14             MR. GARTEISER:  Objection, form.
15       A.    I have no idea what you mean by "both"
16   because a Shopify account necessarily links to
17   wherever you want those inquiries to go.  The
18   Shopify account links directly to the Blue Spike
19   mailing account.  I am the only member of Blue Spike
20   LLC at present.  I am also the only director, the
21   only officer, and the only employee of Blue Spike,
22   Inc., so --
23   BY MR. RAMSEY:
24       Q.    Okay.
25       A.    -- which one of my hats do I answer?  Do
```

Electronically signed by Daniel J. Skur (101-371-132-7809)
Electronically signed by Daniel J. Skur (101-371-132-7809)

848b174b-2a03-457f-b33d-92e8025b449a

Page 1142

1  I say that the employee Scott Moskowitz takes it and
2  hands it to the officer? The officer Scott
3  Moskowitz tells the employee Scott Moskowitz, what
4  do we do with this? I mean, it all comes to me, so
5  I'm not really clear on how you're differentiating
6  between the two entities.
7     Q.    All right. Well, let me ask it this
8  way. If I sent an email via bluespike.com and you
9  received it, and my email were addressed to Blue
10 Spike, Inc., would you respond on behalf of Blue
11 Spike, Inc.?
12    A.    If it was a Blue Spike-related question,
13 sure. But I get contacts through LinkedIn and
14 Twitter and all kinds of different places. Google
15 searches in which people may send nonbusiness
16 inquiries, in fact, perhaps personal inquiries to
17 that address, but again, we did not do any shopping
18 cart type business until we set up the Shopify
19 account where we offered the watermarking product,
20 and for a year we offered, you know, the ability to
21 see if we could go through with the Giovanni
22 abstraction engine if anyone was interested in doing
23 it, and to date, there have been no inquiries, no
24 sales, no emails.
25    Q.    Okay. If I were to -- if I were to send

Electronically signed by Daniel J. Skur (101-371-132-7809)
Electronically signed by Daniel J. Skur (101-371-132-7809)
848b174b-2a03-457f-b33d-92e8025b449a

1       A.      Oh, okay.  Pardon.

2               (Exhibit 13 introduced.)

3    BY MR. RAMSEY:

4       Q.      So Mr. Moskowitz, Exhibit 13, as we've discussed before, is Audible Magic's notice of 30(b)(6) deposition to Blue Spike LLC.  You understand that today you're testifying on behalf of Blue Spike LLC in response to the topics in Exhibit 13, correct?

10      A.      I do.

11      Q.      And please describe for me what you've done to prepare to be knowledgeable about the topics 1 through 42 in Exhibit 13.

14      A.      I'm not sure what you mean by "prepare."

15      Q.      Well, have you reviewed any documents or spoken with anybody in the weeks leading up to today's deposition of Blue Spike LLC to refresh your recollection about topics 1 through 42?

19      A.      As I believe that I had testified earlier in the deposition in December as well as earlier today, the preparation was essentially part of my discovery process trying to make sure that of the topics named, that I had access to information and/or substance that would help me be fully responsive to the topics that are named in this

Deposition Resources, Inc.
800.295.4109

Electronically signed by Daniel J. Skur (101-371-132-7809)
Electronically signed by Daniel J. Skur (101-371-132-7809)                    848b174b-2a03-457f-b33d-92e8025b449a

Page 1233

1  Exhibit 13.
2      Q.      Once you received Exhibit 13, did you do
3  anything specific, for example, walk through the
4  topics, and attempt to refresh your recollection
5  about those topics, specifically?
6              MR. GARTEISER:  Objection, form.
7      A.      "Specifically" meaning with aided memory
8  or unaided memory?
9  BY MR. RAMSEY:
10     Q.      Did you attempt to aid your memory on
11 the -- on the issues in topics 1 through 42 by going
12 back and reviewing documents or talking with your
13 colleagues at Blue Spike LLC?
14             MR. GARTEISER:  Objection, form.
15     A.      Well, first, I'm not understanding the
16 question because, as I had mentioned, I'm currently
17 the sole member of Blue Spike LLC and also the
18 manager for Blue Spike LLC.  I do not believe that I
19 spoke with any other colleagues, perhaps, for
20 instance, from Blue Spike, Inc., but I read the
21 topics, as I had said previously, and a number of
22 the topics refer to things that are quite easy to
23 respond to, and some of them I'm not quite clear on,
24 but I read, and in producing the documents for
25 discovery, that was my preparation.

Electronically signed by Daniel J. Skur (101-371-132-7809)
Electronically signed by Daniel J. Skur (101-371-132-7809)

848b174b-2a03-457f-b33d-92e8025b449a