```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     TYLER DIVISION

 3
      BLUE SPIKE, LLC,          )
 4                              )
              Plaintiff         )
 5                              )
      vs.                       )
 6                              )
      AUDIBLE MAGIC             )    CASE NO.
 7    CORPORATION,              )    6:15-cv-00584-RWS-CMC
                                )
 8                              )    AUGUST 25, 2015
                                )
 9         Defendant            )    10:00 A.M.

10

11                   ORDER SETTING HEARING

12       BEFORE THE HONORABLE JUDGE CAROLINE CRAVEN

13               UNITED STATES MAGISTRATE

14

15

16

17   COURT REPORTER:        MS. SHAWNA GAUNTT-HICKS, CSR
                            Deputy Court Reporter
18                          United States District Court
                            Eastern District of Texas
19                          Texarkana Division
                            610 Cedar Street
20                          Maud, Texas 75567
                            (903) 276-1090
21                          CSR NO. 9353

22

23

24
     (Proceedings recorded by oral stenography,
25   transcript produced on a CAT system.)
```

```
 1
                               APPEARANCES
 2
      FOR THE PLAINTIFF:
 3
      Christopher A. Honea, Esq.
 4    GARTEISER HONEA, PLLC
      119 W. Ferguson Street
 5    Tyler, Texas 75702
      Phone: (903) 705-7420
 6    Fax: (888) 908-4400
      Chonea@ghiplaw.com
 7

 8    Kirk Anderson, Esq.
      GARTEISER HONEA, PLLC
 9    119 W. Ferguson Street
      Tyler, Texas 75702
10    Phone: (903) 705-7420
      Fax: (888) 908-4400
11    Kanderson@ghiplaw.com

12
      FOR THE DEFENDANT:
13
      Alyssa M. Caridis, Esq.
14    ORRICK HERRINGTON & SUTCLIFFE, LLP - LOS ANGELES
      777 S. Figueroa Street
15    Suite 3200
      Los Angeles, California 90017-5855
16    Phone: (213) 612-2372
      Fax: (213) 612-2499
17    Acaridis@orrick.com

18
      Eric H. Findlay, Esq.
19    FINDLAY CRAFT, PC
      102 N. College Avenue
20    Suite 900
      Tyler, Texas 75702
21    Phone:  (903) 534-1100
      Fax:  (903) 534-1137
22    Efindlay@findlaycraft.com

23


24


25    (Continued)
```

1   Christopher J. Higgins, Esq.
    ORRICK HERRINGTON & SUTCLIFFE, LLP - WASHINGTON DC
2   Columbia Center
    1152 15th Street, NW
3   Washington, DC 20005-1706
    Phone:  (202) 339-8400
4   Fax:  (202) 339-8500
    Chiggins@orrick.com
5

6   Gabriel M. Ramsey, Esq.
    ORRICK HERRINGTON & SUTCLIFFE - MENLO PARK
7   1000 Marsh Road
    Menlo Park, California 94025
8   Phone:  (650) 614-7400
    Fax:  (650) 614-7401
9   Gramsey@orrick.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2
     AUGUST 25, 2015                                      PAGE
3

4    Appearances.......................................    2

5    Hearing...........................................    5

6    Court Reporter's Certificate, ....................  125

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    THE BAILIFF:  All rise.

 2                    THE COURT:  Good morning.

 3                    ALL PRESENT:  Good morning.

 4                    THE COURT:  All right.  I'm going to call

 5    the case that's scheduled for hearing this morning.  It

 6    looks like Blue Spike, LLC v. Audible Magic Corporation,

 7    Case Number 615 CV 584.  We have four motions that the

 8    Court is going to take up today.  And before we get

 9    started, if the parties would like to make announcements

10    for the record?

11                    MR. HONEA:  Your Honor, Christopher Honea

12    and Kirk Anderson on behalf of Blue Spike.

13                    THE COURT:  Good morning.

14                    MR. FINDLAY:  Good morning, Your Honor.

15    Eric Findlay on behalf of the defendant, Audible Magic.

16    Also with me is Mr. Gabe Ramsey, Mr. Christopher

17    Higgins, and Ms. Alyssa Caridis.  And Mr. Higgins and

18    Mr. Ramsey will be handling the argument for our side.

19                    THE COURT:  Okay.  Great.  Thank you.  All

20    right.  All right.  All right.  As I said, we've got

21    four motions.  I know that some of these are quite old,

22    but I think this case is sort of taking all kinds of

23    different forms, and I apologize for that.  It is old,

24    but I think other things have been moving in other areas

25    with regard to this litigation at a pretty good clip, so

1   maybe that sort of compensates for it.

2              I've given you guys two hours per side,

3   which if you use it, great; if you don't, that's fine,

4   too.  I have no preference on the order in which you

5   present these motions.  I know that the plaintiff only

6   has one motion filed that I've set, and we've set three

7   for the defendants.  So if the plaintiff wants to choose

8   how to proceed, I have no problem with that, given

9   you've just got the one motion.

10             MR. HONEA:  Do you guys want to start with

11  your license motion?

12             MR. RAMSEY:  In some ways, Your Honor --

13  well, from the defendant's position, it makes sense, at

14  the very least, to group plaintiff's motions on the

15  counterclaims and the defendant's own motion to dismiss

16  its own patent counterclaim.  That's the only preference

17  that I would have, because, again, grouping together, it

18  would make it a little more efficient.  Other than that,

19  the plaintiff will go along with the Court's discretion.

20             MR. HONEA:  We're fine with that as well,

21  Your Honor.  So if you'd like, we can start with

22  plaintiff's motion for summary judgment.

23             THE COURT:  That sounds great.  Could you

24  get me a legal pad, because I've been taking -- go

25  ahead.

1          MR. HONEA:  Your Honor, I think that the

2     briefing is pretty plain on this law.  I'll keep it

3     relatively short for efficiency's sake.

4          THE COURT:  All right.  I think you need to

5     come up to this podium, because I think our court

6     reporter can hear you better there.  The sound system in

7     this courtroom is terrible.

8          MR. HONEA:  Yes, Your Honor.  My apologies.

9     Again, I was going to just make sure that we're going to

10    keep this short.  I think the briefing is relatively

11    clear on this.  So for efficiency's sake, the

12    Counterclaim 9 fails from Audible Magic because there's

13    no evidence of inequitable conduct.  They failed to cite

14    what would be actual misrepresentations of admitted

15    material to the patent office.

16          Counterclaim 10, again, is -- fails for --

17    as a matter of law because they've shown no evidence of

18    unjust enrichment, that Blue Spike or Scott Moskowitz or

19    any of his entities were somehow unjustly enriched on

20    something that never took place.  And I think the

21    evidence is lacking there, so there's not much to

22    discuss.

23          THE COURT:  I believe that your argument

24    was that the elements, which I can't recall off the top

25    of my head, for unjust enrichment are inapplicable here

1  with regard to the relationship.

2             MR. HONEA:  Inapplicable in there's just no

3  evidence to support it in -- on grounds of bringing a

4  claim.

5             Again, with Counterclaim 11, they've failed

6  to meet the burden of several stand-alone reasons for

7  the Lanham Act violations.  There's been no proof that

8  anything that Blue Spike has done is materially

9  prejudiced or was actionable in the first place or

10  materially prejudiced of Audible Magic.

11             On Counterclaim 12, I believe that,

12  obviously, they agreed that the 308 patent has not been

13  infringed by Blue Spike.  There was never a product to

14  have found infringement.

15             And, finally, on Counterclaim 13, there's

16  no evidence, again, of unfair competition, that they've

17  met any of the elements to show common law unfair

18  competition.  There's no statements from Blue Spike that

19  would show that there was unfair competition through its

20  press release that they've stated to.  They've taken two

21  different statements and they've tried to put them

22  together, and it's a disjointed argument on their part.

23  It's -- again, it's not actionable.  And they failed to

24  show any sort of misappropriation of -- from unfair

25  competition.  Again, there's no proof that Blue Spike or

1   Scott Moskowitz ever took anything from Audible Magic

2   and the evidence -- or the lack of evidence from their

3   own deponents shows that is true.  So, again, I was

4   going to keep this short, Your Honor --

5           THE COURT:  Okay.

6           MR. HONEA:  -- so I'll conclude with that.

7           THE COURT:  Thank you.

8           MR. FINDLAY:  Your Honor, may I approach

9   with some handouts from opposition?

10          THE COURT:  Absolutely.  Thank you.

11          MR. RAMSEY:  All right, Your Honor.  Good

12  morning.  Gabriel Ramsey for the defendants and

13  counter-claimant, Audible Magic.  I'll also keep it

14  short, maybe take a little bit more time than the

15  plaintiff did.  And I've handed the Court some slides to

16  walk through the logic of the argument.

17          I'm going to start with Audible Magic's

18  patent counterclaim since it's sort of a discrete issue

19  and overlaps with Audible Magic's own motion to dismiss

20  the -- that counterclaim that was filed back in

21  February.

22          The long and the short of it is this:  At

23  the beginning of this case, Blue Spike offered for sale

24  for $10,000, on its website, the Giovanni Abstraction

25  Machine, described it in a way that, to this moment,

1  Audible Magic contends violates its 308 patent.  We

2  proceeded with the counterclaim.  We put in expert

3  reports that that offer for sale is, in fact, infringed.

4  We have not conceded that it's not infringed.  And that

5  report is un-rebutted.  Blue Spike did not submit an

6  opposing expert report.

7           Nonetheless, the reason that Audible Magic

8  has moved to dismiss its own counterclaim is as the case

9  went along, it became evident that there was, in fact,

10  no product at work.  So to recall the actionable acts

11  under the Patent Act art, any making, using, selling, or

12  offering for sale, so we were aiming at the "making" and

13  the "using."  They told us they hadn't sold any.  But

14  they did not say that they've not actually created this

15  product, so there was an actual making or use.

16           And the reason this is -- this relates to

17  the rest of the counterclaims by Audible Magic.  There's

18  a history of relationships here between Mr. Moskowitz

19  and Audible Magic, that this was not just -- this was

20  not just a gratuitous act.  If, in fact, Mr. Moskowitz

21  was incorporating code, for example, that he received

22  from Mr. Berry, his co-inventor from Audible Magic, and

23  his predecessor, Blue Spike, it would be a serious

24  competitive issue.

25           So the case proceeded.  The rest of the

1  counterclaims are being prosecuted, but it eventually

2  became evident, despite a lot of conflicting statements.

3  Even the same interrogatories saying -- one

4  interrogatory response from Blue Spike, yes, this

5  product exists and here's what it does.  The next one

6  suggesting that it did not exist.  It was very difficult

7  to get a clear answer.

8           And, in fact, last May 2014, right as this

9  case was getting started, I invited -- there was a

10  suggestion by Blue Spike's counsel on a call that maybe

11  this thing didn't exist.  So I talked with our client

12  and I said, Maybe we should nail this down with them,

13  and if it doesn't really exist, let's not proceed.  So

14  we never got clear clarity until we took depositions

15  where both inventors -- and Mr. Moskowitz said, No, this

16  thing never existed at all.

17           At that point, they had removed the

18  infringing offer for sale.  So, in February, we were

19  looking at the case saying, it doesn't make sense to

20  waste anybody 's time to proceed with a patent

21  counterclaim with no damages claim but just an

22  injunctive claim for a past offer for sale.  And we just

23  elected to let it go at that point to simplify the

24  issues.

25           We moved, under Rule 41, to dismiss that

1  counterclaim.  We cited a couple of cases in our summary

2  judgment briefing that, in fact, when one is attempting

3  to dismiss one claim, if a party filed a Rule 41 motion,

4  the Court can consider it under the standard of Rule 15

5  to amend pleadings.  The cases there are <u>Lowery versus</u>

6  <u>Texas A&M 117 F.3d 242</u> and <u>Orthoflex v. ThermoTEK</u>, 2011

7  U.S. District, LEXIS 107540.  And the standard there is

8  that -- need to amend the complaint shall be freely

9  given if justice so requires.  And here, it simplifies

10 the issues.  There's no prejudice.  There was very

11 little litigation around that counterclaim at all

12 because, obviously, there was no -- a couple of

13 documents regarding the offer for sale, there was no

14 code discovery sort of thing, and plaintiff didn't --

15 rather, counterclaim defendant did not put in an expert

16 report.

17         So we request that the case be pared down,

18 which I think is the general goal of today's activity is

19 to see if that can happen, and simply dismiss the case

20 with that claim with prejudice -- without prejudice, in

21 the event that Blue Spike offers or makes this device or

22 a similar device in the future, and everyone walk away

23 from that claim.

24         And I note that because Blue Spike's

25 counsel just stated that Audible Magic agrees that

1  there's no infringement there, that's not true at all.

2  We've already got an expert report and we are prepared

3  to proceed to trial if the Court is not inclined to

4  grant the motion.  And we've asked for alternative

5  relief that we just substitute a Claim 9 for Claim 1.

6  There's a single claim asserted.  It's a method claim,

7  that we can aim for that offer for sale since it turns

8  out there's no product.

9            With that, I'll turn to the slides, Your

10 Honor, in front of you.  So the highest level, Audible

11 Magic's counterclaims are very fact-intensive.  They're

12 just multiple determinations of witness credibility.

13 This -- these are the kinds of counterclaims there's not

14 clear admissions, there's not a clear, discrete set of

15 facts.  It's what did Mr. Moskowitz do and intend out of

16 memories of the events?  How do they survive today?

17 Is -- are any of these witnesses, including

18 Mr. Moskowitz, evading the real facts?

19            We've got a lot of documents.  I apologize

20 for the bulk of material put in opposition, but it was

21 necessary to explain the chronology of facts that led to

22 the reasonable inferences that a jury or a trier of fact

23 if the case were tried to the judge -- we might want to

24 talk about that at some point.  The inferences from

25 those documents support Audible Magic's counterclaim.

1                Slide 3, now, all reasonable doubts must be

2    on these factual impressions most of you made in Audible

3    Magic's favor.  It's not appropriate, at this juncture,

4    to be weighing evidence.  And again, these are highly

5    factual credibility-specific determinations.  This is

6    not the right type -- these are not the right type of

7    claims for summary judgment.

8                Slide 4, again, we've put in a number of

9    documents that lay out and explain the chronology of

10   Mr. Moskowitz's learning about Muscle Fish's technology,

11   his leveraging of that in his business, and then later

12   making statements about what he'd created and when in

13   the market for marketing purposes, for commercial

14   purposes that were simply not true.  Blue Spike did not

15   put any evidence, notably, in response.  This is not --

16   the basic structure of Blue Spike's motion is to say,

17   No, you haven't shown any evidence in a very general

18   way.  In response, Audible Magic has put in a lot of

19   evidence, we believe, that support the counterclaims,

20   and there was no response to that at all except a sort

21   of general denial.

22               All right.  I'm on Page 5 now.  We'll start

23   with inequitable conduct.  Blue Spike says Audible Magic

24   has not been clear about what material information Blue

25   Spike allegedly misrepresented or omit -- omitted.  In

1   Audible Magic's -- that's just not true, first of all.

2   In Audible Magic's interrogatory response -- that's

3   Exhibit 53 to our briefs -- we laid out a very complete

4   story of all the documentation of the prior art that

5   Mr. Moskowitz was aware of and did not disclose.

6           First and foremost, he was aware of the

7   same Audible Magic technology that is accused in this

8   case.  It used to be owned by a company called Muscle

9   Fish that effectively became Audible Magic.  So as a

10  sort of kernel of the inequitable conduct theory,

11  knowing about the thing that you are ultimately going to

12  accuse in a patent infringement case before you filed

13  for those patents and not disclosing it, materiality

14  can't be denied because it's a virtue of the claims

15  itself.  Blue Spike and Mr. Moskowitz conceded it's

16  material.  And intent to deceive can be inferred from

17  the facts -- and I'll get into the back and forth and

18  relationships a little bit in a moment.

19          Beyond that, Mr. Moskowitz knew about a

20  bunch of other prior art.  As the filing date of his

21  patent approached, lots of fingerprinting companies --

22  this case, to remind the Court, is about audio and video

23  fingerprinting, creating small representations of a

24  sound that you want to look up in the database to

25  identify, Tuneprint, Imagelock, RCS, BDS.

 1              After Muscle Fish sort of began this

 2  business -- and we're getting into the year 2000 -- a

 3  number of these companies showed up, and Mr. Moskowitz

 4  knew about them and did not disclose them.  Each of them

 5  were material to his broad patent claims that he filed

 6  on saying that, I claimed the idea of representing

 7  content based on the characteristics of the content

 8  itself.

 9              On to Page -- on to Slide 6, now, Your

10  Honor.  Mr. Moskowitz knew about Muscle Fish's

11  technology.  Back in 1997, the summer of 1997,

12  Mr. Moskowitz reached out to Muscle Fish.  When I say

13  "Muscle Fish," we're talking about Audible Magic.

14              THE COURT:  Right.

15              MR. RAMSEY:  And says, And -- I -- I'm

16  going to work with you guys.  Can you help me with your

17  watermarking?  Other documents that have come to light

18  at that time suggests that he learned -- he recently

19  learned about Muscle Fish's fingerprinting technology.

20  He was having exchanges with an audio engineering

21  society that has just issued a release about Muscle

22  Fish's technology a couple of days before he reached

23  out.  And he admitted in his deposition that he reached

24  out to Muscle Fish because he'd heard about one

25  particular commercial embodying of their fingerprinting

1   technology called DataBlade.

2            So he calls up Muscle Fish and he has

3   extended negotiations with them about whether they were

4   going to help him with his watermarking, and they

5   exchange with him information about what they were

6   doing.  Mr. Blum of Muscle Fish says he was trying to

7   explain to Mr. Moskowitz what Muscle Fish was doing with

8   fingerprinting was different than the digital

9   watermarking that Blue Spike and Mr. Moskowitz were

10  doing.  And just to, at the highest level, Your Honor,

11  just to remind the Court:  What Mr. Moskowitz is doing

12  at this time, digital watermarking where you're

13  inserting a specific piece of information into a song or

14  image that says, This is what this song is, and then

15  you've got technology in this world that's looking for

16  that particular identifier.  The approach that our

17  client was taking was to look at the perceptual features

18  of a song, the pitch, brightness, timbre, some of the

19  things that can be perceived by the signal and creating

20  a separate set of numbers that represents those things.

21           So our client told Mr. Moskowitz about this

22  in the summer of '97.  The e-mails back and forth were

23  marked "confidential" by Mr. Moskowitz.  There was a

24  misstatement, I believe, in Blue Spike's brief that

25  somehow we were arguing that the label in this case,

1  designation of confidentiality in this case, is what we

2  were referring to.  It's not, Your Honor.  I'll get you

3  the exhibit number in a moment.  Mr. Moskowitz is

4  calling these exchanges with Muscle Fish, in the summer

5  of '97, confidential.  Don't talk about my -- don't

6  disclose my stuff, so the understanding was they

7  wouldn't be disclosing -- Mr. Moskowitz wouldn't be

8  disclosing Muscle Fish's information.

9            On to Slide 7, Your Honor.  As of August of

10 '97, after this back and forth happened, finally

11 Mr. Moskowitz said, Well, you know, Muscle Fish, I don't

12 want to work with you after all.  At least not right

13 now.  And then he makes some very interesting statements

14 that become clear in later documents.  He wants to work

15 with Muscle Fish in the future.  He wants to port with

16 Muscle Fish's own proprietary database technology.

17 Those are his words.  He's recognizing that this is

18 proprietary, confidential information that he's talking

19 to Muscle Fish about.  And he's saying, I'd like to --

20 this is pretty interesting.  In the future, I'd like to

21 use this.  This is a good idea, this fingerprinting

22 thing.  And at the very end of this excerpt in

23 Exhibit 7, he says, I want to work with you, Muscle

24 Fish, on a number of extension projects.  In a little

25 bit later, we'll see how this played out later, a couple

1 years later, when Mr. Moskowitz's watermarking business

2 was failing.

3              Exhibit 8, another example of

4 fingerprinting prior art that Mr. Moskowitz knew about

5 before he filed his patent.  So we knew he knew about

6 Muscle Fish's fingerprinting, which he accuses in his

7 case.  He also knew -- this is about a week before he

8 filed this patent.  Again, I'm on Slide 8.  He's

9 exchanging e-mails with internal folks at Blue Spike,

10 and he sees that there's a system out there called

11 Tuneprint, that does fingerprinting of audio files.  And

12 it's important to note that the stipulated date of

13 conception of Blue Spike's patents is a week after this

14 document.  They stipulated in this case that they didn't

15 come up with the idea fully-formed in the patent

16 application until the date of filing of the patent.  So

17 this document in -- Slide 8 -- is a week before he

18 conceived fully of his intention by his own stipulation

19 where he says, Hey, there's this fingerprinting out

20 there by Tuneprint, another example.  And he did not

21 disclose that.

22              Let's proceed to Slide 9, Your Honor.

23 Slide 9 is about a week and a half after he filed his

24 patent application.  Now he's referring back to

25 Tuneprint, which he knew about, as we've just seen,

1    before he filed or conceived of his invention fully.

2    And he's telling his team, We just filed a patent on

3    monitoring of signals exactly like this, exactly like

4    Tuneprint, based on the massive production of data.  So

5    he's saying, I knew about this Tuneprint thing.  I then

6    filed a patent application on it, and I don't disclose

7    it.  I knew about Muscle Fish, but I've just filed a

8    patent to cover what's already out there in the market

9    before my stipulated date of conception in this case.

10              That's an admission of materiality.  He

11   says, That Tuneprint stuff is exactly like -- exactly

12   the same as my patent that I filed.  So we've shown

13   materiality.  Those are just two examples.  There's a

14   number of other references -- not enough time to address

15   them all today -- but the Muscle Fish -- knowledge of

16   the Muscle Fish fingerprinting, knowledge of Tuneprint

17   are both fingerprinting material references that were

18   not disclosed.  And he admitted this is the same, at

19   least as to Tuneprint, this is the same as what's in my

20   patent and implicitly admits that the Muscle Fish

21   fingerprint is the same as his patent because he's, in

22   fact, accusing this technology in this case.

23              Slide 10, Your Honor, Mr. Moskowitz, who is

24   marketing lead at his company, said that Mr. Moskowitz

25   is "a hawk."  He's keeping apprised of industry

1   developments.  He knows what's out in the fingerprinting

2   space.  His name is Mr. Cassidy.  Mr. Cassidy testified.

3   What is your recollection of why Mr. Moskowitz and

4   you -- your team, was talking about partnering with

5   companies that provide signal abstracting?  This is at

6   the 1999-2000 time frame.  Mr. Cassidy said, Well,

7   that's what they did.  We were looking up -- so at the

8   time, Muscle Fish was going to partner with someone else

9   who was creating abstracting.  Not that they invented

10  it, that it would be a compliment to the watermarking.

11          Slide 11, Your Honor, the similarities

12  between the Muscle Fish prior art, that Mr. Moskowitz

13  learned about back in 1997, and the language that he

14  uses to describe his intention -- at least in broad

15  strokes -- is very similar.  It's words such as taking

16  an audio object.  So by "audio object," it means the

17  original signal.  Segmenting.  Uses the word

18  "segmenting."  "Analyzing 'perceptual features'"

19  or "subjective features" to reduce the sound to a small

20  representation.

21          Those were all words that were used in the

22  Muscle Fish materials that Mr. Moskowitz received.  So

23  the materiality's clear.  It's clearly similar.  It's

24  the same words.  But it's similar in a more specific

25  way.  It's similar in that Mr. Moskowitz, Audible Magic

1  contends -- and we think the evidence supports it --
2  looked at what Muscle Fish was doing, expressed
3  interest, and a few years later writes a patent that
4  adopts, at the highest level anyway, the same concepts
5  of why use a fingerprint instead of a watermark and
6  lists the same language.  It seems like a bit of a
7  defensive move.  This is how I'm going to deal with this
8  industry out here, this fingerprint industry; that is
9  usurping this digital watermarking thing I've been
10  trying to do which is not working as a business.
11            Again, materiality and intent can be
12  inferred from the facts we've shown in many documents in
13  our opposition brief.
14            On to Page 13, Slide 13, there was no
15  fingerprinting prior -- fingerprinting prior art cited
16  at all by Blue Spike in that first patent application
17  filed in September 2000.  None.  He goes out of his way
18  to describe copiously the history of watermarking,
19  injecting an identifier and signal.  In general,
20  signaling processing concepts.  Just enormous amount of
21  prior art was disclosed that first time.  Had nothing to
22  do with fingerprint.  Didn't disclose Muscle Fish,
23  didn't disclose Tuneprint or any of the other handful of
24  fingerprinting companies and work that he knew about at
25  that time, because he wanted the patent.  He needed that

1    patent.  In later applications, he did disclose the
2    Muscle Fish patent and other references.  By -- it was
3    pretty thin.  By and large, he's hiding those -- by
4    Audible Magic's contention, hiding and bearing those
5    couple of handful of relevant references in hundreds and
6    hundreds of watermarking references.  And there's law
7    that this bearing of prior art can also indicate -- can
8    indicate intent to deceive.
9                    I just want to pause for a moment.  The
10   inequitable conduct theory and the facts regarding
11   Muscle Fish and Mr. Moskowitz's exposure to Muscle
12   Fish's listing of language from their technology in his
13   patent application overlaps substantially with the
14   unjust enrichment theories.  Blue Spike does not
15   challenge Audible Magic's unjust enrichment theory under
16   the patent law.  So as we prepare for trial in this
17   case, we put forth to the Court the patent law theory,
18   where we would ask for correction of inventorship in
19   that the Muscle Fish gentlemen contributed, in our
20   theory, to the invention.  Not just that he knew about
21   it.  He took the ideas.
22                    So the factual history of his exposure of
23   these ideas and use of them that I just described of an
24   equitable conduct also supports Audible Magic's unjust
25   enrichments counterclaim.

1           So on Slide 14 now.  So we're a couple of

2  months after Mr. Moskowitz has filed his initial patent

3  application in December 2000.  It's clear what his

4  strategy is.  He's looking around.  Signal abstracts may

5  be better than the watermarking they've been doing.  "We

6  do not have the technology to do this."  This is the

7  turn of the century and he's not created any signaling

8  abstracting technology as he's claimed it, or any

9  fingerprinting technology of any kind.  We don't have

10  this technology.  This is back in -- in the day.

11           There's a number of companies which

12  currently do have this technology.  It's clear there

13  he's talking about companies like Muscle Fish and

14  Tuneprint.  We don't have a problem implementing this

15  technology as part of our business, especially if we can

16  get the technology from elsewhere.  So he's just filed

17  patents on what others were doing.  We know he knew

18  about it before he filed that patent.  And now after

19  he's filed that patent, he's saying, Okay, great.  I've

20  got some patent in my back pocket.  Now, I'm going to go

21  out to these people who really invented this and see if

22  I can partner with them and get some value from this

23  stuff that they're doing.

24           This is, we believe, very serious evidence

25  of Mr. Moskowitz's intent to deceive.  His intent to

1   leverage other folks' intellectual property,

2   particularly our client, Muscle Fish and Audible Magic,

3   and summary judgment of these types of factual issues is

4   just not appropriate.

5            If you could turn to Slide 15, Your Honor.

6   This is two months after that last e-mail.  He's already

7   said internally, We want to go out there and see who we

8   can work with and get this fingerprinting technology.

9   He's, at this point, told his coinventor and business

10  partner, Mike Berry, in a document here, Please reach

11  out to Muscle Fish and others.  See who we can partner

12  with.  Remember, he learned about Muscle Fish back in

13  '97.

14           And Slide 15, this is Exhibit 71.  Now,

15  this is an Audible Magic e-mail from that time.  We just

16  got a call from Mike Berry from Blue Spike.  They're

17  interested in partnering with Audible Magic to come up

18  with a hybrid watermarking CBR system.  CBR is a word

19  that means content-based recognition; that's Muscle

20  Fish's and Audible Magic's technology.  So now we see

21  the result of that strategy of, we know about

22  fingerprinting companies.  We're going to file a patent

23  on their stuff that's already out there, get it in our

24  back pocket.  We're going to reach out and try to

25  partner with the companies who've already been doing

1  that so we can get some value.  And, of course, the

2  first on the list that they reach out to is our client,

3  Audible Magic.

4         He's not -- Mr. Moskowitz is not saying, I

5  invented CBR.  He's saying, I want to use yours, Audible

6  Magic.  Again, evidence of knowledge and intent to

7  deceive through this chronology.

8         Slide 16, "intent can be inferred 'based'

9  on contradictory assertions," from "testimony regarding

10  knowledge and possession of documents lacked

11  credibility."  This chronology is the kind of evidence

12  that a jury or a trier of fact can reasonably infer

13  intent from.  The allegations are of a taking on our

14  unjust enrichment counterclaims.  A trier of fact may

15  look at them and come to the conclusion, after assessing

16  the witnesses and their credibility, whether, in fact,

17  something was taken and whether or not they're telling

18  the truth.  The type of dispute that's well suited for a

19  trier of fact, not summary disposition.

20         Under the inequitable conduct standard --

21  it's true there's a heightened standard now under the --

22  Therasense case, but it's still recognized in Therasense

23  itself, that deceptive intent is rarely proved by direct

24  evidence.  It's often inferred from the facts.  Folks

25  who deceive do not write memos about it outlining the

1 plan, typically.  And here would be evidence that we

2 submit is overwhelming and the inferences are clear.

3 They are the most reasonable inference from the sequence

4 of evidences and the activities that happen and when

5 they happen.

6          And also from Mr. Moskowitz's deceptive

7 behavior at his deposition, and we cite some specific

8 examples of that, but again, this indicates that this is

9 the type of issue where one must look at the witness and

10 determine whether they are telling the truth.

11          On to Page 17, Your Honor, mentioned "Blue

12 Spike did not challenge Audible Magic's patent law-based

13 unjust enrichment claim."  They challenge the common --

14 there's a corresponding common law unjust enrichment

15 claim under Texas law, that after Audible Magic had

16 invested resources into developing value that that value

17 was unfairly usurped by Blue Spike and Mr. Moskowitz.

18 And by that, I mean two specific things under the common

19 law claim.  It is true, if it's public -- if what was

20 taken was public information, purely public

21 information -- for example, an article or a public

22 relief about Muscle Fish's material -- it would be

23 actionable under the patent law.  They don't dispute

24 that cause here.  It would not be actionable under the

25 common law.  It would be -- because it would be

1   preempted by the Patent Act.   Common law unjust

2   enrichment can't protect public information that way.

3   Only the Patent Law regime can.

4              But there's a piece of the allegation that

5   is confidential information.   It's not the notion of

6   perceptual features, per se.   That was in publications

7   and in Muscle Fish's public products which Mr. Moskowitz

8   knew about.   But it was the benefits over watermarking.

9   Remember, 1997 through 2000, this is the moment when the

10  internet audio and music on the internet was just

11  starting.

12             And so there was -- things are taken for

13  granted now in terms of many companies thinking about

14  this -- it's just evident because we're all on the

15  Internet all the time, and using technology to identify

16  music is not an uncommon thing.   But at the time, the

17  music industry faced a real problem and there was lots

18  of folks vying for the solution.   And the biggest public

19  conversation, the only public conversation was

20  watermarking.

21             That's what -- there's an entire industry

22  standard process for the record industry and all the

23  tech companies to get together and say, Okay.   We're

24  going to solve a problem in the way that Mr. Moskowitz

25  is (unintelligible).   Yet, our client, these engineers

1  sitting in California, working at a very small shop and

2  came up with this idea, Oh, gosh, we could have a more

3  flexible way to do this.  That was not a public -- there

4  was not a public conversation about the mode of

5  application of fingerprinting.  That was their

6  confidential information they exchanged in an exchange

7  with Mr. Moskowitz that he recognized was confidential.

8  He's marking their e-mails "confidential."  And he's

9  saying, This is your proprietary database technology.

10 Your applications that you've described for me and

11 Mr. Blum, one of our engineers, told him -- I was

12 talking with Mr. Moskowitz about the benefits over

13 watermarking, our approach to the problem in these

14 confidential discussions.

15           So at least as to that information, the

16 common law unjust enrichment theory, is not preempted.

17 They've not asserted at all that that information was

18 not confidential.  The document says those exchanges

19 were confidential.  And that's really their only

20 argument as to the common law unjust enrichment claim.

21 It's -- that aspect of the claim is not preempted.  It's

22 appropriate for the jury.

23           And on Slide 18, we've -- some law is

24 cited, circuit law and Texas law, about what can -- what

25 can create an implied contractual confidentiality

1   relationship.  University of Colorado Foundation vs.

2   American Cyanamid Company is a good case to look at.  It

3   lays out a case law -- a law -- a lot like this where

4   the counterclaim plaintiff was -- perhaps it was the

5   plaintiff, I've forgotten -- was saying we both have a

6   patent law based on unjust enrichment claim.  And then

7   for a certain portion of the confidential exchanges

8   we've had with the other side, we also have a common law

9   claim based on an implied contract.  And it's our

10  contention that it implied a confidential relationship

11  that arose in those exchanges that Mr. Moskowitz marked

12  "confidential."

13              On to Slide 19, Your Honor.  So with all

14  that background, we move forward to the year 2012.

15  Mr. Moskowitz now has four patents and he initiates a

16  wave of patent infringement lawsuits in this Court.  And

17  on the surface of that, it appears that he purported to

18  have a product called the Giovanni Abstraction Machine.

19  It did not exist.  He's telling the world, You can buy

20  this thing for $10,000.  And he says this technology of

21  his -- and he claims he has technology, and I quote from

22  his website, from Blue Spike's website.  "This

23  technology has powered his Blue Spike products since the

24  turn of the century."

25              So we've just seen a document from

1   December 2000, I think that qualifies as the turn of the

2   century.  When Mr. Moskowitz is saying, We do not have

3   this technology yet.  He didn't have the technology.  He

4   made the story up to serve these lawsuits to put out

5   publically, either to potential defendants to settle,

6   leverage to get them to settle or potentially for those

7   in the community to see if they are going to be trying a

8   case in this matter.  And that is of great concern.  And

9   I hate to put it that bluntly, but I believe that is

10  what is going on.

11          In his deposition transcript, and this is

12  as of January of this year, I asked him:

13          "As of February 2001, had you created this

14  technology that you now say powered your products since

15  the turn of the century?  You've not done that, right?"

16          "That's right.  That's exactly what I've

17  said."

18          So he admitted it.  That kind of false

19  statement in the market is injurious to companies like

20  Audible Magic.  Both because it creates confusion in the

21  market.  And we don't even have to show actual confusion

22  around the Lanham Act.  The standard here is, is there

23  likelihood of confusion?  Is this the kind of statement

24  that is likely to cause confusion in the substantial

25  number of the consuming public?  The answer is yes.

1   When reading those statements whether it's a commercial

2   partner to a prospective juror or Audible Magic's

3   investors, putting pressure on them to settle, these are

4   valid forms of injury and they're likely to be cause of

5   confusion.  And it's the likely confusion that we'd like

6   to address through this counterclaim.

7                 On Slide 20, Your Honor, if we may proceed

8   there.  Similar, another press release on Blue Spike's

9   website says the signal abstract technology is "the same

10  technology powering its own products such as the

11  Giovanni Abstraction Machine."  I asked Mr. Moskowitz

12  and this, again, led -- finally led, once I got this

13  admission, led to our dismissal -- request for dismissal

14  of our patent counterclaim.  Is there a Giovanni

15  Abstraction Machine that can be purchased that powers,

16  you know, your own products with this signal abstracting

17  technology?  And he admitted finally, in his deposition,

18  "I said the Giovanni Abstraction Machine was never

19  built."  That statement is not true.  It's on Blue

20  Spike's website.  It's misleading, to -- has a

21  likelihood of being misleading to the substantial

22  portion of the public and, therefore, constitutes a

23  violation of the Lanham Act.  It's unfair competition.

24                On Slide 21, again, the Giovanni

25  Abstraction Machine itself, that offer, we're no longer

1    pursuing that under the patent theory, but it is still

2    patently false.  And with that, I'll conclude.  The law

3    is, Your Honor, that where a defendant puts out a

4    product that was patently fraudulent and the advertising

5    accompanying those products was the vehicle employed to

6    perpetrate the fraud, that type of activity is

7    actionable under the Lanham Act, and so summary judgment

8    should be denied on that claim as well.  And that's all

9    I have on that, Your Honor, thank you.

10            THE COURT:  Thank you.  Any response?

11            MR. HONEA:  Just briefly, Your Honor.  With

12   the inequitable conduct claim, again, there's no

13   evidence that anything confidential was actually

14   provided to Scott Moskowitz or Mike Berry.  And, in

15   fact, Mike Berry hasn't been brought into this lawsuit

16   for anything that they allege he took.  They allege it,

17   but they didn't even try to bring him in the lawsuit, so

18   it seems to be a little thin there.  And they failed to

19   address that the 223 patent of Audible Magic was

20   subsequently put into the patent -- to the -- into the

21   patent office and was deemed to be the closest to the

22   invention for purposes of prosecuting the remaining of

23   the patents.  So it -- they failed to show anything

24   could have been material even if they had shown that

25   there was something provided.

1                   So that -- would -- with inequitable

2   conduct, I want to make that point.  And then -- and

3   with the Lanham Act claims, that -- Blue Spike offered a

4   product, but similar to a builder offering to build a

5   home, it doesn't have to actually be built yet for there

6   to be an offering.  So I don't think it's misled anyone

7   in the public, and I think the facts in the briefings

8   show that it wasn't misleading or caused any injury.  So

9   thank you.

10                  THE COURT:  Thank you.  All right.

11                  MR. RAMSEY:  Nothing further, Your Honor.

12                  THE COURT:  All right.

13                  MR. ANDERSON:  Your Honor, Mr. Ramsey

14  covered two motions, so if I could just go on with the

15  other motion?

16                  THE COURT:  Sure.

17                  MR. ANDERSON:  Thank you, Your Honor.  So

18  I'll be responding to Audible Magic's motion to dismiss

19  its counterclaim.  And I'd just like to begin by

20  pointing out that there is prejudice to Blue Spike.  It

21  would be prejudiced to Blue Spike if Audible Magic is

22  able to dismiss that claim without prejudice.  As Your

23  Honor knows, this case has been going on for two and a

24  half to three years, so we have -- Blue Spike has

25  drafted claim construction briefing on the 308 patent,

1   obviously argued in claim construction and had claim

2   construction on that issue.  Blue Spike created a

3   tutorial on the 308 patent.  We've had over a dozen

4   depositions of Audible Magic and Blue Spike, actually of

5   just Audible Magic employees and representatives, and

6   some of them on multiple days.  And the 308 patent is at

7   issue in each of those depositions as well.  There have

8   been discovery requests and responses and there have

9   been e-mails and meet-and-confers, so we have spent a

10   considerable amount of time on this 308 patent.

11         So at this point in the case, the time to

12   amend the pleadings has long passed, discovery has

13   ended, and it's inappropriate at this time for Audible

14   Magic to be asking to withdraw that counterclaim without

15   prejudice, so they'd have their cake and eat it too.

16         So Audible Magic talks about being

17   confused.  They're saying in their briefing, and here

18   today, that Blue Spike --

19         THE COURT:  Excuse me.

20         MR. ANDERSON:  Bless you.

21         THE COURT:  Sorry.  Thank you.

22         MR. ANDERSON:  -- that Blue Spike gave

23   conflicting statements about whether this Giovanni

24   Abstraction Machine actually existed.  And I believe

25   that's misleading, Your Honor.  We -- from very early

1  on, Blue Spike expressed to Audible Magic that the

2  program, that the product did not actually exist.  In

3  the -- you know, turning to the actual -- to Audible

4  Magic's motion to dismiss -- I'm sorry I don't have a

5  copy here handy for you.

6           THE COURT:  Well, I've got it in front of

7  me.  What page are you looking at?

8           MR. ANDERSON:  I'll be looking at Pages 4

9  and 5.

10          THE COURT:  Okay.

11          MR. ANDERSON:  So Blue Spike here, in its

12 response to whether it had offered the Giovanni

13 Abstraction Machine, says that -- in the middle there,

14 it did not.  Instead -- let's see.  Blue Spike, LLC

15 provided, for a brief period of time, a product offering

16 named Giovanni Abstraction Machine, which was a service

17 that Blue Spike, LLC offered to build, akin to a builder

18 being hired to build a house because he has the

19 knowledge to do so in his possession.

20          So -- and then on the next page, Blue Spike

21 was asked to admit that it has never written any source

22 code relating to the Giovanni Abstraction Machine.  And

23 I'd like to point out how broad that statement is.

24 We're not asking -- they're not asking now whether a

25 product existed.  They're asking if somebody started, if

1   there was -- we're talking about relating to the

2   Giovanni Abstraction Machine.  It's potential -- it's

3   possible that it's some basic code from the watermarking

4   product could be used.  I mean, it's a very, very broad

5   statement, and Blue Spike's answer is that employees may

6   have written some source code relating to that product

7   or service over a decade.  But that's not to say that

8   the product didn't exist.  And so Audible Magic followed

9   up on that, and they said, well -- they would like --

10  they would like to have access to whatever source code

11  did exist.  And Blue Spike said that to the extent that

12  any code exists, Blue Spike would provide that.  And

13  Ms. Caridis, for Audible Magic, responded -- recognizing

14  that statement and said, Okay, to the extent that that

15  code exists, then we do want to review that code.  And

16  this is in an exhibit attached to Audible Magic -- Blue

17  Spike's opposition.

18            Now, Blue Spike looked and found no code

19  and expressed that to Audible Magic.  And said, Not only

20  is there not a product, we don't even have any code.

21  And then to the extent that any third parties might have

22  some code that we don't know, but we have done our due

23  diligence on that.  So Audible Magic still maintains

24  that they were confused about whether or not this

25  product existed despite the fact that Blue Spike has

1   said explicitly that it didn't exist.

2              Now in Blue Spike's claim construction
3   briefing, Blue Spike said specifically that the product
4   had never existed.  And this is in a footnote in Blue
5   Spike's claim construction briefing.  Blue Spike says,
6   Blue Spike did not, in fact, sell the product that
7   Audible Magic accuses.  Blue Spike offered a product for
8   sale.  Again, as a custom home builder advertises the
9   ability to build a home.  But Audible Magic said that --
10  they actually ignored that very explicit statement.
11  They didn't mention that in their briefing at all.  They
12  said they were confused about what they claim was some
13  sort of implied admission that this product existed.
14  They said in Blue Spike's tutorial when Blue Spike was
15  discussing how that product would work that that
16  confused them about whether the product actually
17  existed.  And so we have a lot of examples here.  The
18  evidence that -- we believe all the evidence is there in
19  the briefing.  But there is a lot of examples where Blue
20  Spike has continually admitted and told Audible Magic
21  that the product does not exist.  And so -- excuse me,
22  Your Honor.

23             I'd like to refer to Defendant's Exhibit --
24  or Slide Number 20, that Mr. Ramsey brought before the
25  Court.

1                    THE COURT:  I got it.

2                    MR. ANDERSON:  And you'll notice that we

3    need to look at the question again that was asked again

4    of Mr. Moskowitz.  He said, "Is it true that the

5    Giovanni Abstraction Machine, that product never existed

6    in any tangible form that could actually be purchased?"

7    Now, he's not talking about there's any related code,

8    whether anything had been started.  He's asking if

9    there's a product for sale.  And Mr. Moskowitz says, No,

10   that machine was never built.

11                   So for Audible Magic to say, Well, that was

12   fine in a definitive answer, I don't think it's

13   convincing, Your Honor.  That's the same answer that

14   Blue Spike has been giving since the very beginning.

15   And so this idea that Audible Magic was confused, I

16   don't think applies today.  And so when you take that,

17   of course, again, with this prejudice, compare that to

18   the prejudice faced by Blue Spike, it just doesn't make

19   sense to allow them to dismiss so late in the case,

20   that claim.

21                   Now, another issue here is Audible Magic

22   and their saying, Well, we can't dismiss without

23   prejudice.  We'd like to substitute that claim.  And

24   again, the problem there is -- extensively, the reason

25   is because they were confused.  But, of course, they

1    could have asserted that Number 9 claim from the very

2    beginning.  They had three amended complaints in which

3    they could have asserted that claim.  And there was no

4    reason why they would wait until they felt definitive --

5    that it was definitive that no product existed before

6    they would assert that claim.

7              So to allow them to assert that now, post

8    claim construction, when there are terms within that

9    claim that would need to be construed, would, again, be

10   very prejudicial to Blue Spike and it's just beyond --

11   it's just not appropriate at this late stage in the

12   case.

13             And so Blue Spike cites to, I believe,

14   Elbaor v. Tripath Imaging, 279 F.3d 314.  And there, the

15   Court says that in situations like this, where

16   dismissing without prejudice is not appropriate, that

17   the Court can craft conditions that will cure that

18   prejudice.  So Blue Spike wants the counterclaim gone as

19   much as Audible Magic, but Blue Spike doesn't want to be

20   prejudiced by dismissal of that claim.  So dismissal

21   with prejudice, we believe, is a more fair result here.

22             And also, Blue Spike believes that it

23   should be awarded its fees for everything that it did in

24   conjunction with preparing for this 308, in defending

25   this 308 patent.

1             One thing that I didn't mention, too, here

2    is that the 308 patent clearly applies to song data that

3    is presented on this client media player.  And I won't

4    rehash the claim construction where Blue Spike was

5    saying client should mean user, but it still says

6    "client."  So there's this data that's being displayed

7    elsewhere on this computer, and so it's simply not the

8    case that the -- that the little description on my

9    Shopify -- let me say it this way:   That description of

10   the Giovanni Abstraction Machine on my Shopify, no one

11   indicated that there was this client media player,

12   and -- the -- in fact, Audible Magic has products that

13   do not display the information.  It might transmit it or

14   keep it or have some action that's tied to that, but not

15   necessarily displaying.  And so, it's Blue Spike's

16   position that that counterclaim wasn't even -- didn't

17   even -- that obviously the Giovanni Abstraction Machine

18   did not infringe that counterclaim and that was

19   relatively -- or very obvious.  So, again, Blue Spike

20   then asks the Court to dismiss that counterclaim with

21   prejudice and then allow Blue Spike its fees related to

22   that claim.  Thank you.

23             THE COURT:  Thank you, Mr. Anderson.

24             MR. RAMSEY:  May I respond to some of that,

25   Your Honor?

1           THE COURT:  Yes, sir, Mr. Ramsey.

2           MR. RAMSEY:  All right.  I'll be brief.

3  In -- the timeline of the parties' interactions around

4  this topic is salient.  I mentioned before that, really,

5  this case didn't get going until about March/April of

6  2014.  As of May 2014, parties were asking to look at

7  each other's code.  We asked Blue Spike to review the

8  Giovanni Abstraction Machine code that corresponds to

9  the product that they were offering for sale, and they

10  said, Yes, you can come to Tyler and look at it there.

11  Ms. Caridis had purchased a plane ticket to come down

12  here and look at the code.  Mr. Brazier (phonetic) said

13  it will be available.  It was shortly after she had

14  scheduled to come down there, in a call, they said, No,

15  the code's not going to be available.  And Mr. Gart

16  [sic], who's not in the courtroom today, made an

17  interesting comment.  I don't remember the exact

18  substance of it, to be honest, but it did suggest that

19  there may not be code.  He's not coming out and telling

20  me there's no code.  There's not product.  It's not that

21  clear at all.  It was, Well, maybe there's a code.

22  We're going to see if it's there.  You can come look at

23  it.  And so it got me thinking.  A caucus with Audible

24  Magic -- and this is in May of 2014, and we said, Look,

25  we determined, well, if there's really not a product and

 1   they will agree to take down the offer for sale, then we

 2   may sell -- dismiss the claim right there.  So I invited

 3   him to a settlement conversation to just clarify that

 4   fact in a concrete enough way that we could rely on it.

 5   And if that turned out to be the case, then we could

 6   have done -- could have dismissed it right then and not

 7   had the proceeding.  No response to that at all.

 8          So throughout the summer, as discovery was

 9   getting (unintelligible) in summer of 2014, we sent

10   request for admissions and interrogatories.  Request for

11   admission asked, Is there code related to the Giovanni

12   Abstraction Machine, because I just heard a suggestion

13   that it might not be?  At the same time, I'd been

14   offered to come and review it.  And the answer was

15   denied.  Admit there is no such code, denied.  All

16   right.  So there is such code, so please produce it.  At

17   the same time, in their interrogatory responses, this is

18   response to Interrogatory 18, we're asking about the

19   Giovanni Abstraction Machine and I quote, Blue Spike

20   says, "The Giovanni Abstraction Machine was a software

21   product offering that could be utilized to create

22   abstracts that would be utilized in a system to monitor

23   signals."  So we've got interrogatories telling us this

24   is how this thing works, this is what it does.  It's

25   talking about it in operational terms.

1                 It's also true that in the same

2     interrogatory responses -- their interrogatory responses

3     that say we've not sold this product.  It's not been

4     created.  So I'm just getting conflicting messages for

5     almost a year now.  Sometimes they're saying, Well, it

6     might exist.  Sometimes they're saying, Well, there

7     might be a code related to it, but maybe not all the

8     code.  At other moments, they're saying, Come look at

9     the code.  And then in other places, they're saying,

10    Yeah, it doesn't exist.  We show up at the Markman

11    hearing -- we had been thinking of this for a long

12    time -- we hear presentation that describes the

13    operation of the Giovanni Abstraction Machine.  This is

14    what it does.  We're trying to simplify the case, not

15    make it more complicated.  If we'd just get a firm

16    answer when I invited that conversation in May, it would

17    have been a much simpler process to simply come to an

18    agreement and say, Look, the thing doesn't exist.  Let's

19    not waste our time.  We would have asked that -- is --

20    that the offer for sale be removed because it is

21    confusing.  Ultimately, they did that anyway.  Once that

22    happened, then -- I have a patent counterclaim on a

23    couple of years of prior offer for sale that doesn't

24    seem like it's worth burdening anybody with.

25                 I think it's not fair to fault Audible

1    Magic for this.  We can't waive our rights to assert a
2    patent claim against a -- and by the way, a patent claim
3    that is viable to this moment.  We've got an expert
4    report and it's not rebutted.  I want to make that
5    absolutely clear.  We're not running away from our
6    patent claim.  It's just a matter of it not being worth
7    it at this point because they removed the offer for sale
8    and we have confirmation that it doesn't exist.
9               I think it would -- I think it is fair to
10   take that Blue Spike -- for sending these conflicting
11   messages over the course of a year.  When we asked, Does
12   the product exist, simply tell us, No, Mr. Ramsey, the
13   product does not exist.  It's that simple.  There is no
14   such thing.  They didn't want to do that.  They didn't
15   want to do that because they kind of want to have --
16   Mr. Anderson mentioned having it both ways.  That's
17   exactly what they want.  They want to be able to pitch
18   this product and we're a real company.  We've got this
19   product that implements our patents, so they don't want
20   to be on the record as saying, No, the thing doesn't
21   exist.  It's actually just a fabrication.  So throughout
22   the course of the case, that played out in our
23   exchanges.  We finally got sworn testimony from two
24   people that said it doesn't exist now and it's never
25   existed.  Once that happened, instead of the conflicting

1   messages I'm getting through the written discovery and
2   then in our informal interactions, then it's sufficient
3   for me to look at my client and say, Okay, you're not
4   going to waive some potential patent rights by walking
5   away from this claim.  Until this happens, we can't rely
6   on these conflicting messages.

7            There is not a big investment in this part
8   of the case.  The 308 patent's also prior art.  I'll
9   note that the deposition questions of Audible Magic's
10  witnesses talked about it as prior art, not about the
11  patent counterclaims.  There's no questions at all about
12  the patent counterclaims.  There is no substantial
13  written discovery.  It was not a big list.  And if only
14  Blue Spike had taken me up on my letter in May and said,
15  Okay, the thing doesn't exist, let's have a settlement
16  talk and not send me conflicting messages for a number
17  of months while I'm trying to sort out, shall I waive
18  this right, shall our client waive this right, or shall
19  we proceed and try to get an answer through discovery,
20  we elected the latter because we're not going to waive
21  our patent rights.

22            So I think that's all I have to say, Your
23  Honor.  There's no prejudice.  This is not a big piece
24  of the case.  The case that Mr. Anderson cites is a Rule
25  41 case about dismissing the entire case when there's a

1   summary judgment motion pending.  That's not the

2   situation here.  We're just asking to pare it down.

3   Perhaps we should have filed under Rule 15 to amend the

4   pleadings to simply drop a claim.  And their leave to

5   amend shall be freely given.  We ask the Court to grant

6   that relief.  We're happy to submit an amended complaint

7   that simply drops the patent counterclaim and proceed

8   with the rest of the case.  Thank you, Your Honor.

9            THE COURT:  Thank you.  Anything else on

10   this issue?

11            MR. ANDERSON:  Actually, just a very small

12   point.  Your Honor, Blue Spike already mentioned a lot

13   of specifics that I pointed out specifically in

14   construction and whatnot and the RFAs.  I just wanted to

15   direct the Court's attention to Exhibit 12 of Docket

16   Number 1617; that's Blue Spike's sur-reply.  And that is

17   a letter from Mr. Garteiser to Mr. Higgins for Audible

18   Magic that says, There's no code to produce in response

19   to your request with respect to the accused device.

20   That's Mr. Garteiser responding to the May request that

21   Mr. Ramsey is talking about.  And so Mr. Ramsey said if

22   only Blue Spike had given us this clear indication that

23   wasn't -- the code wasn't there, then we would have been

24   able to drop it.  And so that is that clear indication.

25            I'd also point the Court to Page 3 of that

1   sur-reply of docket 1617 that has a timeline that's also

2   instructive of how those events played out.  Thank you.

3                    THE COURT:  Thank you.  Anything else from

4   Audible Magic on that?

5                    MR. RAMSEY:  Nothing else, Your Honor.  I

6   think I've said enough.

7                    THE COURT:  Okay.  If y'all don't mind,

8   let's take 10 minutes before we embark on the other

9   ones.  We'll be in recess.

10                   THE BAILIFF:  All rise.

11                   (Whereupon, a recess was had from 10:57

12  a.m. to 11:10 a.m.)

13                   THE BAILIFF:  All rise.

14                   THE COURT:  Please be seated.

15                   THE BAILIFF:  Court is now in session.

16                   THE COURT:  Okay.

17                   MR. RAMSEY:  May we proceed, Your Honor?

18                   THE COURT:  Yes, you may.

19                   MR. FINDLAY:  May I approach, Your Honor,

20  again, with some slides?

21                   MR. RAMSEY:  All right.  Your Honor,

22  Audible Magic moves for summary judgment of

23  non-infringement on Blue Spike's patents.  I'll take

24  that issue up next.

25                   So the core of Audible Magic's summary

1    judgment motion and this is -- I'm on Slide 2 of the

2    PowerPoints --

3                THE COURT:  Okay.

4                MR. RAMSEY:   -- that the Court's been

5    handed.  It's whether Blue Spike repeated an emphatic

6    testimony and admissions that a set of numbers called

7    "MFCCs" constitute the abstract element that appears in

8    every single claim of the asserted patent.  And

9    correspondingly whether -- if that's not the case,

10   whether Audible Magic infringes the asserted patent.

11   Audible Magic contends that Blue Spike has judicially

12   admitted that MFCCs are not abstracts and, therefore,

13   Audible Magic cannot infringe.

14               Claim -- in Slide 3, the representative

15   claim, this is the lead claim that appears in Blue

16   Spike's contentions, the 700 patent, Claim 1.  We can

17   see simply that the word "abstract" appears repeatedly.

18   It appears that way in every claim that's asserted in

19   every patent.

20               On to Slide 4, in broad strokes, the

21   abstract, as it's been mentioned before, can be thought

22   of as a kind of fingerprint.  It's a representation of a

23   signal, an audio signal, or some other type of signal.

24   And the Court may recall the claim construction

25   conversation about that.  The fingerprints that Audible

1    Magic uses are simply a set of numbers called "MFCCs,"
2    Mel Frequency Cepstral Coefficients.  It is a mode of
3    looking at an audio signal and generating -- preparing
4    an appliance of algorithms that generate these numbers,
5    analyzing the spectrum, basically.  Ten numbers per
6    second, as it turns out.  And that ten numbers per
7    second represents the signal.  And that's the accused
8    fingerprint.
9            On Slide 4, we see that Audible Magic's Mel
10   Frequency Cepstral Coefficient, MFCC, is the thing that
11   Blue Spike is now trying to say, This is the fingerprint
12   we accused.  So if MFCCs are abstracts, then there would
13   be a finding of infringement.  If MFCCs are not
14   abstracts, then there can be no infringement.
15           It's important to note this reality that
16   the -- that Audible Magic's fingerprints are these MFCC
17   numbers is the same both for Audible Magic's own systems
18   that it directly controls, and it's true -- it's the
19   same fingerprint used by all of the customer defendants
20   that are now stayed but important to note this would
21   dispense with the entire action of Blue Spike's claims.
22           On Slide 5, I'm going to walk through a
23   couple of slides that -- just to get some nomenclature
24   down because we're going to hear admissions later and
25   they're references to sort of the words I'm going to

1   explain here in the first couple of slides.

2              So MFCC fingerprints are created by a

3   little module of code.  It's about 15 files, something

4   like that, called the "MFCBR" Library.  An MFCBR library

5   stands for Muscle Fish Content Based Recognition or

6   Retrieval.  So it's a very discrete body of code, source

7   code, that has existed since the '90s, 1997-'98, and it

8   exists to this day and it uses exactly the same

9   methodologies.  So the accused MFCC fingerprints are

10   created by the Muscle Fish MFCBR Library.

11             Slide 6, please, Your Honor.  Muscle Fish,

12   and later Audible Magic, filed for a patent; shorthand

13   is the 223 patent.  Filed for it originally back in

14   1996.  It was issued in 1999.  This is -- it doesn't

15   deal with broad system level, everything having to do

16   with all kinds of content recognition, but it does

17   describe the MFCC fingerprints, and it is the patent

18   that corresponds to the MFCBR Library.  It describes the

19   accused products today, the core fingerprinting piece,

20   in any event.  And here we see on Slide 6 -- this is all

21   undisputed, by the way.

22             And Slide 5, which I'd just been speaking

23   about, Blue Spike's own expert says that the MFCBR

24   Library "was the internal basic technology on which all

25   the other applications are built on."  In other words,

1  their own expert is saying, Yeah, that's what I'm

2  talking about when I'm -- when we're asking the question

3  is an abstract or not, I'm talking about MFCBR Library

4  who creates these MFCC fingerprints.  So that's

5  undisputed.

6           THE COURT:  You have to pronounce the other

7  expert's name on Page 6.

8           MR. RAMSEY:  The long version of MFCC.

9           THE COURT:  I just love it.  No, Mr. --  I

10  can't even say it --

11           MR. RAMSEY:  Papakonstantinou.  I've

12  practiced for a long time.

13           THE COURT:  That is a great name.

14           MR. RAMSEY:  It's quite a name.

15           THE COURT:  Love it.  Okay.

16           MR. RAMSEY:  So it's undisputed that these

17  MFCCs are created by the MFCBR Library and that MFCBR

18  Library is what Blue Spike is saying, Okay, that's where

19  the abstract's going to be if there's an abstract at

20  all.

21           Slide 6, again, Blue Spike's expert,

22  Dr. Papakonstantinou says this MFCBR Library embodies

23  the teaching of the 223 patent.  So that's not me saying

24  that.  That is an admission.  It's undisputed that the

25  223 patent describes these Audible Magic fingerprints in

1   the MFCBR Library.

2               Slide 7, please, Your Honor.  Again,

3   Audible Magic -- Blue Spike's own expert says that this

4   223 patent describes the MFCBR Library and does so rely

5   on Audible Magic's own testimony about the accused

6   products today.  That's really important to note.  When

7   Blue Spike's expert says the 223 patent describes what's

8   in this MFCBR Library, he's not -- just -- not that it

9   creates an issue of dispute.  I just want to be clear.

10  He's not pointing to MFCBR Library in the past.  He's

11  quoting testimony of our engineer, Thom Blum, talking

12  about the accused products today.  And Blue Spike's

13  counsel's asking Mr. Blum, our engineer, Does the MFCBR

14  Library -- does your core technology in this MFCBR

15  Library practice the 223 patent?

16              "Yes, I believe that's true."

17              Because it is true.  And then

18  Dr. Papakonstantinou relies on that to opine that the

19  223 patent reflects the accused products today.  This

20  will all become -- why this is important will become

21  clear in a moment.

22              Slide 8, Your Honor.  The accused MFCC

23  fingerprints are created by the MFCBR Library.  These

24  are the accused products today.  And it's admitted, it

25  is undisputed, that the 223 patent describes the core

1    technology of those -- that MFCBR Library and these MFCC

2    fingerprints.  So when we hear admissions about the 223

3    patent, those are admissions about what is in Audible

4    Magic's product today.  It is undisputed.  Blue Spike's

5    own experts have equated these things.

6                    Slide 9, please, Your Honor.  So here's the

7    rub in today's motion for summary judgment.

8    Mr. Moskowitz, who's the sole representative of Blue

9    Spike, LLC, he is the driver of this case, he's one of

10   the co-inventors.  He's the person that Blue Spike, LLC

11   put forward in its complaint as coining the term "signal

12   abstract," testified and admitted repeatedly --

13   judicially admitted -- that MFCCs are not abstracts.

14   I'm going to read them -- he did this multiple times.

15   He -- I asked him questions about MFCCs and he states in

16   his deposition:  "Your contention that an MFCC is

17   somehow equivalent with a signal abstract, I contend

18   that this is not the case."

19                    He testified under oath:  "The mathematics

20   of MFCCs are not equivalent with a signal abstract on --

21   in any way, shape, or form."

22                    I said it many times.  A signal abstract is

23   not the same thing as the MFCCs.  And, again, the claim

24   construction which you based your arguments on was

25   rejected.  So he's saying, You lost claim construction,

1  in my view.  This is what Mr. Moskowitz says.  And under

2  that claim construction, a signal abstract is not the

3  same as the MFCCs.  He says that, "The U.S. Patent and

4  Trademark Office of these [sic] United States agrees

5  with me."  By that, he means, not in the first

6  application where prior art was withheld, but he

7  disclosed this 223 patent that describes the accused

8  fingerprints in the later of the three patent

9  applications.

10          And he's saying to the patent office, let

11  me have my Blue Spike patents over that 223 patent,

12  which describes MFCC fingerprints.  So he's going out of

13  his way to point out that the patent office agrees with

14  me that these MFCC fingerprints are not abstracts.

15          And finally he testifies, "A[n] MFCC, as I

16  understand, is not equivalent to a signal abstract based

17  on the description...as well as the specification and

18  the prosecution history."

19          Please turn to Slide 10, Your Honor.  At

20  another point in Mr. Moskowitz's deposition, I walk him

21  through the figures in the 223 patent that describe the

22  creation of Audible Magic's MFCC fingerprints.  You

23  can't see it in the picture on the right.  It didn't

24  come out very well in the printout, but you can see in

25  these figures, it concludes -- it was 2 through 13 -- it

1  concludes with MFCC computation.  That's what you get at

2  the end of the process.  You get this MFCC fingerprint

3  at the end.  So we're talking through that -- those

4  figures.  Mr. Moskowitz, do Figures 2 through 13 of the

5  223 patent describe your process of creating signal

6  abstracts?  He says, No, that's not true at all.  So

7  he's saying that that patent that describes the accused

8  fingerprints, as I've just shown -- Blue Spike's experts

9  say the 223 patent describes those fingerprints.  He's

10  saying, That's not my -- those are not my abstracts.

11  That's not how you create them.  Again, another

12  admission that MFCCs are not the abstracts of the

13  asserted patents.

14             On Slide 11, Your Honor, it's clear that

15  when Mr. Moskowitz is testifying as to what is not an

16  abstract -- he says, MFCCs are not an abstract, he was

17  using this Court's claim construction.  In his

18  deposition over the course of six days, he referenced

19  the claim construction 114 times, I believe.  I've

20  forgotten the exact number.  Certainly over 100.  He

21  repeatedly testified, I was involved in the claim

22  construction process.  I helped craft it.  I

23  participated and, in fact, showed up at the claim

24  construction hearing.  And when I asked him, What is

25  your definition of a signal abstract, he says, I will

1   refer you to the Court's claim construction, which was

2   just done on October 1st.  He knows the hearing down to

3   the day.  That definition is suitable.  He states under

4   oath, "I will rely on the claim construction...and know

5   them very well."  The third quote down, When I'm talking

6   about signal abstracts, he's talking about

7   abstracts, "as the Court has issued their ruling on the

8   claim construction."  And finally, again, about signal

9   abstracts, "It's in the claim construction in which the

10  term 'signal abstract' was defined...I'll stick by those

11  definitions."

12              Mr. Moskowitz knew exactly what he was

13  saying when he testified repeatedly, indeed emphasized

14  and urged upon it, that MFCCs are not the abstracts of

15  his patents.

16              Turn to Page -- Slide 12, Your Honor.

17  There's also no question that Mr. Moskowitz knew what

18  MFCCs are.  There's no confusion there.  We're

19  discussing MFCCs and he proceeds to describe to me, in

20  great technical detail, "You've asked the question

21  several times about what are MFCCs, or Mel-spaced

22  overlapping triangle filters, which is the way it's

23  described here."  And he proceeds to describe it to me

24  in technical terms what an MFCC is.  He understands what

25  MFCCs are.  There's no confusion in these admissions.

1          Slide 13, Your Honor.  So Mr. Moskowitz
2    clearly has repeatedly admitted, urged that, that MFCCs
3    are not the abstracts of the asserted patents.  So who
4    is Mr. Moskowitz?  Why should this Court hold Blue Spike
5    and Mr. Moskowitz to these judicial admissions?  Why
6    should they be binding?  You hear the undisputed facts.
7    Blue Spike, LLC, the party plaintiff, put forward in its
8    complaint and repeated in every amended complaint that
9    Mr. Moskowitz is the person who, quote, "coined the term
10   'signal abstract.'"  That's what it says in the
11   complaint.
12          They stand by his -- this person as being
13   the one who knows what that term means.  In their view,
14   he coined it.  He's the co-inventor of the asserted
15   patent.  I've mentioned he's helped craft Blue Spike's
16   position and claim construction.  He's Blue Spike's sole
17   representative, its only principal, its only investor,
18   certainly as of the time he made these admissions.  He's
19   the architect of this litigation.
20          It's important to understand why he made
21   these admissions.  It's obvious.  I've explained that
22   the fingerprints used today are the same as the prior
23   art fingerprints in this 223 patent and elsewhere.  And
24   Mr. Moskowitz and Blue Spike are trying to have it both
25   ways in this case.  They're trying, on the one hand, to

1  say, Well, when we're talking about Muscle Fish and

2  Audible Magic's prior art, MFCCs are definitely not

3  abstracts.  Then they put the other hat on and they

4  say, Well, when we're talking about infringement, please

5  let us accuse MFCCs as abstracts.  They're abstracts

6  when you have that hat on.  Can't have it both ways,

7  Your Honor.  That -- Mr. Moskowitz made all these

8  admissions because he's trying to avoid Audible Magic's

9  own MFCC fingerprints as prior art.

10           We'll get to it in a little while about why

11  that's not allowable, not only as a matter of law and

12  policy, but as a practical matter.  That is one very

13  good reason that this Court should apply the judicial

14  admissions document in this case and rule that Blue

15  Spike is bound to their admissions that MFCCs are not

16  abstracts.

17           On to Slide 14, Your Honor.  It's not just

18  Mr. Moskowitz and Blue Spike itself who are saying MFCCs

19  are not abstracts.  Now, in early July -- it took us a

20  while to get the deposition scheduled.  We submitted

21  this deposition excerpt a bit late, and then Blue Spike

22  has responded to it on paper so it's in the record.

23  But, again, Dr. Papakonstantinou, Blue Spike's witness,

24  I asked him, "Do you think Muscle Fish's feature vectors

25  containing MFCC values anticipate the abstract element

1  of the Blue Spike patents?"  There's no mystery what my

2  question was.  I used the word "anticipate."

3                    Dr. Papakonstantinou's report was about

4  anticipation.  It's what -- that's why Blue Spike put it

5  in.  I'm asking do these MFCC values meet that word

6  "abstract" in patent claims.  "No, I don't believe

7  this," was his sworn testimony.  Blue Spike's expert is

8  agreeing with Mr. Moskowitz and Blue Spike that MFCCs

9  are not abstracts.

10                    If you turn to Slide 15, Your Honor.  One

11  thing about Slide 14, Your Honor -- sorry about this --

12  there's a lot of white text and a lot of un-highlighted

13  text.  Why is that there?  Dr. Papakonstantinou goes on

14  to explain why he believes -- he doesn't just say it.

15  It's not an offhand remark.  He explains to me why MFCCs

16  are not abstracts.  He says,  Counsel, this is mixing

17  abstracts.  In other words, he's telling me when I ask

18  him, Are M FCCs abstracts, I'm mixing things up.  He's

19  saying the patents are talking about data-reduced

20  representations.  These are what abstracts are.  And the

21  MFCCs do not meet that.  This is a reasoned, thorough,

22  intentional admission.  And for the same, Mr. Moskowitz

23  is making the admission.  He doesn't want to get -- he

24  doesn't want to get saddled with Audible Magic's own

25  prior art.  They're in a bind here.

1                  On to Slide 15, please.  On Slide 15, we

2    have the deposition testimony of Michael Berry, who's

3    the co-inventor with Mr. Moskowitz on the Blue Spike

4    patents.  And I asked him, When you were writing this

5    patent in 2000, it was not your intent to try to cover

6    prior systems, techniques of creating feature records

7    containing MFCC values?  You're trying to claim that."

8                  "That was not my intent."

9                  Mr. Berry worked at Muscle Fish as a

10   contractor in the '90s and he's admitting, as did

11   Mr. Moskowitz, that these Muscle Fish MFCC fingerprints

12   that are used by Audible Magic to this day, are not

13   abstracts of theses patents.

14                 Slide 16, Your Honor.  Just to conclude

15   that chain of evidence and admissions with Audible

16   Magic's own expert.  Audible Magic's own expert opines

17   and we put in the portions of the opinion detailing

18   precisely why MFCCs are not abstracts.  Mr. Moskowitz

19   agrees with them, Dr. Papakonstantinou agrees with him,

20   and Mr. Berry, the other co-inventor of the patent,

21   agrees with our expert.  There is overwhelming evidence

22   that MFCCs are not abstracts, which that's accused as

23   the fingerprint, as the abstract in this case.

24                 So, to the law, Your Honor, on Slide 17,

25   these admissions constitute judicial admissions, the

1  type of admission that this type of court has the

2  discretion to hold Blue Spike to.  A judicial admission

3  is one that's "made in a judicial proceeding," no

4  question about that here.  It's "contrary to a fact

5  essential to the theory of recovery."  No question that

6  that's the fact here.

7           If MFCCs are not abstracts, there is no way

8  that Audible Magic can infringe the patents.  Those

9  admissions must be "deliberate, clear, and unequivocal"

10  in such a way as to -- that giving these admissions,

11  conclusive if that, meets with public policy and have to

12  be about facts on which a judgment can be based.  Again,

13  no dispute about that.  If MFCCs are not abstracts,

14  there can be no infringement.  That's the only thing

15  that Blue Spike's pointing to is the abstract.

16           Slide 18, Your Honor.  So first, is this

17  this category of admission that may be called a judicial

18  admission?  Yes, in fact, it can be.  There's lots of

19  case law in the Fifth Circuit, the Jonibach case, which

20  says the testimonial of admissions may be judicial

21  admissions.

22           There's a number of cases in the Eastern

23  District and Northern District of Texas.  The Fifth

24  Circuit adopted the judicial admission test from the

25  Texas state courts, so we relied also upon cases such as

1    <u>Austin versus Miller</u> that say deposition admissions can

2    be binding judicial admissions.  The Court can hold a

3    party to those admissions.  <u>Austin v. Miller</u> is

4    particularly relevant the way that it's framed this

5    test.  Judicial admissions are appropriate in matters in

6    which witnesses quote things that are "well within his

7    competence, and his peculiar experience, knowledge,

8    training, and, indeed, in his official

9    responsibilities."  No question Mr. Moskowitz, this --

10   that issue, is MFCC an abstract, are within his peculiar

11   experience.  Blue Spike even says that in its complaint.

12   He coined the term "abstract."  So he's the one who

13   knows best, they say.  And it's certainly within his

14   official responsibilities as the party who prepared the

15   claim construction positions in prosecuting this case.

16              Both "Mr. Moskowitz's and

17   Dr. Papakonstantinou's admissions that MFCCs are not

18   abstracts are contrary to a fact essential to Blue

19   Spike's theory of recovery and may form the basis of

20   summary judgment."

21              Slide 19, Your Honor.  This is an important

22   component of the judicial admission doctrines.  Were

23   "Mr. Moskowitz's admissions deliberate, clear, and

24   unequivocal?"  You bet they were, Your Honor.  They were

25   "emphatic and repeated."  He understood the Court's

1    claim construction.  He understood what "MFCCs" are.

2    These were not offhand comments by an employee far away

3    from the action.  These were thoughtful admissions based

4    on the Court's claim construction.

5              He made these admissions even when there

6    was no question pending about the issue.  In other

7    words, he's going out of his way to assert from the

8    record and establish that MFCCs are not abstracts.

9              In particular, I was asking a question, and

10   Mr. Moskowitz, described for me the mathematics of how

11   you compare two abstracts.  We were on the comparing

12   topic.  He didn't answer that question.  He went -- he

13   decided to answer a different question and go out of his

14   way and state what is at the bottom of Slide 19.  He

15   goes, well, "What I will say is that the mathematics of

16   MFCCs are not equivalent with a signal abstract on -- in

17   any way, shape, or form."

18             That is deliberate, clear, and unequivocal.

19   He's going out of his way to assert it for the record.

20   And, again, the reason is important.  He's trying to

21   avoid Audible Magic's own prior art, the same systems

22   that he's accused as they existed in the prior art.

23   He's in a trap.  So he's deciding to make the decision,

24   the litigation decision, to admit this fact so that he

25   can attempt to save his patents.  That kind of a

1  deliberate choice to concede that MFCCs are not

2  abstracts.  They meet the consequences.  That

3  consequence should be that if he's going to rely upon

4  that admission to try to save his patent's validity,

5  Audible Magic also cannot infringe by using those same

6  structures.

7          There's no evidence that Mr. Moskowitz

8  didn't understand -- there's some cursory argument, but

9  he never put in a declaration that said, I didn't

10  understand.  He did understand.

11          Slide 20, we talked about this a bit

12  already.  "Dr. Papakonstantinou's admission was also

13  deliberate, clear, and unequivocal."  "Do you believe

14  that Muscle Fish's feature vectors containing MFCC

15  values anticipate the abstract?"

16          "No, I don't believe this."

17          Can you explain to me why?

18          "Deliberate, clear, and unequivocal" reason

19  of intentional admissions.

20          On to Slide 21.  So one of the factors in

21  the judicial admission doctrine in the Fifth Circuit and

22  in Texas state law is let's -- we must think about the

23  public policies underlying why one holds a party to

24  clear admissions like this in a deposition.  Does it

25  meet public policy?  Should the Court exercise its

1    discretion and hold the party to these admissions?

2             In this case, holding Mr. Moskowitz and

3    Blue Spike, LLC to the repeated judicial admissions that

4    MFCCs are not abstracts does meet public policy.  I've

5    mentioned repeatedly, but it's very important, he was

6    making the decision to avoid Audible Magic's own

7    fingerprints, the same ones accused in this case, so

8    that he could save the validity of his patent and make

9    admissions in this context.

10            It is fair, and in good public policy

11   and -- as you'll see in a moment -- as a matter of

12   law -- should be held to those admissions.

13   Dr. Papakonstantinou was doing the same thing.

14            On Slide 22, Your Honor, the Court doesn't

15   have to take my word for the fact that this is good

16   public policy.  It's also the law.  That when a party

17   makes an admission about a structure in the prior art to

18   save the patent validity, they can't take the opposite

19   position in their infringement theories.  There's a very

20   old Fifth Circuit case that gets quoted a lot in federal

21   authority that existed before the Federal Circuit even

22   existed.  It's <u>Sterner Lighting versus Allied Electric</u>

23   <u>Supply</u>, and the quote is, "A patent may not, like a

24   'nose of wax,' be twisted one way to avoid anticipation

25   and another to find infringement."

1          Blue Spike can't say on the one hand, MFCCs

2    are decidedly not abstracts to avoid anticipation in the

3    prior art, and then at the same time say, But, please

4    let us extract some money from Audible Magic where we

5    want to say MFCCs are abstract.  You can't have it both

6    ways.  That's the law.

7          Connell versus Sears Roebuck, this is a

8    Federal Circuit case, where the plaintiff in a patent

9    case tried to do exactly this.  The Federal Circuit

10   calls it "improperly carrying water on both shoulders."

11   It's an analogy.  In the Court below, in the Connell

12   case, the plaintiff had tried to point to a structural

13   element in the prior art and say, This does not meet the

14   claims at the same time that accuse that structure in

15   the accused products.

16          District court cited Sterner and said, No,

17   you can't do that, summary judgment non-infringement.

18   So the plaintiff appealed and the Federal Circuit was

19   having none of it and explained, the plaintiffs on

20   appeal, ignoring the trial court's opinion, ignoring the

21   Fifth Circuit Sterner case, and that reflects a

22   "regrettable lack of candor."  And so, again, this --

23   these cases articulate the policy by the Judicial

24   Admission Doctrine should be applied here [sic].

25          Other Federal Circuit and court of claims

1    cases, the predecessor to the Federal Circuit, says that
2    "It is a fundamental principal of patent law that a
3    claim cannot be narrowly construed to avoid invalidity
4    and then broadly construed to encompass the accused
5    device."
6             Again, that's what Blue Spike's trying to
7    do here.  They have made their election.  They have
8    elected repeatedly through their sole principal, through
9    their expert, and it's supported by the co-inventor of
10   the patent and Audible Magic's experts.  MFCCs cannot be
11   abstracts if that patent's going to survive.  That's
12   what they want.  So they should be held with that.  The
13   necessary result of that is that Audible Magic's MFCCs
14   also cannot be abstracts, that are accused in this case.
15            Slide 23, Your Honor.  Another reason why
16   it's good public policy for the Court to exercise its
17   discretion and apply the Judicial Admission Doctrine
18   here is Moskowitz is front and center, central to this
19   dispute, it's "not a rogue, uninterested employee" far
20   away in a department who gets pulled into a deposition,
21   doesn't know what's happening in the case.  He's crafted
22   the case.  He's crafted the claim constructions.  He's
23   guiding the litigation strategy and said, in his
24   deposition under oath, I participated in the claim
25   construction.  He is the person who, as the inventor, is

1   qualified to admit that MFCCs are not abstracts and

2   mentioned Blue Spike in its complaint stands by

3   Mr. Moskowitz as the person who coined this term.

4            Slide 24.  A couple more cases to direct

5   the Court's attention to because I think they are very

6   supportive of Audible Magic's position on this motion.

7   Most recently in <u>GTX versus Kofax</u>, and that was before

8   Judge Davis a few years back.  There we're on a motion

9   for summary judgment of non-infringement just like this

10  case.  The co-inventor of the patent admitted during his

11  30(b)(1) deposition -- it wasn't a corporate rep

12  deposition -- "that key element of asserted claims did

13  not encompass defendant's approach."  That's what's

14  happened here when Mr. Moskowitz, co-inventor and the

15  only principal of the plaintiff, says the MFCCs are not

16  abstracts.

17           In that case, there was actually the

18  plaintiff put in in opposition to summary judgment, and

19  it's some expert evidence -- at least something --

20  saying that -- trying to take the contrary position.

21  But the Court -- Judge Davis noticed that it was

22  cursory.  It was not a lot of detail, not enough to

23  overcome the inventor's submission.  And beyond that,

24  Judge Davis noted its attorney argument.  In this case,

25  we've got repeated strong admissions from Mr. Moskowitz

1   from Dr. Papakonstantinou, from Mr. Berry, and we have

2   the evidence of Audible Magic's own expert why MFCCs are

3   not abstract in the summary judgment record.  It is

4   detailed.  Blue Spike cannot put it in any event that

5   MFCCs are actual abstracts.  They're stuck in a bind

6   here, Your Honor, and they're trying to have it both

7   ways.

8            The GTX case, in that regard, is analogous

9   and the decision can be made under that case.  Similarly

10  in the Teashot case from the District of Colorado, it's

11  a case like this where the plaintiff was a sole -- the

12  sole owner and inventor of the party plaintiff, just

13  like Mr. Moskowitz here who admitted in his deposition

14  that his patent didn't cover the type of structure that

15  the defendant used and the Court held him for that.  And

16  summary judgment of non-infringement was granted.

17           In general, the Federal Circuit has

18  repeatedly explained that inventors' admissions

19  regarding scope of an invention can limit patent claims

20  and they should in this case as well.

21           On to Slide 25, Your Honor.  Really, Blue

22  Spike's only response to the motion is not to say that

23  he did, in fact, make the admissions.  It's somehow the

24  one person who represents Blue Spike, LLC, there's

25  nobody else there.  He's the only person, the sole

1    director, sole shareholder -- at least at the time he

2    made these admissions -- the only representative somehow

3    doesn't bind the entity that he represents.  Who else

4    could it be?  They didn't put in any evidence that if he

5    happened to be sitting for a 30(b)(6) deposition at that

6    time that he would have given another answer.  He

7    wouldn't have.  He would have said exactly the same

8    thing, because everybody's trying to avoid invalidity

9    from Audible Magic's own prior art.

10            But it doesn't matter.  He testified that

11   he didn't distinguish between his own testimony and that

12   of Blue Spike, LLC.  We've had a number of days of

13   deposition, he goes -- I'm asking questions.  He

14   goes, "I mean, it all comes to me so I'm not really

15   clear how you're differentiating between the two

16   entities."

17            He got frustrated when I was trying to

18   slice things that finely because it all -- Blue Spike,

19   LLC is just Mr. Moskowitz.  He testified when he was

20   preparing for his deposition, his 30(b)(6) deposition,

21   he would keep referring me back to his 30(b)(1)

22   testimony in December.  This was in January.  So the

23   fact that some of these admissions were made when

24   Mr. Moskowitz was sitting as a 30(b)(1) representative

25   of Blue Spike as opposed to under a 30(b)(6) notice, in

1   his view, there's no distinction.  And I was explaining

2   to him it just doesn't matter as a matter of law.

3                In Slide 26, it's clear -- and this has

4   been the law forever.  A "corporation may be deposed by

5   30(b)(6) deposition of 'officer, director, or managing

6   agent.'"

7                "Parties seeking the deposition may

8   identify the specific officer, director, or managing

9   agent to be deposed and notice their deposition under

10  Rule 30(b)(1).  The testimony of such a person will be

11  binding on the party."

12               There's no dispute that Mr. Moskowitz is

13  such an officer, director, or managing agent.  He's the

14  only one, the only possible person.  So we send him a

15  deposition notice under 30(b)(1).  His testimony on

16  matters within the scope of the case and what's

17  happening with the company are binding on Blue Spike,

18  LLC.  There was no Rule 30(b)(6) for a long time.  This

19  is the only way you would take the deposition of a

20  corporation.  You would send a 30(b)(1) notice to an

21  agent, an officer, a director, or managing agent,

22  somebody who's able to speak for the company, and ask

23  them questions.

24               Moving to Slide 27.  The reason Rule

25  30(b)(6) came into being is because when the parties

1  would do that, the party proffering the witness would

2  inevitably send an individual who said, Oh, my gosh, I

3  only have the this sliver of knowledge.  I can't talk

4  about this or that or the other thing.  So it's not that

5  that 30(b)(6) is the only way to elicit binding

6  testimony of your company.  The opposite is the truth.

7  30(b)(1) was the mechanism for -- since the inception of

8  the Federal Rules of Civil Procedure as far as I know

9  that that happened, that that binding corporate

10  testimony was elicited.  30(b)(6) was just created to

11  fill the hole where you've got a company where somebody

12  shows up and says, Well, I'm an officer and I know these

13  few facts, but I'm going to deny to disclaim corporate

14  knowledge.  That happens with three or four 30(b)(1)

15  depositions.  We needed a procedural device to solve a

16  problem.  You've got to go educate yourself.  That's all

17  that 30(b)(6) means, on things beyond your personal

18  knowledge.  It's not an issue here.

19            Mr. Moskowitz is Blue Spike, LLC.  And we

20  made submissions with -- regarding issues that only

21  involve Blue Spike, LLC, the patent plaintiff in this

22  case.  And numerous courts have found that.

23            Phillips versus American Honda, "30(b)(1)

24  testimony of a corporate 'officer, director or managing

25  agent' is 'testimony of the corporation.'"  Quote, "such

1    testimony will be, quote, 'binding on the party.'"

2                    Numerous cases support that idea.  He's
3    bound by his testimony even if he was sitting as a
4    30(b)(1) witness as Blue Spike, LLC's officer, director
5    and managing agent.

6                    On Slide 28, Your Honor.  Your Honor, they,
7    Blue Spike, attempts to suggest there's some special
8    procedure.  There's no special procedure.  The cases say
9    the procedure is you "identify a specific officer,
10   director, or managing agent to be deposed and notice
11   that person under Rule 30(b)(1)."

12                   And that's what happened here.  We sent
13   Mr. Moskowitz his deposition notice and he made these
14   admissions as a corporate officer, director, and
15   managing agent admitting a way that MFCCs are not
16   abstracts.  That's the law.

17                   It's also important to note at this point,
18   now Dr. Papakonstantinou has similarly admitted that
19   MFCCs are not abstracts.  There's no dispute that
20   Dr. Papakonstantinou is being affirmatively put forward
21   as the representative of Blue Spike, LLC about what is
22   and is not an abstract.  And he testified under other
23   oath that MFCCs are not abstracts.  So we've got two
24   binding representatives.

25                   On Slide 29, it's important to recognize

1   that "Blue Spike does not rebut all of this evidence

2   that MFCCs are not 'abstracts.'"  They just come back

3   with attorney argument.  They put in no evidence to the

4   contrary.  And that's fatal to Blue Spike's opposition

5   to this summary judgment motion.  As the Court knows,

6   the summary judgment process, the party moving for

7   summary judgment comes forward and puts forward their

8   case, puts forward their evidence.  And we've put forth

9   these overwhelming admissions are that MFCCs are not

10  abstracts.

11          The burden then shifts to Blue Spike to

12  come back and go beyond the pleading and designate

13  specific facts that there's a genuine issue for trial.

14  They would have to come back and show that MFCCs are, in

15  fact, abstracts and they didn't do it.  Your Honor,

16  didn't do it.  Searched the record high and low for

17  actual evidence that MFCCs are abstracts and it's not

18  there.  And the reason is, again, Your Honor, they're in

19  a bind.  They're trying to avoid invalidity and somehow

20  sustain an infringement case on the same theories that

21  they've waived under their invalidity, their attempt to

22  avoid invalidity.  That's just not right.  It's not

23  right as a matter of law or a matter of policy.  And

24  they've not put any evidence to refute Audible Magic's

25  motion.

1             So to sum up on Slide 30, for all of these

2    reasons, "no reasonable jury could conclude that an

3    accused product infringes where the plaintiff admits

4    that accused products do not meet element of asserted

5    claims."  Blue Spike's admitted that MFCCs are not

6    abstracts.  If MFCCs are not abstracts, then Audible

7    Magic, through its MFCC fingerprints, cannot infringe.

8             Applying the Judicial Admission Doctrine

9    here would be the most efficient mode to proceed.

10   There's a number of issues in this case.  It would

11   streamline the case.  It might even, frankly, Your

12   Honor, allow the parties a meaningful conversation, you

13   never know.  At a glance, right at this point, these

14   judicial admissions are so clear that simply reducing

15   the breadth of the case and narrowing it based on

16   admissions is consistent with the purpose of summary

17   judgment in general.  And for those reasons, Audible

18   Magic respectfully requests granting of its summary

19   judgment motion non-infringement.  Thank you.

20             THE COURT:  Thank you, Mr. Ramsey.

21             MR. ANDERSON:  Your Honor, as you know,

22   this motion for summary judgment or any motion for

23   summary judgment is a drastic decision.  There's a high

24   bar.  And Audible Magic simply fails to show that there

25   is not disputed issue of fact.  And one thing that I

1    would just like to -- one major failing that, I think in

2    this argument that we've heard, there's a lot of focus

3    on the element of the abstract rather than the claims of

4    this invention.  And I'll come back to that repeatedly,

5    but that's very important here.

6               So as Mr. Ramsey pointed out, there are

7    criteria for the Court to look to to determine if

8    testimony in a deposition might be considered a judicial

9    admission.  And I'd like to say, too, that those cases

10   are not settled.  As we pointed out in our briefing,

11   this is not settled black letter law.  But some Courts

12   have held that a judicial admission may be found in a

13   deposition testimony.  And that is only when those five

14   prongs are met.  And I'm going to point out two:  One,

15   again, that the testimony must be deliberate, clear, and

16   unequivocal.  And the second one is that to give it the

17   conclusive effect of a judicial admission, removing that

18   fact in evidence meets public policy.  And neither of

19   those prongs are met in this case.

20              So one thing that Mr. Ramsey said there was

21   that Blue Spike's only argument is that the testimony

22   that Mr. Moskowitz gave as a 30(b)(1) representative is

23   not binding as a 30(b)(6) representative -- and I'll

24   touch on that again later -- but that is not Blue

25   Spike's only position.  In fact, Blue Spike agrees with

1  another one which is that we need to look at the entire

2  testimony of Mr. Moskowitz.  And there's six days of

3  deposition transcripts.  We need to look at that entire

4  transcript in order to understand what Mr. Moskowitz is

5  saying.

6          And Mr. Ramsey pointed out that

7  Mr. Moskowitz is -- the sound bites were repeated and

8  emphatic.  But that doesn't rise to the level of clear

9  and unequivocal.  And when taken in context of the

10  entire deposition testimony, it's -- those statements

11  that Mr. Ramsey has pointed to, we can see that they're

12  not meaning exactly -- what -- we can see that in

13  context, it means something more than that.  And

14  what's --

15          THE COURT:  Are there portions that you can

16  cite the Court to, or are you speaking of just having to

17  look at the entire six-day deposition transcript?

18          MR. ANDERSON:  I apologize, Your Honor.

19  And let me point to one in particular.  I'm not sure if

20  this was admitted as an exhibit and we'd be happy to add

21  that.  But it is in our briefing, in Blue Spike's

22  briefing.

23          MR. RAMSEY:  I just object to the

24  introduction.  That's not in the summary judgment

25  record, Your Honor.

1                    THE COURT:  Is it mentioned in your

2    briefing?

3                    MR. ANDERSON:  It is mentioned in the

4    briefing, Your Honor.  So this is not new.  So this is

5    Page 780, line 18.  Mr. Moskowitz refers to his

6    invention as being -- as having the ability to

7    differentiate between versions of a signal, the ability

8    to anticipate an unknown work -- this is the idea of a

9    null set, and the ability to prevent replication of the

10   original signal.

11                   So when asked about what an abstract is,

12   this is his definition of an abstract.

13                   THE COURT:  Was that what the court order

14   said?  I can't remember.

15                   MR. ANDERSON:  No, Your Honor.  The court

16   order said that the abstract is a dated representation

17   that retains perceptual characteristics to the original

18   signal.  What Mr. Moskowitz is referring to are other

19   teachings within the claim language.  So the ability to

20   differentiate between versions, for instance, is in the

21   language of at least three of the four patents-in-suit,

22   the 494, the 700, and the 175.  So it's clear that when

23   Mr. Moskowitz is referring to an abstract, he's

24   referring to his invention.  And Mr. Moskowitz does

25   understand his invention.  But the question is:  Did he

1  understand when he was being asked about an abstract,

2  that he was being limited specifically to not the rest

3  of the invention and to the Court's claim construction.

4           You know, and opposing counsel does point

5  out that he mentions the claim construction.  He's

6  obviously aware of it.  But his deposition testimony,

7  his answers about what an abstract is illustrates what

8  he's talking about here is the entire invention. The

9  same thing with the ability to prevent -- I'm sorry --

10 to anticipate unknown works.  The Null case is something

11 that's also brought up in separate claims.  So we have

12 an inventor talking about his invention.  So for the

13 Court to determine that the sound bites are unequivocal,

14 it really would have to do so in the context of -- like

15 I said, in the context of this entire transcript

16 testimony.

17          You know, just to offer an example, if a

18 driver admits -- during testimony -- that he ran a red

19 light, then maybe that would rise to the level of a

20 judicial admission.  Of course, if we found out in the

21 rest of his six days of testimony that he was color

22 blind or didn't understand what red was, and that would

23 inform that position.  Now, that's -- now -- that's

24 unlikely to happen, obviously when we're talking about

25 the definition of red, but I think the Court would look

1    to this other information.

2              What we're dealing with here is something

3    much more -- forgive the word -- abstract.  We're

4    talking about something that is not as concrete.  We're

5    talking about the invention and the definition of this

6    abstract here.  There's a reason that we have claim

7    construction, because we're talking about the meanings

8    of these terms.

9              THE COURT:  And so -- at some point in

10   time, though, wouldn't you agree that there's got to be

11   an end?  I mean, something's got to have a definition

12   that we can all rely upon, something true.  You know,

13   and shifting it around -- I mean, I don't think you're

14   telling the Court that Mr. Moskowitz didn't understand

15   the question or didn't understand the subject matter or

16   was somehow confused about what was being asked.  I

17   don't --

18             MR. ANDERSON:  Right, Your Honor.  In fact,

19   Blue Spike -- it's not Blue Spike's position -- Blue

20   Spike is not trying to pull back and say that MFCCs are

21   not abstracts.  It's Blue Spike's position that MFCCs

22   are abstracts.  And so, Mr. Moskowitz's testimony, we

23   believe just in the entire context, when he's saying

24   that MFCCs aren't abstracts -- when he's saying that the

25   entire invention isn't.  And that's why I began with

1    saying what's really at issue here is the difference

2    between the elements and the claims themselves, because

3    Audible Magic is narrowing this down to this term of

4    "abstract."

5              Mr. Moskowitz is talking about the

6    invention as a whole and whereas the MFCC itself or --

7    sorry -- that the -- yes, the MFCC itself is an

8    abstract, the claims as a whole is much more than that.

9    That's consistent with Mr. Moskowitz's testimony.  So

10   nothing is being taken back.  All Blue Spike is -- let's

11   read this in context.  And so --

12             THE COURT:  So he didn't really mean what

13   he said he meant when he answered the questions?

14             MR. ANDERSON:  It goes back to the position

15   that he -- if you substitute invention for abstract,

16   that the MFCCs are not the entire invention, which I

17   will get to later on.  Because there's more than the

18   MFCC at issue here.  And that's another thing that I

19   believe Audible Magic is narrowing this too much on is

20   that there is more at issue than the MFCC.  So if we

21   take Mr. Moskowitz's testimony in context, what he said,

22   he understood that he was talking about his invention.

23   And it's true, the MFCC is not the invention.  The MFCC,

24   however, is an abstract.

25             And that is something that Dr. Tewfik

1    testified to or that he had, in his expert report.  And

2    that exhibit -- there is an exhibit, Number 2, attached

3    to Blue Spike's opposition that cites to that evidence.

4    So contrary to what has been said, Blue Spike did put

5    forth evidence of these abstracts.

6            So we have Dr. Tewfik saying that the MFCC

7    is the abstract.  We have Mr. Moskowitz's clarified

8    testimony where the invention is not the abstract which

9    is still consistent.

10           THE COURT:  So has the clarified testimony

11   been submitted to the Court?  Do I have this clarified

12   testimony?

13           MR. ANDERSON:  It's mentioned --

14           THE COURT:  It's referenced?

15           MR. ANDERSON:  It's referenced repeatedly

16   in the briefing, Your Honor.

17           THE COURT:  I'm sorry.  Go ahead.

18           MR. ANDERSON:  So going again to that

19   prong, it's deliberate, clear, and unequivocal.  It --

20   his testimony is equivocal.  His testimony -- Audible

21   Magic can't -- would not be able to explain his --

22   Mr. Moskowitz 's description of what an abstract is.

23   And somehow in a way that would make sense when compared

24   to what Mr. Moskowitz said about the abstract itself.

25   And so only Blue Spike's definition or description here

1    makes sense of his testimony as a whole.

2              Now, I'd like to point out, too, here --

3    I'll use other -- we'll talk about these other

4    statements as well, but, again, because of the issue

5    here is -- this shows there is a dispute of material

6    fact, especially since we have Dr. Tewfik saying that

7    that MFCC is an abstract.  We have a statement by the

8    inventor that requires to be read in context.  It is a

9    little vague.

10             So I'd like to turn to Slide 14 of Audible

11   Magic's slides here.

12             THE COURT:  I'm sorry.  You said 14?

13             MR. ANDERSON:  Slide 14, yes, Your Honor.

14             THE COURT:  Okay.

15             MR. ANDERSON:  So Blue Spike disagrees that

16   there is no mystery in this question that was asked to

17   Dr. Papakonstantinou.  It said -- he was asked, "Do you

18   believe that Muscle Fish's feature vectors containing

19   MFCC values anticipate the abstract element?"  Now,

20   there are a couple problems with that.  First of all, he

21   is being asked to make a legal conclusion.  And more

22   than that, there's this issue again of misidentifying

23   the element versus the claim because -- because the MFCC

24   is not going to anticipate an element, because

25   anticipation only occurs on a claim-by-claim basis.  And

1   so, of course, that would be confusing.  To the extent

2   that this expert understood the legal definition of

3   "anticipation," it would entirely -- it would make sense

4   that he would respond by saying, No, I don't believe

5   that that would be anticipated because you can't

6   anticipate this element.  But, overall, again, we've got

7   this -- we've got a dispute.  We have a material fact

8   that is not clear.

9              In turning to the next slide, Slide 15,

10  this is Michael Berry's testimony.  And I need to point

11  out a couple of words here in what was asked of him,

12  because, again, we need to take these statements in

13  context.  Mr. Berry was asked, "Is it fair to say it was

14  not your intent to try to cover some prior system --

15  technique of creating feature vectors containing MFCC

16  values?  You weren't trying to claim that, were you?"

17  Now, Audible Magic reduces that to say, Michael Berry

18  doesn't believe that abstracts are MFCCs.  And that's

19  not what he's saying at all.  His intent as a

20  co-inventor to specifically capsulate these MFCC values.

21  That day, what was specifically on his mind, was that

22  his intent that he was trying to create this patent that

23  specifically covered those.  And so the one thing I need

24  to point out is, although an MFCC can with an abstract,

25  there are other digital representations that can also be

1  abstracts.  And so he's working at a higher level than

2  that.

3           So this is -- I think it's faulty logic to

4  say when he's being asked whether he was intended to

5  cover the specific prior art system, that does not

6  necessarily mean that an MFCC is not an abstract.  And

7  interestingly, he was not asked that question.  If

8  that's the answer that Audible Magic wanted, they could

9  have asked that question.  Interestingly also,

10 Dr. Papakonstantinou was also not asked that question.

11 Neither of them was asked this clear question:  "Do you

12 think an MFCC is an abstract?"

13          Now, Your Honor, this is not Blue Spike's

14 attempt to have infringement and non-invalidity.  Blue

15 Spike's position is very clear.  The MFCC is an

16 abstract, but that the claims teach much more than what

17 the MFCC alone can do.  And that is why there's

18 additional claim language.  And as you'll see, when you

19 look at Exhibit 2 of Blue Spike's opposition, that

20 sections from Dr. Tewfik's report.  Dr. Tewfik shows

21 that it is extra XML data, this GUID and, more

22 importantly, the AMIMD, that, when added to the

23 fingerprint, when added to this MFCC abstract, are able

24 to do what the claims teach.  And so Blue Spike is not

25 changing its position, nor is Mr. Moskowitz or the

1   experts.  And, I think, when all this is taken into

2   context, that becomes much more clear.

3              The -- and, again, so in order for

4   Mr. Moskowitz's testimony to rise to the level of

5   judicial admission, it's going to take that evidence out

6   of play if that were the case.  And that really is too

7   drastic of a result when we have Dr. Tewfik saying the

8   opposite and when we have Mr. Moskowitz's testimony in

9   context showing that he was speaking about the

10  invention.

11             So that also goes to the public policy

12  issue at play here, which is there's too much of a

13  dispute of these material facts for summary judgment to

14  be found on this point.  And more than that, it's

15  interesting Audible Magic hasn't done an analysis on the

16  -- of the claims at issue here.  Audible Magic's summary

17  judgment motion is simply whether Scott Moskowitz's

18  testimony can be judicial admission.  And their -- that

19  legal issue -- so as I've stated here, that legal issue

20  must be decided in favor of Mr. Moskowitz.

21             So on the issue of 30(b)(1) versus 30(b)(6)

22  testimony, Your Honor, you'll again notice from the

23  slides here that Audible Magic isn't citing any local

24  case or any binding case law.  These are cases that are

25  in other districts and I think that that's telling.  And

1   it's also important that Audible Magic went to great

2   lengths to distinguish between 30(b)(1) and 30(b)(6)

3   testimony.  And everything that Scott Moskowitz said

4   that they're referring to here was done as a 30(b)(1)

5   testimony.  So if they are one and the same in this

6   context, then why would Audible Magic go to such great

7   lengths to make it very clear during those depositions

8   that they were switching back and forth?

9              THE COURT:  I'm looking for that slide that

10  talked about when Mr. Moskowitz talked about that he

11  is -- it's all one and the same.  I think it's on Page

12  25, where he says he's not sure how they're

13  differentiating between the two entities.

14             MR. ANDERSON:  Yes, Your Honor.  How would

15  I respond to that?

16             THE COURT:  Yes.  Yes.

17             MR. ANDERSON:  So, it is -- what I would

18  say is this:  In the 30(b)(6) testimony, deposition

19  context, the attorneys are going to have different

20  objections to make sure that things are limited to those

21  deposition topics.  I think a deponent, too, is on

22  notice what that deponent will be saying will be binding

23  on the company rather than on the part of that deponent

24  itself.  And it's not to say that the deponent's going

25  to say one thing and then it's something entirely

1  different and perjure himself.  But when recognizing

2  that one is speaking for the company as a whole, I think

3  that we could -- it's safe to say that Mr. Moskowitz may

4  have been more deliberate or more retrospective in what

5  those answers would be and recognize whether or not he

6  was speaking for the company as a whole versus himself.

7           THE COURT:  But is he the company really?

8  I mean, isn't he really the company?  Who else would he

9  be harming besides himself if he were to give testimony

10  that's different, whether it's 30(b)(1) or 30(b)(6)?

11           MR. ANDERSON:  There are -- I know that

12  there are other interested parties, at least in the Blue

13  Spike, Incorporated.  And I believe that there may be

14  some dispute about whether or not there are now or there

15  will be other principals.  But I actually -- I couldn't

16  say that it didn't, Your Honor.

17           THE COURT:  But his answer wouldn't be

18  different that there are other principals.  He wouldn't

19  have given different answers, would he?

20           MR. ANDERSON:  I would just say this again.

21  I've been in depositions where the attorney will clarify

22  under 30(b)(1) or under 30(b)(6), and it might even

23  instruct the other side not to continue this line of

24  questioning because it's off the topic or also where

25  somebody might recognize, well, this isn't just my

1  personal opinion about the statement of affairs as a

2  whole but as a company.  And I'd even say this, like,

3  Mr. Moskowitz -- even assuming that he were the

4  company -- has paid for counsel, has paid for experts,

5  has paid for a lot of help in understanding and putting

6  together his case.  And so, if he answers a question as

7  himself, that may be different than what he would answer

8  as a company.  I'm just saying, again, he might just be

9  a little more hesitant.  And not to say that it would be

10 certainly drastically different.

11            For instance, let me point out one thing.

12 In fact, it was mentioned by Audible Magic that he

13 repeatedly said, you know, this is answered in the claim

14 in the specification, it's answered in the patents.  And

15 he tried to -- he tried to answer these questions by

16 referring counsel to the -- for the patent themselves.

17 And had that remained, then we wouldn't -- he wouldn't

18 have had this issue because, again, as I'm saying, he

19 was talking about the invention as a whole and not the

20 claims itself.  And so, I would just like the Court to

21 consider that maybe he would be a little more deliberate

22 in those answers.

23            THE COURT:  Less emphatic?

24            MR. ANDERSON:  Less emphatic.  And he might

25 have stopped to consider how what he's saying might

1   coincide or conflict with what he was saying about what

2   the invention as a whole is.

3            THE COURT:  But it was truthful.  I mean,

4   there's no question as to that.

5            MR. ANDERSON:  Absolutely, Your Honor.  And

6   so, again, this is not the main issue.  This motion is

7   not centered on this specific issue.  It's merely

8   something that just kind of highlights that this isn't

9   as clear as Audible Magic would like it to seem.  But

10  the real issue in play here is what I mentioned earlier

11  about whether this is unequivocal, and we've got some

12  other facts that -- we saw the fact in question.

13           THE COURT:  Thank you.  Anything else on

14  this issue?

15           MR. RAMSEY:  May I respond, Your Honor,

16  just briefly?

17           THE COURT:  Yes.

18           MR. RAMSEY:  All right.  So a couple

19  specific things and a couple of general things.  The

20  motive of Blue Spike's response, at the highest level,

21  is to point to things other than the abstract.  So you

22  heard Mr. Anderson just now mention versions of the

23  reference signal, Null case.  This is all attorney

24  argument standing here right here, right now attempting

25  to change what it is they're pointing to as the

1   abstract.

2            In Slide 4, and the portion of their expert

3   report about which is an abstract, was submitted by

4   Audible Magic.  But Slide 4 as the excerpt.  The only

5   thing that Blue Spike points at as an abstract in that

6   report is the MFCCs.  It's not AMIMIDs.  Mr. Anderson

7   said in Exhibit 2 to our opposition, somehow they're

8   changing their infringement very frankly standing right

9   here.  Oh, no, no.  But abstract meaning that MFCCs

10  combined with AMIMIDs.

11           Exhibit 2, where AMIMIDs is mentioned in

12  discussion of the matching element, wherein a match

13  indicates the query signal, et cetera, et cetera.  It's

14  not about the abstract.  So just to back up a couple of

15  steps.  When Mr. Anderson is talking about versions,

16  when he's talking about the AMIMD, when he's talking

17  about the Null case, he's pointing to elements that are

18  other claims and their specifics.  So, for example, 700

19  Patent Claim 1 has a particular (unintelligible) about

20  differentiating versions.  Other claims do not have

21  that.  That's not about what an abstract is.  That's

22  about what does it mean to differentiate versions under

23  their theory.  What is an abstract is a single

24  conversation.  It's -- the thing they point to is just

25  MFCCs, and that's in the quote that's in Slide 4.

1   Enough about that.

2               To avoid this problem, this bind that
3   they're in, they either got to change their infringement
4   theories and now, on the fly, change their infringement
5   theory and say, Oh, no, we're pointing to this other
6   thing in combination with MFCCs.  It's not in the
7   reports.  It's not in the summary judgment record.
8   That's just arguments from an attorney today.

9               When he's talking about versions of a
10  reference signal in the Null case, he's trying to just
11  also speculate about what it is that Mr. Moskowitz
12  really meant in his deposition.  The formulations that I
13  just heard were things such as, Well, Mr. Moskowitz, I
14  believe, was talking about the invention as a whole and
15  he must have other ideas about the Null case and
16  versions and other things in his mind when he made these
17  clear and deliberate admissions.  It's attorney
18  argument, Your Honor.  It's Mr. Anderson's speculation
19  of what he hopes Mr. Moskowitz might have meant.  There
20  is no declaration by Mr. Moskowitz or any evidence that
21  Mr. Moskowitz meant something other than exactly what it
22  was he said.

23              If I may direct your attention, again, to
24  Slide 11 that has the quotes, the admissions.
25  Mr. Anderson's point, he says, Well, I don't think that

1  Mr. Moskowitz when he says what was not a signal

2  abstract, I don't think he had the claim construction in

3  mind.  He must have been thinking about something more

4  general.  I will point Your Honor to -- I'm sorry.  It's

5  actually Slide 10, Your Honor.  Not Slide 9.  Slide 10.

6           "I've said it many times, a signal abstract

7  is not the same thing as the MFCCs and, again, the claim

8  construction which you based your arguments was

9  rejected."  He didn't say this, way deep in the record,

10  I'm -- by single abstract, I'm adopting this court's

11  claim construction and then make an ill-informed

12  admission later in the deposition.  In the admission, he

13  says -- he's saying under the Court's claim

14  construction, a signal abstract is not the same as the

15  MFCCs.  That's in the middle of Slide 9.

16           And again, at the bottom, the very last

17  quote on Slide 9, "An MFCC, as I understand, is not

18  equivalent to a signal abstract based on the

19  description, the specification, the prosecution history,

20  and the claim construction."  Again, he's adopting the

21  claim construction specifically in his answer what is

22  not an abstract.  MFCCs are not abstracts.

23           So, again, the high level point is --

24  standing here today, Blue Spike has not really joined

25  the arguments.  They're pointing -- the issue is:  Are

1   MFCCs abstracts or not?  They're -- the only theory of

2   of what is an abstract that they put forward ever -- and

3   things are closed now, is that it's the MFCC thing.

4   Yet, to avoid -- to save the patents, they've conceded

5   it away in every other place.  And it is deliberate and

6   unequivocal.

7                   Mr. Anderson's arguments about what

8   Mr. Moskowitz intended and meant is just attorney

9   argument.  There's no evidence that Mr. Moskowitz meant

10  anything other than exactly what he said.  And even if

11  it were the case, there's still binding admissions by

12  Dr. Papakonstantinou.  There's no lack of clarity about

13  what it means for an ex- -- when an expert witness comes

14  forward and is asked, Well, does this -- do these MFCCs

15  anticipate the abstract element?  That was what he was

16  hired to talk about.  The whole report is what he

17  anticipates.  You know, he's supposed to be matching

18  things up to the claim language, not in making opinions.

19  And his opinion, as he expresses in his deposition,

20  admitted that MFCCs do not meet the abstract limitation.

21  That was Dr. Papakonstantinou's job.  So I'd just like

22  to point that out.  Independently of Mr. Moskowitz's

23  admissions, we've also got the expert admitting this.

24                  And so, really just again, we've heard a

25  lot of attorney argument to shift the focus away from --

1    to other things in patents and other elements not

2    related to abstract at all.  It's just not relevant,

3    Your Honor.

4              And I'll just -- the final point is, Your

5    Honor, there's an alternative basis here even if

6    Mr. Moskowitz were deemed only to have made evidentiary

7    admissions.  Let's just assume that all these admissions

8    are purely evidentiary.  The Court may still grant

9    summary judgment and should.  Under the GTX versus Kofax

10   case, Judge Davis -- there was not a judicial admissions

11   conversation there.  There, the inventor just admitted

12   the cue structures didn't meet the elements and there

13   was no rebuttal evidence.  Here, there's no rebuttal

14   evidence.  There's no expert opinion explaining in any

15   detail why the MFCC is an abstract or that it even is.

16   And there's no explanation of Mr. Moskowitz's testimony

17   to contradict what is plain on its face.

18              There is no disputed issue of fact.  Even

19   as a theoretical disputation of a fact when there's such

20   overwhelming evidence on one side of the scales and

21   just -- the only thing on Blue Spike's side, the only

22   evidence in the record is what we submitted which is

23   just to say they point to this MFCC as an abstract in

24   their infringement theory.  No reasonable jury could

25   find that an MFCC is an abstract.  Therefore, no

1 reasonable jury could find that Audible Magic infringes.

2 And like the GTX case, this Court should grant summary

3 judgment if that's appropriate.  Thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Ramsey.

5 Anything else, Mr. Anderson?

6          MR. ANDERSON:  Yes, briefly.  Your Honor,

7 again, it's untrue that Blue Spike hasn't put forth any

8 expert testimony or any evidence here.  And, again, I

9 apologize for not having this exhibit for you.  But in

10 Exhibit 2 of Audible Magic -- or excuse me -- Blue

11 Spike's opposition, there are excerpts from Dr. Tewfick.

12 And I'll read to you from Page -- it's Page 38.  It's

13 Page 4 of the document, but it's Page 38 of the

14 document.

15          MR. RAMSEY:  If I may hand Exhibit 2 to the

16 Court, Your Honor?

17          THE COURT:  Sure, that'd be great.  And you

18 have it in front of you also, Mr. Anderson?

19          MR. ANDERSON:  I do.

20          THE COURT:  Okay.  Thank you.

21          MR. ANDERSON:  So if Your Honor would turn

22 to Page 4.  It begins with the Audible Magic slide

23 below.

24          THE COURT:  Yes.

25          MR. ANDERSON:  It says, "this Audible Magic

1    slide below depicts that a metadata tag called an AMIMD

2    or GUID, this is extra information that's attached onto

3    the MFCC -- is added to the MFCC.  This metadata tag

4    provides the mechanism to which Audible Magic's software

5    makes the differentiation between versions of a song by

6    different artists."  That continues and -- throughout

7    these slides.  For instance, on the second-to-last page,

8    on Page 7, the last paragraph, it says, "not only is

9    Audible Magic software capable of differentiating

10   versions, it does differentiate," and then it talks

11   about -- I apologize, Your Honor.  That was not the one

12   I was looking for.  It's Page 6.

13          THE COURT:  Okay.

14          MR. ANDERSON:  And again, it says here in

15   this last paragraph, "That the GUIDs or metadata tags

16   provide Audible Magic with the ability to effect the

17   differentiation between versions of songs as evidence

18   from this list."

19          And so it has been Blue Spike's position

20   now for quite some time that the MFCC is the abstract

21   and that the MFCC alone as the abstract, cannot do

22   everything that is in the claims.  And so, again, I

23   think Mr. Ramsey is reducing this issue here to the

24   abstract itself.  And it has never been just about the

25   abstract.  Blue Spike, in no way, is changing its

1  position.  It's in this expert report.  And when Scott

2  Moskowitz's deposition testimony is read in context,

3  especially in context of this exhibit, it's evident that

4  his testimony does not conflict either.  He is saying

5  that as a whole, the invention has the ability to create

6  this fingerprint and then differentiate between these

7  versions.  The MFCC abstract alone can't do that.

8          So no matter how you look at it, Your

9  Honor, either right in context, Mr. Moskowitz's position

10 supports what Dr. Tewfik says, or if taken out of

11 context and just in a sound bite, we have this conflict

12 of a material fact.  And either way, both of those show

13 that the -- that summary judgment isn't warranted.

14          I believe also, we covered in our briefing

15 that the cases that Audible Magic cites to on this --

16 are otherwise not applicable here.

17          But I'd like to respond at least, just

18 briefly, to that GTX case that opposing counsel has

19 mentioned a couple times.  And just point out that in

20 that case, you have an issue where a declaration from

21 one expert has been submitted trying to -- in relation

22 to another expert's report and this expert is saying

23 something very specific, that the black pixels are

24 loaded into memory.  And, of course, that's not at all

25 what this original expert report had said.  He said

1   something much more general, that object-grabbing is met

2   by reading in the input image into memory.

3           So you have one expert opining about what

4   another expert said in this declaration which is

5   entirely different than what's going on here.  Where we

6   have Dr. Tewfik has stated that the MFCC is an abstract.

7   But that the claims, in general, teach much more than

8   that, and that more than the abstract is required in

9   order to -- in order to perform the invention and the

10  Blue Spike patents-in-suit.  And that we don't have

11  another expert opining about what this expert said that

12  he did.  And, again, Mr. Moskowitz's testimony is when

13  read in light of what Dr. Tewfik had said makes much

14  more sense than it does when restricted to those sound

15  bites.  That's all, Your Honor.

16          THE COURT:  Okay.  Thank you, Mr. Anderson.

17          MR. RAMSEY:  If I may make two more quick

18  points, Your Honor?

19          THE COURT:  All right.

20          MR. RAMSEY:  Real quickly, in Exhibit 2

21  that Mr. Anderson has been talking about, the Court's

22  been handed.  Just to point out on Page 37, that entire

23  conversation is about an element wherein a match

24  indicates the query signal is aversion at least in one

25  of the reference signals.  It has nothing to do with

1    abstracts.  And it may be true that Mr. Anderson was

2    pointing to other claim elements, but those aren't at

3    issue in this motion.  The question is whether it was

4    not counted abstract.  It's a form of misdirection, Your

5    Honor.  It's just not relevant.

6          And, again, on the differentiation of

7    versions point, I'll just also note that some claims

8    include that limitation, that language, and some claims

9    do not.  So it's pointing to a different limitation

10   that's in some claims and some not, that doesn't have to

11   do with abstract.  So trying to raise that argument at

12   such a high level that it's mixing together elements is

13   just really attempting to avoid the issue.

14         The second point, Your Honor, is, again, a

15   lot of testimony from the attorney about what

16   Mr. Moskowitz meant or didn't mean.  There's no evidence

17   in the record.  Mr. Moskowitz had the opportunity to

18   amend his answers in his errata in great detail; didn't

19   change a thing, with respect to the testimony at issue

20   today.

21         And finally, with the GTX versus Kofax

22   case, I think what Mr. Anderson just pointed out

23   actually proves Audible Magic's point.  In that case,

24   there were, in fact, competing expert declarations put

25   in.  And nonetheless, Judge Davis looked to the inventor

1  admissions, said the plaintiff's expert statement was

2  too cursory in combination with this inventor admission.

3  I'm going to grant summary judgment and

4  non-infringement.

5              In this case, we've got a huge amount of

6  clear admissions.  We've got in the record, Audible

7  Magic's expert opinion as to exactly why MFCCs are not

8  abstracts.  And there was no evidence, other than this

9  Exhibit 2 that we just talked about, that doesn't bear

10 on this issue showing that there was -- that MFCCs are

11 an abstract.  So that way, there's less -- more of a

12 record here appropriate for summary judgment, we

13 believe, in that case.  That's it, Your Honor.  Thank

14 you.

15             THE COURT:  All right.  Thank you.

16 Anything else, Mr. Anderson?

17             MR. ANDERSON:  No, Your Honor.

18             THE COURT:  All right.  I think that leaves

19 just the one motion that has to do with -- it's a

20 partial summary judgment based on license.  We're going

21 to take a break regardless, at least for a few minutes.

22 Did you all want to take a lunch break or take like 15

23 minutes and let's get started?

24             MR. ANDERSON:  I'm fine with just a

25 15-minute break, Your Honor.

1              MR. RAMSEY:  We're fine with that.

2              THE COURT:  All right.  Let's do this,

3     then, let's take a 15-minute recess and then we'll be

4     back.

5              THE BAILIFF:  All rise.

6              (Whereupon, a recess was had from 12:29

7     p.m. to 12:55 p.m.)

8              THE BAILIFF:  All rise.  Court is now back

9     in session.

10             THE COURT:  Please be seated.

11             MR. FINDLAY:  May I approach, Your Honor?

12             THE COURT:  Yes, you may.  Thank you.  All

13    right.

14             MR. HIGGINS:  Your Honor, you've been

15    handed a printout of some PowerPoint slides and also an

16    extra handout.  You can set the handout aside for now.

17    We'll get to that later.  I'll be starting with these

18    slides.

19             THE COURT:  Okay.

20             MR. HIGGINS:  And I'll try to make this

21    argument as efficient as possible and get through this

22    quickly.  But I do want to spend a little time and go

23    through a background of some of the facts related to the

24    license at issue and the products here, and better frame

25    the issue so it's clear as possible before you make this

1    decision.  Because what this really boils down to is the

2    definition of a single term the "patent license."

3    That's the key issue to be decided here.  And that

4    patent license is a license that Blue Spike entered into

5    with RPX Corporation.  RPX paid and negotiated with Blue

6    Spike, $4 million so that it could rid its customers --

7    its members and their customers of the Blue Spike

8    patents.  And this broad RPX license includes any

9    portion of a product that an RPX member contributes to.

10                    That entire product, then, whether the rest

11   is supplied by a third party or an RPX sublicensee,

12   that's covered by a licensed product under this RPX

13   agreement, and that's the sole issue to be decided here.

14                    If you look at Slide 2, Your Honor.  Before

15   I get into the specific arguments here, I'll spend a

16   little time on the background.  As I mentioned, I'll go

17   through the representative claim, explain the RPX

18   agreement, what RPX is and what they do and what's their

19   purpose.  And then I'll hit the arguments Audible Magic

20   products are licensed under this agreement.  And I'll

21   spend just a little time on the alternative issue of the

22   third party beneficiary.

23                    If you go to Slide 3.  We have this in our

24   motion, but I wanted to put it here on our slide to

25   emphasize it again.  This is the single issue to be

1   decided in our motion.  And it's whether the license

2   agreement between RPX and Blue Spike, Audible Magic and

3   its customers' accused products are included in what's

4   defined as "combined license products and services" in

5   the RPX agreement.  To the extent they are, that

6   provides a license to Audible Magic and its customers to

7   the Blue Spike patent portfolio.

8            If you turn to Slide 4, provided is the

9   high level overview of what Audible Magic's position is.

10  And if you look in the blue box, Audible Magic supplies

11  software.  In order for the software to do anything, it

12  has to be combined with some form of hardware.  That

13  hardware is supplied by, for example, Dell computers and

14  servers, and iOS, Android and Windows devices.  When I'm

15  referring to "iOS devices," I'm referring to Apple

16  devices.  Android would include, for example, Samsung

17  and HTC mobile devices and tablets.  And then Windows

18  devices may include IBM, HP, and Dell computers.  But

19  once the Audible Magic software's combined with these

20  elements that are from RPX licensees, that creates a

21  combined licensed product and service as defined in the

22  RPX agreement.  And because of that, Audible Magic

23  products accused in this case are licensed under the

24  agreement.

25            If you turn to Slide 5, Blue Spike, in

1   response to our motion, takes the extraordinary position

2   that we can't rely on their infringement contentions to

3   show that the Audible Magic products are combined with

4   an RPX member's product to meet this definition in the

5   agreement.  They put forth no case law to support this

6   counter-intuitive argument.

7            The other argument that they make is that a

8   third-party product is not included in the RPX license.

9   And as I'll explain shortly, the definition of "combined

10  licensed product and service" in the RPX agreement

11  includes the term "third-party."  So it's not clear how

12  Blue Spike can make this argument that third parties

13  can't contribute to this combined license and servers

14  when it's expressly part of that definition.

15           On Slide 6, this is in our brief, I wanted

16  to note a few of the basic legal principles here.  These

17  are fairly basic points of law, but I just wanted to

18  bring them to the Court's attention.  "Infringement

19  contentions are admissions" on a party.  Blue Spike

20  seems to dispute this in its opposition with no

21  supporting case law.  But the law is clear, the Federal

22  Circuit is clear:  Infringement contentions are

23  admissions.  Parties rely on those contentions to frame

24  the issues in the case.

25           And then the final two points in the slide

1    just emphasize that the choice of law in this contract

2    is Delaware law.  Delaware law is controlling.  These

3    aren't disputed points of law.  But just putting it in,

4    I just remind the Court that Delaware law is the choice

5    of law in this contract.

6                THE COURT:  I'm not trying to hurry you up,

7    but I want to make sure you know that you have 27

8    minutes and you've got 23 slides, and so --

9                MR. HIGGINS:  I'm moving quickly.  So we go

10   to Slide 7.  Now, this is the same representative claim

11   that Mr. Ramsey had in his presentation and this is also

12   the representative claim that Blue Spike's expert uses

13   in their infringement analysis.  I put it on the slide

14   here.

15               You'll notice in our motion, we use Claim

16   11 from the 472 patent.  The elements are nearly the

17   same for purposes of this motion.  Same elements, same

18   principles apply.

19               Now, in Claim 1, there's six elements here.

20   There's a lot to this claim.  What we're really focused

21   on in this motion is everything from the second input

22   down.  "Second input," "second processor," "reference

23   database," and prepping device.  And for purposes of

24   this motion, we don't need to get into the technical

25   details of these claim elements.  All we need to look at

1   is what Blue Spike is pointing to and its infringement

2   contentions.  What is it -- what it's accusing Audible

3   Magic software of running on.  That's what we need to

4   look at for this motion.  If those elements come from an

5   RPX member, then we're within the scope of the license.

6   We don't need to get through claim constructions and

7   technical details and MFCCs again for purposes of this

8   motion.

9             If you turn to Slide 8, Your Honor.  Before

10  we get to the actual RPX agreement, I just want to

11  briefly mention the purpose of RPX.  RPX is a company

12  that has large corporations, Apple, Dell, HP, Samsung as

13  its members.  What RPX does is it goes out and it

14  obtains rights to certain patents or licenses to settle

15  certain lawsuits.  And it does that, as it's on the

16  slide here, "to clear the ecosystem."  It wants to get

17  rid of the threat of any patent rights for certain

18  patents -- for example, the Blue Spike patents here --

19  for all of its RPX members that are paying millions of

20  dollars to be members in this and for those customers.

21  They don't want to hear anything from the patent owners

22  again once they've paid, in this instance, $4 million.

23            If you turn to Slide 9, this is the key

24  provision from the RPX agreement between RPX and Blue

25  Spike.  That's the focus of this motion.  So there's a

1    couple parts of this definition, so I want to break it

2    down a little bit.  At the very beginning, it's

3    important to note that the "'combined license product

4    and service' means any combination...whether by a

5    Sublicensee" and here's the term, "'third party,' of a

6    Licensed Product and Service."  The licensed product and

7    service is what's supplied by the RPX member.

8              So if a third party supplies something, RPX

9    member supplies the other part and meets any element of

10   the claim.  Actually, it's in whole or part of an

11   element or separate claim.  It doesn't have to meet the

12   entire elements of the claim.  "In whole or in part," a

13   third party RPX member of supplying parts to what Blue

14   Spike is accusing of infringement.  That falls within

15   the definition of the combined licensed product and

16   service that was negotiated between RPX and Blue Spike.

17             If you turn to Slide 10, Your Honor.  This

18   settlement agreement can be seen at very broad spectrum.

19   It's including third-party products.  But these type of

20   settle agreements have been routinely upheld by the

21   Courts and found to include third-party products.

22   Earlier this year in the Southern District of New York,

23   there was a patent, nonpracticing entity, PDIC.  They

24   asserted two patents against Hewlett Packard and Fuji

25   Film.  Previously, in that litigation, they settled with

1  Microsoft.  And in that agreement, Microsoft included

2  "any past, present, or future combination, hybrid

3  aggregation that incorporates any offering -- meaning a

4  Microsoft offering...with any third-party offering."

5             What the Court found here, and as the quote

6  on the page says, certainly, it was Microsoft's

7  contention to clear the ecosystem.  Anyone that's using

8  Windows has a license to those patents via Microsoft

9  settlement.  And that's exactly what the Court found for

10 HP and Fuji Film there.

11            This license of the Court applied to

12 third-party products.  It's even broader than the

13 license here.  There's no restriction on it meeting a

14 certain element of the claim.  So it's not like this RPX

15 agreement is some overbroad agreement that has never

16 been construed to, you know, by the Federal Circuit of

17 district courts, the whole third-party products under

18 the license.

19            If you look at Slide 11, I want to briefly

20 summarize, mentioning RPX members here.  So who are

21 these RPX members that are supplying these components

22 that Audible Magic uses as part of its system that Blue

23 Spike is accusing of infringement?  I bolded a few at

24 the top here that pretty much cover 99.9 percent of the

25 products out there on the market that are using Audible

1    Magic.  Importantly, Dell, Apple, Samsung, Hewlett

2    Packard, HTC, IBM, LG and the list goes on and on.  It

3    covers every major mobile device manufacturer computing

4    company out there.

5                If you turn to Slide 12, now that we've

6    covered what the RPX agreement covers and who are those

7    RPX members, this slide is meant to demonstrate the

8    ecosystem and the system that Audible Magic employs and

9    what's accused by Blue Spike.  If you see the elements

10   that are highlighted in green, those are elements that

11   are supplied by RPX licensees via iOS, Android, and

12   Windows devices.  Audible Magic does not supply those

13   devices, yet those are parts of the asserted claims in

14   this case.  And in red, those are elements that are met

15   by Dell servers, Dell computers.  For example, Audible

16   Magic's reference database of all of its fingerprints.

17   That's housed on a Dell computer or a Dell server.  That

18   is not supplied by Audible Magic.

19               And along with the slide that I gave Your

20   Honor, that extra handout there, that shows this diagram

21   next to the claim language.  Just for easy reference as

22   we walk through this later in reference to the RPX

23   agreement so you can see how it relates to the claim

24   language as well.

25               Now, if you turn to Slide 13, the important

1    comparison we need to make here in this motion is what

2    Blue Spike is accusing of infringement here, what is

3    covered by a combined license product and service.  So

4    I'm starting here with the second processor limitation

5    from Claim 1 of the 700 patent.

6              And I started with this element because

7    it's very clear.  If you look at Blue Spike's

8    infringement contentions, this element is met by Audible

9    Magic's libraries on an iOS, Android, Windows, and Linux

10   operating system.  Those are RPX member licensee

11   components.  Audible Magic does not supply the second

12   processor that's part of this claim element.

13             If you turn to the next slide, Slide 14, a

14   very similar issue.  This is the second input.  Audible

15   Magic does not supply the second input.  That second

16   input could be a microphone on your smartphone that

17   receives the audio signal that's coming in.  Again,

18   that's on an iOS, Android, or Windows device.  It's not

19   supplied by Audible Magic.

20             And the last example I'll cover here is

21   with respect to the claims that's on Slide 15.  And this

22   is with respect to the reference database.  Blue Spike

23   points to cited here "Audible Magic's hosted Content ID

24   database."  As I mentioned earlier, this is the

25   reference database of the IDs, the fingerprints.  It's

1    what you look up and compare the incoming signals to

2    find a match.  Those are on Dell servers.  They're on

3    Dell computers.  So this reference database that's on an

4    RPX licensing product is not supplied by Audible Magic.

5              On Page 16, after this briefing was

6    completed, Blue Spike took the depositions of Audible

7    Magic's employees and they asked the question:  "Do you

8    know the models or manufacturers of any of those

9    servers" that host these databases?  The response:

10   "It's from Dell."  And the second quote at the bottom of

11   the page here is just emphasizing, well, how long have

12   you used these Dell computers?  As long as I've been

13   part of the company.  They've always used Dell.  They've

14   always used an RPX license component to host the

15   reference database.  That's what Blue Spike's pointing

16   to in its infringement contentions.  That's what makes

17   the Audible Magic accused product a combined license

18   product and service.  It's combined with a Dell

19   computer, Dell server that is an RPX licensed product

20   and service.

21             On Slide 17, I'm not going to walk through

22   all the text that's on this slide.  This is just to show

23   that Audible Magic's non-infringement expert, Dr. John

24   Strawn, went through every single asserted claim, every

25   element and demonstrated how they were met by either a

1    Dell service, an iOS, Android, Windows device.  Blue

2    Spike took his deposition.  They didn't ask him a single

3    question about this.  This has gone unchallenged.

4              On Slide 18, during discovery, Audible

5    Magic asked Blue Spike for its contentions of whether an

6    Audible Magic accused product constitutes a portion of a

7    combined licensed product or service.  Rather than

8    provide any substantive response or its contention, Blue

9    Spike invented a new theory of patent infringement where

10   it says "proportional liability."  This is not a tort

11   that has to do with negligence.  This is no proportional

12   liability.  As best I can make sense of their answer

13   here, they're saying if an RPX supplies three elements

14   of a claim, Audible Magic supplies four elements of the

15   claim.  Well, then they're proportionally liable and we

16   divide up the claim and divide up damages.  But that's

17   not how patent law works.

18             This proportional, was there a response to

19   this interrogatory; that's their contention.  They are

20   no rebuttal to our facts or our portion that we have

21   combined licensed product or services during discovery.

22             And if you look at the next slide, that's

23   Slide 19, nor did they have any response when we filed

24   the motion.  In the left block over here is Audible

25   Magic's statement under rule 56(a)(2) of undisputed

1    material facts stating that Audible Magic combines its

2    products of a licensed product or service of an RPX

3    member.  Blue Spike's response, in its opposition to

4    this motion, was that it's without knowledge to know how

5    Audible Magic's products work.  If it doesn't have

6    knowledge of how Audible Magic's products work, how did

7    it submit infringement contentions in this case?  What

8    it did put in infringement -- its infringement

9    contentions was that certain components are supplied by

10   RPX members.  Therefore, it's a combined license product

11   or service.

12              It's also important to note that, and Your

13   Honor may remember, we moved to strike the Blue Spike

14   infringement contentions and they ended up

15   supplementing.  But they had professed the whole time

16   that those infringement contentions were adequate.  They

17   included all of their theories.  Well, on January 9th,

18   2015, they served updated infringement contentions well

19   after this briefing was completed in which they claim

20   that they needed more discovery to figure this issue

21   out.  Discovery was closed.  They didn't address any of

22   these issues.  In fact, those citations that we just

23   went through in the infringement contentions are from

24   these updated contentions.  So discovery is closed.

25   They don't need any more discovery.  Their contention is

1  that certain elements of the claims are supplied by RPX

2  members.

3              Audible Magic doesn't supply them.  The

4  only outcome here, and it appears to be -- there's

5  nothing Blue Spike puts forward to dispute this is that

6  what they're accusing is a combined licensed product and

7  service that they've already licensed the rights away

8  to.

9              If you look at Slide 20, it's not just

10  Audible Magic's expert that agrees with this.  Blue

11  Spike's only infringement expert, Dr. Tewfik, in his

12  expert report after the close of fact discovery, after

13  Audible Magic depositions, stated that the comparing

14  device is housed on the back end server.  That server is

15  a Dell server.  Therefore, that's an RPX member's

16  product that's combined with Audible Magic software.  In

17  addition, Dr. Tewfik stated that it is evident to him

18  that a second processor is required to run the software

19  that Audible Magic provides to its OEM manufacturers.

20  If you look at the very bottom, this includes iOS

21  devices such as iPhones and then it goes on to note

22  Android devices.  Those are all RPX member products.

23  None of that is supplied by Audible Magic.

24              And finally, here, I want to preemptively

25  address a few points that Blue Spike raised in its

1    opposition that should just have no relevance to this

2    motion.  And that is that they complained that we didn't

3    walk through every single asserted claim, all 32,

4    because this motion does address the customer

5    requirements, and do an element by element analysis

6    showing how, for each asserted claim, that they're

7    accusing a combined license product or service.  But the

8    plain language of the RPX agreement says we don't have

9    to.  If you look at the highlighted language in combined

10   license product or service and the definition for

11   licensed product or service, it only requires that you

12   satisfy an element or step of a claim in the patents.

13            Patents is defined to include the entire

14   Blue Spike portfolio here.  You meet one step or one

15   claim with this product that you're supplying that's

16   combined to make a combined licensed product or service,

17   you've now gained a license to the entire Blue Spike

18   portfolio.  No element-by-element, claim-by-claim

19   analysis was required.  We picked representative claims

20   and, in fact, our expert, Dr. Strawn, did go through

21   every single -- all 32 asserted claims, and show how

22   this is met.  In our motion, there's a footnote where we

23   go through other claims from each patent to show how

24   this is met.  They don't dispute that.  They put forth

25   no facts to show how there's any difference in the

1  claims that makes any difference with respect to this

2  issue.

3           Another misconception by Blue Spike -- and

4  I've now turned to slide 22, Your Honor -- is that the

5  so-called Patent Laundering Activities clause in the RPX

6  agreement applies.  There can be no dispute that this

7  clause has no effect on Audible Magic's motion.  If you

8  look at the highlighted language here, it says "Patent

9  Laundering Activities shall not include" -- and if you

10 go to Part D -- "any combined license, product, and

11 service."

12          So, again, I go back to the sole issue to

13 be decided here which is:  Are the Audible Magic

14 products part of a combined license product and service?

15 If they are, they're specifically excluded from Patent

16 Laundering Activities.  And if that wasn't enough, if

17 you actually look at what this clause says, this is

18 meant to prevent an end-around to paying royalties to

19 Blue Spike.

20          And it says specifically in the definition,

21 if someone, a third party, supplies a substantially

22 completed form to a manufacturer.  So Company A designs

23 the entire product, supplies it, and has an RPX member

24 who has a license to Blue Spike portfolio, manufactures

25 it, just to avoid paying royalties.  That's clearly not

1 what's happening here.  Audible Magic has been doing the

2 same thing prior to these Blue Spike patents.  There was

3 nothing meant to avoid paying royalties to Blue Spike.

4 And even so, it's specifically excluded from Patent

5 Laundering Activities here.

6           And then finally, on Slide 23, I just want

7 to briefly note the alternative argument that we raised

8 in our motion is that to the extent Your Honor doesn't

9 find that Audible Magic products, themselves, are

10 licensed under the agreement as part of the combined

11 license product or service, Audible Magic itself has an

12 intended third-party beneficiary under Delaware law to

13 the RPX agreement.  RPX's whole purpose and the purpose

14 of putting third party -- the term "third party" -- in

15 the definition for combined license product and service,

16 showed a clear intent to provide a benefit to third

17 parties that are providing portions of a system that are

18 combined with RPX members.  RPX didn't want to hear from

19 Blue Spike ever again.  That's why they negotiated this

20 deal.

21           THE COURT:  You've got nine minutes.

22           MR. HIGGINS:  I'll save those nine minutes

23 for a reply, Your Honor.

24           THE COURT:  I thought you might want to.

25 Okay.

1        MR. HONEA:  Thank you, Your Honor.  I'll be

2   efficient and try and wrap this up quickly because I

3   know it's been a long day.

4        THE COURT:  You have plenty of time.

5        MR. HONEA:  Well, it's been a long day, and

6   I think we can talk about these things rather

7   efficiently and the briefings are on point.  So the

8   important thing to remember here is that I think we want

9   to point out that within the RPX agreement, there's

10  specifically a clause 5.3 Third-Party Infringement which

11  contemplates and clearly shows that the parties did not

12  intend that third-party products would be licensed.  So

13  I think that's the key fact that shows that this isn't

14  something that was contemplated.

15        In fact, if we think about how RPX does

16  business, they have to obtain customers and if they want

17  to obtain customers, those customers must think they

18  have a risk of being sued for patent infringement.  But

19  if their theory, Audible Magic's theory's correct,

20  anybody that uses a Dell computer or Apple products in

21  some sort would be automatically licensed and would

22  never have a need to go to RPX for sublicense.  Does

23  that make sense?  It would be counterintuitive to RPX's

24  business venture to create an agreement that, all of a

25  sudden, everything that someone may use from one of its

1   member's products, which are used in everything we do

2   nowadays, would, all of a sudden, be licensed.

3          Second point with this is Patent Laundering

4   Activities were specifically provided and Audible Magic

5   points out that it excludes combined licensed products,

6   but that begs the question of what's a combined licensed

7   product or service.  And we're arguing that it cannot be

8   here in this circumstances because it's a third party

9   that specifically is excluded from or from contemplation

10  as being a license -- a sublicensee eventually.

11         As far as a third-party beneficiary, I

12  think the Delaware law is very clear that it needs to be

13  materially expressed in the agreement itself as it tends

14  to have benefit third parties -- and nowhere in this

15  agreement does it expressly make that clear.  So, again,

16  I think that's a thin argument.

17         So those are the main points that I wanted

18  to bring up, but I think the briefing is complete.  So

19  thank you.

20         THE COURT:  Thank you.

21         MR. HIGGINS:  I just want to briefly

22  address one point that Mr. Honea raised in this

23  third-party infringement clause.  It doesn't mean what

24  he says it means.  This is nothing more than a standard

25  clause in patent licenses where the patentee, the patent

1  owner of Blue Spike, retains the rights to enforce its

2  patents.  RPX is not getting the right to sue third

3  parties for infringement of the patents.  That's what

4  this clause is for.  This has no effect on whether Blue

5  Spike granted RPX and third parties that it combines its

6  products with, a license under the patents.  This simply

7  says that Blue Spike, as it says here, "shall have the

8  sole right, under its own control, to prosecute any

9  third-party infringement."  Well, this third-party

10  infringement can't include Audible Magic because we're

11  licensed under the combined license and products

12  definition of the agreement, which specifically includes

13  the term "third party."

14              If they didn't mean to include third

15  parties in that definition and within the license, then

16  they wouldn't have included the term "third party"

17  within the definition's combined licensed product and

18  service.  It clearly was meant to encompass those

19  situations that we have here where Dell or Apple or

20  Samsung are providing part of the system that Blue

21  Spike's accusing of infringement.  That's why these

22  companies paid millions of dollars for this license.

23  And that's what's included here.  It's a combined

24  licensed product or service.  This third-party

25  infringement clause has no effect on this motion.  Thank

1  you, Your Honor.

2            THE COURT:  Thank you.

3            MR. HONEA:  Very briefly on the third-party

4  infringement clause, if you look at the very bottom of

5  Page 9 of this agreement -- and I could just read it out

6  loud.

7            THE COURT:  Okay.

8            MR. ANDERSON:  "The parties acknowledge

9  that RPX may, through no action of its own, be named a

10 party to a suit relating to the patents," and this is

11 where the important part starts.  "Provided, however,

12 that neither Blue Spike nor its affiliates will take or

13 initiate any action to join or name RPX or any RPX

14 members or tier companies that have a valid patent

15 license or existing sublicense under this agreement,

16 which is in full force and effect as a party."  So it's

17 basically saying you can't sue RPX on these patents and

18 you can't sue our members and the tier companies that

19 have been outlined in the RPX agreement.  You can't

20 bring this -- they don't say anything about a third

21 party, interestingly enough, of a combined license or

22 product.  So I think the point being that that's

23 consistent with the idea that neither party contemplated

24 that some third party would be able to say, I'm licensed

25 all of a sudden because it uses a Dell server in running

1    its business.  So that's all.  Thank you, Your Honor.

2              THE COURT:  Thank you.  Anything else?

3              MR. RAMSEY:  No, Your Honor.

4              THE COURT:  All right.  I believe that

5    concludes everything that the Court had set for hearing

6    today.  Before I forget, here is Exhibit No. 2 that you

7    gave the Court.  I'm going to pass it to the courtroom

8    deputy, so don't forget that.  Again, I acknowledge that

9    a lot of these motions are -- have been on file for a

10   long time.  I'm going to make my best efforts to have

11   everything out in the next three weeks, so if that

12   changes in any way, I will let you know.  So you can

13   tell your clients it'll be within the next three weeks.

14   And, again, hopefully, I can have it a lot sooner than

15   that, but I will make my best efforts.

16             Is there anything else we need to take up?

17             ALL PRESENT:  No, Your Honor.

18             THE COURT:  Okay.  I appreciate everybody's

19   good preparation.  We'll be adjourned.

20             THE BAILIFF:  All rise.

21             (End of proceedings at 1:25 p.m.)

22

23

24

25

1                              CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true

4   and correct transcript from the oral stenographic notes

5   of the proceedings in the above-titled matter to the

6   best of my ability.

7

8

9   /s/ *Shawna Gauntt-Hicks*                    *09-10-2015*

    _____         _____
10  Shawna Gauntt-Hicks                          Date
    Deputy Reporter
11  State of Texas No. 9353
    Expiration Date: 12/31/2017
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$10,000** [2] - 9:24, 30:20

**'**

**'90s** - 51:7, 61:10
**'97** [4] - 17:22, 18:5, 18:10, 25:13
**'abstracts** [1] - 75:2
**'based'** [1] - 26:8
**'binding** [1] - 74:1
**'combined** [1] - 109:3
**'nose** - 66:24
**'officer** - 72:5, 73:24
**'perceptual** [1] - 21:18
**'signal** [2] - 57:10, 58:10
**'testimony** [1] - 73:25
**'third** [1] - 109:5

**/**

**/s** [1] - 125:9

**0**

**09-10-2015** [1] - 125:9

**1**

**1** [5] - 13:5, 49:16, 92:19, 107:19, 112:5
**10** [7] - 7:16, 20:23, 48:8, 55:19, 94:5, 109:17
**100** [1] - 56:20
**1000** [1] - 3:7
**102** [1] - 2:19
**107540** [1] - 12:7
**10:00** [1] - 1:9
**10:57** [1] - 48:11
**11** [6] - 8:5, 21:11, 56:14, 93:24, 107:16, 110:19
**114** [1] - 56:19
**1152** [1] - 3:2
**117** [1] - 12:6
**119** [2] - 2:4, 2:9
**11:10** [1] - 48:12
**12** [4] - 8:11, 47:15, 57:16, 111:5
**12/31/2017** [1] - 125:11
**125** [1] - 4:6
**12:29** [1] - 103:6
**12:55** [1] - 103:7
**13** [7] - 8:15, 22:14,

55:25, 56:4, 58:1, 111:25
**14** [7] - 24:1, 59:17, 60:11, 84:10, 84:12, 84:13, 112:13
**15** [11] - 12:4, 25:5, 25:14, 47:3, 51:3, 60:10, 61:1, 85:9, 102:22, 112:21
**15-minute** [2] - 102:25, 103:3
**15th** [1] - 3:2
**16** [3] - 26:8, 61:14, 113:5
**1617** [2] - 47:16, 48:1
**17** [3] - 27:11, 61:24, 113:21
**175** [1] - 79:22
**18** [5] - 29:23, 43:18, 62:16, 79:5, 114:4
**19** [4] - 30:13, 63:21, 64:14, 114:23
**1996** [1] - 51:14
**1997** [4] - 16:11, 21:13, 28:9
**1997-'98** [1] - 51:7
**1999** [1] - 51:14
**1999-2000** [1] - 21:6
**1:25** [1] - 124:21
**1st** [1] - 57:2

**2**

**2** [14] - 4:4, 49:1, 55:25, 56:4, 83:2, 86:19, 92:7, 92:11, 97:10, 97:15, 100:20, 102:9, 104:14, 124:6
**20** [4] - 32:7, 38:24, 65:11, 116:9
**2000** [6] - 16:2, 22:17, 24:3, 28:9, 31:1, 61:5
**20005-1706** [1] - 3:3
**2001** [1] - 31:13
**2011** [1] - 12:6
**2012** [1] - 30:14
**2014** [5] - 11:8, 42:6, 42:24, 43:9
**2015** [3] - 1:8, 4:2, 115:18
**202** [2] - 3:3, 3:4
**21** [2] - 32:24, 65:20
**213** [2] - 2:16, 2:16
**22** [2] - 66:14, 118:4
**223** [16] - 33:19, 51:13, 52:23, 52:25, 53:4, 53:7, 53:15, 53:19, 53:25, 54:2, 55:7,

55:11, 55:21, 56:5, 56:9, 58:23
**23** [2] - 68:15, 107:8, 119:6
**24** [1] - 69:4
**242** [1] - 12:6
**25** [4] - 1:8, 4:2, 70:21, 88:12
**26** [1] - 72:3
**27** [2] - 72:24, 107:7
**276-1090** [1] - 1:20
**279** [1] - 40:14
**28** [1] - 74:6
**29** [1] - 74:25

**3**

**3** [4] - 14:1, 47:25, 49:14, 104:23
**30** [1] - 76:1
**30(b)(1** [14] - 69:11, 71:21, 71:24, 72:20, 73:7, 73:14, 73:23, 74:4, 77:22, 87:21, 88:2, 88:4, 89:10, 89:22
**30(b)(1)** [3] - 72:10, 72:15, 74:11
**30(b)(6** [15] - 71:5, 71:20, 71:25, 72:5, 72:18, 72:25, 73:5, 73:10, 73:17, 77:23, 87:21, 88:2, 88:18, 89:10, 89:22
**308** [10] - 8:12, 10:1, 34:25, 35:3, 35:6, 35:10, 40:24, 40:25, 41:2, 46:8
**314** [1] - 40:14
**32** [2] - 117:3, 117:21
**3200** [1] - 2:15
**339-8400** [1] - 3:3
**339-8500** [1] - 3:4
**37** [1] - 100:22
**38** [2] - 97:12, 97:13

**4**

**4** [12] - 14:8, 36:8, 49:20, 50:9, 92:2, 92:4, 92:25, 97:13, 97:22, 104:6, 105:8, 108:22
**41** [3] - 11:25, 12:3, 46:25
**472** [1] - 107:16
**494** [1] - 79:22

**5**

**5** [6] - 4:5, 14:22, 36:9, 50:22, 51:22, 105:25
**5.3** [1] - 120:10
**53** [1] - 15:3
**534-1100** [1] - 2:21
**534-1137** [1] - 2:21
**56(a)(2** [1] - 114:25
**584** [1] - 5:7

**6**

**6** [7] - 16:9, 51:11, 51:20, 52:7, 52:21, 98:12, 106:15
**610** [1] - 1:19
**612-2372** [1] - 2:16
**612-2499** [1] - 2:16
**614-7400** [1] - 3:8
**614-7401** [1] - 3:8
**615** [1] - 5:7
**650** [2] - 3:8, 3:8
**6:15-cv-00584-RWS-CMC** [1] - 1:7

**7**

**7** [5] - 18:9, 18:23, 53:2, 98:8, 107:10
**700** [4] - 49:16, 79:22, 92:18, 112:5
**705-7420** [2] - 2:5, 2:10
**71** [1] - 25:14
**75567** [1] - 1:20
**75702** [3] - 2:5, 2:9, 2:20
**777** [1] - 2:14
**780** [1] - 79:5

**8**

**8** [5] - 19:3, 19:8, 19:17, 53:22, 108:9
**888** [2] - 2:6, 2:10

**9**

**9** [11] - 7:12, 13:5, 19:22, 19:23, 40:1, 54:6, 94:5, 94:15, 94:17, 108:23, 123:5
**900** [1] - 2:20
**90017-5855** [1] - 2:15
**903** [5] - 1:20, 2:5, 2:10, 2:21, 2:21
**908-4400** [2] - 2:6, 2:10
**9353** [2] - 1:21, 125:11

**94025** [1] - 3:7
**99.9** [1] - 110:24
**9th** [1] - 115:17

**A**

**A&M** [1] - 12:6
**a.m** [2] - 48:12
**A.M** [1] - 1:9
**A[n** [1] - 55:15
**ability** [9] - 38:9, 79:6, 79:7, 79:9, 79:19, 80:9, 98:16, 99:5, 125:6
**able** [7] - 34:22, 45:17, 47:24, 72:22, 83:21, 86:23, 123:24
**above-titled** [1] - 125:5
**absolutely** [3] - 9:10, 45:5, 91:5
**abstract** [82] - 32:9, 49:7, 49:17, 49:21, 52:3, 52:19, 54:12, 54:17, 54:20, 54:22, 55:2, 55:16, 56:16, 56:25, 58:10, 59:25, 60:6, 61:23, 62:15, 63:10, 63:12, 64:16, 65:15, 67:5, 70:3, 74:22, 77:3, 79:11, 79:12, 79:16, 79:23, 80:1, 80:7, 81:3, 81:6, 82:4, 82:8, 82:15, 82:24, 83:7, 83:8, 83:22, 83:24, 84:7, 84:19, 85:24, 86:6, 86:12, 86:16, 86:23, 91:21, 92:1, 92:3, 92:5, 92:9, 92:14, 92:21, 92:23, 94:2, 94:6, 94:10, 94:14, 94:18, 94:22, 95:2, 95:15, 95:20, 96:2, 96:15, 96:23, 96:25, 98:20, 98:21, 98:24, 98:25, 99:7, 100:6, 100:8, 101:4, 101:11, 102:11
**abstract'** [1] - 57:10
**abstract's** [1] - 52:19
**abstracting** [4] - 21:5, 21:9, 24:8, 32:16
**Abstraction** [19] - 9:24, 30:18, 32:11, 32:15, 32:18, 32:25, 35:24, 36:13, 36:16, 36:22, 37:2, 39:5, 41:10, 41:17, 42:8, 43:12, 43:19, 43:20,

44:13
**abstracts** [59] - 24:4, 43:22, 49:12, 50:12, 50:14, 54:13, 55:14, 56:6, 56:10, 56:12, 57:6, 57:7, 57:9, 57:14, 58:3, 59:3, 59:5, 59:16, 59:19, 60:9, 60:16, 60:17, 60:18, 60:20, 61:13, 61:18, 61:22, 62:7, 62:13, 63:18, 64:8, 64:11, 65:2, 66:4, 67:2, 68:11, 68:14, 69:1, 69:16, 70:5, 74:16, 74:19, 74:23, 75:10, 75:15, 75:17, 76:6, 81:21, 81:22, 81:24, 83:5, 85:18, 86:1, 94:22, 95:1, 101:1, 102:8
**acaridis@orrick.com** [1] - 2:17
**access** [1] - 37:10
**accompanying** [1] - 33:5
**accuse** [3] - 15:12, 59:5, 67:14
**accused** [26] - 15:7, 47:19, 50:7, 50:12, 51:9, 51:19, 53:5, 53:12, 53:19, 53:22, 53:24, 55:7, 56:7, 61:22, 64:22, 66:7, 67:15, 68:4, 68:14, 76:3, 76:4, 105:3, 105:23, 111:9, 113:17, 114:6
**accuses** [2] - 19:6, 38:7
**accusing** [8] - 20:22, 108:2, 109:14, 110:23, 112:2, 116:6, 117:7, 122:21
**acknowledge** [2] - 123:8, 124:8
**Act** [7] - 8:7, 10:11, 28:1, 31:22, 32:23, 33:7, 34:3
**act** [1] - 10:20
**action** [5] - 41:14, 50:21, 64:3, 123:9, 123:13
**actionable** [6] - 8:9, 8:23, 10:10, 27:23, 27:24, 33:7
**Activities** [5] - 118:5, 118:9, 118:16, 119:5, 121:4
**activities** [1] - 27:4

**activity** [2] - 12:18, 33:6
**acts** [1] - 10:10
**actual** [7] - 7:14, 10:15, 31:21, 36:3, 70:5, 75:17, 108:10
**add** [1] - 78:20
**added** [3] - 86:22, 86:23, 98:3
**addition** [1] - 116:17
**additional** [1] - 86:18
**address** [7] - 20:14, 32:6, 33:19, 115:21, 116:25, 117:4, 121:22
**adequate** [1] - 115:16
**adjourned** [1] - 124:19
**Admission** [3] - 67:24, 68:17, 76:8
**admission** [27] - 20:10, 32:13, 38:13, 43:11, 52:24, 56:12, 60:22, 60:23, 62:1, 62:2, 62:17, 62:18, 62:24, 63:22, 65:4, 65:12, 65:21, 66:17, 77:9, 77:12, 77:17, 80:20, 87:5, 87:18, 94:12, 102:2
**admissions** [54] - 13:14, 43:10, 49:6, 50:24, 54:2, 54:3, 57:25, 58:5, 58:18, 58:21, 59:8, 59:14, 59:15, 61:15, 61:25, 62:9, 62:10, 62:20, 62:21, 63:1, 63:2, 63:3, 63:5, 63:17, 63:23, 64:3, 64:5, 65:19, 65:24, 66:1, 66:3, 66:9, 66:12, 69:25, 70:18, 70:23, 71:2, 71:23, 74:14, 75:9, 76:14, 76:16, 93:17, 93:24, 95:11, 95:23, 96:7, 96:10, 102:1, 102:6, 106:19, 106:23
**admit** [4] - 36:21, 43:15, 64:24, 69:1
**admits** [3] - 20:20, 76:3, 80:18
**admitted** [18] - 7:14, 16:23, 20:18, 31:18, 32:17, 38:20, 49:12, 53:24, 54:12, 54:13, 58:2, 69:10, 70:13, 74:18, 76:5, 78:20, 95:20, 96:11
**admitting** [3] - 61:10,

74:15, 95:23
**adopted** [1] - 62:24
**adopting** [2] - 94:10, 94:20
**adopts** [1] - 22:4
**advertises** [1] - 38:8
**advertising** [1] - 33:4
**affairs** [1] - 90:1
**affiliates** [1] - 123:12
**affirmatively** [1] - 74:20
**agent** [8] - 72:6, 72:9, 72:13, 72:21, 74:5, 74:10, 74:15
**agent'** [1] - 73:25
**aggregation** [1] - 110:3
**agree** [2] - 43:1, 81:10
**agreed** [1] - 8:12
**agreeing** [1] - 60:8
**agreement** [30] - 44:18, 104:13, 104:18, 104:20, 105:2, 105:5, 105:22, 105:24, 106:5, 106:10, 108:10, 108:24, 109:18, 110:1, 110:15, 111:6, 111:23, 117:8, 118:6, 119:10, 119:13, 120:9, 120:24, 121:13, 121:15, 122:12, 123:5, 123:15, 123:19
**agreements** [1] - 109:20
**agrees** [8] - 12:25, 55:4, 55:13, 61:19, 61:21, 77:25, 116:10
**ahead** [2] - 6:25, 83:17
**aim** [1] - 13:7
**aiming** [1] - 10:12
**akin** [1] - 36:17
**algorithms** [1] - 50:4
**ALL** [2] - 5:3, 124:17
**allegation** [1] - 28:4
**allegations** [1] - 26:13
**allege** [2] - 33:16
**allegedly** [1] - 14:25
**Allied** [1] - 66:22
**allow** [4] - 39:19, 40:7, 41:21, 76:12
**allowable** [1] - 59:11
**almost** [1] - 44:5
**alone** [4] - 8:6, 86:17, 98:21, 99:7
**alternative** [4] - 13:4, 96:5, 104:21, 119:7

**Alyssa** [2] - 2:13, 5:17
**amend** [6] - 12:5, 12:8, 35:12, 47:3, 47:5, 101:18
**amended** [3] - 40:2, 47:6, 58:8
**American** [2] - 30:2, 73:23
**AMIMD** [3] - 86:22, 92:16, 98:1
**AMIMIDs** [3] - 92:6, 92:10, 92:11
**amount** [2] - 22:20, 35:10, 102:5
**analogous** [1] - 70:8
**analogy** [1] - 67:11
**analysis** [4] - 87:15, 107:13, 117:5, 117:19
**analyzing** [2] - 21:18, 50:5
**Anderson** [15] - 2:8, 5:12, 41:23, 45:16, 46:24, 91:22, 92:6, 92:15, 97:5, 97:18, 100:16, 100:21, 101:1, 101:22, 102:16
**ANDERSON** [33] - 34:13, 34:17, 35:20, 35:22, 36:8, 36:11, 39:2, 47:11, 76:21, 78:18, 79:3, 79:15, 81:18, 82:14, 83:13, 83:15, 83:18, 84:13, 84:15, 88:14, 88:17, 89:11, 89:20, 90:24, 91:5, 97:6, 97:19, 97:21, 97:25, 98:14, 102:17, 102:24, 123:8
**Anderson's** [3] - 93:18, 93:25, 95:7
**Android** [6] - 105:14, 111:11, 112:9, 112:18, 114:1, 116:22
**android** [1] - 105:16
**ANGELES** [1] - 2:14
**Angeles** [1] - 2:15
**announcements** [1] - 5:9
**answer** [17] - 11:7, 31:25, 37:5, 39:12, 39:13, 43:14, 44:16, 46:19, 64:12, 64:13, 71:6, 86:8, 89:17, 90:7, 90:15, 94:21, 114:12
**answered** [1] - 82:13,

90:13, 90:14
**answers** [6] - 80:7, 89:5, 89:19, 90:6, 90:22, 101:18
**anticipate** [9] - 59:25, 60:2, 65:15, 79:8, 80:10, 84:19, 84:24, 85:6, 95:15
**anticipated** [1] - 85:5
**anticipates** [1] - 95:17
**anticipation** [5] - 60:4, 66:24, 67:2, 84:25, 85:3
**anyway** [2] - 22:4, 44:21
**apologies** [1] - 7:8
**apologize** [5] - 5:23, 13:19, 78:18, 97:9, 98:11
**appeal** [1] - 67:20
**appealed** [1] - 67:18
**APPEARANCES** [1] - 2:1
**Appearances............. ...........................** [1] - 4:4
**Apple** [5] - 105:15, 108:12, 111:1, 120:20, 122:19
**appliance** [1] - 50:4
**applicable** [1] - 99:16
**application** [8] - 19:16, 19:24, 20:6, 22:16, 23:13, 24:3, 29:5, 55:6
**applications** [4] - 23:1, 29:10, 51:25, 55:9
**applied** [2] - 67:24, 110:11
**applies** [3] - 39:16, 41:2, 118:6
**apply** [3] - 59:13, 68:17, 107:18
**applying** [1] - 76:8
**appreciate** [1] - 124:18
**apprised** [1] - 20:25
**approach** [6] - 9:8, 17:16, 29:13, 48:19, 69:13, 103:11
**approached** [1] - 15:21
**appropriate** [8] - 14:3, 25:4, 29:22, 40:11, 40:16, 63:5, 97:3, 102:12
**architect** [1] - 58:19
**areas** [1] - 5:24
**argued** [1] - 35:1

arguing [2] - 17:25, 121:7
argument [21] - 5:18, 7:23, 8:22, 9:16, 29:20, 65:8, 69:24, 75:3, 77:2, 77:21, 91:24, 93:18, 95:9, 95:25, 101:11, 103:21, 106:6, 106:7, 106:12, 119:7, 121:16
arguments [7] - 54:24, 93:8, 94:8, 94:25, 95:7, 104:15, 104:19
arose [1] - 30:11
art [22] - 10:11, 15:4, 15:20, 19:4, 21:12, 22:15, 22:21, 23:7, 46:8, 46:10, 55:6, 58:23, 59:2, 59:9, 60:25, 64:21, 64:22, 66:17, 67:3, 67:13, 71:9, 86:5
article [1] - 27:21
articulate [1] - 67:23
artists [1] - 98:6
aside [1] - 103:16
aspect [1] - 29:21
assert [5] - 40:6, 40:7, 45:1, 64:7, 64:19
asserted [18] - 13:6, 29:17, 40:1, 40:3, 49:8, 49:10, 49:18, 56:13, 58:3, 58:14, 69:12, 76:4, 109:24, 111:13, 113:24, 117:3, 117:6, 117:21
assertions [1] - 26:9
assessing [1] - 26:15
assume [1] - 96:7
assuming [1] - 90:3
attached [3] - 37:16, 83:2, 98:2
attempt [3] - 64:25, 75:21, 86:14
attempting [3] - 12:2, 91:24, 101:13
attempts [1] - 74:7
attention [4] - 47:15, 69:5, 93:23, 106:18
attorney [9] - 69:24, 75:3, 89:21, 91:23, 93:8, 93:17, 95:8, 95:25, 101:15
attorneys [1] - 88:19
AUDIBLE [1] - 1:6
Audible [169] - 5:6, 5:15, 7:12, 8:10, 9:1, 9:13, 9:17, 9:19, 10:1, 10:7, 10:17,

10:19, 10:22, 12:25, 13:10, 13:25, 14:2, 14:18, 14:23, 15:1, 15:2, 15:7, 15:9, 16:13, 21:25, 23:4, 23:15, 23:24, 25:2, 25:15, 25:17, 25:20, 26:3, 26:5, 27:12, 27:15, 31:20, 32:2, 33:19, 34:18, 34:21, 35:4, 35:5, 35:13, 35:16, 36:1, 36:3, 37:8, 37:13, 37:16, 37:19, 37:23, 38:7, 38:9, 38:20, 39:11, 39:15, 39:21, 40:19, 41:12, 42:23, 44:25, 46:9, 47:17, 48:4, 48:22, 48:25, 49:10, 49:11, 49:13, 49:25, 50:9, 50:16, 50:17, 51:12, 52:25, 53:3, 53:5, 54:3, 55:22, 59:2, 59:8, 60:24, 61:12, 61:15, 61:16, 62:8, 64:21, 65:5, 66:6, 67:4, 68:10, 68:19, 69:6, 70:2, 71:9, 75:24, 76:6, 76:17, 76:24, 82:3, 82:19, 83:20, 84:10, 85:17, 86:8, 87:15, 87:16, 87:23, 88:1, 88:6, 90:12, 91:9, 92:4, 97:1, 97:10, 97:22, 97:25, 98:4, 98:9, 98:16, 99:15, 101:23, 102:6, 104:19, 105:2, 105:6, 105:9, 105:10, 105:19, 105:22, 106:3, 108:2, 110:22, 110:25, 111:8, 111:12, 111:15, 111:18, 112:8, 112:11, 112:14, 112:19, 112:23, 113:4, 113:6, 113:17, 113:23, 114:4, 114:6, 114:14, 114:24, 115:1, 115:5, 115:6, 116:3, 116:10, 116:13, 116:16, 116:19, 116:23, 118:7, 118:13, 119:1, 119:9, 119:11, 120:19, 121:4, 122:10
audio [9] - 15:22,

16:20, 19:11, 21:16, 28:10, 49:23, 50:3, 112:17
AUGUST [2] - 1:8, 4:2
August [1] - 18:9
Austin [2] - 63:1, 63:3
authority [1] - 66:21
automatically [1] - 120:21
available [2] - 42:13, 42:15
Avenue [1] - 2:19
aversion [1] - 100:24
avoid [14] - 59:8, 64:21, 66:6, 66:24, 67:2, 68:3, 71:8, 75:19, 75:22, 93:2, 95:4, 101:13, 118:25, 119:3
awarded [1] - 40:23
aware [3] - 15:5, 15:6, 80:6

# B

background [3] - 30:14, 103:23, 104:16
BAILIFF [7] - 5:1, 48:10, 48:13, 48:15, 103:5, 103:8, 124:20
bar [1] - 76:24
Based [1] - 51:5
based [14] - 16:7, 20:4, 25:19, 27:12, 30:6, 30:9, 54:24, 55:16, 62:12, 64:3, 76:15, 94:8, 94:18, 102:20
basic [5] - 14:16, 37:3, 51:24, 106:16, 106:17
basis [3] - 63:19, 84:25, 96:5
BDS [1] - 15:25
bear [1] - 102:9
bearing [2] - 23:4, 23:7
became [3] - 10:9, 11:2, 15:9
become [3] - 18:14, 53:20
becomes [1] - 87:2
BEFORE [1] - 1:12
began [2] - 16:1, 81:25
begin [1] - 34:19
beginning [4] - 9:23, 39:14, 40:2, 109:2
begins [1] - 97:22

begs [1] - 121:6
behalf [2] - 5:12, 5:15
behavior [1] - 27:7
believes [2] - 40:22, 60:14
below [3] - 67:11, 97:23, 98:1
beneficiary [3] - 104:22, 119:12, 121:11
benefit [2] - 119:16, 121:14
benefits [2] - 28:8, 29:12
berry [7] - 10:22, 25:10, 33:14, 61:9, 61:20, 70:1, 85:13
Berry [4] - 25:16, 33:15, 61:2, 85:17
Berry's [1] - 85:10
best [5] - 63:13, 114:12, 124:10, 124:15, 125:6
bet [1] - 63:24
better [3] - 7:6, 24:5, 103:24
between [15] - 10:18, 21:12, 71:11, 71:15, 79:7, 79:20, 82:2, 88:2, 88:13, 98:5, 98:17, 99:6, 105:2, 108:24, 109:16
beyond [5] - 15:19, 40:10, 69:23, 73:17, 75:12
big [3] - 46:7, 46:13, 46:23
biggest [1] - 28:18
bind [5] - 60:25, 70:5, 71:3, 75:19, 93:2
binding [1] - 58:6, 63:2, 72:11, 72:17, 73:5, 73:9, 74:24, 77:23, 87:24, 88:22, 95:11
bit [7] - 9:14, 15:18, 18:25, 22:6, 59:21, 65:11, 109:2
bite [1] - 99:11
bites [3] - 78:7, 80:13, 100:15
black [2] - 77:11, 99:23
Bless [1] - 35:20
blind [1] - 80:22
block [1] - 114:24
Blue [202] - 5:6, 5:12, 7:18, 8:8, 8:13, 8:18, 8:25, 9:23, 10:5, 10:23, 11:4, 11:10,

12:21, 12:24, 14:14, 14:16, 14:23, 14:24, 15:15, 17:9, 17:24, 19:9, 19:13, 22:16, 23:14, 25:16, 27:11, 27:17, 30:22, 30:23, 32:8, 32:19, 34:3, 34:20, 34:21, 34:24, 35:2, 35:4, 35:18, 35:22, 36:1, 36:11, 36:14, 36:17, 36:20, 37:5, 37:11, 37:12, 37:16, 37:18, 37:25, 38:2, 38:3, 38:4, 38:5, 38:6, 38:7, 38:14, 38:19, 39:14, 39:18, 40:10, 40:13, 40:18, 40:19, 40:22, 41:4, 41:15, 41:19, 41:21, 42:7, 43:19, 45:10, 46:14, 47:12, 47:16, 47:22, 48:23, 49:5, 49:11, 49:15, 50:11, 50:21, 51:23, 52:18, 52:21, 53:3, 53:7, 53:12, 54:4, 54:8, 54:10, 55:11, 56:8, 58:4, 58:7, 58:15, 58:16, 58:24, 59:14, 59:18, 59:21, 59:23, 60:1, 60:4, 60:7, 60:8, 61:3, 62:2, 62:15, 63:11, 63:18, 66:3, 67:1, 68:6, 69:2, 70:4, 70:21, 70:24, 71:12, 71:18, 71:25, 72:17, 73:19, 73:21, 74:4, 74:7, 74:21, 75:1, 75:4, 75:11, 76:5, 77:21, 77:24, 77:25, 78:21, 81:19, 81:21, 82:10, 83:3, 83:4, 83:25, 84:15, 86:13, 86:14, 86:19, 86:24, 89:12, 91:20, 92:5, 94:24, 96:21, 97:7, 97:10, 98:19, 98:25, 100:10, 104:4, 104:5, 104:7, 105:2, 105:7, 105:25, 106:12, 106:19, 107:12, 108:1, 108:18, 108:24, 109:13, 109:16, 110:22, 111:9, 112:2, 112:7, 112:22, 113:6, 113:15, 114:1, 114:5, 114:8, 115:3, 115:13, 116:5,

116:10, 116:25,
117:14, 117:17,
118:3, 118:19,
118:24, 119:2,
119:3, 119:19,
122:1, 122:4, 122:7,
122:20, 123:12
**blue** [1] - 105:10
**BLUE** [1] - 1:3
**Blum** [4] - 17:6, 29:11,
53:11, 53:13
**bluntly** [1] - 31:9
**body** [1] - 51:6
**boils** [1] - 104:1
**bolded** [1] - 110:23
**bottom** [5] - 64:14,
94:16, 113:10,
116:20, 123:4
**bound** [2] - 59:15,
74:3
**box** [1] - 105:10
**Brazier** [1] - 42:12
**breadth** [1] - 76:15
**break** [4] - 102:21,
102:22, 102:25,
109:1
**brief** [5] - 17:24,
22:13, 36:15, 42:2,
106:15
**briefing** [19] - 7:2,
7:10, 12:2, 34:25,
35:17, 38:3, 38:5,
38:11, 38:19, 77:10,
78:21, 78:22, 79:2,
79:4, 83:16, 99:14,
113:5, 115:19,
121:18
**briefings** [2] - 34:7,
120:7
**briefly** [9] - 33:11,
91:16, 97:6, 99:18,
108:11, 110:19,
119:7, 121:21, 123:3
**briefs** [1] - 15:3
**brightness** [1] - 17:18
**bring** [4] - 33:17,
106:18, 121:18,
123:20
**bringing** [1] - 8:3
**broad** [8] - 16:5,
21:14, 36:23, 37:4,
49:20, 51:15, 104:8,
109:18
**broader** [1] - 110:12
**broadly** [1] - 68:4
**brought** [3] - 33:15,
38:24, 80:11
**build** [4] - 34:4, 36:17,
36:18, 38:9
**builder** [3] - 34:4,

36:17, 38:8
**built** [4] - 32:19, 34:5,
39:10, 51:25
**bulk** [1] - 13:20
**bunch** [1] - 15:20
**burden** [2] - 8:6, 75:11
**burdening** [1] - 44:24
**business** [9] - 14:11,
16:2, 19:1, 22:10,
24:15, 25:9, 120:16,
120:24, 124:1
**buy** [1] - 30:19

# C

**cake** [1] - 35:15
**California** [3] - 2:15,
3:7, 29:1
**candor** [1] - 67:22
**cannot** [9] - 49:13,
65:5, 68:3, 68:10,
68:14, 70:4, 76:7,
98:21, 121:7
**capable** [1] - 98:9
**capsulate** [1] - 85:20
**Caridis** [4] - 2:13,
5:17, 37:13, 42:11
**CAROLINE** [1] - 1:12
**carrying** [1] - 67:10
**case** [98] - 5:5, 5:22,
9:23, 10:8, 10:25,
11:9, 11:19, 12:17,
12:19, 13:23, 15:8,
15:12, 15:22, 17:25,
18:1, 19:7, 19:14,
20:9, 20:22, 23:17,
26:22, 30:2, 30:3,
31:8, 34:23, 35:11,
39:19, 40:12, 41:8,
42:5, 43:5, 44:14,
45:22, 46:8, 46:24,
46:25, 47:8, 49:9,
54:9, 54:18, 58:25,
59:14, 61:23, 62:19,
63:15, 66:2, 66:7,
66:20, 67:8, 67:9,
67:12, 67:21, 68:14,
68:21, 68:22, 69:10,
69:17, 69:24, 70:8,
70:9, 70:10, 70:11,
70:20, 72:16, 73:22,
75:8, 75:20, 76:10,
76:11, 76:15, 77:19,
80:10, 87:6, 87:24,
90:6, 91:23, 92:17,
93:10, 93:15, 95:11,
96:10, 97:2, 99:18,
99:20, 101:22,
101:23, 102:5,
102:13, 105:23,

106:5, 106:21,
106:24, 111:14,
115:7
**CASE** [1] - 1:6
**Case** [1] - 5:7
**cases** [12] - 12:1, 12:5,
62:22, 62:25, 67:23,
68:1, 69:4, 74:2,
74:8, 77:9, 87:24,
99:15
**Cassidy** [3] - 21:2,
21:6
**CAT** [1] - 1:25
**category** [1] - 62:17
**caucus** [1] - 42:23
**caused** [1] - 34:8
**CBR** [3] - 25:18, 26:5
**Cedar** [1] - 1:19
**center** [1] - 68:18
**Center** [1] - 3:2
**centered** [1] - 91:7
**central** [1] - 68:18
**century** [4] - 24:7,
30:24, 31:2, 31:15
**Cepstral** [2] - 50:2,
50:10
**certain** [7] - 30:7,
108:14, 108:15,
108:17, 110:14,
115:9, 116:1
**certainly** [5] - 56:20,
58:18, 63:13, 90:10,
110:6
**Certificate** [1] - 4:6
**CERTIFICATION** [1] -
125:1
**CERTIFY** [1] - 125:3
**cetera** [2] - 92:13
**chain** [1] - 61:15
**challenge** [2] - 23:15,
27:12, 27:13
**change** [4] - 91:25,
93:3, 93:4, 101:19
**changes** [1] - 124:12
**changing** [3] - 86:25,
92:8, 98:25
**characteristics** [2] -
16:7, 79:17
**chiggins@orrick.**
**com** [1] - 3:4
**choice** [3] - 65:1,
107:1, 107:4
**chonea@ghiplaw.**
**com** [1] - 2:6
**choose** [1] - 6:7
**Christopher** [4] - 2:3,
3:1, 5:11, 5:16
**chronology** [4] -
13:21, 14:9, 26:7,
26:11

**circuit** [1] - 29:24
**Circuit** [14] - 62:19,
62:24, 65:21, 66:20,
66:21, 67:8, 67:9,
67:18, 67:21, 67:25,
68:1, 70:17, 106:22,
110:16
**circumstances** [1] -
121:8
**citations** [1] - 115:22
**cite** [3] - 7:13, 27:7,
78:16
**cited** [5] - 12:1, 22:15,
29:24, 67:16, 112:23
**cites** [4] - 40:13,
46:24, 83:3, 99:15
**citing** [1] - 87:23
**Civil** [1] - 73:8
**Claim** [6] - 13:5,
49:14, 49:16, 92:19,
107:19, 112:5
**claim** [108] - 8:4,
11:21, 11:22, 12:3,
12:20, 12:23, 13:5,
13:6, 27:13, 27:15,
27:19, 29:20, 29:21,
30:6, 30:9, 33:8,
33:12, 34:22, 34:25,
35:1, 38:2, 38:5,
38:12, 39:20, 39:23,
40:1, 40:3, 40:6,
40:8, 40:9, 40:20,
41:4, 41:22, 43:2,
45:2, 45:6, 46:5,
47:4, 49:8, 49:15,
49:18, 49:24, 54:23,
54:25, 55:2, 56:17,
56:19, 56:21, 56:23,
57:1, 57:4, 57:8,
57:9, 58:16, 61:7,
63:15, 64:1, 64:4,
68:3, 68:22, 68:24,
79:19, 80:3, 80:5,
81:6, 84:23, 84:25,
85:16, 86:18, 90:13,
94:2, 94:7, 94:11,
94:13, 94:20, 94:21,
95:18, 101:2,
104:17, 107:10,
107:12, 107:15,
107:20, 107:25,
108:6, 109:10,
109:11, 109:12,
110:14, 111:21,
111:23, 112:12,
113:24, 114:14,
114:15, 114:16,
115:19, 117:3,
117:6, 117:12,
117:15, 117:18

**claim-by-claim** [2] -
84:25, 117:18
**claimant** [1] - 9:13
**claimed** [2] - 16:6,
24:8
**claims** [34] - 14:7,
15:14, 16:5, 30:21,
34:3, 50:21, 60:6,
67:14, 67:25, 69:12,
70:19, 76:5, 77:3,
80:11, 82:2, 82:8,
86:16, 86:24, 87:16,
90:20, 92:18, 92:20,
98:22, 100:7, 101:7,
101:8, 101:10,
111:13, 112:21,
116:1, 117:19,
117:21, 117:23,
118:1
**clarified** [3] - 83:7,
83:10, 83:11
**clarify** [2] - 43:3, 89:21
**clarity** [2] - 11:14,
95:12
**clause** [9] - 118:5,
118:7, 118:17,
120:10, 121:23,
121:25, 122:4,
122:25, 123:4
**clear** [49] - 7:11, 11:7,
11:14, 13:14, 14:24,
18:14, 21:23, 24:3,
24:12, 27:2, 42:21,
45:5, 47:22, 47:24,
53:9, 53:21, 56:14,
62:9, 63:23, 64:18,
65:13, 65:18, 65:24,
71:15, 72:3, 76:14,
77:15, 78:8, 79:22,
83:19, 85:8, 86:11,
86:15, 87:2, 88:7,
91:9, 93:17, 102:6,
103:25, 106:11,
106:21, 106:22,
108:16, 110:7,
112:7, 119:16,
121:12, 121:15
**clearly** [6] - 21:23,
41:2, 58:2, 118:25,
120:11, 122:18
**client** [12] - 11:11,
17:17, 17:21, 25:2,
26:2, 28:25, 41:3,
41:5, 41:6, 41:11,
46:3, 46:18
**clients** [1] - 124:13
**clip** [1] - 5:25
**close** [1] - 116:12
**closed** [3] - 95:3,
115:21, 115:24

**closest** [1] - 33:21

**co** [9] - 10:22, 54:10, 58:14, 61:3, 61:20, 68:9, 69:10, 69:14, 85:20

**co-inventor** [8] - 10:22, 58:14, 61:3, 61:20, 68:9, 69:10, 69:14, 85:20

**co-inventors** [1] - 54:10

**code** [30] - 10:21, 12:14, 36:22, 37:3, 37:6, 37:10, 37:12, 37:15, 37:18, 37:20, 37:22, 39:7, 42:7, 42:8, 42:12, 42:19, 42:20, 42:21, 43:11, 43:15, 43:16, 44:7, 44:8, 44:9, 47:18, 47:23, 51:3, 51:6, 51:7

**code's** [1] - 42:15

**Coefficient** [1] - 50:10

**Coefficients** [1] - 50:2

**coincide** [1] - 91:1

**coined** [4] - 58:9, 58:14, 63:12, 69:3

**coining** [1] - 54:11

**coinventor** [1] - 25:9

**College** [1] - 2:19

**color** [1] - 80:21

**Colorado** [2] - 30:1, 70:10

**Columbia** [1] - 3:2

**combination** [3] - 93:6, 102:2, 110:2

**combination... whether** [1] - 109:4

**combined** [32] - 92:10, 105:4, 105:12, 105:19, 105:21, 106:3, 106:9, 106:13, 109:15, 112:3, 113:17, 113:18, 114:7, 114:21, 115:10, 116:6, 116:16, 117:7, 117:9, 117:16, 118:10, 118:14, 119:10, 119:15, 119:18, 121:5, 121:6, 122:11, 122:17, 122:23, 123:21

**combines** [2] - 115:1, 122:5

**coming** [2] - 42:19, 112:17

**comment** [1] - 42:17

**comments** [1] - 64:2

**commercial** [3] - 14:13, 16:25, 32:1

**common** [9] - 8:17, 27:13, 27:14, 27:18, 27:25, 28:1, 29:16, 29:20, 30:8

**community** [1] - 31:7

**companies** [14] - 15:21, 16:3, 21:5, 22:24, 24:11, 24:13, 25:22, 25:25, 28:13, 28:23, 31:19, 122:22, 123:14, 123:18

**Company** [2] - 30:2, 118:22

**company** [18] - 15:8, 20:24, 45:18, 72:17, 72:22, 73:6, 73:11, 88:23, 89:2, 89:6, 89:7, 89:8, 90:2, 90:4, 90:8, 108:11, 111:4, 113:13

**compare** [3] - 39:17, 64:11, 113:1

**compared** [1] - 83:23

**comparing** [2] - 64:11, 116:13

**comparison** [1] - 112:1

**compensates** [1] - 6:1

**competence** [1] - 63:7

**competing** [1] - 101:24

**competition** [5] - 8:16, 8:18, 8:19, 8:25, 32:23

**competitive** [1] - 10:24

**complained** [1] - 117:2

**complaint** [8] - 12:8, 47:6, 54:11, 58:8, 58:11, 63:11, 69:2

**complaints** [1] - 40:2

**complete** [2] - 15:3, 121:18

**completed** [3] - 113:6, 115:19, 118:22

**complicated** [1] - 44:15

**compliment** [1] - 21:10

**component** [2] - 63:22, 113:14

**components** [3] - 110:21, 112:11, 115:9

**computation** [1] -

**comment** — 56:1

**computer** [4] - 41:7, 111:17, 113:19, 120:20

**computers** [5] - 105:13, 105:18, 111:15, 113:3, 113:12

**computing** [1] - 111:3

**concede** [1] - 65:1

**conceded** [3] - 10:4, 15:15, 95:4

**conceived** [2] - 19:18, 20:1

**conception** [2] - 19:13, 20:9

**concepts** [2] - 22:4, 22:20

**concern** [1] - 31:8

**conclude** [4] - 9:6, 33:2, 61:14, 76:2

**concludes** [3] - 55:25, 56:1, 124:5

**conclusion** [2] - 26:15, 84:21

**conclusive** [2] - 62:11, 77:17

**concrete** [2] - 43:4, 81:4

**conditions** [1] - 40:17

**conduct** [8] - 7:13, 14:23, 15:10, 23:10, 23:24, 26:20, 33:12, 34:2

**confers** [1] - 35:9

**confidential** [14] - 17:23, 18:5, 18:18, 28:5, 29:6, 29:7, 29:8, 29:14, 29:18, 29:19, 30:7, 30:10, 30:12, 33:13

**confidentiality** [2] - 18:1, 29:25

**confirmation** [1] - 45:8

**conflict** [3] - 91:1, 99:4, 99:11

**conflicting** [7] - 11:2, 35:23, 44:4, 45:10, 45:25, 46:6, 46:16

**confused** [7] - 35:17, 37:24, 38:12, 38:16, 39:15, 39:25, 81:16

**confusing** [2] - 44:21, 85:1

**confusion** [8] - 31:20, 31:21, 31:23, 31:24, 32:5, 57:18, 57:25

**conjunction** [1] - 40:24

**Connell** [2] - 67:7, 67:11

**consequence** [1] - 65:3

**consequences** [1] - 65:2

**consider** [3] - 12:4, 90:21, 90:25

**considerable** [1] - 35:10

**considered** [1] - 77:8

**consistent** [4] - 76:16, 82:9, 83:9, 123:23

**constitute** [2] - 49:7, 61:25

**constitutes** [2] - 32:22, 114:6

**construction** [33] - 34:25, 35:1, 35:2, 38:2, 38:5, 40:8, 41:4, 47:14, 49:24, 54:24, 54:25, 55:2, 56:17, 56:19, 56:22, 56:24, 57:1, 57:8, 57:9, 58:16, 63:15, 64:1, 64:4, 68:25, 80:3, 80:5, 81:7, 94:2, 94:8, 94:11, 94:14, 94:20, 94:21

**construction...and** [1] - 57:4

**constructions** [2] - 68:22, 108:6

**construed** [4] - 40:9, 68:3, 68:4, 110:16

**consuming** [1] - 31:25

**containing** [5] - 59:25, 61:7, 65:14, 84:18, 85:15

**contemplated** [2] - 120:14, 123:23

**contemplates** [1] - 120:11

**contemplation** [1] - 121:9

**contend** [1] - 54:17

**contends** [3] - 10:1, 22:1, 49:11

**Content** [2] - 51:5, 112:23

**content** [4] - 16:7, 25:19, 51:16

**content-based** [1] - 25:19

**contention** [7] - 23:4, 30:10, 54:16, 110:7, 114:8, 114:19, 115:25

**contentions** [16] - 49:16, 106:2,

**106:19, 106:22, 106:23, 108:2, 112:8, 113:16, 114:5, 115:7, 115:9, 115:14, 115:16, 115:18, 115:23, 115:24**

**context** [18] - 66:9, 78:9, 78:13, 80:14, 80:15, 81:23, 82:11, 82:21, 84:8, 85:13, 87:2, 87:9, 88:6, 88:19, 99:2, 99:3, 99:9, 99:11

**continually** [1] - 38:20

**continue** [1] - 89:23

**Continued** [1] - 2:25

**continues** [1] - 98:6

**contract** [3] - 30:9, 107:1, 107:5

**contractor** [1] - 61:10

**contractual** [1] - 29:25

**contradict** [1] - 96:17

**contradictory** [1] - 26:9

**contrary** [5] - 62:4, 63:18, 69:20, 75:4, 83:4

**contribute** [1] - 106:13

**contributed** [1] - 23:19

**contributes** [1] - 104:9

**control** [1] - 122:8

**controlling** [1] - 107:2

**controls** [1] - 50:18

**conversation** [10] - 28:19, 29:4, 43:3, 44:16, 49:25, 76:12, 92:24, 96:11, 100:23

**convincing** [1] - 39:13

**copiously** [1] - 22:18

**copy** [1] - 36:5

**core** [4] - 48:25, 51:19, 53:14, 53:25

**corporate** [5] - 69:11, 73:9, 73:13, 73:24, 74:14

**CORPORATION** [1] - 1:7

**corporation** [3] - 72:4, 72:20, 73:25

**Corporation** [2] - 5:6, 104:5

**corporations** [1] - 108:12

**correct** [2] - 120:19, 125:4

**correction** [1] - 23:18

corresponding [1] - 27:14
correspondingly [1] - 49:9
corresponds [2] - 42:8, 51:18
Counsel [1] - 60:16
counsel [6] - 11:10, 12:25, 80:4, 90:4, 90:16, 99:18
counsel's [1] - 53:13
counted [1] - 101:4
counter [2] - 9:13, 106:6
counter-claimant [1] - 9:13
counter-intuitive [1] - 106:6
counterclaim [25] - 6:16, 7:16, 8:11, 8:15, 9:18, 9:20, 10:2, 10:8, 11:21, 12:1, 12:11, 12:15, 13:25, 23:25, 30:4, 32:6, 32:14, 34:19, 35:14, 40:18, 41:16, 41:18, 41:20, 44:22, 47:7
Counterclaim [2] - 7:12, 8:5
counterclaims [9] - 6:15, 10:17, 11:1, 13:11, 13:13, 14:19, 26:14, 46:11, 46:12
counterintuitive [1] - 120:23
couple [17] - 12:1, 12:12, 16:22, 18:25, 23:5, 24:1, 44:23, 50:23, 51:1, 69:4, 84:20, 85:11, 91:18, 91:19, 92:14, 99:19, 109:1
course [9] - 26:1, 39:17, 39:25, 45:11, 45:22, 56:18, 80:20, 85:1, 99:24
court [6] - 7:5, 62:1, 67:16, 67:25, 79:13, 79:15
COURT [77] - 1:1, 1:17, 5:2, 5:4, 5:13, 5:19, 6:23, 7:4, 7:23, 9:5, 9:7, 9:10, 16:14, 33:10, 34:10, 34:12, 34:16, 35:19, 35:21, 36:6, 36:10, 39:1, 41:23, 42:1, 47:9, 48:3, 48:7, 48:14, 48:16, 48:18, 49:3,

52:6, 52:9, 52:13, 52:15, 76:20, 78:15, 79:1, 79:13, 81:9, 82:12, 83:10, 83:14, 83:17, 84:12, 84:14, 88:9, 88:16, 89:7, 89:17, 90:23, 91:3, 91:13, 91:17, 97:4, 97:17, 97:20, 97:24, 98:13, 100:16, 100:19, 102:15, 102:18, 103:2, 103:10, 103:12, 103:19, 107:6, 119:21, 119:24, 120:4, 121:20, 123:2, 123:7, 124:2, 124:4, 124:18
Court [47] - 1:17, 1:18, 4:6, 5:8, 9:15, 12:4, 13:3, 15:22, 17:11, 23:17, 30:16, 38:25, 40:15, 40:17, 41:20, 47:5, 47:25, 48:15, 49:24, 57:7, 58:4, 59:13, 63:2, 65:25, 66:14, 67:11, 68:16, 69:21, 70:15, 75:5, 77:7, 78:16, 80:13, 80:25, 81:14, 83:11, 90:20, 96:8, 97:2, 97:16, 103:8, 107:4, 110:5, 110:9, 110:11, 124:5, 124:7
court's [2] - 67:20, 94:10
Court's [12] - 6:19, 47:15, 49:4, 56:17, 57:1, 63:25, 64:4, 69:5, 80:3, 94:13, 100:21, 106:18
courtroom [3] - 7:7, 42:16, 124:7
Courts [2] - 77:11, 109:21
courts [3] - 62:25, 73:22, 110:17
cover [7] - 20:8, 61:5, 70:14, 85:14, 86:5, 110:24, 112:20
covered [6] - 34:14, 85:23, 99:14, 104:12, 111:6, 112:3
covers [2] - 111:3, 111:6
CRAFT [1] - 2:19
craft [3] - 40:17, 56:22, 58:15
crafted [2] - 68:21, 68:22

CRAVEN [1] - 1:12
create [6] - 29:25, 43:21, 56:11, 85:22, 99:5, 120:24
created [11] - 10:14, 14:12, 24:7, 31:13, 35:2, 44:4, 51:2, 51:10, 52:17, 53:23, 73:10
creates [4] - 31:20, 52:4, 53:9, 105:20
creating [6] - 15:23, 17:19, 21:9, 56:5, 61:6, 85:15
creation [1] - 55:22
credibility [4] - 13:12, 14:5, 26:11, 26:16
credibility-specific [1] - 14:5
criteria [1] - 77:7
CSR [2] - 1:17, 1:21
cue [1] - 96:12
cure [1] - 40:17
cursory [3] - 65:8, 69:22, 102:2
custom [1] - 38:8
customer [2] - 50:19, 117:4
customers [7] - 104:6, 104:7, 105:6, 108:20, 120:16, 120:17
customers' [1] - 105:3
CV [1] - 5:7
Cyanamid [1] - 30:2

D

damages [2] - 11:21, 114:16
data [5] - 20:4, 41:2, 41:6, 60:19, 86:21
data-reduced [1] - 60:19
database [10] - 15:24, 18:16, 29:9, 107:23, 111:16, 112:22, 112:24, 112:25, 113:3, 113:15
databases [1] - 113:9
DataBlade [1] - 17:1
Date [2] - 125:10, 125:11
date [4] - 15:20, 19:12, 19:16, 20:9
dated [1] - 79:16
Davis [5] - 69:8, 69:21, 69:24, 96:10, 101:25
days [6] - 16:22, 35:6, 56:18, 71:12, 78:2,

80:21
DC [2] - 3:1, 3:3
deal [3] - 22:7, 51:15, 119:20
dealing [1] - 81:2
decade [1] - 37:7
deceive [5] - 15:16, 23:8, 24:25, 26:7, 26:25
December [3] - 24:3, 31:1, 71:22
deceptive [2] - 26:23, 27:6
decided [6] - 64:13, 87:20, 104:3, 104:13, 105:1, 118:13
decidedly [1] - 67:2
deciding [1] - 64:23
decision [6] - 64:23, 64:24, 66:6, 70:9, 76:23, 104:1
declaration [4] - 65:9, 93:20, 99:20, 100:4
declarations [1] - 101:24
deemed [2] - 33:21, 96:6
deep [1] - 94:9
DEFENDANT [1] - 2:12
defendant [5] - 1:9, 5:15, 12:15, 33:3, 70:15
defendant's [3] - 6:13, 6:15, 69:13
Defendant's [1] - 38:23
defendants [4] - 6:7, 9:12, 31:5, 50:19
defending [1] - 40:24
defensive [1] - 22:7
defined [3] - 105:4, 105:21, 117:13
defined...I'll [1] - 57:10
definitely [1] - 59:2
definition [19] - 56:25, 57:3, 79:12, 80:25, 81:5, 81:11, 83:25, 85:2, 104:2, 106:4, 106:9, 106:14, 109:1, 109:15, 117:10, 118:20, 119:15, 122:12, 122:15
definition's [1] - 122:17
definitions [1] - 57:11
definitive [3] - 39:12,

40:4, 40:5
Delaware [5] - 107:2, 107:4, 119:12, 121:12
deliberate [12] - 62:9, 63:23, 64:18, 65:1, 65:13, 65:18, 77:15, 83:19, 89:4, 90:21, 93:17, 95:5
Dell [19] - 105:13, 108:12, 111:1, 111:15, 111:17, 113:2, 113:3, 113:10, 113:12, 113:13, 113:18, 113:19, 114:1, 116:15, 120:20, 122:19, 123:25
dell [1] - 105:18
demonstrate [1] - 111:7
demonstrated [1] - 113:25
denial [1] - 14:21
denied [4] - 15:14, 33:8, 43:15
deny [1] - 73:13
department [1] - 68:20
depicts [1] - 98:1
deponent [3] - 88:21, 88:22, 88:23
deponent's [1] - 88:24
deponents [1] - 9:3
deposed [3] - 72:4, 72:9, 74:10
deposition [41] - 16:23, 27:7, 31:11, 32:17, 46:9, 54:16, 55:20, 56:18, 59:20, 59:21, 61:2, 63:1, 65:24, 68:20, 68:24, 69:11, 69:12, 70:13, 71:5, 71:13, 71:20, 72:5, 72:7, 72:9, 72:15, 72:19, 74:13, 77:8, 77:13, 78:3, 78:10, 78:17, 80:6, 88:18, 88:21, 93:12, 94:12, 95:19, 99:2, 114:2
depositions [8] - 11:14, 35:4, 35:7, 73:15, 88:7, 89:21, 113:6, 116:13
Deputy [2] - 1:17, 125:10
deputy [1] - 124:8
describe [2] - 21:14, 22:18, 51:17, 55:21, 56:5, 57:19, 57:23

**described** [5] - 9:25, 23:23, 29:10, 57:23, 64:10

**describes** [10] - 44:12, 51:18, 52:25, 53:4, 53:7, 53:25, 55:7, 55:12, 56:7, 56:9

**description** [5] - 41:8, 41:9, 83:22, 83:25, 94:19

**description...as** [1] - 55:17

**designate** [1] - 75:12

**designation** [1] - 18:1

**designs** [1] - 118:22

**despite** [2] - 11:2, 37:25

**detail** [4] - 57:20, 69:22, 96:15, 101:18

**detailed** [1] - 70:4

**detailing** [1] - 61:17

**details** [2] - 107:25, 108:7

**determinations** [2] - 13:12, 14:5

**determine** [3] - 27:10, 77:7, 80:13

**determined** [1] - 42:25

**developing** [1] - 27:16

**developments** [1] - 21:1

**device** [10] - 12:21, 12:22, 47:19, 68:5, 73:15, 107:23, 111:3, 112:18, 114:1, 116:14

**devices** [9] - 105:14, 105:15, 105:16, 105:17, 105:18, 111:12, 111:13, 116:21, 116:22

**diagram** [1] - 111:20

**difference** [3] - 82:1, 117:25, 118:1

**different** [14] - 5:23, 8:21, 17:8, 64:13, 88:19, 89:1, 89:10, 89:18, 89:19, 90:7, 90:10, 98:6, 100:5, 101:9

**differentiate** [5] - 79:7, 79:20, 92:22, 98:10, 99:6

**differentiating** [4] - 71:15, 88:13, 92:20, 98:9

**differentiation** [3] - 98:5, 98:17, 101:6

**difficult** [1] - 11:6

**digital** [4] - 17:8,

**diligence** [1] - 37:23

**direct** [4] - 26:23, 47:15, 69:4, 93:23

**directly** [1] - 50:18

**director** [9] - 71:1, 72:5, 72:8, 72:13, 72:21, 73:24, 74:4, 74:10, 74:14

**disagrees** [1] - 84:15

**disclaim** [1] - 73:13

**disclose** [8] - 15:5, 16:4, 18:6, 19:21, 20:6, 22:22, 22:23, 23:1

**disclosed** [3] - 20:18, 22:21, 55:7

**disclosing** [3] - 15:13, 18:7, 18:8

**discovery** [14] - 12:14, 35:8, 35:12, 43:8, 46:1, 46:13, 46:19, 114:4, 114:21, 115:20, 115:21, 115:24, 115:25, 116:12

**discrete** [3] - 9:18, 13:14, 51:6

**discretion** [4] - 6:19, 62:2, 66:1, 68:17

**discuss** [1] - 7:22

**discussing** [2] - 38:15, 57:19

**discussion** [1] - 92:12

**discussions** [1] - 29:14

**disjointed** [1] - 8:22

**dismiss** [13] - 6:15, 9:19, 10:8, 11:25, 12:3, 12:19, 34:18, 34:22, 36:4, 39:19, 39:22, 41:20, 43:2

**dismissal** [4] - 32:13, 40:20

**dismissed** [1] - 43:6

**dismissing** [2] - 40:16, 46:25

**dispense** [1] - 50:21

**display** [1] - 41:13

**displayed** [1] - 41:6

**displaying** [1] - 41:15

**disposition** [1] - 26:19

**disputation** [1] - 96:19

**dispute** [15] - 26:18, 27:23, 53:9, 62:13, 68:19, 72:12, 74:19, 84:5, 85:7, 87:13, 89:14, 106:20, 116:5, 117:24, 118:6

**disputed** [3] - 76:25,

96:18, 107:3

**distinction** [1] - 72:1

**distinguish** [2] - 71:11, 88:2

**district** [2] - 67:16, 110:17

**DISTRICT** [2] - 1:1, 1:1

**District** [7] - 1:18, 1:18, 12:7, 62:23, 70:10, 109:22

**districts** [1] - 87:25

**divide** [2] - 114:16

**DIVISION** [1] - 1:2

**Division** [1] - 1:19

**Docket** [1] - 47:15

**docket** [1] - 48:1

**doctrine** [1] - 65:21

**Doctrine** [3] - 67:24, 68:17, 76:8

**doctrines** [1] - 63:22

**document** [8] - 19:14, 19:17, 25:10, 29:18, 30:25, 59:14, 97:13, 97:14

**documentation** [1] - 15:4

**documents** [8] - 12:13, 13:19, 13:25, 14:9, 16:17, 18:14, 22:12, 26:10

**dollars** [2] - 108:20, 122:22

**done** [7] - 8:8, 31:15, 37:22, 43:6, 57:2, 87:15, 88:4

**doubts** [1] - 14:1

**down** [13] - 11:12, 12:17, 42:11, 42:14, 43:1, 47:2, 50:24, 57:2, 57:5, 82:3, 104:1, 107:22, 109:2

**dozen** [1] - 35:3

**Dr** [30] - 52:22, 53:18, 59:23, 60:3, 60:13, 61:19, 63:17, 65:12, 66:13, 70:1, 74:18, 74:20, 82:25, 83:6, 84:6, 84:17, 86:10, 86:20, 87:7, 95:12, 95:21, 97:11, 99:10, 100:6, 100:13, 113:23, 116:11, 116:17, 117:20

**drafted** [1] - 34:25

**drastic** [2] - 76:23, 87:7

**drastically** [1] - 90:10

**driver** [2] - 54:9, 80:18

**drop** [2] - 47:4, 47:24

**drops** [1] - 47:7

**due** [1] - 37:22

**during** [5] - 69:10, 80:18, 88:7, 114:4, 114:21

---

**E**

**e-mail** [2] - 25:6, 25:15

**e-mails** [4] - 17:22, 19:9, 29:8, 35:9

**early** [2] - 35:25, 59:19

**Eastern** [1] - 62:22

**EASTERN** [1] - 1:2

**eastern** [1] - 1:18

**easy** [1] - 111:21

**eat** [1] - 35:15

**ecosystem** [3] - 108:16, 110:7, 111:8

**educate** [1] - 73:16

**effect** [6] - 77:17, 98:16, 118:7, 122:4, 122:25, 123:16

**effectively** [1] - 15:9

**efficiency's** [2] - 7:3, 7:11

**efficient** [4] - 6:18, 76:9, 103:21, 120:2

**efficiently** [1] - 120:7

**efforts** [2] - 124:10, 124:15

**efindlay@ findlaycraft.com** [1] - 2:22

**either** [6] - 31:5, 93:3, 99:4, 99:9, 99:12, 113:25

**Elbaor** [1] - 40:14

**elected** [3] - 11:23, 46:20, 68:8

**election** [1] - 68:7

**Electric** [1] - 66:22

**element** [25] - 49:7, 59:25, 67:13, 69:12, 76:4, 77:3, 84:19, 84:23, 84:24, 85:6, 92:12, 95:15, 100:23, 109:9, 109:11, 110:14, 112:6, 112:8, 112:12, 113:25, 117:5, 117:12, 117:18

**element-by-element** [1] - 117:18

**elements** [21] - 7:24, 8:17, 82:2, 92:17, 96:1, 96:12, 101:2, 101:12, 105:20, 107:16, 107:17, 107:19, 107:25,

108:4, 109:12, 111:9, 111:10, 111:14, 114:13, 114:14, 116:1

**elicit** [1] - 73:5

**elicited** [1] - 73:10

**elsewhere** [3] - 24:16, 41:7, 58:23

**embark** [1] - 48:8

**embodies** [1] - 52:22

**embodying** [1] - 16:25

**emphasize** [2] - 104:25, 107:1

**emphasized** [1] - 57:13

**emphasizing** [1] - 113:11

**emphatic** [5] - 49:5, 63:25, 78:8, 90:23, 90:24

**employed** [1] - 33:5

**employee** [2] - 64:2, 68:19

**employees** [3] - 35:5, 37:5, 113:7

**employs** [1] - 111:8

**encompass** [3] - 68:4, 69:13, 122:18

**end** [6] - 18:22, 56:2, 56:3, 81:11, 116:14, 118:18

**End** [1] - 124:21

**end-around** [1] - 118:18

**ended** [2] - 35:13, 115:14

**enforce** [1] - 122:1

**engineer** [2] - 53:11, 53:13

**engineering** [1] - 16:20

**engineers** [2] - 28:25, 29:11

**enormous** [1] - 22:20

**enriched** [1] - 7:19

**enrichment** [11] - 7:18, 7:25, 23:14, 23:15, 26:14, 27:13, 27:14, 28:2, 29:16, 29:20, 30:6

**enrichments** [1] - 23:25

**entered** [1] - 104:4

**entire** [18] - 28:21, 46:25, 50:21, 78:1, 78:3, 78:10, 78:17, 80:8, 80:15, 81:23, 81:25, 82:16, 100:22, 104:10, 109:12, 117:13,

117:17, 118:23
**entirely** [3] - 85:3, 88:25, 100:5
**entities** [2] - 7:19, 71:16, 88:13
**entity** [2] - 71:3, 109:23
**equated** [1] - 54:5
**equitable** [1] - 23:24
**equivalent** [5] - 54:17, 54:20, 55:16, 64:16, 94:18
**equivocal** [1] - 83:20
**Eric** [2] - 2:18, 5:15
**errata** [1] - 101:18
**especially** [3] - 24:15, 84:6, 99:3
**Esq** [6] - 2:3, 2:8, 2:13, 2:18, 3:1, 3:6
**essential** [2] - 62:5, 63:18
**establish** [1] - 64:8
**et** [2] - 92:13
**evading** [1] - 13:18
**event** [3] - 12:21, 51:20, 70:4
**events** [2] - 13:16, 48:2
**eventually** [2] - 11:1, 121:10
**evidence** [45] - 7:13, 7:17, 7:21, 8:3, 8:16, 9:2, 14:4, 14:15, 14:17, 14:19, 22:1, 24:24, 26:6, 26:11, 26:24, 27:1, 33:13, 38:18, 61:15, 61:21, 65:7, 69:19, 70:2, 71:4, 75:1, 75:3, 75:8, 75:17, 75:24, 77:18, 83:3, 83:5, 87:5, 93:20, 95:9, 96:13, 96:14, 96:20, 96:22, 97:8, 98:17, 101:16, 102:8
**evidences** [1] - 27:4
**evident** [5] - 10:9, 11:2, 28:14, 99:3, 116:17
**evidentiary** [2] - 96:6, 96:8
**ex** [1] - 95:13
**exact** [2] - 42:17, 56:20
**exactly** [15] - 20:3, 20:11, 31:16, 45:17, 51:8, 57:12, 67:9, 71:7, 78:12, 93:21, 95:10, 102:7, 110:9
**example** [11] - 10:21,

19:3, 19:20, 27:21, 80:17, 92:18, 105:13, 105:16, 108:18, 111:15, 112:20
**examples** [4] - 20:13, 27:8, 38:17, 38:19
**except** [1] - 14:20
**excerpt** [3] - 18:22, 59:21, 92:4
**excerpts** [1] - 97:11
**exchange** [2] - 17:5, 29:6
**exchanged** [1] - 29:6
**exchanges** [6] - 16:20, 18:4, 29:18, 30:7, 30:11, 45:23
**exchanging** [1] - 19:9
**excluded** [3] - 118:15, 119:4, 121:9
**excludes** [1] - 121:5
**Excuse** [1] - 35:19
**excuse** [2] - 38:21, 97:10
**exercise** [2] - 65:25, 68:16
**exhibit** [16] - 15:3, 18:3, 18:23, 19:3, 25:14, 37:16, 78:20, 83:2, 92:7, 92:11, 97:9, 97:10, 97:15, 99:3, 124:6
**Exhibit** [5] - 38:23, 47:15, 86:19, 100:20, 102:9
**exist** [18] - 11:6, 11:11, 11:13, 30:19, 36:2, 37:8, 37:11, 38:1, 38:21, 44:6, 44:10, 44:18, 45:8, 45:12, 45:13, 45:21, 45:24, 46:15
**existed** [1] - 11:16, 35:24, 36:25, 37:25, 38:4, 38:13, 38:17, 39:5, 40:5, 45:25, 51:7, 64:22, 66:21, 66:22
**existing** [1] - 123:15
**exists** [4] - 11:5, 37:12, 37:15, 51:8
**experience** [2] - 63:7, 63:11
**expert** [41] - 10:2, 10:6, 12:15, 13:2, 45:3, 51:23, 52:1, 52:21, 53:3, 53:7, 60:7, 61:16, 61:21, 68:9, 69:19, 70:2, 83:1, 85:2, 92:2,

95:13, 95:23, 96:14, 97:8, 99:1, 99:21, 99:22, 99:25, 100:3, 100:4, 100:11, 101:24, 102:1, 102:7, 107:12, 113:23, 116:10, 116:11, 116:12, 117:20
**expert's** [2] - 52:7, 99:22
**experts** [5] - 54:5, 56:8, 68:10, 87:1, 90:4
**Expiration** [1] - 125:11
**explain** [9] - 13:21, 14:9, 17:7, 51:1, 60:14, 65:17, 83:21, 104:17, 106:9
**explained** [3] - 58:21, 67:19, 70:18
**explaining** [2] - 72:1, 96:14
**explains** [1] - 60:15
**explanation** [1] - 96:16
**explicit** [1] - 38:10
**explicitly** [1] - 38:1
**exposure** [2] - 23:11, 23:22
**expressed** [4] - 22:2, 36:1, 37:19, 121:13
**expresses** [1] - 95:19
**expressly** [2] - 106:14, 121:15
**extended** [1] - 17:3
**extension** [1] - 18:24
**extensively** [1] - 39:24
**extent** [6] - 37:11, 37:14, 37:21, 85:1, 105:5, 119:8
**extra** [4] - 86:21, 98:2, 103:16, 111:20
**extract** [1] - 67:4
**extraordinary** [1] - 106:1

**F**

**F.3d** [2] - 12:6, 40:14
**fabrication** [1] - 45:21
**face** [1] - 96:17
**faced** [2] - 28:17, 39:18
**fact** [44] - 10:3, 10:9, 10:20, 11:8, 12:2, 13:11, 13:22, 20:22, 26:12, 26:14, 26:16, 26:19, 33:15, 37:25,

38:6, 41:12, 43:4, 56:23, 62:4, 62:6, 62:18, 63:18, 64:24, 66:15, 70:23, 71:23, 75:15, 76:25, 77:18, 77:25, 81:18, 84:6, 85:7, 90:12, 91:12, 96:18, 96:19, 99:12, 101:24, 115:22, 116:12, 117:20, 120:13, 120:15
**fact-intensive** [1] - 13:11
**factors** [1] - 65:20
**facts** [18] - 13:15, 13:18, 13:21, 15:17, 22:12, 23:10, 26:24, 34:7, 58:6, 62:12, 73:13, 75:13, 87:13, 91:12, 103:23, 114:20, 115:1, 117:25
**factual** [4] - 14:2, 14:5, 23:22, 25:3
**failed** [5] - 7:13, 8:5, 8:23, 33:18, 33:23
**failing** [2] - 19:2, 77:1
**fails** [3] - 7:12, 7:16, 76:24
**fair** [5] - 40:21, 44:25, 45:9, 66:10, 85:13
**fairly** [1] - 106:17
**falls** [1] - 109:14
**false** [2] - 31:18, 33:2
**far** [4] - 64:2, 68:19, 73:8, 121:11
**fatal** [1] - 75:4
**fault** [1] - 44:25
**faulty** [1] - 86:3
**favor** [2] - 14:3, 87:20
**Fax** [6] - 2:6, 2:10, 2:16, 2:21, 3:4, 3:8
**FCCs** [1] - 60:18
**feature** [5] - 59:24, 61:6, 65:14, 84:18, 85:15
**features** [3] - 17:17, 21:19, 28:6
**features'** [1] - 21:18
**February** [3] - 9:21, 11:18, 31:13
**federal** [1] - 66:20
**Federal** [10] - 66:21, 67:8, 67:9, 67:18, 67:25, 68:1, 70:17, 73:8, 106:21, 110:16
**fees** [2] - 40:23, 41:21
**felt** [1] - 40:4
**Ferguson** [2] - 2:4, 2:9
**few** [7] - 22:3, 69:8,

73:13, 102:21, 106:16, 110:23, 116:25
**Fifth** [5] - 62:19, 62:23, 65:21, 66:20, 67:21
**Figueroa** [1] - 2:14
**figure** [1] - 115:20
**figures** [3] - 55:21, 55:25, 56:4
**Figures** [1] - 56:4
**file** [2] - 25:22, 124:9
**filed** [22] - 6:6, 9:20, 12:3, 15:12, 16:5, 19:5, 19:8, 19:23, 20:1, 20:2, 20:6, 20:7, 20:12, 22:17, 24:2, 24:16, 24:18, 24:19, 47:3, 51:12, 51:13, 114:23
**files** [2] - 19:11, 51:3
**filing** [2] - 15:20, 19:16
**fill** [1] - 73:11
**Film** [1] - 109:25
**film** [1] - 110:10
**filters** [1] - 57:22
**final** [2] - 96:4, 106:25
**finally** [10] - 8:15, 18:10, 32:12, 32:17, 45:23, 55:15, 57:8, 101:21, 116:24, 119:6
**Findlay** [2] - 2:18, 5:15
**FINDLAY** [5] - 2:19, 5:14, 9:8, 48:19, 103:11
**fine** [5] - 6:3, 6:20, 39:12, 102:24, 103:1
**finely** [1] - 71:18
**fingerprint** [12] - 20:21, 22:5, 22:8, 22:22, 49:22, 50:8, 50:11, 50:19, 56:2, 61:23, 86:23, 99:6
**fingerprinting** [21] - 15:21, 15:23, 16:19, 16:25, 17:8, 18:21, 19:4, 19:6, 19:11, 19:19, 20:16, 20:17, 21:1, 22:15, 22:24, 24:9, 25:8, 25:22, 29:5, 51:19
**fingerprints** [23] - 49:25, 50:16, 51:2, 51:9, 51:17, 52:4, 52:5, 53:23, 54:2, 55:8, 55:12, 55:14, 55:22, 56:8, 56:9,

58:22, 58:23, 59:9, 61:11, 66:7, 76:7, 111:16, 112:25
**firm** [1] - 44:15
**first** [10] - 8:9, 15:1, 15:6, 22:16, 22:21, 26:2, 51:1, 55:5, 62:16, 84:20
**Fish** [34] - 16:1, 16:12, 16:13, 16:24, 17:2, 17:6, 17:7, 18:4, 18:11, 18:15, 18:19, 18:24, 20:7, 20:15, 20:16, 20:20, 21:8, 21:12, 21:22, 22:2, 22:22, 23:2, 23:11, 23:19, 24:13, 25:2, 25:11, 25:12, 51:5, 51:10, 51:11, 59:1, 61:9, 61:11
**fish** [1] - 15:9
**Fish's** [14] - 14:10, 16:10, 16:19, 16:22, 18:8, 18:16, 19:6, 23:12, 25:20, 27:22, 28:7, 59:24, 65:14, 84:18
**five** [1] - 77:13
**flexible** [1] - 29:3
**fly** [1] - 93:4
**focus** [3] - 77:2, 95:25, 108:25
**focused** [1] - 107:20
**folks** [3] - 19:9, 26:24, 28:18
**folks'** [1] - 25:1
**followed** [1] - 37:8
**footnote** [2] - 38:4, 117:22
**FOR** [3] - 1:1, 2:2, 2:12
**force** [1] - 123:16
**foregoing** [1] - 125:3
**foremost** [1] - 15:6
**forever** [1] - 72:4
**forget** [2] - 124:6, 124:8
**forgive** [1] - 81:3
**forgotten** [2] - 30:5, 56:20
**form** [7] - 39:6, 54:21, 63:19, 64:17, 101:4, 105:12, 118:22
**formed** [1] - 19:15
**forms** [2] - 5:23, 32:4
**formulations** [1] - 93:12
**forth** [10] - 15:17, 17:22, 18:10, 23:17, 75:8, 83:5, 88:8,

97:7, 106:5, 117:24
**forward** [10] - 30:14, 54:11, 58:7, 74:20, 75:7, 75:8, 95:2, 95:14, 116:5
**Foundation** [1] - 30:1
**four** [6] - 5:7, 5:21, 30:15, 73:14, 79:21, 114:14
**frame** [3] - 21:6, 103:24, 106:23
**framed** [1] - 63:4
**frankly** [2] - 76:11, 92:8
**fraud** [1] - 33:6
**fraudulent** [1] - 33:4
**freely** [2] - 12:8, 47:5
**Frequency** [2] - 50:2, 50:10
**front** [4] - 13:10, 36:6, 68:18, 97:18
**frustrated** [1] - 71:17
**Fuji** [2] - 109:24, 110:10
**full** [1] - 123:16
**fully** [3] - 19:15, 19:18, 20:1
**fully-formed** [1] - 19:15
**fundamental** [1] - 68:2
**future** [4] - 12:22, 18:15, 18:20, 110:2

**G**

**Gabe** [1] - 5:16
**Gabriel** [2] - 3:6, 9:12
**gained** [1] - 117:17
**Gart** [1] - 42:15
**GARTEISER** [2] - 2:4, 2:8
**Garteiser** [2] - 47:17, 47:20
**GAUNTT** [1] - 1:17
**Gauntt** [2] - 125:9, 125:10
**GAUNTT-HICKS** [1] - 1:17
**Gauntt-Hicks** [1] - 125:9, 125:10
**general** [10] - 12:18, 14:17, 14:21, 22:19, 70:17, 76:17, 91:19, 94:4, 100:1, 100:7
**generate** [1] - 50:4
**generating** [1] - 50:3
**gentlemen** [1] - 23:19
**genuine** [1] - 75:13
**Giovanni** [19] - 9:24, 30:18, 32:11, 32:14,

32:18, 32:24, 35:23, 36:12, 36:16, 36:22, 37:2, 39:5, 41:10, 41:17, 42:8, 43:11, 43:19, 43:20, 44:13
**given** [7] - 6:2, 6:8, 12:9, 47:5, 47:22, 71:6, 89:19
**glance** [1] - 76:13
**goal** [1] - 12:18
**gosh** [2] - 29:2, 73:2
**grabbing** [1] - 100:1
**gramsey@orrick. com** [1] - 3:9
**grant** [5] - 13:4, 47:5, 96:8, 97:2, 102:3
**granted** [3] - 28:13, 70:16, 122:5
**granting** [1] - 76:18
**gratuitous** [1] - 10:20
**Great** [1] - 5:19
**great** [10] - 6:3, 6:23, 24:19, 31:8, 52:13, 57:20, 88:1, 88:6, 97:17, 101:18
**green** [1] - 111:10
**grounds** [1] - 8:3
**group** [1] - 6:14
**grouping** [1] - 6:17
**GTX** [6] - 69:7, 70:8, 96:9, 97:2, 99:18, 101:21
**GUID** [2] - 86:21, 98:2
**guiding** [1] - 68:23
**GUIDs** [1] - 98:15
**guys** [3] - 6:2, 6:10, 16:16

**H**

**half** [2] - 19:23, 34:24
**hand** [3] - 58:25, 67:1, 97:15
**handed** [4] - 9:15, 49:5, 100:22, 103:15
**handful** [2] - 22:23, 23:5
**handling** [1] - 5:18
**handout** [3] - 103:16, 111:20
**handouts** [1] - 9:9
**handy** [1] - 36:5
**happy** [2] - 47:6, 78:20
**hardware** [2] - 105:12, 105:13
**harming** [1] - 89:9
**hat** [2] - 59:3, 59:6
**hate** [1] - 31:9
**hawk** [1] - 20:25
**head** [1] - 7:25

**hear** [7] - 7:6, 44:12, 50:24, 54:2, 58:6, 108:21, 119:18
**heard** [6] - 16:24, 43:12, 77:2, 91:22, 93:13, 95:24
**HEARING** [1] - 1:11
**hearing** [5] - 5:5, 44:11, 56:24, 57:2, 124:5
**Hearing.................. .................... [1] - 4:5
**heightened** [1] - 26:21
**held** [4] - 66:12, 68:12, 70:15, 77:12
**help** [3] - 16:16, 17:4, 90:5
**helped** [2] - 56:22, 58:15
**HEREBY** [1] - 125:3
**HERRINGTON** [3] - 2:14, 3:1, 3:6
**hesitant** [1] - 90:9
**Hewlett** [2] - 109:24, 111:1
**HICKS** [1] - 1:17
**Hicks** [2] - 125:9, 125:10
**hiding** [2] - 23:3, 23:4
**Higgins** [4] - 3:1, 5:17, 47:17
**HIGGINS** [5] - 103:14, 103:20, 107:9, 119:22, 121:21
**high** [5] - 75:16, 76:23, 94:23, 101:12, 105:9
**higher** [1] - 86:1
**highest** [4] - 13:10, 17:10, 22:4, 91:20
**highlighted** [4] - 60:12, 111:10, 117:9, 118:8
**highlights** [1] - 91:8
**highly** [1] - 14:4
**himself** [4] - 89:1, 89:6, 89:9, 90:7
**hired** [2] - 36:18, 95:16
**history** [5] - 10:18, 22:18, 23:22, 55:18, 94:19
**hit** [1] - 104:19
**hold** [4] - 58:4, 62:2, 63:2, 66:1
**holding** [1] - 66:2
**holds** [1] - 65:23
**hole** [1] - 73:11
**home** [3] - 34:5, 38:8,

38:9
**Honda** [1] - 73:23
**Honea** [3] - 2:3, 5:11, 121:22
**HONEA** [13] - 2:4, 2:8, 5:11, 6:10, 6:20, 7:1, 7:8, 8:2, 9:6, 33:11, 120:1, 120:5, 123:3
**honest** [1] - 42:18
**Honor** [112] - 5:11, 5:14, 6:12, 6:21, 7:1, 7:8, 9:4, 9:8, 9:11, 12:4, 16:10, 17:10, 18:2, 18:9, 19:22, 20:23, 21:11, 25:5, 27:11, 30:13, 32:7, 33:3, 33:9, 33:11, 34:11, 34:13, 34:17, 34:23, 35:25, 38:22, 39:13, 41:25, 46:23, 47:8, 47:12, 48:5, 48:17, 48:19, 48:21, 51:11, 53:2, 53:22, 54:6, 55:19, 56:14, 57:16, 58:1, 59:7, 59:17, 60:10, 60:11, 61:14, 61:24, 62:16, 63:21, 63:24, 66:14, 68:15, 70:6, 70:21, 74:6, 75:15, 75:18, 76:12, 76:21, 78:18, 78:25, 79:4, 79:15, 81:18, 83:16, 84:13, 86:13, 87:22, 88:14, 89:16, 91:5, 91:15, 93:18, 94:4, 94:5, 96:3, 96:5, 97:3, 97:6, 97:16, 97:21, 98:11, 99:9, 100:15, 100:18, 101:5, 101:14, 102:13, 102:17, 102:25, 103:11, 103:14, 104:14, 108:9, 109:17, 111:20, 115:13, 118:4, 119:8, 119:23, 120:1, 123:1, 124:1, 124:3, 124:17
**HONORABLE** [1] - 1:12
**hopefully** [1] - 124:14
**hopes** [1] - 93:19
**host** [2] - 113:9, 113:14
**hosted** [1] - 112:23
**hours** [1] - 6:2
**house** [1] - 36:18
**housed** [2] - 111:17, 116:14

**HP** [3] - 105:18, 108:12, 110:10
**HTC** [2] - 105:17, 111:2
**huge** [1] - 102:5
**hundreds** [2] - 23:5, 23:6
**hurry** [1] - 107:6
**hybrid** [2] - 25:18, 110:2

## I

**IBM** [2] - 105:18, 111:2
**ID** [1] - 112:23
**idea** [8] - 16:6, 18:21, 19:15, 29:2, 39:15, 74:2, 79:8, 123:23
**ideas** [3] - 23:21, 23:23, 93:15
**identifier** [2] - 17:16, 22:19
**identify** [4] - 15:25, 28:15, 72:8, 74:9
**IDs** [1] - 112:25
**ignored** [1] - 38:10
**ignoring** [2] - 67:20
**ill** [1] - 94:11
**ill-informed** [1] - 94:11
**illustrates** [1] - 80:7
**image** [2] - 17:14, 100:2
**Imagelock** [1] - 15:25
**Imaging** [1] - 40:14
**implementing** [1] - 24:14
**implements** [1] - 45:19
**implicitly** [1] - 20:20
**implied** [4] - 29:25, 30:9, 30:10, 38:13
**important** [18] - 19:12, 50:15, 50:20, 53:6, 53:20, 58:20, 63:21, 64:20, 66:5, 74:17, 74:25, 77:5, 88:1, 109:3, 111:25, 115:12, 120:8, 123:11
**importantly** [2] - 86:22, 111:1
**impressions** [1] - 14:2
**improperly** [1] - 67:10
**IN** [1] - 1:1
**inapplicable** [2] - 7:25, 8:2
**inappropriate** [1] - 35:13
**inception** [1] - 73:7

**inclined** [1] - 13:3
**include** [8] - 101:8, 105:16, 105:18, 109:21, 117:13, 118:9, 122:10, 122:14
**included** [6] - 105:3, 106:8, 110:1, 115:17, 122:16, 122:23
**includes** [4] - 104:8, 106:11, 116:20, 122:12
**including** [2] - 13:17, 109:19
**incoming** [1] - 113:1
**Incorporated** [1] - 89:13
**incorporates** [1] - 110:3
**incorporating** [1] - 10:21
**indeed** [2] - 57:13, 63:8
**independently** [1] - 95:22
**INDEX** [1] - 4:1
**indicate** [2] - 23:7, 23:8
**indicated** [1] - 41:11
**indicates** [3] - 27:8, 92:13, 100:24
**indication** [2] - 47:22, 47:24
**individual** [1] - 73:2
**industry** [6] - 20:25, 22:8, 28:17, 28:21, 28:22
**inequitable** [7] - 7:13, 14:23, 15:10, 23:10, 26:20, 33:12, 34:1
**inevitably** [1] - 73:2
**infer** [1] - 26:12
**inference** [1] - 27:3
**inferences** [3] - 13:22, 13:24, 27:2
**inferred** [4] - 15:16, 22:12, 26:8, 26:24
**inform** [1] - 80:23
**informal** [1] - 46:2
**information** [15] - 14:24, 17:5, 17:13, 18:8, 18:18, 27:20, 27:21, 28:2, 28:5, 29:6, 29:15, 29:17, 41:13, 81:1, 98:2
**informed** [1] - 94:11
**infringe** [5] - 41:18, 49:13, 62:8, 65:5, 76:7

**infringed** [3] - 8:13, 10:3, 10:4
**Infringement** [1] - 120:10
**infringement** [50] - 8:14, 13:1, 15:12, 30:16, 48:23, 50:13, 50:14, 59:4, 62:14, 66:19, 66:25, 67:17, 69:9, 70:16, 75:20, 76:19, 86:14, 92:8, 93:3, 93:4, 96:24, 102:4, 106:2, 106:18, 106:22, 107:13, 108:1, 109:14, 110:23, 112:2, 112:8, 113:16, 113:23, 114:9, 115:7, 115:8, 115:14, 115:16, 115:18, 115:23, 116:11, 120:18, 121:23, 122:3, 122:9, 122:10, 122:21, 122:25, 123:4
**infringes** [3] - 49:10, 76:3, 97:1
**infringing** [1] - 11:18
**initial** [1] - 24:2
**initiate** [1] - 123:13
**initiates** [1] - 30:15
**injecting** [1] - 22:19
**injunctive** [1] - 11:22
**injurious** [1] - 31:19
**injury** [2] - 32:4, 34:8
**input** [6] - 100:2, 107:21, 107:22, 112:14, 112:15, 112:16
**inserting** [1] - 17:13
**instance** [4] - 79:20, 90:11, 98:7, 108:22
**instead** [2] - 22:5, 36:14, 45:25
**instruct** [1] - 89:23
**instructive** [1] - 48:2
**intellectual** [1] - 25:1
**intend** [2] - 13:15, 120:12
**intended** [3] - 86:4, 95:8, 119:12
**intensive** [1] - 13:11
**intent** [15] - 15:16, 22:11, 23:8, 24:25, 26:6, 26:8, 26:13, 26:23, 61:5, 61:8, 85:14, 85:19, 85:22, 119:16
**intention** [2] - 19:18,

21:14
**intentional** [2] - 60:22, 65:19
**interactions** [2] - 42:3, 46:2
**interest** [1] - 22:3
**interested** [2] - 25:17, 89:12
**interesting** [4] - 18:13, 18:20, 42:17, 87:15
**interestingly** [3] - 86:7, 86:9, 123:21
**internal** [2] - 19:9, 51:24
**internally** [1] - 25:7
**internet** [2] - 28:10
**Internet** [1] - 28:15
**interrogatories** [3] - 11:3, 43:10, 43:23
**Interrogatory** [1] - 43:18
**interrogatory** [6] - 11:4, 15:2, 43:17, 44:2, 114:19
**introduction** [1] - 78:24
**intuitive** [1] - 106:6
**invalidity** [6] - 68:3, 71:8, 75:19, 75:21, 75:22, 86:14
**invented** [4] - 21:9, 24:21, 26:5, 114:9
**invention** [25] - 20:1, 23:20, 33:22, 70:19, 77:4, 79:6, 79:24, 79:25, 80:3, 80:8, 80:12, 81:5, 81:25, 82:6, 82:15, 82:16, 82:22, 82:23, 83:8, 87:10, 90:19, 91:2, 93:14, 99:5, 100:9
**inventor** [15] - 10:22, 58:14, 61:3, 61:20, 68:9, 68:25, 69:10, 69:14, 70:12, 80:12, 84:8, 85:20, 96:11, 101:25, 102:2
**inventor's** [1] - 69:23
**inventors** [2] - 11:15, 54:10
**inventors'** [1] - 70:18
**inventorship** [1] - 23:18
**invested** [1] - 27:16
**investment** [1] - 46:7
**investor** [1] - 58:17
**investors** [1] - 32:3
**invited** [3] - 11:9, 43:2, 44:16
**involve** [1] - 73:21

**involved** [1] - 56:21
**iOS** [7] - 105:14, 105:15, 111:11, 112:9, 112:18, 114:1, 116:20
**iPhones** [1] - 116:21
**issue** [47] - 9:18, 10:24, 27:9, 35:2, 35:7, 39:21, 47:10, 48:24, 53:9, 63:10, 64:6, 73:18, 75:13, 76:25, 82:1, 82:18, 82:20, 84:4, 84:22, 87:12, 87:16, 87:19, 87:21, 90:18, 91:6, 91:7, 91:10, 91:14, 94:25, 96:18, 98:23, 99:20, 101:3, 101:13, 101:19, 102:10, 103:24, 103:25, 104:3, 104:13, 104:21, 104:25, 112:14, 115:20, 118:2, 118:12
**issued** [3] - 16:21, 51:14, 57:7
**issues** [7] - 11:24, 12:10, 25:3, 73:20, 76:10, 106:24, 115:22
**it'll** [1] - 124:13
**itself** [13] - 15:15, 16:8, 26:23, 32:25, 59:18, 82:6, 82:7, 83:24, 88:24, 90:20, 98:24, 119:11, 121:13

## J

**January** [3] - 31:12, 71:22, 115:17
**job** [1] - 95:21
**john** [1] - 113:23
**join** [1] - 123:13
**joined** [1] - 94:24
**Jonibach** [1] - 62:19
**Judge** [3] - 69:8, 69:21, 69:24
**judge** [3] - 13:23, 96:10, 101:25
**JUDGE** [1] - 1:12
**judgment** [33] - 6:22, 12:2, 14:7, 25:3, 33:7, 47:1, 48:22, 49:1, 54:7, 62:12, 63:20, 67:17, 69:9, 69:18, 70:3, 70:16, 75:5, 75:6, 75:7,

76:17, 76:19, 76:22,
76:23, 78:24, 87:13,
87:17, 93:7, 96:9,
97:3, 99:13, 102:3,
102:12, 102:20
**judicial** [21] - 58:5,
59:13, 61:25, 62:2,
62:3, 62:17, 62:20,
62:24, 63:2, 63:5,
63:22, 65:21, 66:3,
76:14, 77:8, 77:12,
77:17, 80:20, 87:5,
87:18, 96:10
**Judicial** [3] - 67:23,
68:17, 76:8
**judicially** [2] - 49:11,
54:13
**July** [1] - 59:19
**juncture** [1] - 14:3
**juror** [1] - 32:2
**jury** [6] - 13:22, 26:12,
29:22, 76:2, 96:24,
97:1
**justice** [1] - 12:9

## K

**kanderson@ghiplaw
.com** [1] - 2:11
**keep** [6] - 7:2, 7:10,
9:4, 9:13, 41:14,
71:21
**keeping** [1] - 20:25
**kernel** [1] - 15:10
**key** [4] - 69:12, 104:3,
108:23, 120:13
**kind** [8] - 24:9, 26:11,
31:18, 31:23, 45:15,
49:22, 64:25, 91:8
**kinds** [3] - 5:22, 13:13,
51:16
**Kirk** [2] - 2:8, 5:12
**knowing** [1] - 15:11
**knowledge** [11] -
20:15, 20:16, 26:6,
26:10, 36:19, 63:7,
73:3, 73:14, 73:18,
115:4, 115:6
**knows** [6] - 21:1,
34:23, 57:2, 58:13,
63:13, 75:5
**Kofax** [1] - 69:7, 96:9,
101:21

## L

**label** [1] - 17:25
**lack** [3] - 9:2, 67:22,
95:12
**lacked** [1] - 26:10

**lacking** [1] - 7:21
**laid** [1] - 15:3
**language** [13] - 21:13,
22:6, 23:12, 79:19,
79:21, 86:18, 95:18,
101:8, 111:21,
111:24, 117:8,
117:9, 118:8
**Lanham** [5] - 8:7,
31:22, 32:23, 33:7,
34:3
**large** [2] - 23:3,
108:12
**last** [7] - 11:8, 25:6,
94:16, 98:7, 98:8,
98:15, 112:20
**late** [3] - 39:19, 40:11,
59:21
**latter** [1] - 46:20
**Laundering** [5] -
118:5, 118:9,
118:16, 119:5, 121:3
**law** [50] - 7:2, 7:17,
8:17, 23:6, 23:16,
23:17, 27:12, 27:14,
27:15, 27:19, 27:23,
27:25, 28:1, 29:16,
29:20, 29:23, 29:24,
30:3, 30:6, 30:8,
33:2, 59:11, 61:24,
62:19, 65:22, 66:12,
66:16, 67:6, 68:2,
72:2, 72:4, 74:16,
75:23, 77:11, 87:24,
106:5, 106:17,
106:21, 107:1,
107:2, 107:3, 107:4,
107:5, 114:17,
119:12, 121:12
**Law** [1] - 28:25
**law-based** [1] - 27:12
**lawsuit** [2] - 33:15,
33:17
**lawsuits** [3] - 30:16,
31:4, 108:15
**lay** [1] - 14:9
**lays** [1] - 30:3
**lead** [2] - 20:24, 49:15
**learned** [4] - 16:18,
16:19, 21:13, 25:12
**learning** [1] - 14:10
**least** [12] - 6:14,
18:12, 20:19, 21:14,
29:15, 69:19, 71:1,
79:21, 89:12, 99:17,
100:24, 102:21
**leave** [1] - 47:4
**leaves** [1] - 102:18
**led** [4] - 13:21, 32:12,
32:13

**left** [1] - 114:24
**legal** [6] - 6:24, 84:21,
85:2, 87:19, 106:16
**lengths** [2] - 88:2,
88:7
**less** [3] - 90:23, 90:24,
102:11
**letter** [3] - 46:14,
47:17, 77:11
**level** [12] - 13:10,
17:10, 22:4, 51:15,
78:8, 80:19, 86:1,
87:4, 91:20, 94:23,
101:12, 105:9
**leverage** [2] - 25:1,
31:6
**leveraging** [1] - 14:11
**LEXIS** [1] - 12:7
**LG** [1] - 111:2
**liability** [2] - 114:10,
114:12
**liable** [1] - 114:15
**libraries** [1] - 112:9
**Library** [16] - 51:4,
51:10, 51:18, 51:24,
52:3, 52:17, 52:18,
52:22, 53:1, 53:4,
53:8, 53:10, 53:14,
53:15, 53:23, 54:1
**library** [1] - 51:4
**license** [37] - 6:11,
102:20, 103:24,
104:2, 104:4, 104:8,
105:1, 105:4, 105:6,
106:8, 106:13,
108:5, 109:3, 110:8,
110:11, 110:13,
110:18, 112:3,
113:14, 113:17,
115:10, 117:7,
117:10, 117:17,
118:10, 118:14,
118:24, 119:11,
119:15, 121:10,
122:6, 122:11,
122:15, 122:22,
123:15, 123:21
**licensed** [25] - 104:12,
104:20, 105:21,
105:23, 106:10,
109:6, 109:15,
113:19, 114:7,
114:21, 115:2,
116:6, 116:7,
117:11, 117:16,
119:10, 120:12,
120:21, 121:2,
121:5, 121:6,
122:11, 122:17,
122:24, 123:24

**Licensed** [1] - 109:6
**licensee** [1] - 112:10
**licensees** [2] - 105:20,
111:11
**licenses** [2] - 108:14,
121:25
**licensing** [1] - 113:4
**light** [3] - 16:17,
80:19, 100:13
**Lighting** [1] - 66:22
**likelihood** [2] - 31:23,
32:21
**likely** [3] - 31:24, 32:4,
32:5
**limit** [1] - 70:19
**limitation** [4] - 95:20,
101:8, 101:9, 112:4
**limited** [2] - 80:2,
88:20
**line** [2] - 79:5, 89:23
**Linux** [1] - 112:9
**list** [4] - 26:2, 46:13,
98:18, 111:2
**listing** [1] - 23:12
**lists** [1] - 22:6
**litigation** [6] - 5:25,
12:11, 58:19, 64:24,
68:23, 109:25
**LLC** [15] - 1:3, 5:6,
36:14, 36:17, 54:9,
54:10, 58:7, 66:3,
70:24, 71:12, 71:19,
72:18, 73:19, 73:21,
74:21
**LLC's** [1] - 74:4
**LLP** [2] - 2:14, 3:1
**loaded** [1] - 99:24
**local** [1] - 87:23
**logic** [2] - 9:16, 86:3
**Look** [1] - 42:24
**look** [34] - 15:24,
17:17, 26:15, 27:9,
30:2, 39:3, 42:6,
42:10, 42:12, 42:22,
44:8, 44:18, 46:3,
77:7, 78:1, 78:3,
78:17, 80:25, 86:19,
99:8, 104:14,
105:10, 107:25,
108:4, 110:19,
112:7, 113:1,
114:22, 116:9,
116:20, 117:9,
118:8, 118:17, 123:4
**looked** [3] - 22:2,
37:18, 101:25
**looking** [9] - 11:19,
17:15, 21:7, 24:4,
36:7, 36:8, 50:3,
88:9, 98:12

**looks** [1] - 5:6
**LOS** [1] - 2:14
**Los** [1] - 2:15
**lost** [1] - 54:25
**loud** [1] - 123:6
**love** [2] - 52:9, 52:15
**low** [1] - 75:16
**Lowery** [1] - 12:5
**lunch** [1] - 102:22

## M

**Machine** [18] - 9:25,
30:18, 32:11, 32:15,
32:18, 32:25, 36:13,
36:16, 36:22, 37:2,
39:5, 41:10, 41:17,
42:8, 43:12, 43:19,
43:20, 44:13
**machine** [2] - 35:24,
39:10
**Magic** [116] - 5:6, 5:15,
7:12, 8:10, 9:1, 9:13,
10:1, 10:7, 10:17,
10:19, 10:22, 12:25,
14:18, 14:23, 15:7,
15:9, 16:13, 21:25,
25:2, 25:15, 25:17,
26:3, 26:6, 27:15,
31:20, 33:19, 34:21,
35:4, 35:5, 35:14,
35:16, 36:1, 37:8,
37:13, 37:16, 37:19,
37:23, 38:7, 38:9,
38:20, 39:11, 39:15,
39:21, 40:19, 41:12,
42:24, 45:1, 47:18,
48:4, 48:22, 49:10,
49:11, 49:13, 50:1,
51:12, 52:25, 53:3,
61:12, 62:8, 65:5,
67:4, 76:7, 76:18,
76:24, 82:3, 82:19,
83:21, 85:17, 86:8,
87:15, 87:23, 88:1,
88:6, 90:12, 91:9,
92:4, 97:1, 97:10,
97:22, 97:25, 98:9,
98:16, 99:15,
104:19, 105:2,
105:6, 105:10,
105:19, 105:22,
106:3, 108:3,
110:22, 111:1,
111:8, 111:12,
111:18, 112:11,
112:15, 112:19,
113:4, 113:17,
114:5, 114:6,
114:14, 115:1,

116:3, 116:13,
116:16, 116:19,
116:23, 118:13,
119:1, 119:9,
119:11, 121:4,
122:10
**MAGIC** [1] - 1:6
**Magic's** [53] - 9:17,
9:19, 13:11, 13:25,
14:3, 15:1, 15:2,
23:4, 23:15, 23:24,
25:20, 27:12, 32:2,
34:18, 36:4, 46:9,
48:25, 50:9, 50:16,
50:17, 53:5, 54:4,
55:22, 59:2, 59:8,
60:24, 61:16, 64:21,
66:6, 68:10, 68:13,
69:6, 70:2, 71:9,
75:24, 84:11, 87:16,
98:4, 101:23, 102:7,
105:9, 111:16,
112:9, 112:23,
113:7, 113:23,
114:25, 115:5,
115:6, 116:10,
118:7, 120:19
**MAGISTRATE** [1] -
1:13
**mail** [2] - 25:6, 25:15
**mails** [4] - 17:22, 19:9,
29:8, 35:9
**main** [2] - 91:6, 121:17
**maintains** [1] - 37:23
**major** [2] - 77:1, 111:3
**managing** [8] - 72:5,
72:8, 72:13, 72:21,
73:24, 74:5, 74:10,
74:15
**manufacturer** [2] -
111:3, 118:22
**manufacturers** [2] -
113:8, 116:19
**manufactures** [1] -
118:24
**March/April** [1] - 42:5
**marked** [2] - 17:23,
30:11
**market** [5] - 14:13,
20:8, 31:19, 31:21,
110:25
**marketing** [2] - 14:13,
20:24
**marking** [1] - 29:8
**Markman** [1] - 44:10
**Marsh** [1] - 3:7
**Marshall** [1] - 1:19
**massive** [1] - 20:4
**match** [2] - 92:12,
100:23, 113:2

**matching** [2] - 92:12,
95:17
**material** [13] - 7:15,
13:20, 14:24, 15:16,
16:5, 20:17, 27:22,
33:24, 84:5, 85:7,
87:13, 99:12, 115:1
**materiality** [4] - 15:13,
20:10, 20:13, 22:11
**materiality's** [1] -
21:23
**materially** [3] - 8:8,
8:10, 121:13
**materials** [1] - 21:22
**mathematics** [3] -
54:19, 64:10, 64:15
**matter** [14] - 7:17,
31:8, 45:6, 59:11,
59:12, 66:11, 71:10,
72:2, 75:23, 81:15,
99:8, 125:5
**matters** [2] - 63:5,
72:16
**Maud** [1] - 1:20
**mean** [14] - 27:18,
37:4, 41:5, 71:14,
81:11, 81:13, 82:12,
86:6, 89:8, 91:3,
92:22, 101:16,
121:23, 122:14
**meaning** [3] - 78:12,
92:9, 110:3
**meaningful** [1] - 76:12
**meanings** [1] - 81:7
**means** [9] - 21:16,
25:19, 55:5, 58:13,
73:17, 78:13, 95:13,
109:4, 121:24
**meant** [11] - 82:13,
93:12, 93:19, 93:21,
95:8, 95:9, 101:16,
111:7, 118:18,
119:3, 122:18
**mechanism** [2] - 73:7,
98:4
**media** [2] - 41:3, 41:11
**meet** [14] - 8:6, 35:9,
60:5, 60:21, 65:2,
65:25, 66:4, 67:13,
76:4, 95:20, 96:12,
106:4, 109:11,
117:14
**meet-and-confers** [1]
- 35:9
**meeting** [1] - 110:13
**meets** [3] - 62:11,
77:18, 109:9
**Mel** [3] - 50:2, 50:9,
57:21
**Mel-spaced** [1] - 57:21

**member** [9] - 104:9,
108:5, 109:7, 109:9,
109:13, 112:10,
115:3, 116:22,
118:23
**member's** [3] - 106:4,
116:15, 121:1
**members** [12] - 104:7,
108:13, 108:19,
108:20, 110:20,
110:21, 111:7,
115:10, 116:2,
119:18, 123:14,
123:18
**memories** [1] - 13:16
**memory** [2] - 99:24,
100:2
**memos** [1] - 26:25
**MENLO** [1] - 3:6
**Menlo** [1] - 3:7
**mention** [4] - 38:11,
41:1, 91:22, 108:11
**mentioned** [17] -
27:11, 42:4, 45:16,
47:12, 49:21, 58:15,
66:5, 69:2, 79:1,
79:3, 83:13, 90:12,
91:10, 92:11, 99:19,
104:16, 112:24
**mentioning** [1] -
110:20
**mentions** [1] - 80:5
**merely** [1] - 91:7
**messages** [5] - 44:4,
45:11, 46:1, 46:6,
46:16
**met** [9] - 8:17, 77:14,
77:19, 100:1,
111:14, 112:8,
113:25, 117:22,
117:24
**metadata** [3] - 98:1,
98:3, 98:15
**method** [1] - 13:6
**methodologies** [1] -
51:9
**MFCBR** [17] - 51:4,
51:10, 51:18, 51:23,
52:3, 52:17, 52:22,
53:1, 53:4, 53:8,
53:10, 53:13, 53:14,
53:23, 54:1
**MFCC** [54] - 50:10,
50:16, 51:2, 51:9,
51:17, 52:4, 52:8,
53:22, 54:1, 54:16,
55:12, 55:14, 55:15,
55:22, 56:1, 56:2,
57:24, 59:9, 59:25,
60:5, 61:7, 61:11,

63:10, 65:14, 76:7,
82:6, 82:7, 82:18,
82:20, 82:23, 83:6,
84:7, 84:19, 84:23,
85:15, 85:20, 85:24,
86:6, 86:12, 86:15,
86:17, 86:23, 94:17,
95:3, 96:15, 96:23,
96:25, 98:3, 98:20,
98:21, 99:7, 100:6
**MFCCs** [71] - 49:7,
49:12, 50:1, 50:12,
50:13, 52:17, 54:13,
54:15, 54:20, 54:23,
55:3, 56:12, 56:16,
57:14, 57:18, 57:19,
57:21, 57:25, 58:2,
59:2, 59:5, 59:15,
59:18, 60:8, 60:15,
60:21, 61:18, 61:22,
62:7, 62:13, 63:17,
64:1, 64:8, 64:16,
65:1, 66:4, 67:1,
67:5, 68:10, 68:13,
69:1, 69:15, 70:2,
70:5, 74:15, 74:19,
74:23, 75:2, 75:9,
75:14, 75:17, 76:5,
76:6, 81:20, 81:21,
81:24, 82:16, 85:18,
92:6, 92:9, 92:25,
93:6, 94:7, 94:15,
94:22, 95:1, 95:14,
95:20, 102:7,
102:10, 108:7
**Michael** [3] - 61:2,
85:10, 85:17
**microphone** [1] -
112:16
**Microsoft** [4] - 110:1,
110:4, 110:8
**Microsoft's** [1] - 110:6
**middle** [2] - 36:13,
94:15
**might** [15] - 13:23,
37:21, 41:13, 43:13,
44:6, 44:7, 76:11,
77:8, 89:22, 89:25,
90:8, 90:24, 90:25,
93:19, 119:24
**mike** [1] - 33:14
**Mike** [3] - 25:10,
25:16, 33:15
**Miller** [2] - 63:1, 63:3
**million** [2] - 104:6,
108:22
**millions** [2] - 108:19,
122:22
**mind** [4] - 48:7, 85:21,
93:16, 94:3

**minutes** [6] - 48:8,
102:21, 102:23,
107:8, 119:21,
119:22
**misappropriation** [1] -
8:24
**misconception** [1] -
118:3
**misdirection** [1] -
101:4
**misidentifying** [1] -
84:22
**misleading** [4] -
32:20, 32:21, 34:8,
35:25
**misled** [1] - 34:6
**misrepresentations**
[1] - 7:14
**misrepresented** [1] -
14:25
**misstatement** [1] -
17:24
**mixing** [3] - 60:16,
60:18, 101:12
**mobile** [2] - 105:17,
111:3
**mode** [3] - 29:4, 50:2,
76:9
**models** [1] - 113:8
**module** [1] - 51:3
**moment** [8] - 9:25,
15:18, 18:3, 23:9,
28:9, 45:3, 53:21,
66:11
**moments** [1] - 44:8
**money** [1] - 67:4
**monitor** [1] - 43:22
**monitoring** [1] - 20:3
**months** [3] - 24:2,
25:6, 46:17
**morning** [6] - 5:2, 5:3,
5:5, 5:13, 5:14, 9:12
**Moskowitz** [103] -
7:18, 9:1, 10:18,
10:20, 11:15, 13:15,
13:18, 15:5, 15:15,
15:19, 16:3, 16:10,
16:12, 17:7, 17:9,
17:11, 17:21, 17:23,
18:3, 18:7, 18:11,
19:4, 20:23, 20:24,
21:3, 21:12, 21:22,
21:25, 24:2, 26:4,
27:17, 28:7, 28:24,
29:7, 29:12, 30:11,
30:15, 31:2, 32:11,
33:14, 39:4, 39:9,
54:8, 55:1, 56:4,
56:15, 57:12, 57:17,
58:1, 58:4, 58:5,

58:9, 58:24, 59:7,
59:18, 60:8, 60:22,
61:3, 61:11, 61:18,
63:9, 64:10, 65:7,
66:2, 68:18, 69:3,
69:14, 69:25, 70:13,
71:19, 71:24, 72:12,
73:19, 74:13, 77:22,
78:2, 78:4, 78:7,
79:5, 79:18, 79:23,
79:24, 81:14, 82:5,
83:22, 83:24, 86:25,
87:20, 88:3, 88:10,
89:3, 90:3, 93:11,
93:13, 93:19, 93:20,
93:21, 94:1, 95:8,
95:9, 96:6, 101:16,
101:17
**Moskowitz's** [20] -
14:10, 19:1, 23:11,
24:25, 27:6, 55:20,
63:16, 63:23, 81:22,
82:9, 82:21, 83:7,
87:4, 87:8, 87:17,
95:22, 96:16, 99:2,
99:9, 100:12
**most** [4] - 14:2, 27:3,
69:7, 76:9
**motion** [46] - 6:6, 6:9,
6:11, 6:15, 6:22,
9:19, 12:3, 13:4,
14:16, 34:15, 34:18,
36:4, 47:1, 49:1,
54:7, 69:6, 69:8,
70:22, 75:5, 75:25,
76:19, 76:22, 87:17,
91:6, 101:3, 102:19,
104:24, 105:1,
106:1, 107:15,
107:17, 107:21,
107:24, 108:4,
108:8, 108:25,
112:1, 114:24,
115:4, 117:2, 117:4,
117:22, 118:7,
119:8, 122:25
**motions** [6] - 5:7,
5:21, 6:5, 6:14,
34:14, 124:9
**motive** [1] - 91:20
**move** [2] - 22:7, 30:14
**moved** [3] - 10:8,
11:25, 115:13
**moves** [1] - 48:22
**moving** [4] - 5:24,
72:24, 75:6, 107:9
**MR** [75] - 5:11, 5:14,
6:10, 6:12, 6:20, 7:1,
7:8, 8:2, 9:6, 9:8,
9:11, 16:15, 33:11,

34:11, 34:13, 34:17,
35:20, 35:22, 36:8,
36:11, 39:2, 41:24,
42:2, 47:11, 48:5,
48:17, 48:19, 48:21,
49:4, 52:8, 52:11,
52:14, 52:16, 76:21,
78:18, 78:23, 79:3,
79:15, 81:18, 82:14,
83:13, 83:15, 83:18,
84:13, 84:15, 88:14,
88:17, 89:11, 89:20,
90:24, 91:5, 91:15,
91:18, 97:6, 97:15,
97:19, 97:21, 97:25,
98:14, 100:17,
100:20, 102:17,
102:24, 103:1,
103:11, 103:14,
103:20, 107:9,
119:22, 120:1,
120:5, 121:21,
123:3, 123:8, 124:3
**MS** [1] - 1:17
**multiple** [3] - 13:12,
35:6, 54:14
**Muscle** [48] - 14:10,
16:1, 16:10, 16:12,
16:13, 16:19, 16:21,
16:24, 17:2, 17:6,
17:7, 18:4, 18:8,
18:11, 18:15, 18:16,
18:19, 18:23, 19:6,
20:7, 20:15, 20:16,
20:20, 21:8, 21:12,
21:22, 22:2, 22:22,
23:2, 23:11, 23:19,
24:13, 25:2, 25:11,
25:12, 25:19, 27:22,
28:7, 51:5, 51:10,
51:11, 59:1, 59:24,
61:9, 61:11, 65:14,
84:18
**muscle** [1] - 15:8
**music** [3] - 28:10,
28:16, 28:17
**must** [9] - 14:1, 27:9,
62:9, 65:22, 77:15,
87:20, 93:15, 94:3,
120:17
**mystery** [2] - 60:1,
84:16

# N

**nail** [1] - 11:12
**name** [5] - 21:2, 52:7,
52:13, 52:14, 123:13
**named** [2] - 36:16,
123:9

**narrowing** [3] - 76:15,
82:3, 82:19
**narrowly** [1] - 68:3
**nearly** [1] - 107:16
**necessarily** [2] -
41:15, 86:6
**necessary** [2] - 13:21,
68:13
**need** [17] - 7:4, 12:8,
39:3, 40:9, 78:1,
78:3, 85:10, 85:12,
85:23, 107:24,
107:25, 108:3,
108:6, 112:1,
115:25, 120:22,
124:16
**needed** [3] - 22:25,
73:15, 115:20
**needs** [1] - 121:12
**negligence** [1] -
114:11
**negotiated** [3] - 104:5,
109:16, 119:19
**negotiations** [1] - 17:3
**never** [15] - 7:20, 8:13,
11:14, 11:16, 32:18,
36:21, 38:4, 39:5,
39:10, 45:24, 65:9,
76:13, 98:24,
110:15, 120:22
**new** [2] - 79:4, 114:9
**New** [1] - 109:22
**next** [9] - 11:5, 36:20,
48:24, 85:9, 111:21,
112:13, 114:22,
124:11, 124:13
**nine** [2] - 119:21,
119:22
**NO** [2] - 1:6, 1:21
**nobody** [1] - 70:25
**nomenclature** [1] -
50:23
**non** [8] - 48:23, 67:17,
69:9, 70:16, 76:19,
86:14, 102:4, 113:23
**non-infringement** [7]
- 48:23, 67:17, 69:9,
70:16, 76:19, 102:4,
113:23
**non-invalidity** [1] -
86:14
**none** [3] - 22:17,
67:19, 116:23
**nonetheless** [2] -
10:7, 101:25
**nonpracticing** [1] -
109:23
**Northern** [1] - 62:23
**notably** [1] - 14:15
**note** [13] - 12:24,

19:12, 46:9, 50:15,
50:20, 53:6, 74:17,
101:7, 106:16,
109:3, 115:12,
116:21, 119:7
**noted** [1] - 69:24
**notes** [1] - 125:4
**nothing** [8] - 22:21,
34:11, 48:5, 82:10,
100:25, 116:5,
119:3, 121:24
**notice** [10] - 39:2,
71:25, 72:9, 72:15,
72:20, 74:10, 74:13,
87:22, 88:22, 107:15
**noticed** [1] - 69:21
**notion** [1] - 28:5
**nowadays** [1] - 121:2
**nowhere** [1] - 121:14
**null** [1] - 79:9
**Null** [5] - 80:10, 91:23,
92:17, 93:10, 93:15
**Number** [4] - 5:7,
38:24, 47:16, 83:2
**number** [13] - 14:8,
16:3, 18:3, 18:24,
20:14, 24:11, 31:25,
40:1, 46:16, 56:20,
62:22, 71:12, 76:10
**numbers** [7] - 17:20,
49:6, 50:1, 50:4,
50:5, 50:6, 50:17
**numerous** [2] - 73:22,
74:2
**NW** [1] - 3:2

# O

**oath** [4] - 54:19, 57:4,
68:24, 74:23
**object** [4] - 21:16,
78:23, 100:1
**object-grabbing** [1] -
100:1
**objections** [1] - 88:20
**obtain** [2] - 120:16,
120:17
**obtains** [1] - 108:14
**obvious** [2] - 41:19,
58:21
**obviously** [6] - 8:12,
12:12, 35:1, 41:17,
80:6, 80:24
**occurs** [1] - 84:25
**October** [1] - 57:2
**OEM** [1] - 116:19
**OF** [1] - 1:1
**offer** [11] - 10:3, 11:18,
11:22, 12:13, 13:7,
32:25, 43:1, 44:20,

44:23, 45:7, 80:17
**offered** [6] - 9:23,
34:3, 36:12, 36:17,
38:7, 43:14
**offering** [8] - 10:12,
34:4, 34:6, 36:15,
42:9, 43:21, 110:3,
110:4
**offering...with** [1] -
110:4
**offers** [1] - 12:21
**offhand** [2] - 60:15,
64:2
**office** [4] - 7:15,
33:21, 55:10, 55:13
**Office** [1] - 55:4
**officer** [7] - 72:8,
72:13, 72:21, 73:12,
74:4, 74:9, 74:14
**official** [2] - 63:8,
63:14
**often** [1] - 26:24
**old** [3] - 5:21, 5:23,
66:20
**omit** [1] - 14:25
**omitted** [1] - 14:25
**once** [5] - 32:12,
44:21, 45:25,
105:19, 108:22
**One** [1] - 77:14
**one** [46] - 6:6, 6:9,
11:3, 11:5, 12:2,
12:3, 16:24, 27:9,
29:11, 41:1, 41:10,
54:9, 58:13, 58:25,
59:12, 60:10, 62:3,
63:12, 65:20, 65:23,
66:24, 67:1, 70:24,
72:14, 76:25, 77:1,
77:16, 77:20, 78:1,
78:19, 85:23, 88:5,
88:11, 88:25, 89:2,
90:11, 96:20, 98:11,
99:21, 100:3,
100:24, 102:19,
117:14, 120:25,
121:22
**ones** [2] - 48:9, 66:7
**operating** [1] - 112:10
**operation** [1] - 44:13
**operational** [1] - 43:25
**opine** [1] - 53:18
**opines** [1] - 61:16
**opining** [2] - 100:3,
100:11
**opinion** [6] - 61:17,
67:20, 90:1, 95:19,
96:14, 102:7
**opinions** [1] - 95:18
**opportunity** [1] -

101:17

**opposed** [1] - 71:25
**opposing** [3] - 10:6, 80:4, 99:18
**opposite** [3] - 66:18, 73:6, 87:8
**opposition** [13] - 9:9, 13:20, 22:13, 37:17, 69:18, 75:4, 83:3, 86:19, 92:7, 97:11, 106:20, 115:3, 117:1
**oral** [2] - 1:24, 125:4
**order** [8] - 6:4, 78:4, 79:13, 79:16, 87:3, 100:9, 105:11
**ORDER** [1] - 1:11
**original** [4] - 21:17, 79:10, 79:17, 99:25
**originally** [1] - 51:13
**ORRICK** [3] - 2:14, 3:1, 3:6
**Orthoflex** [1] - 12:6
**otherwise** [1] - 99:16
**outcome** [1] - 116:4
**outlined** [1] - 123:19
**outlining** [1] - 26:25
**overall** [1] - 85:6
**overbroad** [1] - 110:15
**overcome** [1] - 69:23
**overlapping** [1] - 57:22
**overlaps** [2] - 9:19, 23:13
**overview** [1] - 105:9
**overwhelming** [4] - 27:2, 61:21, 75:9, 96:20
**own** [26] - 6:15, 6:16, 9:3, 9:19, 10:8, 18:16, 19:18, 32:10, 32:16, 50:17, 51:23, 52:1, 53:3, 53:5, 54:5, 59:9, 60:24, 61:16, 64:21, 66:6, 70:2, 71:9, 71:11, 122:8, 123:9
**owned** [1] - 15:8
**owner** [2] - 70:12, 122:1
**owners** [1] - 108:21

## P

**p.m** [3] - 103:7, 124:21
**Packard** [2] - 109:24, 111:2
**pad** [1] - 6:24
**page** [14] - 14:22, 36:7, 36:20, 79:5, 97:12, 97:13, 97:22,

98:7, 98:12, 110:6, 113:11, 123:5
**PAGE** [1] - 4:2
**Page** [10] - 16:9, 22:14, 27:11, 47:25, 52:7, 57:16, 88:11, 98:8, 100:22, 113:5
**Pages** [1] - 36:8
**paid** [6] - 90:4, 90:5, 104:5, 108:22, 122:22
**Papakonstantinou** [13] - 52:11, 52:22, 53:18, 59:23, 60:13, 61:19, 66:13, 70:1, 74:18, 74:20, 84:17, 86:10, 95:12
**Papakonstantinou's** [4] - 60:3, 63:17, 65:12, 95:21
**paper** [1] - 59:22
**paragraph** [2] - 98:8, 98:15
**pare** [1] - 47:2
**pared** [1] - 12:17
**PARK** [1] - 3:6
**Park** [1] - 3:7
**part** [16] - 8:22, 24:15, 46:7, 88:23, 106:14, 109:9, 109:10, 109:12, 110:22, 112:12, 113:13, 118:10, 118:14, 119:10, 122:20, 123:11
**partial** [1] - 102:20
**participated** [2] - 56:23, 68:24
**particular** [5] - 16:25, 17:16, 64:9, 78:19, 92:19
**particularly** [2] - 25:2, 63:4
**parties** [16] - 5:9, 37:21, 42:6, 72:7, 72:25, 76:12, 89:12, 106:12, 106:23, 119:17, 120:11, 121:14, 122:3, 122:5, 122:15, 123:8
**parties'** [1] - 42:3
**partner** [6] - 21:8, 24:22, 25:10, 25:11, 25:25, 32:2
**partnering** [2] - 21:4, 25:17
**parts** [3] - 109:1, 109:13, 111:13
**Party** [1] - 120:10
**party** [44] - 12:3, 58:7,

63:3, 63:14, 65:23, 66:1, 66:16, 70:12, 72:11, 73:1, 74:1, 75:6, 104:11, 104:22, 106:8, 106:11, 106:19, 109:5, 109:8, 109:13, 109:19, 109:21, 110:4, 110:12, 110:17, 118:21, 119:12, 119:14, 120:12, 121:8, 121:11, 121:23, 122:9, 122:13, 122:16, 122:24, 123:3, 123:10, 123:16, 123:21, 123:23, 123:24
**pass** [1] - 124:7
**passed** [1] - 35:12
**past** [3] - 11:22, 53:10, 110:2
**Patent** [9] - 10:11, 28:1, 28:3, 55:3, 92:19, 118:5, 118:15, 119:4, 121:3
**patent** [114] - 6:16, 7:15, 8:12, 9:18, 10:1, 11:20, 15:12, 15:21, 16:5, 19:5, 19:8, 19:15, 19:16, 19:24, 20:2, 20:6, 20:8, 20:12, 20:20, 20:21, 22:3, 22:16, 22:25, 23:1, 23:2, 23:13, 23:16, 23:17, 24:2, 24:18, 24:19, 24:20, 25:22, 27:12, 27:23, 30:6, 30:16, 32:14, 33:1, 33:19, 33:20, 33:21, 34:25, 35:3, 35:6, 35:10, 40:25, 41:2, 44:22, 45:2, 45:6, 46:4, 46:11, 46:12, 46:21, 47:7, 49:8, 49:10, 49:16, 49:19, 51:12, 51:13, 51:17, 52:23, 52:25, 53:4, 53:7, 53:15, 53:19, 53:25, 54:3, 55:7, 55:8, 55:10, 55:11, 55:13, 55:21, 56:5, 56:7, 56:9, 58:15, 58:23, 60:6, 61:5, 61:20, 66:8, 66:18, 66:23, 67:8, 68:2, 68:10, 69:10, 70:14, 70:19, 73:21, 85:22, 90:16,

104:2, 104:4, 105:7, 107:16, 108:17, 108:21, 109:23, 112:5, 114:9, 114:17, 117:23, 118:8, 120:18, 121:25, 123:14
**patent's** [3] - 46:8, 65:4, 68:11
**patentee** [1] - 121:25
**patently** [2] - 33:2, 33:4
**patents** [36] - 15:13, 19:13, 24:17, 30:15, 33:23, 45:19, 48:23, 55:11, 56:13, 57:15, 58:3, 60:1, 60:19, 61:4, 61:13, 62:8, 64:25, 79:21, 90:14, 95:4, 96:1, 100:10, 104:8, 108:14, 108:18, 109:24, 110:8, 117:12, 117:13, 119:2, 122:2, 122:3, 122:6, 123:10, 123:17
**patents-in-suit** [2] - 79:21, 100:10
**pause** [1] - 23:9
**paying** [4] - 108:19, 118:18, 118:25, 119:3
**PC** [1] - 2:19
**PDIC** [1] - 109:23
**peculiar** [2] - 63:7, 63:10
**pending** [2] - 47:1, 64:6
**people** [2] - 24:21, 45:24
**per** [4] - 6:2, 28:6, 50:5, 50:6
**perceived** [1] - 17:19
**percent** [1] - 110:24
**perceptual** [3] - 17:17, 28:6, 79:17
**perform** [1] - 100:9
**perhaps** [2] - 30:4, 47:3
**period** [1] - 36:15
**perjure** [1] - 89:1
**perpetrate** [1] - 33:6
**person** [10] - 54:10, 58:9, 58:12, 68:25, 69:3, 70:24, 70:25, 72:10, 72:14, 74:11
**personal** [2] - 73:17, 90:1
**Phillips** [1] - 73:23
**Phone** [6] - 2:5, 2:10,

2:16, 2:21, 3:3, 3:8
**phonetic** [1] - 42:12
**picked** [1] - 117:19
**picture** [1] - 55:23
**piece** [4] - 17:13, 28:4, 46:23, 51:19
**pitch** [2] - 17:18, 45:17
**pixels** [1] - 99:23
**place** [3] - 7:20, 8:9, 95:5
**places** [1] - 44:9
**plain** [3] - 7:2, 96:17, 117:8
**plaintiff** [17] - 6:5, 6:7, 6:19, 9:15, 12:14, 30:4, 30:5, 58:7, 67:8, 67:12, 67:18, 69:15, 69:18, 70:11, 70:12, 73:21, 76:3
**PLAINTIFF** [1] - 2:2
**Plaintiff** [1] - 1:4
**plaintiff's** [3] - 6:14, 6:22, 102:1
**plaintiffs** [1] - 67:19
**plan** [1] - 27:1
**plane** [1] - 42:11
**play** [3] - 87:6, 87:12, 91:10
**played** [3] - 18:25, 45:22, 48:2
**player** [2] - 41:3, 41:11
**pleading** [1] - 75:12
**pleadings** [3] - 12:5, 35:12, 47:4
**plenty** [1] - 120:4
**PLLC** [2] - 2:4, 2:8
**pocket** [2] - 24:20, 25:24
**podium** [1] - 7:5
**point** [42] - 11:17, 11:23, 13:24, 25:9, 34:2, 35:11, 36:23, 45:7, 47:12, 47:25, 55:13, 55:20, 67:12, 74:17, 76:13, 77:14, 78:19, 80:4, 81:9, 84:2, 85:10, 85:24, 87:14, 90:11, 91:21, 92:24, 93:25, 94:4, 94:23, 95:22, 96:4, 96:23, 99:19, 100:22, 101:7, 101:14, 101:23, 120:7, 120:9, 121:3, 121:22, 123:22
**pointed** [6] - 47:13, 77:6, 77:10, 78:6, 78:11, 101:22
**pointing** [11] - 34:20,

53:10, 62:15, 91:25, 92:17, 93:5, 94:25, 101:2, 101:9, 108:1, 113:15
**points** [9] - 92:5, 100:18, 106:17, 106:25, 107:3, 112:23, 116:25, 121:5, 121:17
**policies** [1] - 65:23
**policy** [11] - 59:12, 62:11, 65:25, 66:4, 66:10, 66:16, 67:23, 68:16, 75:23, 77:18, 87:11
**port** [1] - 18:15
**portfolio** [4] - 105:7, 117:14, 117:18, 118:24
**portion** [6] - 30:7, 32:22, 92:2, 104:9, 114:6, 114:20
**portions** [3] - 61:17, 78:15, 119:17
**position** [18] - 6:13, 41:16, 58:16, 66:19, 69:6, 69:20, 77:25, 80:23, 81:19, 81:21, 82:14, 86:15, 86:25, 98:19, 99:1, 99:9, 105:9, 106:1
**positions** [1] - 63:15
**possession** [2] - 26:10, 36:19
**possible** [4] - 37:3, 72:14, 103:21, 103:25
**post** [1] - 40:7
**potential** [3] - 31:5, 37:2, 46:4
**potentially** [1] - 31:6
**powered** [2] - 30:23, 31:14
**powering** [1] - 32:10
**PowerPoint** [1] - 103:15
**PowerPoints** [1] - 49:2
**powers** [1] - 32:15
**practical** [1] - 59:12
**practice** [1] - 53:15
**practiced** [1] - 52:12
**precisely** [1] - 61:18
**predecessor** [2] - 10:23, 68:1
**preempted** [3] - 28:1, 29:16, 29:21
**preemptively** [1] - 116:24
**preference** [2] - 6:4,

6:16
**prejudice** [14] - 12:10, 12:20, 34:20, 34:22, 35:15, 39:17, 39:18, 39:23, 40:16, 40:18, 40:21, 41:21, 46:23
**prejudiced** [4] - 8:9, 8:10, 34:21, 40:20
**prejudicial** [1] - 40:10
**preparation** [1] - 124:19
**prepare** [1] - 23:16
**prepared** [2] - 13:2, 63:14
**preparing** [3] - 40:24, 50:3, 71:20
**prepping** [1] - 107:23
**present** [2] - 6:5, 110:2
**PRESENT** [2] - 5:3, 124:17
**presentation** [2] - 44:12, 107:11
**presented** [1] - 41:3
**press** [2] - 8:20, 32:8
**pressure** [1] - 32:3
**pretty** [5] - 5:25, 7:2, 18:20, 23:3, 110:24
**prevent** [2] - 79:9, 80:9, 118:18
**previously** [1] - 109:25
**principal** [4] - 58:17, 68:2, 68:8, 69:15
**principals** [2] - 89:15, 89:18
**principles** [2] - 106:16, 107:18
**printout** [1] - 55:24, 103:15
**problem** [8] - 6:8, 24:14, 28:17, 28:24, 29:13, 39:24, 73:16, 93:2
**problems** [1] - 84:20
**procedural** [1] - 73:15
**Procedure** [1] - 73:8
**procedure** [3] - 74:8, 74:9
**proceed** [10] - 6:8, 11:13, 11:20, 13:3, 19:22, 32:7, 46:19, 47:7, 48:17, 76:9
**proceeded** [2] - 10:2, 10:25
**proceeding** [2] - 43:7, 62:3
**proceedings** [3] - 1:24, 124:21, 125:5
**proceeds** [2] - 57:19,

57:23
**process** [6] - 28:22, 44:17, 56:2, 56:5, 56:22, 75:6
**processing** [1] - 22:20
**processor** [4] - 107:22, 112:4, 112:12, 116:18
**produce** [2] - 43:16, 47:18
**produced** [1] - 1:25
**Product** [1] - 109:6
**product** [73] - 8:13, 10:10, 10:15, 11:5, 13:8, 30:18, 33:4, 34:4, 36:2, 36:15, 36:25, 37:4, 37:6, 37:8, 37:20, 37:25, 38:3, 38:6, 38:7, 38:13, 38:15, 38:16, 38:21, 39:5, 39:9, 40:5, 42:9, 42:20, 42:25, 43:21, 44:3, 45:12, 45:13, 45:18, 45:19, 54:4, 76:3, 104:9, 104:10, 104:12, 105:21, 106:4, 106:8, 106:10, 109:3, 109:6, 109:15, 112:3, 113:4, 113:17, 113:18, 113:19, 114:6, 114:7, 114:21, 115:2, 115:10, 116:6, 116:16, 117:7, 117:10, 117:11, 117:15, 117:16, 118:10, 118:14, 118:23, 119:11, 119:15, 121:7, 122:17, 122:24, 123:22
**production** [1] - 20:4
**products** [37] - 28:7, 30:23, 31:14, 32:10, 32:16, 33:5, 41:12, 51:19, 53:6, 53:12, 53:19, 53:24, 67:15, 76:4, 103:24, 104:20, 105:3, 105:4, 105:23, 106:3, 109:19, 109:21, 110:12, 110:17, 110:25, 115:2, 115:5, 115:6, 116:22, 118:14, 119:9, 120:12, 120:20, 121:1, 121:5, 122:6, 122:11

**professed** [1] - 115:15
**proffering** [1] - 73:1
**program** [1] - 36:2
**projects** [1] - 18:24
**prong** [1] - 83:19
**prongs** [2] - 77:14, 77:19
**pronounce** [1] - 52:6
**proof** [2] - 8:7, 8:25
**property** [1] - 25:1
**proportional** [3] - 114:10, 114:11, 114:18
**proportionally** [1] - 114:15
**proprietary** [3] - 18:16, 18:18, 29:9
**prosecute** [1] - 122:8
**prosecuted** [1] - 11:1
**prosecuting** [2] - 33:22, 63:15
**prosecution** [2] - 55:18, 94:19
**prospective** [1] - 32:2
**protect** [1] - 28:2
**proved** [1] - 26:23
**proves** [1] - 101:23
**provide** [5] - 21:5, 37:12, 98:16, 114:8, 119:16
**provided** [6] - 33:14, 33:25, 36:15, 105:8, 121:4, 123:11
**provides** [3] - 98:4, 105:6, 116:19
**providing** [2] - 119:17, 122:20
**provision** [1] - 108:24
**public** [22] - 27:19, 27:20, 27:21, 28:2, 28:7, 28:18, 28:19, 29:3, 29:4, 31:25, 32:22, 34:7, 62:11, 65:23, 65:25, 66:4, 66:10, 66:16, 68:16, 77:18, 87:11
**publically** [1] - 31:5
**publications** [1] - 28:6
**pull** [1] - 81:20
**pulled** [1] - 68:20
**purchased** [2] - 32:15, 39:6, 42:11
**purely** [2] - 27:20, 96:8
**purported** [1] - 30:17
**purpose** [5] - 76:16, 104:19, 108:11, 119:13
**purposes** [6] - 14:13, 14:14, 33:22,

107:17, 107:23, 108:7
**pursuing** [1] - 33:1
**put** [33] - 8:21, 10:2, 12:15, 13:20, 14:8, 14:15, 14:18, 23:17, 31:4, 31:9, 33:20, 54:11, 58:7, 59:3, 60:4, 61:17, 65:9, 69:18, 70:4, 71:4, 74:20, 75:3, 75:8, 75:24, 83:4, 95:2, 97:7, 101:24, 104:24, 106:5, 107:13, 115:8, 117:24
**puts** [4] - 33:3, 75:7, 75:8, 116:5
**putting** [4] - 32:3, 90:5, 107:3, 119:14

**Q**

**qualified** [1] - 69:1
**qualifies** [1] - 31:1
**query** [3] - 92:13, 100:24
**questioning** [1] - 89:24
**questions** [7] - 46:9, 46:11, 54:15, 71:13, 72:23, 82:13, 90:15
**quick** [1] - 100:17
**quickly** [4] - 100:20, 103:22, 107:9, 120:2
**quite** [3] - 5:21, 52:14, 98:20
**quote** [11] - 30:21, 43:19, 57:5, 58:9, 63:6, 66:23, 74:1, 92:25, 94:17, 110:5, 113:10
**Quote** [1] - 73:25
**quoted** [1] - 66:20
**quotes** [1] - 93:24
**quoting** [1] - 53:11

**R**

**raise** [1] - 101:11
**raised** [3] - 116:25, 119:7, 121:22
**RAMSEY** [22] - 6:12, 9:11, 16:15, 34:11, 41:24, 42:2, 48:5, 48:17, 48:21, 49:4, 52:8, 52:11, 52:14, 52:16, 78:23, 91:15, 91:18, 97:15, 100:17, 100:20,

103:1, 124:3

**Ramsey** [18] - 3:6, 5:16, 5:18, 9:12, 34:13, 38:24, 42:1, 45:12, 47:21, 76:20, 77:6, 77:20, 78:6, 78:11, 97:4, 98:23, 107:11

**ran** [1] - 80:18

**rarely** [1] - 26:23

**rather** [5] - 12:15, 77:3, 88:23, 114:7, 120:6

**RCS** [1] - 15:25

**reach** [3] - 25:10, 25:24, 26:2

**reached** [3] - 16:12, 16:22, 16:23

**read** [7] - 54:14, 82:11, 84:8, 97:12, 99:2, 100:13, 123:5

**reading** [2] - 32:1, 100:2

**real** [5] - 13:18, 28:17, 45:18, 91:10, 100:20

**reality** [1] - 50:15

**really** [20] - 11:13, 24:21, 29:19, 42:4, 42:25, 53:6, 70:21, 71:14, 80:14, 82:1, 82:12, 87:6, 89:7, 89:8, 93:12, 94:24, 95:24, 101:13, 104:1, 107:20

**reason** [11] - 10:7, 10:16, 39:24, 40:4, 59:13, 64:20, 65:18, 68:15, 72:24, 75:18, 81:6

**reasonable** [6] - 13:22, 14:1, 27:3, 76:2, 96:24, 97:1

**reasonably** [1] - 26:12

**reasoned** [1] - 60:21

**reasons** [3] - 8:6, 76:2, 76:17

**rebut** [1] - 75:1

**rebuttal** [3] - 96:13, 114:24

**rebutted** [2] - 10:5, 45:4

**received** [2] - 10:21, 21:22

**receives** [1] - 112:17

**recently** [2] - 16:18, 69:7

**recess** [4] - 48:9, 48:11, 103:3, 103:6

**Recognition** [1] - 51:5

**recognition** [2] -

25:19, 51:16

**recognize** [3] - 74:25, 89:5, 89:25

**recognized** [2] - 26:22, 29:7

**recognizing** [2] - 18:17, 37:13, 89:1

**recollection** [1] - 21:3

**record** [15] - 5:10, 28:22, 45:20, 59:22, 64:8, 64:19, 70:3, 75:16, 78:25, 93:7, 94:9, 96:22, 101:17, 102:6, 102:12

**recorded** [1] - 1:24

**records** [1] - 61:6

**recovery** [2] - 62:5, 63:19

**red** [4] - 80:18, 80:22, 80:25, 111:14

**reduce** [1] - 21:19

**reduced** [1] - 60:19

**reduces** [1] - 85:17

**reducing** [2] - 76:14, 98:23

**refer** [2] - 38:23, 57:1

**reference** [11] - 91:23, 93:10, 100:25, 107:22, 111:16, 111:21, 111:22, 112:22, 112:25, 113:3, 113:15

**referenced** [3] - 56:18, 83:14, 83:15

**references** [6] - 20:14, 20:17, 23:2, 23:5, 23:6, 50:25

**referring** [10] - 18:2, 19:24, 71:21, 79:18, 79:23, 79:24, 88:4, 90:16, 105:15

**refers** [1] - 79:5

**reflects** [2] - 53:19, 67:21

**refute** [1] - 75:24

**regard** [3] - 5:25, 8:1, 70:8

**regarding** [5] - 12:13, 23:10, 26:9, 70:19, 73:20

**regardless** [1] - 102:21

**regime** [1] - 28:3

**regrettable** [1] - 67:22

**rehash** [1] - 41:4

**rejected** [2] - 54:25, 94:9

**related** [6] - 39:7, 41:21, 43:11, 44:7, 96:2, 103:23

**relates** [2] - 10:16, 111:23

**relating** [4] - 36:22, 37:1, 37:6, 123:10

**relation** [1] - 99:21

**relationship** [3] - 8:1, 30:1, 30:10

**relationships** [2] - 10:18, 15:18

**relatively** [3] - 7:3, 7:10, 41:19

**release** [3] - 8:20, 16:21, 32:8

**relevance** [1] - 117:1

**relevant** [4] - 23:5, 63:4, 96:2, 101:5

**relied** [1] - 62:25

**relief** [3] - 13:5, 27:22, 47:6

**relies** [1] - 53:18

**rely** [3] - 44:3, 46:5, 53:4, 57:4, 65:3, 81:12, 106:2, 106:23

**remained** [1] - 90:17

**remaining** [1] - 33:22

**remark** [1] - 60:15

**remember** [6] - 25:12, 28:9, 42:17, 79:14, 115:13, 120:8

**remind** [3] - 15:22, 17:11, 107:4

**removed** [3] - 11:17, 44:20, 45:7

**removing** [1] - 77:17

**rep** [1] - 69:11

**repeated** [6] - 49:5, 58:8, 63:25, 66:3, 69:25, 78:7

**repeatedly** [11] - 49:17, 54:12, 56:21, 57:13, 58:2, 66:5, 68:8, 70:18, 77:4, 83:15, 90:13

**replication** [1] - 79:9

**reply** [3] - 47:16, 48:1, 119:23

**report** [15] - 10:5, 10:6, 12:16, 13:2, 45:4, 60:3, 83:1, 86:20, 92:3, 92:6, 95:16, 99:1, 99:22, 99:25, 116:12

**REPORTER** [1] - 1:17

**reporter** [1] - 7:6

**Reporter** [2] - 1:17, 125:10

**Reporter's** [1] - 4:6

**reports** [2] - 10:3, 93:7

**representation** [3] - 21:20, 49:22, 79:16

**representations** [3] - 15:23, 60:20, 85:25

**representative** [12] - 49:14, 54:8, 58:17, 71:2, 71:24, 74:21, 77:22, 77:23, 104:17, 107:10, 107:12, 117:19

**representatives** [2] - 35:5, 74:24

**representing** [1] - 16:6

**represents** [4] - 17:20, 50:7, 70:24, 71:3

**request** [6] - 12:17, 32:13, 43:10, 47:19, 47:20

**requests** [2] - 35:8, 76:18

**required** [3] - 100:8, 116:18, 117:19

**requirements** [1] - 117:5

**requires** [2] - 12:9, 84:8, 117:11

**resources** [1] - 27:16

**respect** [5] - 47:19, 101:19, 112:21, 112:22, 118:1

**respectfully** [1] - 76:18

**respond** [5] - 41:24, 85:4, 88:15, 91:15, 99:17

**responded** [2] - 37:13, 59:22

**responding** [2] - 34:18, 47:20

**response** [18] - 11:4, 14:15, 14:18, 14:20, 15:2, 33:10, 36:12, 43:7, 43:18, 47:18, 70:22, 91:20, 106:1, 113:9, 114:8, 114:18, 114:23, 115:3

**responses** [4] - 35:8, 43:17, 44:2

**responsibilities** [2] - 63:9, 63:14

**rest** [6] - 10:17, 10:25, 47:8, 80:2, 80:21, 104:10

**restricted** [1] - 100:14

**restriction** [1] - 110:13

**result** [4] - 25:21, 40:21, 68:13, 87:7

**retains** [2] - 79:17, 122:1

**Retrieval** [1] - 51:6

**representations** [3] -

**retrospective** [1] - 89:4

**review** [3] - 37:15, 42:7, 43:14

**RFAs** [1] - 47:14

**rid** [2] - 104:6, 108:17

**rights** [7] - 45:1, 46:4, 46:21, 108:14, 108:17, 116:7, 122:1

**rise** [9] - 5:1, 48:10, 48:13, 78:8, 80:19, 87:4, 103:5, 103:8, 124:20

**risk** [1] - 120:18

**Road** [1] - 3:7

**Roebuck** [1] - 67:7

**rogue** [1] - 68:19

**routinely** [1] - 109:20

**royalties** [3] - 118:18, 118:25, 119:3

**RPX** [60] - 104:5, 104:8, 104:9, 104:11, 104:12, 104:17, 104:18, 105:2, 105:5, 105:20, 105:22, 106:4, 106:8, 106:10, 108:5, 108:10, 108:11, 108:13, 108:19, 108:24, 109:7, 109:8, 109:13, 109:16, 110:14, 110:20, 110:21, 111:6, 111:7, 111:11, 111:22, 112:10, 113:4, 113:14, 113:19, 114:13, 115:2, 115:10, 116:1, 116:15, 116:22, 117:8, 118:5, 118:23, 119:13, 119:18, 120:9, 120:15, 120:22, 122:2, 122:5, 123:9, 123:13, 123:17, 123:19

**RPX's** [2] - 119:13, 120:23

**rub** [1] - 54:7

**rule** [7] - 11:25, 12:3, 12:4, 46:24, 47:3, 59:14, 114:25

**Rule** [4] - 72:10, 72:18, 72:24, 74:11

**Rules** [1] - 73:8

**ruling** [1] - 57:7

**run** [1] - 116:18

**running** [3] - 45:5,

108:3, 123:25

# S

**saddled** [1] - 60:24
**safe** [1] - 89:3
**sake** [2] - 7:3, 7:11
**sale** [14] - 9:23, 10:3, 10:12, 11:18, 11:22, 12:13, 13:7, 38:8, 39:9, 42:9, 43:1, 44:20, 44:23, 45:7
**salient** [1] - 42:4
**Samsung** [4] - 105:16, 108:12, 111:1, 122:20
**satisfy** [1] - 117:12
**save** [6] - 64:25, 65:4, 66:8, 66:18, 95:4, 119:22
**saw** [1] - 91:12
**scales** [1] - 96:20
**scheduled** [3] - 5:5, 42:14, 59:20
**scope** [3] - 70:19, 72:16, 108:5
**Scott** [6] - 7:18, 9:1, 33:14, 87:17, 88:3, 99:1
**se** [1] - 28:6
**searched** [1] - 75:16
**Sears** [1] - 67:7
**seated** [2] - 48:14, 103:10
**second** [16] - 50:6, 50:7, 77:16, 98:7, 101:14, 107:21, 107:22, 112:4, 112:11, 112:14, 112:15, 113:10, 116:18, 121:3
**second-to-last** [1] - 98:7
**sections** [1] - 86:20
**see** [20] - 12:19, 18:25, 24:21, 25:7, 25:11, 25:20, 31:7, 36:14, 42:22, 49:17, 50:9, 51:20, 55:23, 55:24, 66:11, 78:11, 78:12, 86:18, 111:9, 111:23
**seeking** [1] - 72:7
**seem** [2] - 44:24, 91:9
**sees** [1] - 19:10
**segmenting** [2] - 21:17, 21:18
**sell** [2] - 38:6, 43:2
**selling** [1] - 10:11
**send** [4] - 46:16, 72:14, 72:20, 73:2

**sending** [1] - 45:10
**sense** [9] - 6:13, 11:19, 39:19, 83:23, 84:1, 85:3, 100:14, 114:12, 120:23
**sent** [2] - 43:9, 74:12
**separate** [3] - 17:20, 80:11, 109:11
**September** [1] - 22:17
**sequence** [1] - 27:3
**serious** [2] - 10:23, 24:24
**serve** [1] - 31:4
**served** [1] - 115:18
**server** [6] - 111:17, 113:19, 116:14, 116:15, 123:25
**servers** [5] - 105:14, 106:13, 111:15, 113:2, 113:9
**service** [25] - 36:16, 37:7, 105:21, 106:10, 109:7, 109:16, 112:3, 113:18, 113:20, 114:1, 114:7, 115:2, 115:11, 116:7, 117:7, 117:10, 117:11, 117:16, 118:11, 118:14, 119:11, 119:15, 121:7, 122:18, 122:24
**Service** [1] - 109:6
**service'** [1] - 109:4
**services** [2] - 105:4, 114:21
**session** [2] - 48:15, 103:9
**set** [9] - 6:6, 13:14, 17:20, 49:6, 50:1, 79:9, 103:16, 124:5
**SETTING** [1] - 1:11
**settle** [5] - 31:5, 31:6, 32:3, 108:14, 109:20
**settled** [3] - 77:10, 77:11, 109:25
**settlement** [4] - 43:3, 46:15, 109:18, 110:9
**several** [2] - 8:6, 57:21
**shall** [7] - 12:8, 46:17, 46:18, 47:5, 118:9, 122:7
**shape** [2] - 54:21, 64:17
**shareholder** [1] - 71:1
**SHAWNA** [1] - 1:17
**Shawna** [2] - 125:9, 125:10
**shift** [1] - 95:25

**shifting** [1] - 81:13
**shifts** [1] - 75:11
**shop** [1] - 29:1
**Shopify** [2] - 41:9, 41:10
**short** [5] - 7:3, 7:10, 9:4, 9:14, 9:22
**shorthand** [1] - 51:12
**shortly** [2] - 42:13, 106:9
**shoulders** [1] - 67:10
**show** [15] - 8:17, 8:19, 8:24, 31:21, 33:23, 34:8, 44:10, 75:14, 76:24, 99:12, 106:3, 113:22, 117:21, 117:23, 117:25
**showed** [3] - 16:3, 56:23, 119:16
**showing** [3] - 87:9, 102:10, 117:6
**shown** [6] - 7:17, 14:17, 20:12, 22:12, 33:24, 56:8
**shows** [7] - 9:3, 73:12, 84:5, 86:20, 111:20, 120:11, 120:13
**sic** [2] - 42:16, 55:4
**sic]** [1] - 67:24
**side** [6] - 5:18, 6:2, 30:8, 89:23, 96:20, 96:21
**signal** [35] - 17:19, 21:5, 21:17, 22:19, 24:4, 32:9, 32:16, 49:23, 50:3, 50:7, 54:11, 54:17, 54:20, 54:22, 55:2, 55:16, 56:5, 56:25, 57:6, 57:8, 64:16, 79:7, 79:10, 79:18, 91:23, 92:13, 93:10, 94:1, 94:6, 94:14, 94:18, 100:24, 112:17
**signaling** [2] - 22:20, 24:7
**signals** [4] - 20:3, 43:23, 100:25, 113:1
**similar** [8] - 12:22, 21:15, 21:23, 21:24, 21:25, 32:8, 34:4, 112:14
**similarities** [1] - 21:11
**similarly** [2] - 70:9, 74:18
**simple** [1] - 45:13
**simpler** [1] - 44:17
**simplifies** [1] - 12:9
**simplify** [2] - 11:23, 44:14

**simply** [13] - 12:19, 14:14, 41:7, 44:17, 45:12, 47:4, 47:7, 49:17, 50:1, 76:14, 76:24, 87:17, 122:6
**single** [10] - 13:6, 49:8, 92:23, 94:10, 104:2, 104:25, 113:24, 114:2, 117:3, 117:21
**sitting** [4] - 29:1, 71:5, 71:24, 74:3
**situation** [1] - 47:2
**situations** [2] - 40:15, 122:19
**six** [5] - 56:18, 78:2, 78:17, 80:21, 107:19
**six-day** [1] - 78:17
**slice** [1] - 71:18
**slide** [82] - 14:1, 14:8, 18:9, 19:8, 19:22, 19:23, 20:23, 21:11, 22:14, 24:1, 25:5, 26:8, 29:23, 30:13, 32:7, 32:24, 49:14, 50:9, 50:22, 51:11, 51:20, 51:22, 52:21, 53:2, 53:22, 54:6, 55:19, 56:14, 58:1, 60:10, 60:11, 61:1, 61:14, 61:24, 62:16, 63:21, 65:11, 66:14, 68:15, 69:4, 72:3, 72:24, 74:6, 74:25, 76:1, 84:10, 84:13, 85:9, 88:9, 92:2, 92:4, 92:25, 94:5, 97:22, 98:1, 104:14, 104:24, 105:25, 106:15, 106:25, 107:10, 107:13, 108:9, 108:16, 108:23, 109:17, 110:19, 111:5, 111:7, 111:19, 111:25, 112:13, 113:21, 113:22, 114:4, 114:22, 116:9, 118:4, 119:6
**Slide** [20] - 16:9, 19:17, 25:14, 38:24, 49:1, 49:20, 57:16, 59:17, 61:1, 64:14, 65:20, 70:21, 93:24, 94:5, 94:15, 94:17, 104:23, 105:8, 112:21, 114:23
**slides** [11] - 9:15, 13:9, 48:20, 50:23, 51:1, 84:11, 87:23,

98:7, 103:15, 103:18, 107:8
**sliver** [1] - 73:3
**small** [4] - 15:23, 21:19, 29:1, 47:11
**smartphone** [1] - 112:16
**so-called** [1] - 118:5
**society** [1] - 16:21
**software** [8] - 43:20, 98:4, 98:9, 105:11, 108:3, 116:16, 116:18
**software's** [1] - 105:19
**sold** [2] - 10:13, 44:3
**sole** [10] - 54:8, 58:16, 68:8, 70:11, 70:12, 70:25, 71:1, 104:13, 118:12, 122:8
**solution** [1] - 28:18
**solve** [2] - 28:24, 73:15
**someone** [3] - 21:8, 118:21, 120:25
**something's** [1] - 81:11
**sometimes** [2] - 44:5, 44:6
**song** [5] - 17:13, 17:14, 17:18, 41:2, 98:5
**songs** [1] - 98:17
**sooner** [1] - 124:14
**Sorry** [1] - 35:21
**sorry** [7] - 36:4, 60:11, 80:9, 82:7, 83:17, 84:12, 94:4
**sort** [12] - 5:22, 6:1, 8:24, 9:18, 12:14, 14:20, 15:10, 16:1, 38:13, 46:17, 50:25, 120:21
**sound** [7] - 7:6, 15:24, 21:19, 78:7, 80:13, 99:11, 100:14
**sounds** [1] - 6:23
**source** [4] - 36:21, 37:6, 37:10, 51:6
**Southern** [1] - 109:22
**space** [1] - 21:2
**spaced** [1] - 57:21
**speaking** [5] - 51:22, 78:16, 87:9, 89:2, 89:6
**special** [2] - 74:7, 74:8
**specific** [13] - 14:5, 17:13, 21:24, 27:7, 27:18, 72:8, 74:9, 75:13, 86:5, 91:7,

91:19, 99:23, 104:15
**specifically** [14] - 38:3, 47:13, 80:2, 85:20, 85:21, 85:23, 94:21, 118:15, 118:20, 119:4, 120:10, 121:4, 121:9, 122:12
**specification** [3] - 55:17, 90:14, 94:19
**specifics** [2] - 47:13, 92:18
**spectrum** [2] - 50:5, 109:18
**speculate** [1] - 93:11
**speculation** [1] - 93:18
**spend** [3] - 103:22, 104:15, 104:21
**spent** [1] - 35:9
**SPIKE** [1] - 1:3
**Spike** [147] - 5:6, 5:12, 7:18, 8:8, 8:13, 8:18, 8:25, 9:23, 10:5, 10:23, 11:4, 12:21, 14:14, 14:23, 14:25, 15:15, 17:9, 19:9, 22:16, 23:14, 25:16, 27:12, 27:17, 30:23, 34:3, 34:20, 34:21, 34:24, 35:2, 35:4, 35:18, 35:22, 36:1, 36:11, 36:14, 36:17, 36:20, 37:11, 37:12, 37:18, 37:25, 38:3, 38:5, 38:6, 38:7, 38:14, 38:20, 39:14, 39:18, 40:10, 40:13, 40:18, 40:19, 40:22, 41:4, 41:19, 41:21, 42:7, 43:19, 45:10, 46:14, 47:12, 47:22, 49:5, 49:11, 50:11, 52:18, 54:9, 54:10, 55:11, 58:4, 58:7, 58:24, 59:15, 59:18, 59:21, 60:1, 60:4, 60:8, 61:3, 62:2, 63:11, 66:3, 67:1, 69:2, 70:4, 70:24, 71:12, 71:18, 71:25, 72:17, 73:19, 73:21, 74:4, 74:7, 74:21, 75:1, 75:11, 77:25, 81:19, 81:20, 82:10, 83:4, 84:15, 86:24, 89:13, 92:5, 94:24, 97:7, 98:25, 100:10, 104:4, 104:6, 104:7, 105:2, 105:7,
105:25, 106:12, 106:19, 108:1, 108:18, 108:25, 109:14, 109:16, 110:23, 111:9, 112:2, 112:22, 113:6, 114:2, 114:5, 114:9, 115:13, 116:5, 116:25, 117:14, 117:17, 118:3, 118:19, 118:24, 119:2, 119:3, 119:19, 122:1, 122:5, 122:7, 123:12
**Spike's** [55] - 11:10, 12:24, 14:16, 17:24, 19:13, 30:22, 32:8, 32:20, 37:5, 37:17, 38:2, 38:5, 38:14, 41:15, 47:16, 48:23, 49:16, 50:21, 51:23, 52:21, 53:3, 53:7, 53:12, 54:4, 56:8, 58:15, 58:16, 59:23, 60:7, 62:15, 63:19, 68:6, 70:22, 75:4, 76:5, 77:21, 77:25, 78:21, 81:19, 81:21, 83:3, 83:25, 86:13, 86:15, 86:19, 91:20, 96:21, 97:11, 98:19, 107:12, 112:7, 113:15, 115:3, 116:11, 122:21
**stage** [1] - 40:11
**stand** [2] - 8:6, 58:12
**stand-alone** [1] - 8:6
**standard** [7] - 12:4, 12:7, 26:20, 26:21, 28:22, 31:22, 121:24
**standing** [3] - 91:24, 92:8, 94:24
**stands** [2] - 51:5, 69:2
**start** [4] - 6:10, 6:21, 9:17, 14:22
**started** [6] - 5:9, 11:9, 36:25, 39:8, 102:23, 112:6
**starting** [3] - 28:11, 103:17, 112:4
**starts** [1] - 123:11
**State** [1] - 125:11
**state** [3] - 62:25, 64:14, 65:22
**statement** [11] - 31:19, 31:23, 32:19, 36:23, 37:5, 37:14, 38:10, 84:7, 90:1, 102:1, 114:25
**statements** [10] - 8:18, 8:21, 11:2, 14:12, 18:13, 32:1, 35:23, 78:10, 84:4, 85:12
**states** [2] - 54:15, 57:3
**STATES** [2] - 1:1, 1:13
**States** [2] - 1:18, 55:4
**stating** [1] - 115:1
**stayed** [1] - 50:20
**stenographic** [1] - 125:4
**stenography** [1] - 1:24
**step** [2] - 117:12, 117:14
**steps** [1] - 92:15
**Sterner** [3] - 66:22, 67:16, 67:21
**stick** [1] - 57:10
**still** [7] - 26:22, 33:1, 37:23, 41:5, 83:9, 95:11, 96:8
**stipulated** [3] - 19:12, 19:14, 20:9
**stipulation** [1] - 19:18
**stopped** [1] - 90:25
**story** [2] - 15:4, 31:4
**strategy** [3] - 24:4, 25:21, 68:23
**Strawn** [2] - 113:24, 117:20
**streamline** [1] - 76:11
**Street** [5] - 1:19, 2:4, 2:9, 2:14, 3:2
**strike** [1] - 115:13
**strokes** [2] - 21:15, 49:20
**strong** [1] - 69:25
**structural** [1] - 67:12
**structure** [4] - 14:16, 66:17, 67:14, 70:14
**structures** [2] - 65:6, 96:12
**stuck** [1] - 70:5
**stuff** [4] - 18:6, 20:11, 24:23, 25:23
**subject** [1] - 81:15
**subjective** [1] - 21:19
**sublicense** [2] - 120:22, 123:15
**Sublicensee** [1] - 109:5
**sublicensee** [2] - 104:11, 121:10
**submission** [1] - 69:23
**submissions** [1] - 73:20
**submit** [4] - 10:5, 27:2, 47:6, 115:7
**submitted** [5] - 59:20,
83:11, 92:3, 96:22, 99:21
**subsequently** [1] - 33:20
**substance** [1] - 42:18
**substantial** [3] - 31:24, 32:21, 46:12
**substantially** [2] - 23:13, 118:21
**substantive** [1] - 114:8
**substitute** [3] - 13:5, 39:23, 82:15
**sudden** [3] - 120:25, 121:2, 123:25
**sue** [3] - 122:2, 123:17, 123:18
**sued** [1] - 120:18
**sufficient** [1] - 46:2
**suggest** [2] - 42:18, 74:7
**suggesting** [1] - 11:6
**suggestion** [2] - 11:10, 43:12
**suggests** [1] - 16:18
**suit** [3] - 79:21, 100:10, 123:10
**suitable** [1] - 57:3
**Suite** [2] - 2:15, 2:20
**suited** [1] - 26:18
**sum** [1] - 76:1
**summarize** [1] - 110:20
**summary** [33] - 6:22, 12:1, 14:7, 25:3, 26:19, 33:7, 47:1, 48:22, 48:25, 54:7, 63:20, 67:17, 69:9, 69:18, 70:3, 70:16, 75:5, 75:6, 75:7, 76:16, 76:18, 76:22, 76:23, 78:24, 87:13, 87:16, 93:7, 96:9, 97:2, 99:13, 102:3, 102:12, 102:20
**summer** [5] - 16:11, 17:22, 18:4, 43:8, 43:9
**supplementing** [1] - 115:15
**supplied** [10] - 104:11, 105:13, 109:7, 111:11, 111:18, 112:19, 113:4, 115:9, 116:1, 116:23
**supplies** [2] - 105:10, 109:8, 109:9, 114:13, 114:14, 118:21, 118:23
**Supply** [1] - 66:23
**supply** [4] - 111:12, 112:11, 112:15, 116:3
**supplying** [3] - 109:13, 110:21, 117:15
**support** [5] - 8:3, 13:25, 14:19, 74:2, 106:5
**supported** [1] - 68:9
**supporting** [1] - 106:21
**supportive** [1] - 69:6
**supports** [3] - 22:1, 23:24, 99:10
**supposed** [1] - 95:17
**sur** [2] - 47:16, 48:1
**sur-reply** [2] - 47:16, 48:1
**surface** [1] - 30:17
**survive** [2] - 13:16, 68:11
**sustain** [1] - 75:20
**SUTCLIFFE** [3] - 2:14, 3:1, 3:6
**switching** [1] - 88:8
**sworn** [2] - 45:23, 60:7
**system** [13] - 1:25, 7:6, 19:10, 25:18, 43:22, 51:15, 85:14, 86:5, 110:22, 111:8, 112:10, 119:17, 122:20
**systems** [3] - 50:17, 61:6, 64:21

---

# T

**tablets** [1] - 105:17
**tag** [2] - 98:1, 98:3
**tags** [1] - 98:15
**talks** [2] - 35:16, 98:10
**tangible** [1] - 39:6
**teach** [3] - 86:16, 86:24, 100:7
**teaching** [1] - 52:23
**teachings** [1] - 79:19
**team** [2] - 20:2, 21:4
**Teashot** [1] - 70:10
**tech** [1] - 28:23
**technical** [4] - 57:20, 57:24, 107:24, 108:7
**technique** [1] - 85:15
**techniques** [1] - 61:6
**technology** [33] - 14:10, 15:7, 16:11, 16:19, 16:22, 17:1, 17:15, 18:16, 20:22, 23:12, 24:6, 24:8,

24:9, 24:10, 24:12, 24:15, 24:16, 25:8, 25:20, 28:15, 29:9, 30:20, 30:21, 30:23, 31:3, 31:14, 32:9, 32:10, 32:17, 51:24, 53:14, 54:1
**ten** [2] - 50:5, 50:6
**tends** [1] - 121:13
**term** [13] - 54:11, 57:10, 58:9, 58:13, 63:12, 69:3, 82:3, 104:2, 106:11, 109:5, 119:14, 122:13, 122:16
**terms** [5] - 28:13, 40:8, 43:25, 57:24, 81:8
**terrible** [1] - 7:7
**test** [2] - 62:24, 63:5
**testified** [9] - 21:2, 54:12, 54:19, 56:21, 57:13, 71:10, 71:19, 74:22, 83:1
**testifies** [1] - 55:15
**testifying** [1] - 56:15
**testimonial** [1] - 62:20
**testimony** [51] - 26:9, 45:23, 49:6, 53:5, 53:11, 60:7, 61:2, 71:11, 71:22, 72:10, 72:15, 73:6, 73:10, 73:24, 74:1, 74:3, 77:8, 77:13, 77:15, 77:21, 78:2, 78:10, 80:6, 80:16, 80:18, 80:21, 81:22, 82:9, 82:21, 83:8, 83:10, 83:12, 83:20, 84:1, 85:10, 87:4, 87:8, 87:18, 87:22, 88:3, 88:5, 88:18, 89:9, 96:16, 97:8, 99:2, 99:4, 100:12, 101:15, 101:19
**Tewfick** [1] - 97:11
**Tewfik** [10] - 82:25, 83:6, 84:6, 86:20, 87:7, 99:10, 100:6, 100:13, 116:11, 116:17
**Tewfik's** [1] - 86:20
**TEXAS** [1] - 1:1
**Texas** [12] - 1:18, 1:20, 2:5, 2:9, 2:20, 12:6, 27:15, 29:24, 62:23, 62:25, 65:22, 125:11
**text** [3] - 60:12, 60:13, 113:22

**that'd** [1] - 97:17
**THE** [87] - 1:1, 1:1, 1:12, 2:2, 2:12, 5:1, 5:2, 5:4, 5:13, 5:19, 6:23, 7:4, 7:23, 9:5, 9:7, 9:10, 16:14, 33:10, 34:10, 34:12, 34:16, 35:19, 35:21, 36:6, 36:10, 39:1, 41:23, 42:1, 47:9, 48:3, 48:7, 48:10, 48:13, 48:14, 48:15, 48:16, 48:18, 49:3, 52:6, 52:9, 52:13, 52:15, 76:20, 78:15, 79:1, 79:13, 81:9, 82:12, 83:10, 83:14, 83:17, 84:12, 84:14, 88:9, 88:16, 89:7, 89:17, 90:23, 91:3, 91:13, 91:17, 97:4, 97:17, 97:20, 97:24, 98:13, 100:16, 100:19, 102:15, 102:18, 103:2, 103:5, 103:8, 103:10, 103:12, 103:19, 107:6, 119:21, 119:24, 120:4, 121:20, 123:2, 123:7, 124:2, 124:4, 124:18, 124:20
**themselves** [3] - 82:2, 90:16, 119:9
**theoretical** [1] - 96:19
**theories** [5] - 23:14, 66:19, 75:20, 93:4, 115:17
**theory** [15] - 15:10, 23:10, 23:15, 23:17, 23:20, 29:16, 33:1, 62:5, 63:19, 92:23, 93:5, 95:1, 96:24, 114:9, 120:19
**theory's** [1] - 120:19
**Therasense** [2] - 26:22
**therefore** [5] - 32:22, 49:12, 96:25, 115:10, 116:15
**ThermoTEK** [1] - 12:6
**theses** [1] - 61:13
**they've** [16] - 7:17, 8:5, 8:16, 8:20, 8:21, 10:14, 24:5, 29:17, 75:21, 75:24, 95:4, 108:22, 113:13, 116:7
**thin** [3] - 23:3, 33:18,

121:16
**thinking** [4] - 28:13, 42:23, 44:11, 94:3
**third** [35] - 37:21, 57:5, 104:11, 104:22, 106:8, 106:11, 106:12, 109:8, 109:13, 109:19, 109:21, 110:4, 110:12, 110:17, 118:21, 119:12, 119:14, 119:16, 120:12, 121:8, 121:11, 121:14, 121:23, 122:2, 122:5, 122:9, 122:13, 122:14, 122:16, 122:24, 123:3, 123:20, 123:24
**Third** [1] - 120:10
**third-party** [15] - 106:8, 106:11, 109:19, 109:21, 110:4, 110:12, 110:17, 119:12, 120:12, 121:11, 121:23, 122:9, 122:24, 123:3
**Third-Party** [1] - 120:10
**Thom** [1] - 53:11
**thorough** [1] - 60:21
**thoughtful** [1] - 64:3
**threat** [1] - 108:17
**three** [9] - 6:6, 34:24, 40:2, 55:8, 73:14, 79:21, 114:13, 124:11, 124:13
**throughout** [2] - 43:8, 45:21, 98:6
**ticket** [1] - 42:11
**tied** [1] - 41:14
**tier** [2] - 123:14, 123:18
**timbre** [1] - 17:18
**timeline** [2] - 42:3, 48:1
**titled** [1] - 125:5
**today** [17] - 5:8, 13:16, 20:15, 35:18, 39:16, 42:16, 51:19, 53:6, 53:12, 53:19, 53:24, 54:4, 58:22, 93:8, 94:24, 101:20, 124:6
**today's** [2] - 12:18, 54:7
**together** [5] - 6:17, 8:22, 28:23, 90:6, 101:12

**took** [8] - 7:20, 9:1, 11:14, 23:21, 33:16, 59:19, 113:6, 114:2
**top** [2] - 7:24, 110:24
**topic** [3] - 42:4, 64:12, 89:24
**topics** [1] - 88:21
**tort** [1] - 114:10
**touch** [1] - 77:24
**Trademark** [1] - 55:4
**training** [1] - 63:8
**transcript** [4] - 1:25, 31:11, 78:4, 78:17, 80:15, 125:4
**transcripts** [1] - 78:3
**transmit** [1] - 41:13
**trap** [1] - 64:23
**trial** [4] - 13:3, 23:16, 67:20, 75:13
**triangle** [1] - 57:22
**tried** [6] - 8:21, 13:23, 67:9, 67:12, 90:15
**trier** [4] - 13:22, 26:12, 26:14, 26:19
**Tripath** [1] - 40:14
**true** [17] - 9:3, 13:1, 14:14, 15:1, 26:21, 27:19, 32:19, 39:4, 44:1, 50:18, 53:16, 53:17, 56:6, 81:12, 82:23, 101:1, 125:3
**truth** [3] - 26:18, 27:10, 73:6
**truthful** [1] - 91:3
**try** [8] - 25:24, 33:17, 46:19, 61:5, 65:4, 85:14, 103:20, 120:2
**trying** [24] - 17:6, 22:10, 31:7, 44:14, 46:17, 50:11, 58:24, 58:25, 59:8, 61:7, 64:20, 68:6, 69:20, 70:6, 71:8, 71:17, 75:19, 81:20, 85:16, 85:22, 93:10, 99:21, 101:11, 107:6
**Tuneprint** [11] - 15:25, 19:11, 19:20, 19:25, 20:4, 20:5, 20:11, 20:16, 20:19, 22:23, 24:14
**turn** [19] - 13:9, 24:7, 25:5, 30:24, 31:1, 31:15, 55:19, 57:16, 60:10, 84:10, 97:21, 105:8, 105:25, 108:9, 108:23, 109:17, 111:5, 111:25, 112:13
**turned** [2] - 43:5,

118:4
**turning** [2] - 36:3, 85:9
**turns** [2] - 13:7, 50:6
**tutorial** [2] - 35:3, 38:14
**twisted** [1] - 66:24
**two** [16] - 6:2, 8:20, 20:13, 25:6, 27:18, 34:14, 34:23, 45:23, 64:11, 71:15, 74:23, 77:14, 88:13, 100:17, 106:25, 109:24
**TYLER** [1] - 1:2
**Tyler** [4] - 2:5, 2:9, 2:20, 42:10
**type** [10] - 14:6, 26:18, 27:9, 33:6, 49:23, 62:1, 70:14, 109:19
**types** [1] - 25:3
**typically** [1] - 27:1

**U**

**U.S** [2] - 12:7, 55:3
**ultimately** [2] - 15:11, 44:21
**un-highlighted** [1] - 60:12
**un-rebutted** [1] - 10:5
**unchallenged** [1] - 114:3
**uncommon** [1] - 28:16
**under** [40] - 10:11, 11:25, 12:4, 23:15, 26:20, 26:21, 27:15, 27:18, 27:23, 27:24, 33:1, 33:7, 47:3, 54:19, 55:1, 57:3, 68:24, 70:9, 71:25, 72:9, 72:15, 74:11, 74:22, 75:21, 89:22, 92:22, 94:13, 96:9, 104:12, 104:20, 105:23, 110:17, 114:25, 119:10, 119:12, 122:6, 122:8, 122:11, 123:15
**underlying** [1] - 65:23
**understood** [4] - 63:25, 64:1, 82:22, 85:2
**undisputed** [8] - 51:21, 52:5, 52:16, 52:24, 53:25, 54:4, 58:6, 114:25
**unequivocal** [11] - 62:9, 63:24, 64:18, 65:13, 65:18, 77:16,

78:9, 80:13, 83:19, 91:11, 95:6
**unfair** [5] - 8:16, 8:17, 8:19, 8:24, 32:23
**unfairly** [1] - 27:17
**unintelligible** [2] - 43:9, 92:19
**unintelligible)** [1] - 28:25
**uninterested** [1] - 68:19
**UNITED** [2] - 1:1, 1:13
**United** [2] - 1:18, 55:4
**university** [1] - 30:1
**unjust** [12] - 7:18, 7:25, 23:14, 23:15, 23:24, 26:14, 27:13, 27:14, 28:1, 29:16, 29:20, 30:6
**unjustly** [1] - 7:19
**unknown** [2] - 79:8, 80:10
**unlikely** [1] - 80:24
**untrue** [1] - 97:7
**up** [29] - 5:8, 7:5, 15:24, 16:3, 17:2, 19:15, 21:7, 25:17, 29:2, 31:4, 37:9, 44:10, 46:14, 48:24, 56:23, 60:18, 73:12, 76:1, 80:11, 92:14, 95:18, 107:6, 113:1, 114:16, 115:14, 120:2, 121:18, 124:16
**updated** [2] - 115:18, 115:24
**upheld** [1] - 109:20
**urged** [2] - 57:14, 58:2
**user** [1] - 41:5
**uses** [8] - 21:14, 21:17, 50:1, 51:8, 107:12, 110:22, 120:20, 123:25
**usurped** [1] - 27:17
**usurping** [1] - 22:9
**utilized** [2] - 43:21, 43:22

## V

**vague** [1] - 84:9
**valid** [2] - 32:4, 123:14
**validity** [3] - 65:4, 66:8, 66:18
**value** [4] - 24:22, 26:1, 27:16
**values** [7] - 59:25, 60:5, 61:7, 65:15, 84:19, 85:16, 85:20

**vectors** [4] - 59:24, 65:14, 84:18, 85:15
**vehicle** [1] - 33:5
**venture** [1] - 120:24
**version** [1] - 52:8
**versions** [13] - 79:7, 79:20, 91:22, 92:15, 92:20, 92:22, 93:9, 93:16, 98:5, 98:10, 98:17, 99:7, 101:7
**versus** [11] - 12:5, 63:1, 66:22, 67:7, 69:7, 73:23, 84:23, 87:21, 89:6, 96:9, 101:21
**via** [2] - 110:8, 111:11
**viable** [1] - 45:3
**video** [1] - 15:22
**view** [3] - 55:1, 58:13, 72:1
**violates** [1] - 10:1
**violation** [1] - 32:23
**violations** [1] - 8:7
**virtue** [1] - 15:14
**vs** [2] - 1:5, 30:1
**vying** [1] - 28:18

## W

**wait** [1] - 40:4
**waive** [5] - 45:1, 46:4, 46:17, 46:18, 46:20
**waived** [1] - 75:21
**walk** [7] - 9:16, 12:22, 50:22, 55:20, 111:22, 113:21, 117:3
**walking** [1] - 46:4
**wants** [5] - 6:7, 18:14, 18:15, 40:18, 108:16
**warranted** [1] - 99:13
**Washington** [1] - 3:3
**WASHINGTON** [1] - 3:1
**waste** [2] - 11:20, 44:19
**water** [1] - 67:10
**watermark** [1] - 22:5
**watermarking** [15] - 16:17, 17:4, 17:9, 17:12, 19:1, 21:10, 22:9, 22:18, 23:6, 24:5, 25:18, 28:8, 28:20, 29:13, 37:3
**wave** [1] - 30:16
**wax** [1] - 66:24
**ways** [6] - 6:12, 45:16, 58:25, 59:6, 67:6, 70:7
**website** [5] - 9:24,

30:22, 32:9, 32:20
**week** [4] - 19:7, 19:13, 19:17, 19:23
**weeks** [2] - 124:11, 124:13
**weighing** [1] - 14:4
**whatnot** [1] - 47:14
**whereas** [1] - 82:6
**wherein** [2] - 92:12, 100:23
**white** [1] - 60:12
**who've** [1] - 25:25
**whole** [16] - 82:6, 82:8, 84:1, 89:2, 89:6, 90:2, 90:19, 91:2, 93:14, 95:16, 99:5, 109:10, 109:12, 110:17, 115:15, 119:13
**Windows** [7] - 105:14, 105:17, 110:8, 111:12, 112:9, 112:18, 114:1
**withdraw** [1] - 35:14
**withheld** [1] - 55:6
**witness** [6] - 13:12, 27:9, 59:23, 73:1, 74:4, 95:13
**witnesses** [4] - 13:17, 26:16, 46:10, 63:6
**word** [7] - 21:17, 25:18, 49:17, 60:2, 60:5, 66:15, 81:3
**words** [9] - 18:17, 21:15, 21:21, 21:24, 50:25, 51:25, 60:17, 64:7, 85:11
**works** [3] - 43:24, 80:10, 114:17
**world** [2] - 17:15, 30:19
**worth** [2] - 44:24, 45:6
**wrap** [1] - 120:2
**write** [1] - 26:25
**writes** [1] - 22:3
**writing** [1] - 61:4
**written** [4] - 36:21, 37:6, 46:1, 46:13

## X

**XML** [1] - 86:21

## Y

**y'all** [1] - 48:7
**year** [6] - 16:2, 30:14, 31:12, 44:5, 45:11, 109:22
**years** [5] - 19:1, 22:3,

34:24, 44:23, 69:8
**York** [1] - 109:22
**yourself** [1] - 73:16