IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| **BLUE SPIKE, LLC,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Case No. 6:15-cv-584** |
| | § | **SEALED** |
| **AUDIBLE MAGIC CORPORATION** | § | |
| *Defendant.* | § | |

| | |
|---|---|
| **AUDIBLE MAGIC CORPORATION** | § |
| *Counterclaim Plaintiff,* | § |
| | § |
| **v.** | § |
| | § |
| **BLUE SPIKE LLC, BLUE SPIKE, INC.** | § |
| **and SCOTT A. MOSKOWITZ** | § |
| *Counterclaim Defendants.* | § |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

The above-referenced case was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636.  The following pending motion is before the Court:

> **Blue Spike, LLC, Blue Spike, Inc., and Scott Moskowitz's Motion for Summary Judgment on Audible Magic Counterclaims 9-13 (Docket Entry # 14).**

The Court, having reviewed the relevant briefing and hearing arguments of counsel August 25, 2015, recommends Blue Spike's motion for summary judgment be **DENIED**.

### I. BACKGROUND

On  August 27, 2012, Plaintiff Blue Spike, LLC filed suit against Defendant Audible Magic Corporation ("Audible Magic"), alleging infringement of four patents: U.S. Patent Nos. 7,346,472

(the '472 Patent), 7,660,700 (the '700 Patent), 7,949,494 (the '494 Patent), and 8,214,175 (the '175 Patent) (collectively "Asserted Patents").  The Asserted Patents describe a method and device for monitoring and analyzing signals. Audible Magic's answer included twelve counterclaims against Blue Spike, LLC, Blue Spike, Inc., and Scott Moskowitz (collectively "Blue Spike"). Audible Magic eventually brought thirteen counterclaims against Blue Spike. It later clarified that counterclaims 1 through 9 are asserted against Blue Spike, LLC alone.

Previously, Blue Spike filed motions to dismiss counterclaims 10, 11, and 13.   The undersigned recommended the motions be denied.  (Cause No. 6:12cv499, Docket Entry # 1656). On August 15, 2014, District Judge Schneider adopted the Report and Recommendation as the findings and conclusions of the Court.  *Id*., Docket Entry # 1690.

## II.  THE MOTION

Blue Spike has moved, pursuant to Federal Rule of Civil Procedure 56,  for summary judgment on Audible Magic's counterclaims 9 through 13,[1] which allege inequitable conduct (counterclaim 9), unjust enrichment (counterclaim 10), Lanham Act violations (counterclaim 11), infringement of Audible Magic's '308 patent (counterclaim 12),[2] and common-law unfair competition (counterclaim 13). Although Blue Spike's motion contains eleven attachments, Blue Spike's motion does not include statements of the issues to be decided by the Court or of undisputed material facts, as required by Local Rule CV-56(a).

---

[1] Counterclaims 1 through 8, which are not the subject of Blue Spike's motion for summary judgment, seek declarations of invalidity and non-infringement for the patents-in-suit.

[2] Audible Magic has separately moved to dismiss counterclaim 12, but without prejudice. The Court considers whether to dismiss counterclaim 12 with or without prejudice in a separate Report and Recommendation, issued contemporaneously with this R&R.

The Court uses the "Factual Background" section provided by Audible Magic in its response, along with the citations to the over eighty exhibits attached to the response.  In its response, Audible Magic argues the counterclaims are fact intensive and not appropriate for summary judgment.

### III. EVIDENCE AND ASSERTIONS

#### A.      Audible Magic's allegations

Before setting out the evidence, the Court provides background as contained in Audible Magic's answer to Blue Spike's First Amended Complaint in order to give context. Audible Magic's predecessor was a consulting company called Muscle Fish, LLC ("Muscle Fish").  (Docket Entry # 3 at pg. 16, ¶16).  Beginning in 1992, Muscle Fish engineers worked on systems for analyzing content and signals. In the 1990s, Muscle Fish engineers designed a system for looking up and comparing known and unknown content, based on a set of features of content called "MFCCs." The Muscle Fish engineers published papers about this technology. *Id.* at pgs. 16-17, ¶18.

In 1996, Muscle Fish filed application No. 08/681,174 on aspects of its MFCC-based fingerprinting technology. A continuation-in-part application was filed on July 21, 1997, resulting in the issuance of U.S. Patent No. 5,918,223 on aspects of the MFCC-based technology on June 29, 1999.  *Id.*  In the 1990s, interest in Muscle Fish's pioneering content recognition system was very high and the technology was known in the industry. *Id.* at pg. 17, ¶19.  Muscle Fish disclosed, marketed, and sold its technology and systems to numerous companies.  *Id.*  In 2000, Muscle Fish was merged into Audible Magic, and Audible Magic acquired all of Muscle Fish's intellectual property.  *Id.* at pg. 18, ¶20.

According to Audible Magic's answer, in the mid-1990s, neither Moskowitz nor Michael Berry, the applicants for the Asserted Patents (nor Blue Spike, Inc.), was developing or selling any

technology to identify content or signals based on the content or signal itself. *Id.* In 1994, Moskowitz formed the DICE Company to develop a watermarking system called "Argent." *Id.* at pg. 19, ¶22. He formed that company, which was based in Palo Alto, California, with Marc Cooperman, who had a technical background. Cooperman's job was to create a working digital watermarking system because Moskowitz had no technical ability to do so. Cooperman worked on this project between March 1995 and October 1996, but the two were unable to develop a working system. Thereafter, as alleged by Cooperman, Moskowitz took the existing assets and intellectual property of the DICE Company, without informing Cooperman, and ultimately moved them to a new company, called "Blue Spike, Inc.," thus freezing out Cooperman. *Id.* Cooperman sued Moskowitz and Blue Spike, Inc. in two different lawsuits. *Id.* at pg. 19, ¶23. Going into 1997, upon information and belief, Moskowitz was in litigation with Cooperman; he had no technical person who could create any product for him, and he lacked sufficient technical background to create such software systems himself. *Id.*

According to Audible Magic, at least as early as 1997, while Moskowitz's business was struggling, Moskowitz became aware of the pre-existing Muscle Fish content-based recognition systems. *Id.* at pgs. 19-20, ¶24. In the summer of 1997, Moskowitz contacted Muscle Fish and inquired about Muscle Fish's technology, and Muscle Fish representatives told Moskowitz that Muscle Fish had "developed the Audio Information Retrieval (AIR) DataBlade module for the Informix Universal Server." *Id.* at pg. 20, ¶24. Similarly, in a telephone call with Muscle Fish in the summer of 1997, after having learned about Muscle Fish's technology and recognizing its value, Moskowitz told Muscle Fish that it should obtain a trademark on the name of one of its products, "SoundFisher," which was one embodiment of Muscle Fish's content-based recognition technology.

4

After his interactions with Muscle Fish, Moskowitz formally incorporated Blue Spike, Inc. in November 1997. As alleged further in the answer, Moskowitz did not disclose the foregoing prior art to the PTO.  *Id.* Audible Magic alleges Moskowitz and Blue Spike then used the ideas learned from Muscle Fish for their own benefit.  Specifically, they allegedly filed patents purporting to cover content recognition and now accuse the same Muscle Fish technology that predated the patents by years. *Id.* at pgs. 21 & 23, ¶¶27-28, 33.

**B.    Audible Magic's summary judgment evidence**

**1.    Moskowitz's conversations with Muscle Fish**

Muscle Fish "was doing exact matching years before" Audible Magic approached Muscle Fish to license that technology.  (Keislar Dep. at 27:22-28:10).  According to Doug Keislar, an employee of Audible Magic, Muscle Fish started a relationship in 1994 with a client named Digital Generations, and Muscle Fish demonstrated to Digital Generations that it could do "ad detection on radio, broadcast radio. . . ."  *Id.* at 28:10-21.  According to Keislar, Muscle Fish "promoted its content-based retrieval technology widely," including publicizing it on their website.  *Id.* at 33:1-5.

In June of 1997, Muscle Fish released an Audio Information Retrieval (AIR)  DataBlade module ("AIR DataBlade") that implemented its content fingerprinting and recognition technology in Informix brand databases. (Moskowitz Dep. at 442:15-17). The AIR DataBlade created and saved fingerprints of audio files that reflected: "Perceptual attributes, such as pitch or loudness" and could "[a]nalyze and store acoustic and perceptual features of a sound. . . . " (AM Ex. 3, AUDMAG01092705) (AM Ex. 49). Keislar described AIR DataBlade as audio identification technology, "the core of MFCBR," offered through a database company called Informix. (Keislar Dep. at 34:23-35:6).

5

Moskowitz testified he learned about Muscle Fish at least as early as 1997, in the context of work concerning a watermarking product called "DataBlade." (Moskowitz Depo. at 8:17-12:15) (Keislar Dep. at 33:23-36:12). Moskowitz testified he recalled a press release regarding AIR DataBlade; that he saw the name Muscle Fish in a press release relating to "NEC's watermarking offering;" that his knowledge about the product was not limited to email exchanges with Muscle Fish that continued into approximately November of 1997; and that he knew more about the AIR DataBlade in 1997 than he could recall at the time of his deposition. (Moskowitz Dep. at 9:19-21, 11:20-12:5, 426:9-426:25, 430:11-25, 431:10-14, 432:8-12, 432:23-433:8, 443:7-25, 446:17-458:6). Moskowitz did not deny that he had reviewed the AIR DataBlade product documentation. *Id.* at 458:10-458:13, 443:7-25.

According to Audible Magic, the evidence also suggests Moskowitz learned about Muscle Fish from the AudioEngineering Society ("AES"). Moskowitz was involved with AES, testifying that he "participated in 1996 in the -- at AES, the Audio Engineering Society." *Id.* at 498:1-2. For example, on November 4, 1996, Moskowitz emailed a consultant: "I will be in LA for the Audio Engineering Society show if you have time to meet in person." (AM Ex. 4). On June 10, 1997, the AES emailed an announcement to members about an upcoming meeting on June 24, 1997, where Muscle Fish was presenting on "Content-based Classification, Search and Retrieval of Audio." (AM Ex. 5). The description of the subject was:

> There are many audio and multimedia applications which benefit from the ability to classify and search audio based on the characteristics of the audio rather than by keywords. These include automatic segmentation and classification of audio or video recordings (e.g., news or sports footage), multimedia databases and file systems, surveillance, sound browsers for effects designers and musicians, and content-based audio processing equipment. This talk will describe the Muscle Fish technologies for audio analysis and comparison. The analysis reduces sounds to low-level perceptual

6

and acoustical attributes as well as higher-level statistical models of the behaviors of these attributes. Given such an analysis, sounds can then be searched, classified or retrieved by any one or a combination of the attributes, by specifying previously learned categories based on these attributes, or by selecting or entering reference sounds and asking the engine to retrieve sounds that are similar (or dissimilar) to them.

*Id.*

On June 30, 1997, just weeks after this AES publication and release of AIR DataBlade, Moskowitz contacted Muscle Fish:

We understand you have done work with Informix on their Tiger line of multimedia databases. Would it be possible to estimate work to provide CODEC meeting certain technical specs for our audio implementation of our Argent digital watermark technology. We are trying to provide a number of CODECs that can be user specified to meet various needs to flexibly watermark audio samples.

(AM Ex. 6). Thom Blum of Muscle Fish responded, confirming that Muscle Fish offered the "AIR DataBlade," stating as follows:

Just so you're clear, Muscle Fish developed the Audio Information Retrieval (AIR) DataBlade module for the Informix Universal Server. We are not involved with the 'TigerMark' DataBlade from NEC, which I believe is a watermarking system for graphics-only files.[3]

(AM Ex. 8). That same day, Moskowitz talked with Blum on the phone. (AM Ex. 9). There were several follow-up calls and emails throughout the course of July and thereafter. (Moskowitz Dep. at 470:7-19).

During the calls, Blum detailed the techniques and operation of AIR DataBlade, which analyzed "perceptual features" of audio, such as pitch, brightness and loudness, and created representations reflecting those features. Blum testified that "[w]hen [he] discussed technology with

---

[3] The following day, on July 1, 1997, Moskowitz emailed AES stating: "we are interested in following developments of 'Internet Audio.' Would you all please provide us with information on how to keep abreast of your activities?" (AM Ex. 7).

7

Scott [Moskowitz] . . . [he] was explaining to him kind of what [they] do in [their] audio information retrieval data blade. . . ." (Blum Dep. at 258:12-14).  Blum testified he "went through some -- some details without, you know, getting into exactly how we do what we do. But I was certainly covering what we do and -- because I was trying to explain how what we do is different than a watermark and why it -- why it is better for at least the kinds of applications that we had envisioned." *Id.* at 258:19-25) (AM Ex. 9, 11-16).  During these calls, Blum explained the benefits over watermarking as follows:

Q. And can you tell me about this contact that you had with Scott Moskowitz?

A. Yeah, we -- we were at the office in Berkeley, and I got a phone call -- actually, I got some email that -- from Scott Moskowitz, and he was inquiring about some work that Muscle Fish was doing with Informix at the time, and he wanted to know what we were working on with Informix and offering us a -- soon to be offering us a product for the Informix database system.

He wanted to know if that did watermarking. And I explained that . . . in the email message I said that it did not do watermarking and that I think he was thinking of a different company that was also working on a project for Informix called Tiger or TigerMark, or the product was called TigerMark. I think it was made by NEC. And that [] was a watermarking product, but that what our product was was something we called an audio information retrieval blade.

Informix had contracted with us for us to take our CBR technology and turn it into like a plug-in for their database management systems. And they'd done this with various companies for – they wanted to have their database be capable of handling what they called rich media multimedia, so video and audio and images and things like that.

And so I responded to Scott [Moskowitz] and I said: I think you're thinking of the TigerMark data blade. We actually make the audio information retrieval blade. I believe there was a mail message that said -- from Scott saying he'd like to talk to us about it, he had an interest in it and he'd like to talk to us about it. And so I said: Okay, let's set up a meeting, give me a call, and I can talk to you.

So I got a phone call from him a few days later and I explained, again, that we weren't in the business of doing watermarking; that we were taking a very different

approach to the whole thing. And for various reasons, one being that we thought we had a pretty nifty invention in the way we were producing the stuff and doing, you know, analysis of audio and comparing audios. And the other was that -- that our technology didn't require that you embed anything in the audio file itself.

And I explained why I thought that was an advantage, in our case anyway, why that worked better than having a watermark that had to be sort of injected into the signal. And I think he understood that. I mean -- but he kind of was pressing us to get involved with code[cs] or things that he was working on.

(Blum Dep. at 237:18-240:4 & 259:1-260:12).  Moskowitz also spoke with Doug Keislar. Keislar testified as follows:

My understanding was at the time that Scott was doing watermarking and wanted to be able to handle different audio formats and he thought perhaps our datablade would work well for him in that regard.

(Keislar Dep. at 148:23-149:2).

Moskowitz testified that in these 1997 exchanges, Blum made it clear that Muscle Fish developed AIR DataBlade. (Moskowitz Dep. at 442:2-443:5, 444:1-23, 458:22-459:19, 710:19-711:20). Moskowitz acknowledged he discussed Muscle Fish's content recognition technology: "sometime around June of 1997 and November of 1997, and the folks who were cc'd on that email provide probably the basis of the folks that I had discussed whatever it was that Muscle Fish could potentially do. . . ." *Id*. at 707:9-709:5.  Moskowitz testified Muscle Fish was "incapable of doing the work" he had original inquired about so "the result is nothing came of it." *Id*. at 470:16-19.

These communications about the system based on perceptual features, and the benefits over digital watermarking, were Muscle Fish's confidential and proprietary information. According to Audible Magic, Moskowitz created the impression during these exchanges that the parties were treating discussion of their respective technologies as confidential. Moskowitz testified he

9

understood confidential information was exchanged. *Id*. at 444:24-446:2, 445:6-46:2. He even marked exchanges "CONFIDENTIAL." (AM Ex. 16).  In an email a month later, Moskowitz referred to the information that he learned from his discussions as Muscle Fish's "proprietary database technology." (AM Ex. 17). There was no indication by Muscle Fish that Moskowitz could use its ideas in his later patent application.

Beyond these exchanges, Moskowitz admitted he was aware of a 1996 Muscle Fish IEEE article entitled "Content-Based Classification, Search and Retrieval of Audio." Although Moskowitz testified he does not remember if he saw the article before 2000, he did not deny knowing about it before filing his patent. (Moskowitz Dep. at 681:2-7, 683:15-18, 684:8-12, 710:19-711:20) (discussing the IEEE article and testifying that he understood that the same inventors created the AIR DataBlade); 714:20-715:20 (testifying that he believed that the "Content-Based Classification Search and Retrieval of Audio, again dated fall of 1996" was "describing what Muscle Fish was or was not doing.")).

On August 5, 1997, Moskowitz told Muscle Fish that he was not going to work with them, but he stated as follows:

> Some **areas which I feel would be suited in working with Muscle Fish** is perhaps Wintel work on the finalized application and any **porting with your own proprietary database technology**. I was a little hesitant in making this decision because **I want to work with you all on a number of extension-projects**. . . .

*Id*. at 473:6-474:19 (emphasis added); *see also* AM Ex. 17. Moskowitz testified the meaning of "porting to Muscle Fish's proprietary database technology" was plain on its face; he was referring to AIR DataBlade. (Moskowitz Dep. at 483:5-21, 484:20-25, 492:15-493:2). Moskowitz testified he was interested in porting with Muscle Fish's proprietary database technology with his

watermarking technology because he believed that Muscle Fish's business was not doing very well, and he believed he could improve that situation. *Id.* at 488:23-489:13, 489:16-491:8.

At that point, in August of 1997, Moskowitz instead hired Michael Berry, a contractor also working for Muscle Fish. *Id.* at 18:20-25; Ex. 19, 25:4-26:5, 106:19-107:4) ("Muscle Fish . . . is a contract—software contracting company that I subcontracted for starting in 1997"). Moskowitz was aware of this fact. (Moskowitz Dep. at 477:6-22). Berry discussed Muscle Fish with Moskowitz: "Q: Okay. Did you ever have any conversations with Moskowitz about Muscle Fish at any time when you were at Blue Spike? A: Certainly." (Berry Dep. at 107:2-4, 133:6-9). Muscle Fish engineers testified Berry knew the types of technology made by Muscle Fish. For example, Muscle Fish engineer Jim Wheaton testified Berry "had an understanding of what we were about, what kind of software we had, what kind of audio techniques we used." (Wheaton Dep. at 206:2-8).

According to Audible Magic, Moskowitz continued to receive information about Muscle Fish's technology. Specifically, in mid-March 1998, Moskowitz met the publisher of a multimedia technology newsletter in Amsterdam. (Moskowitz Dep. at 1173:16-1178:10) (AM Ex. 21). On May 26, 1998, Moskowitz emailed him to inquire if he had any news. (AM Ex. 22). Two days later, Moskowitz received a copy of a newsletter, which described the Muscle Fish technology as follows:

> Muscle Fish Content-based classification, search and retrieval of audio. Muscle Fish's CBR (content-based retrieval) technology allows you to search for audio files on the basis of how they sound. It can also be used to classify sound files or live sound inputs. How might people want to access sounds? We believe there are several useful methods, all of which we have attempted to incorporate into our system. - Simile: saying one sound is like another sound or a group of sounds in terms of some characteristics. For example, 'like the sound of a herd of elephants.' A simpler example would be to say that it belongs to the class of speech sounds or the class of applause sounds, where the system has previously been trained on other sounds in this class. - Acoustical/perceptual features: describing the sounds in terms of commonly understood physical characteristics such as brightness, pitch, and

11

loudness. - Subjective features: describing the sounds using personal descriptive language. This requires training the system (in our case, by example) to understand the meaning of these descriptive terms. For example, a user might be looking for a 'shimmering' sound. - Onomatopoeia: making a sound similar in some quality to the sound you are looking for. For example, the user could making a buzzing sound to find bees or electrical hum. In a retrieval application, all of the above could be used in combination with traditional keyword and text queries. http://www.musclefish.com.

(Moskowitz Dep. at 535:6 to 538:25) (AM Ex. 23).

According to Moskowitz, he understood this was a "recitation of some features of things that allegedly Muscle Fish may or may not have done." (Moskowitz Dep. at 711:21-712:8, 714:20-715:20). Moskowitz admitted this description was "to the best of my knowledge, the ways that we could retrieve and/or search for content at that time. . . ." *Id.* at 744:24-745:4, 541:3-542:22 (stating belief that Muscle Fish technology was means to archive, categorize and retrieve files).

Audible Magic asserts the evidence shows, over the next three years, "a persistent plan to use Muscle Fish's content recognition technology in conjunction with or as an alternative to Blue Spike's watermarking technology." (Docket Entry # 23 at 8).  For example, over the fall of 1997, Moskowitz emailed Thom Blum at Muscle Fish, "attempting to keep him engaged."  *Id.*; *see* AM Exs. 24-32. In December 1998 and January 1999, Blue Spike licensed the resample code and algorithm used by Muscle Fish's fingerprinting algorithms, which changes the resolution of sample audio, *i.e.* creating numbers which represent a segment of sound compactly, but still preserves the basic sound. (Blum Dep. at 42:19-245:1, 246:10-247:15) (Berry Dep. at 133:14-134:10).

Moskowitz instructed Berry to ask for that code, but to keep Muscle Fish in the dark: "Okay. Without mentioning that it is for this, see how much it would cost and the timing." (AM Exs. 33 & 84). According to Audible Magic, Moskowitz urged Berry to try to exert ownership over Muscle Fish's intellectual property, stating he wanted to "have total ownership over it." (AM Ex. 34).  Berry

also noted: "Musclefish has the code we need already written. It would just take a small amount of alteration on their part." (AM Ex. 35). Despite Blue Spike's use of this key portion of Muscle Fish's recognition library, Muscle Fish did not grant a license to Blue Spike to use its fingerprinting algorithms. (Blum Dep. at 247:10-15).

In April and May 2000, just four months before Moskowitz filed for the asserted patents, Blue Spike again asked Muscle Fish for technical assistance. (AM Ex. 36). That agreement was not completed, however, because Moskowitz again attempted to exert ownership over Muscle Fish's work and intellectual property. (AM Ex. 37). The draft agreement in Muscle Fish's files bore the notation: "Never signed (no agreement on NDA/IP issues)." (AM Ex. 38).

## 2. Moskowitz's patents

According to Audible Magic, Moskowitz derived his patents from the early Muscle Fish work. Audible Magic **first** asserts that Moskowitz, in his patents, appropriated Muscle Fish's ideas regarding the benefits of using the perceptual features of a signal as an identifier, rather than inserting a digital watermark, as follows:

> One such additive signal that may be utilized is a digital watermark—which ideally cannot be removed without perceptually altering the original signal. A watermark may also be used as a monitoring signal (for example, by encoding an identifier that uniquely identifies the original digital signal into which the identifier is being embedded). A digital watermark used for monitoring is also an additive signal, and such a signal may make it difficult for the user who wants to duplicate a signal without paying a royalty—mainly by degrading the perceptual quality of the original signal if the watermark (and hence the additive monitoring signal) is removed. This is, however, is a different solution to the problem. . . . The present invention eliminates the need of anyadditive monitoring signal because the present invention utilizes the underlying content signal as the identifier itself.

('472 patent at 5:5-20) ('700 patent at 5:5-20) ('494 patent at 5:13-28) ('175 patent at 5:13-28). Moskowitz successfully argued to the PTO that the point of novelty was the ability to identify a

13

signal without having to insert data, "precisely as disclosed to him by Muscle Fish."  (Docket Entry # 23 at 10); *see e.g.* AM Ex. 43 at 7 (arguing that invention identified signal based on attributes of signal itself and prior art involved "unique identification binary value . . . which is the identification code placed onto the original signal," an "embedded code signal" and an "identification code is encoded into the original signal."); AM Ex. 44 at 10 (arguing that prior art "discloses additive information, the 'informational signal', having no relationship with the perceptual nature of the reference signal. The present invention[s] is not so limited."); AM Ex. 45 at 14, 19-20 (same); AM Ex. 46 at 19 (arguing that benefit over prior art is that signal could be identified using "the signal alone" where in prior art signal couldn't be recognized if "stripped of its associated 'identification signal'"). The PTO accepted these arguments and allowed the claims on the basis that the prior art before it "do not teach . . . creating an abstract of the . . . signal using perceptual qualities of the . . . signal such that the abstract retains a perceptual relationship to the . . . signal from which it is derived." (AM Ex. 47).

Audible Magic **further** asserts Moskowitz, in the specification and claims of the asserted patents, incorporated fundamental Muscle Fish ideas of taking an "audio object," "segmenting" it, analyzing "perceptual features," "perceptual attributes" or "subjective features" of the audio, and then "reduce the sound to a small set of parameters" that represent it.  Audible Magic's expert analyzed the similarities, concluding:

> There are a number of very specific terms and nomenclature and very specific principles which are found in the asserted patents. It is my opinion that it is notable and would be unusual for this specific combination of terms, nomenclature and principles to be found both in the earlier Muscle Fish prior art publications and systems and in the later asserted patents, filed on September 7, 2000, unless the authors of the asserted patents had access to information concerning the earlier Muscle Fish prior art and had adopted some of the Muscle Fish terms, nomenclature and principles in the asserted patents.

(AM Ex. 50, Expert Report of Dr. Schuyler Quackenbush at ¶745).

Moskowitz admitted the prior art Muscle Fish technology created data-reduced representations of content that were searched against other data-reduced representations. (Moskowitz Dep. at 750:8-23). He acknowledged that, like the Muscle Fish technology he learned about in 1997 and 1998, his patents allowed searches for audio files based on how they sound. *Id.* at 554:18-555:9, discussing AM Ex. 23 (description of Muscle Fish technology received by Moskowitz in 1998). Moskowitz stated his patent filing was a system and method for identifying content based on the content itself. *Id.* at 209:6-11. He testified that he believed "if anything, the signal abstract is an improvement over a failed product that Muscle Fish offered. . . . " *Id.* at 694:6-11. When asked whether he was the first person ever to come up with the idea of looking at a signal, analyzing the attributes of the signal, and creating a fingerprint of the signal based on its attributes, Mr. Moskowitz testified "No, I never said that." *Id.* at 1091:14-20.

In Moskowitz's first patent application, he did not name the Muscle Fish inventors as co-inventors, and he did not disclose Muscle Fish's work. Moskowitz recognized his obligation to disclose all material prior art. *Id.* at 49:18-51:2, 953:14-25, 975:2-21. He admitted he would have to disclose prior art with "words that were similar" or "things that were similar" to his patents. *Id.* at 955:6-22.

**3.      Other content fingerprinting systems predating Moskowitz's patents**

Moskowitz was involved with and knowledgeable about the content monitoring and recognition industry. *Id.* at 184:1-185:2, 206:1-15, 210:1-19, 509:4-511:24, 513:2-523:12, 183:20-183:23, 925:1-13, 739:3-13, 509:4-511:24, 497:8-500:14; *see also* Cassidy Dep. at 51:2-16, 40:22-24, 59:19-63:13. Moskowitz testified that prior to September 7, 2000, he interacted with many

companies involved with content fingerprinting. (Moskowitz Dep. at 746:2-753:5). He testified he did not believe that he was the first person to come up with the concept of creating data-reduced representations of a signal. *Id.* at 900:15-19. Mr. Cassidy, Blue Spike's marketing lead, testified that in 1999 and 2000, Moskowitz and Blue Spike were well aware of companies doing content monitoring and fingerprinting, which was the architectural alternative to watermarking. (Cassidy Dep. at 81:10-82:1, 82:23-84:2).

According to Audible Magic, Moskowitz and Blue Spike were aware of numerous other signal fingerprinting and monitoring systems, as detailed in Audible Magic's Supplemental Response to Interrogatory No. 18. (AM Ex. 53). For example, Moskowitz had repeated interactions with an individual named Andreas Sappelt and his company Digital Hanse, and an individual named Elliot Mazer and his company RCS, both of which provided such systems. Like Muscle Fish, he repeatedly discussed partnering with these companies to use their fingerprinting technologies. He was also aware of other such fingerprinting systems, including the Xift, BDS, Imagelock and APIS systems. *Id.*

The Tuneprint fingerprinting system is representative of material prior art, beyond the Muscle Fish technology, that Moskowitz withheld. On August 28, 2000, prior to Blue Spike's stipulated date of conception (Dkt. 1899), Moskowitz received an email describing Tuneprint:

> 'Fingerprinting' of Audio Files? Posted by CmdrTaco on Monday August 28, @06:52AM from the tech-I'd-love-to-see dept. Pseudonymous Coward writes: 'This could be interesting: Tuneprint is an audio fingerprinting algorithm. It takes the unique 'fingerprint' of a sound clip, which can then be compared to a fingerprint database to get more information about the clip, like title and artist, lyrics, URLs, related music, copyright status, or almost anything else. The fingerprint doesn't change even if the sound is compressed, converted to a different file format, broadcast over the radio and so on.' www.tuneprint.com.

(AM Ex. 54).

Moskowitz had a printout of the tuneprint.com website from that time, which described the technology in detail. (AM Ex. 55). Moskowitz also had a September 1, 2000 article, a week prior to filing the patents, regarding Napster's piracy problem and the technology of Tuneprint and others as a solution to the problem. (AM Ex. 56).  Moskowitz did not disclose this prior art.

On September 13, 2000, a week after filing the asserted patents, Cassidy emailed Moskowitz asking about a "Napster like service" which used "a database of signal abstracts." (AM Ex. 57). Moskowitz responded by referring back to the prior art Tuneprint system that pre-existed his patent filing and conception date, stating: "you can check out. . . tuneprint.com for instance concerning how it would look. we filed a patent on monitoring of signals which is exactly like this. . . .  abstracts of music or movies based on a massive reduction of the data of the actual signal. . . . yields a signal abstract which is not additive as a watermark is. . . ." *Id.*; *see also* AM Ex. 58 (9/16/2000 email Moskowitz stated: "We have completed 2 patent filings on Monitoring signals (this relates to stuff like tuneprint, btw"). Moskowitz only disclosed digital watermarking prior art in his September 7, 2000 application. (AM Ex. 59).

**4.      Audible Magic evidence regarding Moskowitz's intent to deceive**

According to Audible Magic, from the first time that Moskowitz learned about Muscle Fish's technology, he intended to "port" it to his watermarking technology.  By 2000, Moskowitz's need for fingerprinting technology was acute and he had both commercial and personal motivations to deceive the PTO. Berry testified that after 1999, it was difficult for Blue Spike to raise money and its business model did not justify further funding because "I don't know that it was clear how we were going to make money with the products that we had in-house." (Berry Dep. at 39:25-40:20). By April of 2000, Blue Spike personnel were seriously questioning the viability of Moskowitz's

technical and business strategy regarding digital watermarking, as reflected in an exchange between Berry and a contractor named Peter Jensen. (AM Exs. 60-61). According to Audible Magic, having failed to get traction in the SDMI watermarking standard setting process, by July 25, 2000, Moskowitz stated as follows: "I believe that we should also be contemplating our own exit from SDMI. . . ." (AM Ex. 62). Berry testified that by late 2000, SDMI was ending, and there was frustration by everyone at Blue Spike. (Berry Dep. at15:20-16:17). Cassidy testified that Blue Spike's strategy for attracting investment and attention in the market turned on success within SDMI.(Cassidy Dep. at 52, 28:7-20).

Audible Magic asserts in the summer of 2000, as numerous setbacks called into question the viability of watermarking, Blue Spike's business plans began to explicitly contemplate partnering with third parties offering signal fingerprinting or monitoring technologies. In particular, in July 2000, after Warner Music rejected a deal with Blue Spike, Moskowitz explicitly indicated that in response it was necessary to partner with a fingerprinting company called Digital Hanse. (AM Ex. 63). Blue Spike's August 2000 business plan indicated that it "has entered into an co-development agreement with Digital Hanse, a company providing powerful signal recognition services over the Internet to act as a passive music file search mechanism to determine music file authenticity." (AM Ex. 64 at BLU0205998).

In general, in the business plan, Blue Spike "proposes to promote its licensing and technology partnering programs through an aggressive industry marketing and public relations program." *Id.* Moskowitz and Berry both testified Blue Spike never created a signal abstracting technology or a signal monitoring system. Berry, the primary technical person at Blue Spike, testified "we did not come close to making a product surrounding signal abstracts." (Berry Dep. at 21:5-14) (Moskowitz

18

Dep. at1385:8 to 1386:7, 1241:2-23, 1119:19 to 1119:23) ("Q. As -- here is my question. As of February 2001, Blue Spike, Inc. had not built a signal abstract-based database identification system, right? A. That's exactly what I've said.")

According to Audible Magic, Blue Spike needed a partner's fingerprinting technology to carry out its plans. Cassidy testified there was never discussion of creating a database of fingerprints, but this was something they "knew about as architectural approaches." (Cassidy Dep. at 61:4-62:2, 79:14-21). Cassidy explained that, in 2000, the team discussed partnering with other companies that provided signal abstracting "[b]ecause that's what they did," "that's what they did all the time," and "that's where their expertise apparently was." *Id.* at 88:7-20, 91:4-17). On December 5, 2000, Moskowitz stated in an email to others at Blue Spike the following:

> just to remind you… watermarking may NOT be the best technology for monitoring. signal abstracts might be far more accurate and easier to implement. we do not have technology to do this but we have filed two patents and I have spoken to a number of companies which currently have the technology. I do not have any problem offering both to demonstrate 2 systems, especially if we can get the technology from elsewhere and spend some time better crafting the technology to the task suggested.

(AM Ex. 65); *see also* AM Ex. 66 (12/28/2000 discussing "combining signal abstracts/signal recognition techniques" and "watermarks"); AM Ex. 67 (Feb. 2001 proposal to ASCAP describing signal abstracts as a "backup" to watermarking).

On January 22, 2001, Moskowitz told Blue Spike shareholders that "Blue Spike has also recently begun to explore strategic partners in the tracking and monitoring space. . . ." (AM Ex. 68); *see also* Moskowitz Dep. at 1056:21-1057:18, 1080:21-1081:9). On February 5, 2001, Moskowitz discussed "Potential partners for development" of fingerprinting technology. The first company on the list was "MuscleFish." (AM Ex. 69). On February 14, 2001, Moskowitz told Berry the following: "Mike - please put feelers out to Muscle Fish…" about providing their fingerprinting technology.

(AM Ex. 70). That same day, Berry contacted Muscle Fish (by that point part of Audible Magic):

> We just got a call from Mike Berry, who is CTO of the watermarking company Blue Spike. . . . Mike used to live in the Bay Area and worked for Muscle Fish a few years ago as a subcontractor on several projects. . . . Blue Spike is interested in partnering with Audible Magic to come up with a hybrid watermarking/CBR system for broadcast monitoring. They would use watermarks for newly released (future) content, and our technology for existing content. They are focusing on the broadcast monitoring market now, since SDMI is 'in the process of disintegrating' (in Mike's words). . . .

(AM Ex. 71).

Moskowitz testified that at this time, Blue Spike had challenges with SDMI, was running out of money, and was deciding whether to shut down. (Moskowitz Dep. at 1042:9-1043:18, 1101:14-1103:3).

### 5.   Moskowitz' alleged statements that he was the "first to create" and offers for sale of The Giovanni Abstraction Machine

According to Audible Magic, Moskowitz made false and misleading statements on Blue Spike's website suggesting Blue Spike was the "first to create" fingerprinting technology and asserting that "this technology has powered his Blue Spike products since the turn of the century," particularly "The Giovanni Abstraction Machine." (AM Exs. 72-73). Moskowitz offered the Giovanni Abstraction Machine for $10,000 on the Internet. (AM Ex. 79).  Moskowitz and Berry testified Blue Spike never built any signal abstracting technology. (Moskowitz Dep. at 1061:13-1062:1 & 1235:16-1237:8 (admitting that Giovanni Abstraction Machine did not exist in 2000 or 2001)). Moskowitz has acknowledged "the Giovanni abstraction machine was never produced or created." *Id.* at 1484:1-21, 1475:23-1478:2, 1474:23-1475:21, 1473:10-1474:7, 1384:10-23; 44:15-44:19 ("We don't have a signal abstracting product."). He testified he drafted the statements, stating they were intended for a commercial purpose, *i.e.* "marketing." *Id.* at

20

1479:19-1482:6.

## IV. DISCUSSION

### A.      Counterclaim 9 - inequitable conduct

Blue Spike argues there is no evidence it misrepresented or omitted **material** information or that they did so with specific **intent to deceive** the PTO.  Specifically, Blue Spike argues Audible Magic cannot show "but-for" materiality of the information allegedly misrepresented or omitted from its patent applications.  *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (Undisclosed prior art is "but-for material if the PTO would not have allowed a claim had it been aware of" it). Even assuming there is some evidence suggesting "but-for" materiality, Blue Spike asserts Audible Magic cannot prove Blue Spike acted with the specific intent to deceive the PTO.

In its motion, Blue Spike relies on deposition testimony from applicants Moskowitz and Berry, wherein they testified they did not misrepresent or omit anything material in their patent applications.  (Moskowitz Dep. at 396:12-20) (Berry Dep. at 54:1-11). Blue Spike also relies on testimony of Audible Magic employees that they had no information about what Moskowitz did before the PTO. (Ikezoye Dep. at 198:18-199:16)(Keislar Dep. at 169:4-169:16)(Blum Dep. at 265:5-16).[4]

To prove Blue Spike obtained the patents-in-suit through inequitable conduct before the PTO, Audible Magic must show "by clear and convincing evidence" that Blue Spike "(1) misrepresented

---

[4] Audible Magic asserts its employees' personal knowledge is not pertinent.  According to Audible Magic, its employees would not have any idea what Moskowitz was doing in the PTO, and Moskowitz would naturally be the "person who has knowledge of what he did, said, and thought 20 years ago."  (Docket Entry # 26 at 1).

or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1344 (Fed. Cir.2013). Audible Magic provided over fifteen pages of evidence supporting its counterclaims, tying the narrative to over eighty exhibits.[5]  Audible Magic's evidence, outlined in detail above, lays out the history between Moskowitz and Muscle Fish.  Audible Magic's argument is as follows:

> If the Patent Office had been aware that the Muscle Fish inventors had (1) developed the claimed analysis of 'perceptual features' to create a fingerprint, for example in its AIR DataBlade product and others, (2) discovered the benefits of that approach over watermarking (3) told Moskowitz all about that approach, and (4) that Moskowitz actually lifted their language in his claims, the Patent Office would not have treated Moskowitz as the inventor of these concepts. If the examiner had been aware that joinder of the true inventors at Muscle Fish was required, the patents would not have issued. Moreover, if Moskowitz had disclosed the Muscle Fish systems, and systems such as Tuneprint, RCS, Digital Hanse and others, which created fingerprints based on the signal itself to look up content(instead of using watermarks), he could not have argued during prosecution or in his specification, that the prior art 'only' contemplated watermarking. Moskowitz convinced the examiner that analysis of 'perceptual features' was novel and the prior art only disclosed 'additive' signals like watermarks. Based on those arguments, the examiner issued the patent. But for withholding the true facts of inventorship and the scope of the prior art, the patents would not have issued. . . .

> Moskowitz carried out a deliberate scheme to conceal all prior art fingerprinting technology that he knew about, in order to get a patent on that technology. In the years leading up to his patent filing, he researched and tried to engage the very same companies that created the prior art he withheld. He did so in order to use their technology, because he was unable to make it himself. Above all else, this fact demonstrates that Moskowitz made a deliberate *choice* not to disclose Muscle Fish and the other prior art, with an intent to deceive. The evidence shows that his plan was to leverage others' technology commercially, yet at the same time get patents that he could later assert against the real inventors of the technology. He knew that Muscle Fish's and Tuneprint's prior art documents, as well as other systems, were material to patentability. Indeed, he used Muscle Fish's language in his claims and he knew about Tuneprint before his claimed date of conception, didn't disclose it, and a week after filing his patent application noted that Tuneprint was the same as the patents he had just filed.

---

[5] Blue Spike did not submit any additional evidence in its reply.

(Docket Entry # 23 at 19-20)(emphasis in original).  According to Audible Magic, the fact Moskowitz now claims he met his duty of disclosure or that Blue Spike's expert opines that cumulative prior art was disclosed in later applications does not change in any way that the "most compelling conclusion to be drawn from the evidence is that the withheld prior art was material and Moskowitz intended to deceive."[6]  (Docket Entry # 23 at 21)(emphasis omitted).

Before considering Blue Spike's materiality argument, the Court first considers whether there is sufficient evidence that Blue Spike misrepresented or omitted information with specific intent to mislead or deceive the PTO.

### 1.      Intent to deceive

Among other things, Audible Magic asserts Moskowitz's initial patent application "took specific words from Muscle Fish, which only occur together in its technology and documents,"[7] while at the same time ignoring the prior art Moskowitz "decisively knew about prior to filing his part application."  *Id.*  Audible Magic has submitted evidence showing Moskowitz knew about the Muscle Fish AIR DataBlade content database system and publications describing analysis of a

---

[6] The '700, '494, and '175 patents all share a specification with the first-filed '472 patent. Audible Magic asserts Moskowitz's "whole plan was to withhold prior art to obtain the key initial patent, which had the broadest claims, and then leverage that into continuation applications." (Docket Entry # 23 at 21, n. 6).  According to Audible Magic, Moskowitz has no reasonable explanation for withholding all that he knew, and the failure to disclose prior art in that first application triggers the doctrine of "infectious unenforceability." If the applicant defrauds the PTO, there is no defense if in continuation applications he dumps prior art on the PTO.  Audible Magic argues this is such a situation, and "the entire chain is unenforceable due to the initial fraud."  *Id.* (citing *Agfa Corp. v. Creo Products Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006) ("inequitable conduct early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application.")).

[7] These "specific words" include taking an "audio object," "segmenting" it, analyzing "perceptual features," "perceptual attributes" or "subjective features" of the audio, and then "reduc[ing] the sound to a small set of parameters."  (Docket Entry # 23 at 18).

signal's "perceptual" features and reducing the signal to a representation of those features, all of which are asserted as invalidating prior art. (AM Ex. 50 at 117-133, 1292-1341).

Blue Spike tries to frame inequitable conduct only in terms of the undisclosed '223 patent and the 1996 Muscle Fish article.  The evidence is not limited to only these.  Audible Magic argues it is undisputed that prior to his patent filing he was aware of "mountains of material prior art beyond these." (Docket Entry # 23 at 19). Yet, Moskowitz disclosed none of this in his September 7, 2000 initial patent application for the '472 patent.

What is more, Audible Magic states Moskowitz provided conflicting testimony concerning when he learned about the '223 patent and the 1996 Muscle Fish article.  There is evidence suggesting Moskowitz knew about the Muscle Fish 1996 article and the description of Muscle Fish technology received in the 1998 newsletter, and that from his confidential discussions with Muscle Fish, he knew about the benefits Muscle Fish discovered over watermarking and as reflected in its prior art.  There is evidence suggesting that Moskowitz knew of a "very large number of highly material content recognition systems and publications that analyzed a signal, and created a fingerprint for that signal for later lookup and identification." (Docket Entry #23 at 18).[8]

When viewing the extensive evidence submitted by Audible Magic with all reasonable inferences drawn in Audible Magic's favor, Audible Magic could show by clear and convincing evidence the single most reasonable inference that can be drawn from this evidence is that Moskowitz intended to deceive.  *See American Calcar, Inc. v. American Honda Motor Co., Inc.,* 768

---

[8] In its First Supplemental Responses and Objections to Blue Spike's Second Set of Interrogatories (AM Ex. 53), Audible Magic asserted applicants were aware of Muscle Fish/Audible Magic prior art, Tuneprint prior art, Imagelock prior art, RCS prior art, BDS prior art, and Digital Hanse prior art, "that carried out the same functions." (Docket Entry # 23 at 18).

F.3d 1185 (Fed. Cir.2014)(noting intent can be inferred based on "contradictory assertions" made by the inventor).

## 2.  "But-for" materiality

According to Audible Magic, "[b]ut for withholding the true facts of inventorship and the scope of the prior art, the patents would not have issued." *Id*. at 20.  *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291-92 (Fed. Cir. 2011) ("prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art"); *see also Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1345 (Fed. Cir. 2013) ("A party alleging inequitable conduct, however, need not strictly demonstrate but-for materiality in all cases. . . . Where the patentee has engaged in affirmative acts of egregious misconduct. . . materiality is presumed.").

According to Audible Magic, Moskowitz's arguments to the PTO "turned on the benefits and novelty of analyzing 'perceptual features' of a signal and creating a fingerprint, compared to watermarking. In other words, he identified the problems of watermarking, and then argued that the solution was precisely the same facets of Muscle Fish prior art that he hid from the Patent Office." *Id*. (citing *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1335 (Fed. Cir. 2012)). Audible Magic argues Moskowitz "affirmatively misrepresented the prior art in the specification, by *only* discussing digital watermarking prior art and the 'general weakness in digital watermark technology.'"[9] (Docket Entry # 23 at 19)(emphasis in original).

The Court need not decide whether the evidence could support a finding of affirmative acts

---

[9] Moskowitz testified "[t]he present invention eliminates the need of any additive monitoring signal because the present invention utilizes the underlying content signal as the identifier itself." (Moskowitz Dep. at 5:18-20).

of egregious misconduct.  In *Nobelbiz*, *Inc. v. Global Connect, LLC*, Cause No. 6:12cv244 (Docket

Entry #310),  Judge Schroeder recently concluded as follows:

> Against the stringent standards for establishing inequitable conduct, Defendants'
> counterclaim is not particularly compelling. Nonetheless, the Court is not persuaded
> that summary judgment against Defendants is warranted. **Fact questions remain
> involving at least the materiality of the non-disclosed documents** and the
> credibility of NobelBiz's witnesses regarding the intent element.

*Id*. at 10 (emphasis adeed).  Here, the Court is not persuaded summary judgment is warranted.[10] The

Court is not convinced there is no way Audible Magic can make its required showing that the alleged

prior art is but-for material and that it would have precluded the issuance of the Asserted Patents.

The Court recommends this part of Blue Spike' motion be **denied.**

## B.  Counterclaim 10 - unjust enrichment

The Court previously denied Blue Spike' motion to dismiss Audible Magic's inequitable

conduct counterclaim, holding Audible Magic had sufficiently pled a situation where one party

unfairly benefits at the expense of another. (Cause No. 6:12cv499, Docket Entry # 1656 at 8).

In its motion for summary judgment, Blue Spike **first** assert federal law preempts unjust

enrichment claims that are based on misappropriation of publicly disseminated ideas, such as those

described in Muscle Fish's 1996 article and the '223 patent.  Thus, according to Blue Spike, if

---

[10] The Court uses oft repeated standards to resolve Blue Spike's motion for summary judgment.  Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the court establish there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c). Blue Spike, as the movant, bears the initial burden to demonstrate the absence of any material fact. *Celotex v. Catrett,* 477 U.S. 317, 332 (1986).  If Blue Spike meets that burden, Audible Magic must point to admissible evidence demonstrating there is a genuine issue for trial.  FED. R. CIV. P. 56(e).  In assessing the proof, the court views the evidence in the light most favorable to the nonmovant. *Matshusita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

Moskowitz really misappropriated Muscle Fish's ideas as alleged, then Audible Magic has a patent infringement claim, not an unjust enrichment claim.  Blue Spike **further** argues there is no evidence it "obtained a benefit from another by fraud, duress, or the taking of undue advantage," as required to prove unjust enrichment.[11] *See Newington Ltd. v. Forrester*, 2008 WL 4908200, *4 (N.D. Tex. Nov. 13, 2008).  **Finally,** Blue Spike argues Texas law does no support a claim of unjust enrichment here.

In response, Audible Magic states it is asserting multiple claims for relief relating to Moskowitz's alleged derivation of the Asserted Patents from the Muscle Fish inventors, one of which is a claim of unjust enrichment and disgorgement of profits under § 102(f) of the Patent Act based on wrongfully omitted co-inventors.[12]  Blue Spike does not seek summary judgment of Audible Magic's theories under the Patent Act. Nor does Blue Spike dispute that derivation of ideas

---

[11] According to Blue Spike, the evidence shows, if anything, Audible Magic used information "gleaned from Blue Spike—not the other way around." *See* Moskowitz January 15, 2015 Dep. at 1315:21-1317:4.

[12] According to Blue Spike, Moskowitz derived his patents from the Muscle Fish inventors, improperly omitted them as co-inventors, and failed to join them as plaintiffs. (Docket Entry # 3, Affirmative Defenses, ¶¶ 4, 10, 28-29, Counterclaim 2, 4, 6, 8; *see also* AM Ex. 50, §XI.P.) Under 35 U.S.C. §102(f), a patent is invalid where true inventors are improperly omitted. Once shown that co-inventors were omitted, the question becomes whether the unnamed inventors did not act with deceptive intent. After inventorship is established, the court can correct inventorship pursuant to 35 U.S.C. §256. *See Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298 (Fed. Cir. 2003) and 196 F.3d 1366, 1374-1375 (Fed. Cir. 1999) The co-inventors are equitable titleholders of the patent, under patent law principles, and entitled to federal equitable remedies, including disgorgement of wrongfully obtained profits. *See Univ. of Colo. Found., Inc.*, 216 F. Supp. 2d 1188, 1205-1206 (D. Colo. 2002), *aff'd* 342 F.3d 1298 (Fed. Cir.2003) (added inventors' "status as the equitable title holders … constitutes a separate and independent ground for requiring [named patent holder] to disgorge to Plaintiffs the profits it unjustly gained as the putative holder of the Patent—that is, the Patent-Related Profits."). According to Audible Magic, disgorgement of unjust enrichment under the Patent Act is "an alternative to the disgorgement of unjust enrichment" under state law. *Id.*

from public information of unnamed inventors, and disgorgement of profits, are proper under § 102(f).  Rather, in both its motion and reply, Blue Spike challenges the common law unjust enrichment claim.  For this reason alone, the Court recommends summary judgment be denied on this counterclaim.[13]

Additionally, regarding its claim for unjust enrichment under Texas common law, Audible Magic disagrees with Blue Spike's assertion this case involves solely the use of public information. According to Audible Magic, it is "well recognized that, separate from unjust enrichment theories under patent law, common law unjust enrichment theories provide a remedy for such a 'breach of a contract implied in law' regarding disclosure of materials in a relationship of confidence." (Docket Entry # 23 at 23-24)(quoting *Univ. of Colo. Found., Inc. v. American Cyanamid Co.*, 342 F.3d 1298, 1306-07 (Fed. Cir.2003).  Audible Magic argues under its common law theory, "the use of Muscle Fish's confidential research and revelations regarding the benefits of analyzing perceptual features of a signal over watermarking, in order to obtain a patent, constitutes common law unjust enrichment." *Id.* at 24.  *See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d215, 233-234 (1st Cir. Mass. 2005) (unjust enrichment theory where parties exchanged information in confidence and receiving party used it to craft patent application; summary judgment was inappropriate).

Although Blue Spike argues Moskowitz did not have a confidential relationship with or receive any confidential information from Muscle Fish, a jury could conclude from the evidence

_____

[13] According to Audible Magic, given the common facts underlying the §102(f) theory and Audible Magic's unjust enrichment and unfair competition claims, the jury will hear the facts regarding inventorship and the Court will ultimately rule on the equitable claim for correction of inventorship. *See Shum v. Intel Corp.*, 499 F.3d 1272, 1279 (Fed. Cir. 2007).

produced by Audible Magic that the conversations between Moskowitz and Muscle Fish in the 1990s were confidential.  Moskowitz marked communications with Muscle Fish as "CONFIDENTIAL" and referred to Muscle Fish's technology as "proprietary."  (AM Exs. 16 & 17).  The Court is of the opinion Audible Magic's unjust enrichment counterclaim should proceed.  Thus, the Court recommends this part of Blue Spike' motion for summary judgment be **denied**.

## C.      Counterclaim 11 - Lanham Act violation

Audible Magic's counterclaim 11 alleges a violation of the Lanham Act, 15 U.S.C. §1125(a),which provides in relevant part that a "person who, or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable to a civil action by any person who believes that he or she is likely to be damaged by such act." The five elements of a Lanham Act claim are (1) a false or misleading statement of fact about a product; (2) such statement deceived or had the capacity to deceive a substantial segment of potential consumers; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the product is in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the statement. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir.2000).

According to Audible Magic's counterclaim, Blue Spike made false and misleading statements regarding "The Giovanni® Abstraction Machine™," about Blue Spike, and about Blue Spike' activities. Audible Magic alleges such false and misleading statements include, but are not limited to the following: On the www.bluespike.com website, Blue Spike, Inc., Blue Spike, LLC,

29

and Moskowitz state that Moskowitz and Blue Spike were the "first to create" content "fingerprinting" technology.  (Docket Entry #3 at 45, ¶84).

Audible Magic alleges these false and misleading statements in materials on Blue Spike's website were available and accessible to Audible Magic's customers and potential customers. Audible Magic further asserts Blue Spike states or implies falsely and misleadingly that there is risk in using technology of parties other than Blue Spike, including Audible Magic and others. *Id*. at 45, ¶85.  According to Audible Magic, the facts are contrary to Blue Spike's false and misleading statements that Blue Spike or its products or technology are "first" or are expressly or impliedly superior for that reason. Audible Magic alleges Blue Spike's false and misleading statements omit facts that demonstrate the falsity and misleading nature of the statements. *Id.*

Blue Spike contends its website does not claim to be "first to create" content-fingerprinting technology.  Rather, it states as follows: "The question is, was Shazam first to create this technology?  One company, Blue Spike, LLC, answers 'No.'" Blue Spike further asserts Audible Magic has not produced evidence of any of the essential elements of its Lanham Act claim for that statement, namely that it was false or misleading, that it was about a product in interstate commerce, that it deceived or had the potential to deceiver, that any deception was material, or that it injured Audible Magic.  Additionally, Blue Spike argues Audible Magic does not have standing to sue it for a statement made about Shazam, a completely different company from either Blue Spike or Audible Magic.

Audible Magic does not limits its Lanham Act claim to just the above alleged statement, but asserts Blue Spike violated the Lanham Act by making the following false and misleading statements on its website: (1) that it is a "software company with several software products, such as the

30

Giovanni® Abstraction Machine™" (AM Ex. 72); (2) that it was the "first to create" fingerprinting "technology" *id.*; (3) that "this technology has powered his Blue Spike products since the turn of the century," particularly "Giovanni® Abstraction Machine™" *id.*; (4) that its patented "signal abstract technology" was "powering its own products such as The Giovanni® Abstraction Machine™" (AM Ex. 73); (5) that its competitors were using "borrowed technology" from Blue Spike (AM Ex. 72); and (6) that if consumers paid $10,000, they could purchase the purported Giovanni Abstraction Machine. (AM Ex. 79).

According to Audible Magic, the statements were both literally false and misleading: "Blue Spike now admits that there has *never* been *any* Blue Spike signal abstracting "technology" and certainly no [GAM], and therefore there is no way that Blue Spike could be the 'first to create' such technology."  Even worse, Blue Spike set up a website to collect $10,000 from anyone who would pay for the fake [GAM]."  (Docket Entry #23 at 26)(AM Ex.79) (Moskowitz Dep. at1544:5-1549:14 (if user clicked on shopping cart button, alleged "product" added to online shopping cart, admitting that page permitted payment by credit cards and "in general, we accept checks"); 1534:15-1537:16 (admitting that Blue Spike made a commercial "offer" of the Giovanni Abstraction Machine, "you can add to the cart a $10,000 amount"); 602:1-23 (admitting that Blue Spike offered the Giovanni Abstraction Machine for sale; 603:15-610:20 (same)).

To support recovery under the Lanham Act, a statement must be "material" in the sense that it is "likely to influence the consumer's purchasing decision." *Pizza Hut*, 227 F.3d at 496. According to Blue Spike, Audible Magic has produced no evidence that any statement actually influenced or would have influenced purchasing decisions. Blue Spike focuses on the "first to create" allegation, asserting Audible Magic has produced no evidence showing that consumers would have

believed—based on Blue Spike's actual statement or "on Audible Magic's misquotation of that statement—that Blue Spike's technology was superior or that using other companies' technology was riskier." (Docket Entry # 14 at 14).  Blue Spike points out that generalized statements by Blue Spike that its goods or services were superior would not be actionable anyway. *See Pizza Hut*, 227 F.3d at 496-97 (generalized claim of superiority over comparable products is not actionable under Lanham Act).

Finally, Blue Spike asserts there is no evidence of any competitive harm to Audible Magic; Audible Magic has not shown that it lost a single sale or suffered any other type of injury based on Blue Spike's actual statement or the statement that Audible Magic falsely imputes to Blue Spike. In response, Audible Magic asserts a literally false statement is material without proof of public reaction or consumer reliance. *Id.* at 497.

A claim may also be deemed literally false, and material, for Lanham Act purposes if it is "false by necessary implication." *Eastman Chem. Co. v. Plastipure, Inc. & Certichem*, 2013 U.S. Dist. LEXIS 124340, *10-11 (W.D. Tex. August 30, 2013) (citing *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1367 (Fed. Cir. 2013)). Under this criterion, "if the words or images, considered in context, necessarily imply a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required." *Hall*, 705 F.3d at 1367. According to Audible Magic, these literally false statements, made in interstate commerce, were material and had the potential to deceive a substantial segment of consumers. *See Pizza Hut,* 227 F.3d at 497 (literally false statements actionable without proof of public reaction or consumer reliance); *Logan v. Burgers Ozark Country Cured Hams*, 263 F.3d 447 (5th Cir. 2001) (defendant "made literally false statements, [it]s argument that it did not mislead its customers. . . is inconsequential."); *PPX Enters. v. Audiofidelity*

32

*Enters.*, 1987 U.S. App. LEXIS 6048, *18-19 (2d Cir.1987) (Lanham Act liability where defendant's "products were patently fraudulent, and the advertising accompanying those products was the vehicle employed to perpetrate the fraud"); *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1344 (Fed. Cir. 1999) (Lanham Act claim reaches "a seller who, by exaggerating the scope of a patent, creates a false impression that he is the exclusive source of the product."). Audible Magic contends "the false statements were, at least, to induce $10,000 payments for a product that doesn't exist." (Docket Entry # 23 at 27) (citing Moskowitz Dep. at 1480:12-20 (statements were "marketing")).

Thus, according to Audible Magic, these statements were material and likely to cause injury to Audible Magic in two ways: (1) consumers would be induced to pay Blue Spike rather than Audible Magic for fingerprinting technology and (2) Blue Spike leveraged the statements to influence industry participants to pay settlements which, as discussed, should have gone to Audible Magic/Muscle Fish as the true inventors. Audible Magic has cited authority indicating literally false statements are actionable under the Lanham Act without proof of consumer reliance and in the absence of precise dollar amounts of actual loss. *See e.g. Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*, 520 F.3d 393, 401 (5th Cir. 2008) (Lanham Act injury element where evidence led to "unavoidable inference is that the misrepresentation was done to maximize [defendant's] bargaining power"; likely injury was sufficient even in absence of precise dollar amount of actual loss).

In *Schlotsky's*, the plaintiff claimed the defendant "damaged its goodwill and profited by misrepresenting that it was solely authorized to act on behalf of the franchisor in relevant respects," causing "confusion" or deception as to the affiliation connection, or association of such person with another. *Id*. at 399-400. The Fifth Circuit first stated § 43(a) "of the Lanham Act has been

33

characterized as a remedial statute that should be broadly construed." *Id.* at 399.  The Fifth Circuit held the reach of § 43(a) of the Lanham Act "was sufficient to encompass the defendant's deceptions." *Id.* at 400.

Although this issue is a closer one, the Court is not convinced Audible Magic's Lanham Act counterclaim fails as a matter of law.  The Court, viewing all of the evidence in the light most favorable to Audible Magic, recommends this part of Blue Spike's motion be **denied.**  *Matshusita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

## D.      Counterclaim 13 - common law unfair competition

The Court has previously denied Blue Spike's motion to dismiss Audible Magic's common law unfair competition counterclaim, finding Audible Magic had stated a claim for violation of § 43(a) of the Lanham Act and also for misappropriation of Audible Magic technology.  (Cause No. 6:12cv499, Docket Entry # 1656 at 15-16).

The first basis for Audible Magic's common law unfair competition counterclaim is that Blue Spike allegedly made false and misleading statements about its GAM technology being "first."  The basis for this claim overlaps substantially Audible Magic's Lanham Act claim. A "claim for common law unfair competition [is] analyzed under the elements of [a] claim of false advertising in violation of the Lanham Act" when the two claims are based on "essentially the same" allegations. *Axxiom Mfg., Inc. v. McCoy Inves., Inc.*, No. Civ. A. H-09-3735, 2010 WL 2545584, at *7 (S.D. Tex. June 21, 2010).

The second basis for Audible Magic's common law unfair competition counterclaim is Blue Spike's alleged taking of Audible Magic's proprietary information. According to Audible Magic, there is evidence that:

34

Moskowitz induced Muscle Fish to engage in confidential communications with him, during which he learned about Muscle Fish's AIR DataBlade, which analyzed the perceptual qualities of a signal, to create a fingerprint of the signal, and the benefits of that approach over Moskowitz's watermarking approach. Moskowitz then claimed as his own this confidential revelation, borne from years of research by Muscle Fish, and used it as the cornerstone for his arguments to the Patent Office. By leveraging the Muscle Fish research in this way, Moskowitz took the benefit of Muscle Fish's work, in order to unfairly obtain and profit from patents, at the expense of Audible Magic/Muscle Fish. The damages have been outlined in Audible Magic's expert report. [Ex. 78] This decidedly constitutes unfair competition under *Alcatel USA, Inc. v. DGITechs., Inc.*, 166 F.3d 772, 788 (5th Cir. 1999), and the Court has already recognized this as a legally cognizable theory. [Dkt. 1656 at pp. 15-16].

(Docket Entry # 23 at 28-29).

Blue Spike does not substantively address this second basis in its reply brief, instead incorporating by reference the arguments made in the motion for summary judgment and "stand[ing] by [its] previous analysis of Counterclaim 13" (arguments which the Court has considered in the context of that counterclaim). In its motion, Blue Spike primarily argues Audible Magic's allegation of misappropriation "lacks supporting evidence," specifically that Blue Spike ever "used" Audible Magic's products or did so "in competition" with Audible Magic. The Court, having viewed the evidence in the light most favorable to Audible Magic, finds the evidence is sufficient to withstand summary judgment. The Court recommends Blue Spike's motion for summary judgment regarding counterclaim 13 be **denied.**

Based on the foregoing, it is

**RECOMMENDED** that Blue Spike, LLC, Blue Spike, Inc., and Scott Moskowitz's Motion for Summary Judgment on Audible Magic Counterclaims 9-13 (Docket Entry # 14) be **DENIED.**

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 26th day of February, 2016.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE