# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| BLUE SPIKE, LLC,<br><br>*Plaintiff*<br>v.<br><br>AUDIBLE MAGIC CORPORATION<br>*Defendant*<br><br><br>AUDIBLE MAGIC CORPORATION,<br><br>*Counterclaim Plaintiff*<br>v.<br><br>BLUE SPIKE, LLC, BLUE SPIKE, INC.<br>and SCOTT A. MOSKOWITZ<br><br>*Counterclaim Defendants* | Civil Action No. 6:15-CV-00584-RWS-CMC |

**AUDIBLE MAGIC CORPORATION'S OPPOSITION TO BLUE SPIKE'S OBJECTION TO REPORT AND RECOMMENDATION DENYING MOTION FOR SUMMARY JUDGMENT ON AUDIBLE MAGIC'S COUNTERCLAIMS 9-13**

**FILED UNDER SEAL**

**I.      INTRODUCTION**

After extensive briefing and a detailed hearing, the Court issued a comprehensive, detailed Report and Recommendation to deny Blue Spike's motion for summary judgment ("R & R"). The Court should affirm the R&R and deny Blue Spike's motion for summary judgment.

**II.     COUNTERCLAIM 9 OF INEQUITABLE CONDUCT IS LEGALLY SUFFICIENT AND INVOLVES DISPUTED ISSUES OF FACT**

   **A.     The Withheld Prior Art Was Highly Material**

Blue Spike incorrectly argues that information withheld by Mr. Moskowitz was not "material." [Obj., p. 1]  Blue Spike focuses its argument on the Muscle Fish '223 patent. [Obj., p. 2]  The first problem with this argument is that it entirely ignores the detailed evidence of different, earlier Muscle Fish prior art known to, but withheld by, Mr. Moskowitz.  In particular, he knew about the 1997 Muscle Fish "AIR DataBlade" product and related publications.  This was an early system that created and saved fingerprints of audio files reflecting:  "Perceptual attributes, such as pitch or loudness" and could "[a]nalyze and store acoustic and perceptual features of a sound." [Dkt. 23-5; Dkt. 23, pp. 3-9]

Mr. Moskowitz's initial Sept. 7, 2000 patent application used specific word combinations that are identical to Muscle Fish's AIR DataBlade system and associated publications. [Dkt. 23, pp. 10-12]  Materiality of this prior art is beyond dispute.  Mr. Moskowitz admitted he had an obligation to disclose prior art with "words that were similar" or "things that were similar" to his patents. [Dkt. 23-3 at 955:6-22]  He convinced the examiner that analysis of "perceptual features" was novel and that the prior art only disclosed "additive" signals. [*See* Dkt. 23, pp. 9-10, 19-20]  The PTO only cited prior art involving adding information to identify signals.  Against that backdrop, Mr. Moskowitz told the PTO that his patent used perceptual features to identify signals. [Dkt. 23, p. 10]  The examiner accepted the argument and allowed the claims on this basis, finding the prior art did not teach creating signal representations "using perceptual qualities of the ... signal ...." [*Id.*]  This was the *only* basis for allowance.

1

Thus, by necessity, the PTO would not have allowed the claims if aware of the withheld prior art. Blue Spike has not articulated, and cannot even now articulate, what aspect of its patents renders the "perceptual features" prior art not "but for" material. Instead, Blue Spike asserts vaguely, without support or explanation, that its patents must "teach something novel above and beyond Muscle Fish's invention." [Obj., p. 2] Where there is only a minor difference between prior art and claims, the prior art is considered "but for" material. *Am. Calcar v. Am. Honda Motor*, 768 F.3d 1185, 1189-1190 (Fed. Cir. 2014) (court puts itself in the shoes of the examiner and "[t]he court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction."). The Court considered all evidence, found it could show the withheld prior art was "but for" material and because factual questions remain, summary judgment is inappropriate. [R&R, pp. 5-15, 25-26]

As in prior briefing, Blue Spike again ignores all of the foregoing Muscle Fish prior art and attempts to argue that because the '223 patent was cited in *later* Blue Spike patent applications that this somehow immunizes Blue Spike from its failure to disclose everything else. [Obj., p. 2] First, the argument fails because it ignores all of the other Muscle Fish prior art. Blue Spike cannot avoid that prior art by pretending it does not exist. The fact that the '223 patent was cited in later applications has no bearing on failure to cite the different, and earlier, AIR DataBlade system and related material. The Court already properly rejected Blue Spike's attempt to ignore the early Muscle Fish prior art and to reduce the issues to the belated disclosure of the '223 patent in later patent applications. [R&R, p. 24]

Second, Blue Spike improperly conflates the initial Blue Spike application with later applications. But these are not the same patents, and the earliest Blue Spike application had broader claims than the later applications. There is no dispute that the examiner had no Muscle Fish prior art, or any other withheld prior art, in the initial application.[1] The fact that the '223 patent was cited in the latter three

---

[1] Blue Spike makes the outrageous assertion (Obj., n. 1) that because an examiner learned of a piece of

Blue Spike applications sheds no light on the failure to disclose that or any other Muscle Fish prior art in the first application, where no Muscle Fish or other material prior art was disclosed at all.[2] Indeed, this is precisely the reason for the infectious unenforceability doctrine. Given that Blue Spike only obtained the first patent by withholding material prior art, but for that it would never have gotten to the second, third or fourth application. *See Agfa Corp. v. Creo Products Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006) ("inequitable conduct early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application"), cited at R&R, n. 6.

Further, Blue Spike incorrectly asserts, with respect to other withheld prior art (*e.g.*, Tuneprint, that "Audible Magic produced nothing more than passing references to these systems. No mechanics are explained; no specifics discussed." [Obj., p. 2] This ignores the evidence. For example, on Aug. 8, 2000, before Blue Spike's stipulated conception date, Moskowitz received an email about Tuneprint:

> "'Tuneprint is an audio fingerprinting algorithm. It takes the unique 'fingerprint' of a sound clip, which can then be compared to a fingerprint database to get more information about the clip, . . . . The fingerprint doesn't change even if the sound is compressed, converted to a different file format, broadcast over the radio and so on.' www.tuneprint.com." [Dkt. 23-56]

Moskowitz had additional evidence relating to TunePrint as well. [Dkt. 23-57; Dkt. 23-58]

Moskowitz did not disclose this prior art. Materiality is clear from his choice and the surrounding facts. Indeed, on September 13, 2000, a week after filing the asserted patents, Peter Cassidy emailed Moskowitz asking about a "Napster like service" which used "a database of signal abstracts." [Dkt. 23-

---

withheld prior art in a later application, that they must have known about it in the first application. The argument makes no sense and is contradicted by the facts, which show that the examiner was not aware of the withheld Muscle Fish prior art during the first application.

[2] The '223 patent is not discussed by the examiner or Blue Spike in any application. Blue Spike's continuation applications list hundreds of references and the '223 patent is buried therein. This may constitute inequitable conduct. *See Synqor v. Cisco*, 2012 U.S. Dist. LEXIS 129463, *19 (E.D. Tex. 2012) ("A review of the cases reveals that a voluminous list of references contained in an IDS can…lead to a finding of inequitable conduct if a material reference was 'buried' in the IDS"); *Wright Asphalt v. Pelican Ref.*, 2011 U.S. Dist. LEXIS 54209, n. 2 (S.D. Tex. 2011) ("In such cases, the 'burial' actively conceals the information, and courts treat it as if it was not disclosed at all."). That the buried reference was not examined in continuations has no bearing on materiality to the first application. [*See* Dkt. 26, p. 4]

59] Moskowitz responded by referring back to the prior art Tuneprint system that pre-existed his patent filing and conception date, stating: "you can check out… tuneprint.com for instance concerning how it would look. we filed a patent on monitoring of signals which is exactly like this…. abstracts of music or movies based on a massive reduction of the data of the actual signal…. yields a signal abstract which is not additive as a watermark is…" [*Id*.; *see also* Dkt. 23-60 (9/16/2000 email Moskowitz stated: "We have completed 2 patent filings on Monitoring signals (this relates to stuff like tuneprint, btw)."] In other words, Mr. Moskowitz decisively admitted that Tuneprint was material to the patents.

### B. Mr. Moskowitz Acted With Intent To Deceive

Blue Spike incorrectly argues that there was no intent to deceive. Blue Spike suggests that the sole evidence is withholding of prior art. [Obj., p. 3] But there is extensive additional evidence of intent to deceive, as detailed at Dkt. 23, pp. 3-9, 14-16. For example, Blue Spike did not have any fingerprinting technology itself and needed to partner with other fingerprinting technology providers, thus Moskowitz had a motivation to obtain patents in the space at any cost. Moskowitz had extensive knowledge of numerous prior art systems, such as Tuneprint. And Moskowitz was highly experienced with patent prosecution and aware of his disclosure duty. Audible Magic detailed this and additional evidence in its briefing, and the Court provided a recitation of the evidence as well in the R&R.

The Court properly based its determination on this evidence. [R&R, pp. 17-20, 23-25] Beyond the foregoing, that Mr. Moskowitz provided conflicting testimony about when he learned of certain prior art supports a finding of an intent to deceive. [*Id.* at 23-24] The Federal Circuit has held that while contradictory assertions do not, alone, establish intent, where there is also other evidence (as in the instant case), intent to deceive is supported where the inventor's "testimony regarding his knowledge and possession of documents lacked credibility." *Am. Calcar, Inc.*, 768 F.3d at 1191-1192.[3]

---

[3] There, the Court found that lack of credibility alone is not a basis to infer intent, but *affirmed* a finding

4

Blue Spike argues that some inference other than intent can be gleaned from the facts. [Obj., pp. 3-4] Not true. The intentional disclosure of extensive irrelevant prior art concerning while withholding the highly material known prior art, shows a conscious decision. This demonstrates deceptive intent to deceive.[4] Mr. Moskowitz was highly experienced with patent prosecution and was aware of his duty to disclose, further showing that his withholding was knowing and intentional. *See Am. Calcar, Inc.*, 768 F.3d at 1191-1192 (intent inferred where inventor had personal knowledge of material prior art, acknowledged the information's importance, there was evidence of a deliberate decision to withhold prior art and make more limited, irrelevant disclosures, and failure to disclosure multiple prior art "demonstrates a deliberative process, not an accident or mistake.")

The Court found, correctly, that Audible Magic could show by clear and convincing evidence that the single most reasonable inference that can be drawn from this evidence is that Mr. Moskowitz intended to deceive. [R&R, p. 24] Where fact questions remain about the credibility of witnesses regarding the intent element, summary judgment is inappropriate. *Nobelbiz, Inc. v. Global Connect, LLC*, 6:12-cv-244 (Dkt. 310); *see also FilmTec Corp. v. Hydranautics*, 982 F.2d 1546, 1553 (Fed. Cir. 1992) ("We will not invade the province of the district court to judge matters of credibility.")

### III. COUNTERCLAIM 10 OF UNJUST ENRICHMENT IS LEGALLY SUFFICIENT AND INVOLVES DISPUTED ISSUES OF FACT

Blue Spike objects to the Court's ruling on Audible Magic's unjust enrichment counterclaim, by reference to principles of inequitable conduct, namely that Blue Spike disclosed a Muscle Fish patent in

---

of intent where there were numerous other factors indicating intent, coupled with lack of credibility and contradictory statements by the inventor. *See id.*

[4] Blue Spike now attempts (Obj. at n. 5) to characterize two cited patents as purportedly disclosing the material it withheld. This attempt fails. That U.S. Patent 6,453,252 mentions a "fingerprint" in no way absolves Moskowitz from withholding Muscle Fish prior art based on "perceptual features" and using precisely the same words as the claims. As for U.S. Patent 7,043,050, simply consider that it is a system for "embedding and detecting a 1-bit watermark." It does not substitute for the withheld prior art.

three of its later applications. [Obj., p. 4-5] Because Blue Spike's arguments do not even address common law unjust enrichment, they must be rejected.[5] As discussed in Audible Magic's briefing, substantial evidence shows that Mr. Moskowitz misled Muscle Fish, took its confidential ideas regarding the benefits of looking at perceptual features of content over watermarking, and profited by claiming that innovation for himself in the patent. [Dkt. 23, pp. 3-12, 23-25]

For example, in order to obtain his patents, filed in 2000, Mr. Moskowitz successfully argued to the PTO that creating representations of signals "using perceptual qualities of the ... signal" had numerous benefits over the limitations of prior art digital watermarking, which required "additive" information inserted into a signal. [Dkt. 23, pp. 9-20] This is *precisely* the confidential information and technological benefits conveyed to Mr. Moskowitz by Thom Blum of Muscle Fish in the summer of 1997, during confidential exchanges and attempted collaboration. [*Id.* pp. 5-6 (Moskowitz learned from Muscle Fish about audio analysis and comparison techniques, and that this approach did not require embedding data in the audio file itself, as opposed to watermarks that had to be injected into a signal)][6] This conduct constitutes obtaining "a benefit from another by fraud, duress, or the taking of undue advantage." *Newington Ltd. v. Forrester*, 2008 U.S. Dist. LEXIS 92601, *11 (N.D. Tex. 2008).

Blue Spike makes a confusing argument that ideas usurped by Moskowitz were purportedly in the '223 patent, disclosed in only three later Blue Spike applications, but not the first. First, it is not true: the '223 patent does not discuss benefits of using a signal's "perceptual features" over digital watermarking. That patent does not discuss Muscle Fish's confidential work regarding how use of "perceptual

---

[5] Blue Spike did not move for summary judgment on Audible Magic's Patent Act unjust enrichment claim. [R&R, pp. 27-28] Yet, Blue Spike now mischaracterizes a 102(f) case to suggest omitted co-inventors had to jointly conceive all patent elements. [Obj, p. 5] Omitted inventors must only make a contribution to conception of one claim and there is no lower limit on the quantity or quality of contribution, or limit on the type or amount of contribution. Inventors need only have some communication at approximately the time of inventive effort. *See* CAFC Model Jury Inst. 4.3d; *Fina Oil and Chem. v. Ewen*, 123 F.3d 1466 (Fed. Cir. 1997); *Canon Comp. v. Nu-Kote*, 134 F.3d 1085 (Fed. Cir. 1998).
[6] Also, in 1998-1999 Moskowitz had confidential Muscle Fish resample code that created a compact sound representation but preserved the sound. [Dkt. 23-12, at242, 246-7, 133-134; Dkt. 23 at 8-9]

6

features" obviated the need to "inject" or "embed" data in a file or signal, as disclosed to Mr. Moskowitz in a confidential collaboration. Second, it is irrelevant that the patent was cited in later applications. It does not change that in the first application Blue Spike claimed a compact representation based on "perceptual features" and argued benefits learned from Muscle Fish over watermarking prior art, without naming the Muscle Fish inventors. The Court properly analyzed these issues, in detail, and determined this fact-intensive inquiry should proceed to trial. [R&R, pp. 26-29]

### IV. COUNTERCLAIM 11 OF A LANHAM ACT VIOLATION IS LEGALLY SUFFICIENT AND INVOLVES DISPUTED ISSUES OF FACT

Blue Spike argues that the false statements on its website were purportedly only about "its patent rights" or "publicizing a patent." [Obj., p. 5; *see also* Dkt. 14] But it is obvious that the statements at issue are not about mere patent rights. Rather, they falsely state, in commerce, that Blue Spike had a *product* called the Giovanni Abstraction Machine and that it had particular characteristics. *Zenith Elecs. Corp.*, 182 F.3d at 1348 (Lanham Act prohibits false statements made in commerce). Blue Spike falsely told the world: (1) "Blue Spike, LLC is a Texas-based software company **with several software products, such as The Giovanni® Abstraction Machine™**" [Dkt. 23-74 (emphasis added)], (2) "**Moskow[it]z claims this technology has powered his Blue Spike products since the turn of the century**." [Dkt. 23-74 (emphasis added)], (3) the technology described in its '175 patent was "**powering its own products such as the Giovanni® Abstraction Machine™**." [Dkt. 23-75 (emphasis added)], (4) it was the **"first to create" fingerprinting "technology."** [Dkt. 23-74 (emphasis added)], (5) for $10,000, consumers could purchase a Giovanni Abstraction Machine. [Dkt. 23-81]

It is now undisputed that there never was a "Giovanni Abstraction Machine," not at the "turn of the century," not ever. And it certainly was never "powered" by the technology of the '175 patent, because it is admitted that neither Moskowitz nor any other person at Blue Spike created such technology. And because no "technology" was ever created, it is literally false that such technology was "first." No

doubt, as Blue Spike argues, Moskowitz did make some statements about his patents on the website. [Obj. at pp. 5-6] But those aren't the statements at issue. Blue Spike simply ignores all of Mr. Moskowitz's significant, literally false statements about the "product" and "technology," set forth above.

Blue Spike asserts that the statements have more than one reasonable interpretation. [*Id*., pp. 6-7] The argument is frivolous. There is not more than one reasonable interpretation of statements that a Blue Spike patent was "powering its own products such as the Giovanni Abstraction Machine" or that the company has "several software products, such as The Giovanni Abstraction Machine." Those are not, as Blue Spike asserts, an offer to "build software." [*Id*., n. 8] Those are plainly false statements that there *is* a "product" that exists and has particular qualities. But, the product never existed. The inventors did not know how to create it. As the only technical person at Blue Spike admitted: "we did not come close to making a product surrounding signal abstracts." [Dkt. 23-21, 21:5-14] Because the statements are literally false, there is no need for evidence of actual consumer confusion, as correctly found by the Court. [R&R, pp. 32-33, *citing Pizza Hut,* 227 F.3d at 497 and other authority][7]

## V.   COUNTERCLAIM 13 OF UNFAIR COMPETITION IS LEGALLY SUFFICIENT AND INVOLVES DISPUTED ISSUES OF FACT

Blue Spike's objection on common law unfair competition relies upon its objections regarding the Lanham Act and unjust enrichment. Audible Magic likewise incorporates its responses above.

\*          \*          \*

For the foregoing reasons (and those stated in the R&R) the Court should deny summary judgment.

---

[7] Injury flows from the fact that Audible Magic and Blue Spike target consumers of digital fingerprinting technology and IP licensing (other technology companies). The false statements were likely to cause both to divert resources to Blue Spike instead of Audible Magic. Blue Spike asserts (Obj., p. 8) that if a party pays licensing revenue to Blue Spike instead of Audible Magic, it is not actionable if the licensee happens to be an Audible Magic competitor. This is not so. A party is "not free to make false or misleading statements about its product" and "consumers and competitors have a right to expect that such representations have factual support and the Lanham Act provides a vehicle to enforce that expectation." *Healthpoint, Ltd. v. Stratus Pharms.*, 273 F. Supp. 2d 769, 792-793 (W.D. Tex. 2001)

Dated: March 23, 2016

Respectfully submitted,

By: */s/ Eric H. Findlay*
Eric H. Findlay (Texas Bar No. 00789886)
Walter W. Lackey, Jr. (Texas Bar No. 24050901)
FINDLAY CRAFT, P.C.
102 North College Avenue, Suite 900
Tyler, TX 75702
Telephone:  (903) 534-1100
Facsimile:  (903) 534-1137
efindlay@findlaycraft.com
wlackey@findlaycraft.com

Gabriel M. Ramsey– LEAD ATTORNEY
I. Neel Chatterjee
ORRICK, HERRINGTON & SUTCLIFFE, LLP
1000 Marsh Road
Menlo Park, CA 94025
Telephone:  (650) 614-7400
Facsimile:  (650) 614-7401
gramsey@orrick.com
nchatterjee@orrick.com

Alyssa M. Caridis
ORRICK, HERRINGTON & SUTCLIFFE, LLP
777 S. Figueroa St.
Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020
Facsimile:  (213) 612-2499
acaridis@orrick.com

Christopher J. Higgins
ORRICK, HERRINGTON & SUTCLIFFE, LLP
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8418
chiggins@orrick.com

*Attorneys for Defendant Audible Magic Corp.*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served electronically on opposing counsel pursuant to Local Rule CV-5(a)(7)(C) on March 23, 2016.

>*/s/ Eric H. Findlay*
>Eric H. Findlay

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I hereby certify that authorization to file this document under seal was provided by the Protective Order entered in the previously consolidated action 6:12-cv-499.

>*/s/ Eric H. Findlay*
>Eric H. Findlay