# Exhibit 4

Case 6:15-cv-00584-RWS-CMC   Document 102-6   Filed 05/02/16   Page 2 of 3 PageID #:  4789

# Google and Facebook's new tactic in the tech wars

Google and Facebook are using a controversial legal doctrine to channel money to the Electronic Frontier Foundation, the Center for Democracy and Technology, and other groups that share their hostility to online copyright enforcement.

By **Matt Vella**
Monday, July 30, 2012 4:18 PM

Google and Facebook are using a controversial legal doctrine to channel money to the Electronic Frontier Foundation, the Center for Democracy and Technology, and other groups that share their hostility to online copyright enforcement.

By Roger Parloff, senior editor



FORTUNE — If the Electronic Frontier Foundation, the nation's preeminent digital rights nonprofit, had disclosed last year that it received a cool $1 million gift from Google — about 17% of its total revenue — some eyebrows might have been raised. The group typically describes itself as "member-supported" and, like most nonprofits, it treasures its above-the-commercial-fray, public-interest-group aura and reputation for independence.

In fact, Google GOOG did transfer $1 million to the EFF last year, but the money did not have to be, and wasn't, reported as a corporate donation. And if, as currently planned, the EFF receives another $1 million this year from Facebook FB, it won't have to report that as a donation either. That's because both transfers are formally court-ordered outlays being paid by those companies to settle class-action suits.

"Well, of course those aren't donations!" the reader might interject. "They're the diametric opposite: involuntary, judicially mandated payments forced upon them by an adversary!" That's not the whole story either. These payments to the EFF are being made in suits the EFF played no role in bringing, and the defendants themselves — Google and Facebook, in these instances — helped select EFF to be their beneficiary.

These weird, hybridized outlays — part punitive fine, part voluntary donation — are called *cy pres* awards, meaning "as close as possible" (from the old Norman, *cy pres comme possible*). The theory behind them goes like this: In settling, the plaintiffs lawyers and the defendants agreed that awarding damages to actual class members would be impractical, because the sums owed each would be so tiny as to not warrant the expense of distribution. Accordingly, the parties agreed to pay the class nothing, but to pay a sum instead to charities that would serve as the next best thing, because the charities would theoretically promote the interests of class members in some indirect fashion pertinent to the lawsuit.

MORE: **Megaupload and the twilight of copyright**

These two awards to the EFF, for instance, stem from suits that alleged that Google and Facebook each violated their customers' privacy rights — in Google's case, by exposing users' email contacts during its botched launch of its Google Buzz social network in February 2010 and, in Facebook's, by exploiting users' (including minors') identities and likenesses without express permission in its so-called "Sponsored Stories" ads in January 2011. In these two cases 21 other nonprofits also received, or stand to receive, money, though the EFF would be the biggest winner, taking in about 12% of the total $16.1 million doled out. (While the Google Buzz settlement was approved in May 2011, the Sponsored Stories settlement was just proposed in June, and is still being challenged by dissenters.)

Giving *cy pres* money to the EFF makes sense, the parties in each case have argued, because digital privacy issues are one of the subjects the EFF monitors. It has not infrequently scolded (though never sued) Google and Facebook for privacy glitches and intrusions, and has advocated privacy legislation and policies that those companies oppose.

At the same time, the EFF is often an ally of Google and Facebook when it comes to staving off liability to rights holders over user-generated infringing content, like pirated movies, photos, or music. Perhaps for these reasons, for instance, Google gave EFF about $25,000 in conventional, purely voluntary donations in 2010, and about $18,000 more in 2011.

In fact, at least half of the *cy pres* recipients in these cases would very likely be getting at least some donations from Google or Facebook this year, whether or not any suit had ever been lodged against them. For instance, the Center for Democracy and Technology (CDT), which got $500,000 from the Google Buzz *cy pres* award in 2011, received $340,000 in voluntary contributions from Google the year before. It's now slated to receive $1 million from the proposed Facebook award, though Facebook has been listed as one of CDT's leading e-commerce benefactors since at least 2009. Similarly, the Center for Internet and Society at Stanford (CIS), which received $500,000 from the Google Buzz award, had collected $400,000 in voluntary contributions from Google the year before (which amounted to 51% of CIS's total revenue that year). This year CIS will collect $600,000 from Facebook's Sponsored Stories settlement, if approved.

MORE: **One filmmaker's fight against the cyberlockers**

The EFF, CDT, and Stanford's CIS all reliably line up on the tech sector side in scrimmages with copyright holders. All three supported, for instance, the January Internet blackout protest against the Stop Online Piracy Act — legislation opposed by both Google and Facebook. EFF and CDT also each submitted amicus briefs supporting Google in its two most important recent litigations: Viacom's suit against Google's YouTube unit for copyright infringement, and a suit by Rosetta Stone, the language course company, challenging Google's practices of auctioning off other companies' trademarks for use as paid-search keywords and allowing them to be used in ad text as well.

Now if some neutral individual had been tasked with awarding money to a charity that was single mindedly devoted to fighting precisely the sorts of wrongs alleged in the Google Buzz and Sponsored Stories class actions, his first choice would probably have been one that the settling parties in each case passed over entirely: the Electronic Privacy Information Center (EPIC).

Unlike any of the 22 *cy pres* recipients jointly proposed by the parties in the two cases, EPIC actually filed complaints against Google and Facebook with the U.S. Federal Trade Commission over the Google Buzz launch and Facebook's use of members' identities and likenesses in ad campaigns without permission. Prompted by EPIC's complaints, the FTC brought enforcement actions against each company which culminated in consent decrees.

How, then, could the parties — again and again — have overlooked EPIC when doling out the cash? How, indeed, when so many of the groups that the parties did select—like the YMCA of Greater Long Beach, Youth Radio of Oakland, the Brookings Institute (a regular Google beneficiary), and the MacArthur Foundation (a regular Facebook beneficiary) — are hardly thought of as digital privacy watchdogs?

**MORE: The quiet scandal of the HIV home test kit**

Could it be that the defendants in each case blackballed EPIC precisely because it was too aggressively devoted to combatting the wrongs that allegedly harmed the class? Lead Google Buzz plaintiffs attorney Gary Mason declined to comment, explaining that settlement negotiations are confidential. Two lead plaintiffs attorneys in the Sponsored Stories case did not return calls.

In the Google Buzz case in March 2011, EPIC and seven other privacy-focused nonprofits objected to their exclusion from the *cy pres* funds, protesting that the plaintiffs lawyers and Google had, in effect, arranged to give the majority of those funds "to organizations that are currently paid by Google to lobby for or to consult for the company." (The EFF, CDT, and CIS all reject that characterization of their relationship to Google. They aver, rather, their complete independence, and stress that any corporate donations they accept are "unrestricted" in nature —meaning that they come with no strings attached.)

In May 2011, Chief Judge James Ware of the federal district court in San Jose granted EPIC's request, carving out a $500,000 tranche for it. (At the same time he spontaneously—without prompting from anyone—sliced off another $500,000 piece for an ethics center at Santa Clara University, a school where Judge Ware serves on the law school faculty.)

Tech companies did not invent *cy pres* awards. The doctrine is ancient, having arisen to address a recurring problem in trusts law. For instance, when President Franklin D. Roosevelt set up the March of Dimes Foundation in 1938, he specified that it would fight polio. But once that disease was tamed, the foundation sought permission to fight other diseases. Invoking the *cy pres* doctrine, courts granted its request, finding that doing so would carry out Roosevelt's original intent as closely as possible.

**MORE: The constitutional right to a free lunch**

In the 1980s the *cy pres* doctrine—"or rather something parading in its name," as federal appeals court judge Richard Posner archly put it in a 2004 ruling—burrowed its way into the realm of class-action settlements. Critics have referred to *cy pres* awards as judicial "slush funds," since judges, plaintiffs lawyers, and—as the Google Buzz and Sponsored Stories cases suggest—even defendants can use them to further their own agendas. In the past ten months three federal appeals courts have struck down *cy pres* awards after concluding that they funded charities that had virtually nothing to do with the class members for whom the cases were ostensibly filed.

The key recurring concern with any class action settlement is that plaintiffs attorneys, desiring to maximize their fees, and defendant corporations, eager to minimize total payout, will collude to achieve their goals at the expense of class members. *Cy pres* awards can be enlisted in that abusive process, attorney Theodore H. Frank of the Center for Class Action Fairness, has written, by "disguising the true cost of a settlement to the defendant to maximize the share of the actual recovery received by the plaintiffs attorneys."

For instance, in the Google Buzz case, on the face of things the plaintiffs attorneys were receiving about one-quarter of the total award — $2.1 million of an $8.1 million fund — which sounds well within the normal range. Yet a critic might protest that none of this particular award went to the actual class members, while much of it went to charities the defendant probably would have funded to some degree anyway. If so, then the attorneys fees may have been excessive given how little the lawyers actually won for the class.

In the Facebook class action, the potential for fee inflation is even more palpable. If the deal is approved, the plaintiffs attorneys get $10 million, the nonprofits get $10 million, and the class members get zilch, which does not look great even on its face. To the extent that some of the nonprofits are also regular beneficiaries of Facebook's largesse, and would likely have gotten at least some of their *cy pres* money even without any lawsuit, the attorneys would be getting more than half the cash generated by the settlement, which looks even worse.

**MORE: In defense of John Roberts**

In court papers supporting the deal, the plaintiffs stress that the Facebook settlement also includes injunctive relief from which class members may benefit in the future, because Facebook has agreed to fiddle with some of the fine print in its terms-of-service agreements and to give its users opportunities to "opt-out" of the Sponsored Stories program. The plaintiffs then claim that these structural changes are effectively worth –are you sitting down? — $103 million to the class, because class members will "now have the opportunity to control the use of what is essentially a [redacted]/month advertising asset." (The redacted figure remains under seal.)

In July, EPIC and attorneys representing other objecting class members each challenged the adequacy of the Facebook settlement. Alternatively, EPIC and three other privacy groups have asked the court to redetermine cy pres recipients using transparent, open-application procedures. These objections have not yet been ruled upon, in part because, as soon as they were lodged, U.S. District Judge Lucy Koh recused herself from the case. Though she did not state her reasons, she and her husband had ties to some of the charities that stood to gain from the settlement, according to published reports.

Since other *cy pres* awards have been upheld despite similar or worse apparent conflicts, Judge Koh's sensitivity was at least progress of a sort.