# EXHIBIT 6

**Ramsey, Gabriel M.**

| | |
|---|---|
| **From:** | Molly Jones <mjones@ghiplaw.com> |
| **Sent:** | Friday, September 25, 2015 9:33 AM |
| **To:** | Caridis, Alyssa; Ramsey, Gabriel M.; Higgins, Christopher J.; Eric Findlay; Chatterjee, I. Neel; Walter Lackey |
| **Cc:** | Randall Garteiser; Chris Honea; bluespike@ghiplaw.com |
| **Subject:** | Re: Blue Spike v. Audible Magic - Case No. 15-584, Preliminary Draft Pretrial Order |
| **Attachments:** | 2015.09.25 DRAFT Proposed Final Pretrial Order [BLU and AM Edits].docx |

Counsel,

Please find attached a revised draft of the pretrial order reflecting Blue Spike's updated list of Motions *in Limine*. (I also accepted certain formatting edits but generally left Audible Magic's substantive redlines as-is for now.)

Regards,

Molly Jones
Garteiser Honea
mjones@ghiplaw.com
44 N San Pedro Road
San Rafael, CA 94903
888-908-4400
www.ghiplaw.com

On Sep 24, 2015, at 3:03 PM, Colin Jensen <cjensen@ghiplaw.com> wrote:

Please use the following dial-in information for Friday's call at 12 pm CST / 10 am PST:

- **888-908-4400, 6, x104, 1188#**



Colin Jensen
888.908.4400 x103 / cjensen@ghiplaw.com
119 W Ferguson St, Tyler, TX 75702-7203
44 N San Pedro, San Rafael, CA 94903
http://www.ghiplaw.com

This e-mail message may contain confidential information or information protected by attorney-client privilege, the doctrine of attorney work product or other applicable privileges and protections, and is intended solely for use by the intended recipient. Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. If you are not the intended recipient, please destroy all copies of this message, including your original copy, and contact the sender immediately. We also advise that any federal tax advice provided in this communication is not intended or written to be used, and cannot be used by the recipient or any other taxpayer for the purpose of avoiding tax

penalties that may be imposed on the recipient or any other taxpayer, or in promoting, marketing or recommending to another party any transaction or matter addressed herein.



On Sep 24, 2015, at 3:08 PM, Caridis, Alyssa <acaridis@orrick.com> wrote:

Molly,

We are available at 12 p.m. Central (10 a.m. Pacific) on Friday.  Can you please circulate a dial-in?

Alyssa

---

**From:** Molly Jones [mailto:mjones@ghiplaw.com]
**Sent:** Wednesday, September 23, 2015 12:06 PM
**To:** Caridis, Alyssa <acaridis@orrick.com>
**Cc:** Randall Garteiser <rgarteiser@ghiplaw.com>; Ramsey, Gabriel M. <gramsey@orrick.com>; Higgins, Christopher J. <chiggins@orrick.com>; Eric Findlay <efindlay@findlaycraft.com>; Chatterjee, I. Neel <nchatterjee@orrick.com>; Walter Lackey <wlackey@findlaycraft.com>; Chris Honea <chonea@ghiplaw.com>; <bluespike@ghiplaw.com> <bluespike@ghiplaw.com>;
**Subject:** Re: Blue Spike v. Audible Magic - Case No. 15-584, Preliminary Draft Pretrial Order

Alyssa,

Please find Blue Spike's general and specific objections to Audible Magic's revised list of trial exhibits. As the parties work to reduce the claims and streamline the issues to be resolved at trial, Blue Spike reserves the right to further object on the basis of FRE 402 and 403, pursuant to paragraph 11 of the trial preparation order. Deposition counter-designations are forthcoming.

Blue Spike is available to meet and confer on the pretrial order and trial exhibit objections this Friday, September 25 between 10am and 4pm Central. Please suggest a time that works best, and we will circulate dial-in information.

Best,
Molly

Molly Jones
Garteiser Honea
mjones@ghiplaw.com
44 N San Pedro Road
San Rafael, CA 94903
888-908-4400
www.ghiplaw.com

On Sep 23, 2015, at 10:27 AM, "Caridis, Alyssa" <acaridis@orrick.com> wrote:

Thanks Molly. Please let us know when we can expect Blue Spike's exhibit objections and counter-designations.  We're two days past the extended deadline that Blue Spike set.

Alyssa

**From:** Molly Jones [mailto:mjones@ghiplaw.com]
**Sent:** Wednesday, September 23, 2015 10:20 AM
**To:** Caridis, Alyssa <acaridis@orrick.com>
**Cc:** Randall Garteiser <rgarteiser@ghiplaw.com>; Ramsey, Gabriel M. <gramsey@orrick.com>; Higgins, Christopher J. <chiggins@orrick.com>; Eric Findlay <efindlay@findlaycraft.com>; Chatterjee, I. Neel <nchatterjee@orrick.com>; Walter Lackey <wlackey@findlaycraft.com>; Chris Honea <chonea@ghiplaw.com>; <bluespike@ghiplaw.com> <bluespike@ghiplaw.com>
**Subject:** Re: Blue Spike v. Audible Magic - Case No. 15-584, Preliminary Draft Pretrial Order

Thank you, Alyssa. Confirming receipt. I'll confirm lead counsel's availability to meet and confer and get back to you.

All the best,
Molly


Molly Jones
Garteiser Honea
mjones@ghiplaw.com
44 N San Pedro Road
San Rafael, CA 94903
888-908-4400
www.ghiplaw.com


On Sep 23, 2015, at 10:17 AM, "Caridis, Alyssa" <acaridis@orrick.com> wrote:

Randall,

I sent Audible Magic's portions yesterday.  See attached.

Alyssa

**From:** Randall Garteiser
[mailto:rgarteiser@ghiplaw.com]
**Sent:** Wednesday, September 23, 2015 10:14 AM
**To:** Ramsey, Gabriel M. <gramsey@orrick.com>
**Cc:** Molly Jones <mjones@ghiplaw.com>; Caridis, Alyssa
<acaridis@orrick.com>; Higgins, Christopher J.
<chiggins@orrick.com>; Eric Findlay
<efindlay@findlaycraft.com>; Chatterjee, I. Neel
<nchatterjee@orrick.com>; Walter Lackey
<wlackey@findlaycraft.com>; Chris Honea
<chonea@ghiplaw.com>; <bluespike@ghiplaw.com>
<bluespike@ghiplaw.com>
**Subject:** Re: Blue Spike v. Audible Magic - Case No. 15-
584, Preliminary Draft Pretrial Order

Gabe,

It's been 4 days can you provide us an update on
when we can get your client's sections?

Thanks,
Randy

On Sep 19, 2015, at 12:11 AM, Ramsey, Gabriel M.
wrote:

> Molly,
>
> Thank you very much for
> this.  Audible Magic will contribute
> its proposed materials to the pretrial
> submission over the next few days,
> and we can meet and confer next
> week, after you have had a bit to
> consider our positions.
>
> Sincerely,
>
> Gabe

**From:** Molly Jones
[mailto:mjones@ghiplaw.com]
**Sent:** Friday, September 18, 2015 9:58
PM
**To:** Caridis, Alyssa; Higgins, Christopher
J.; Eric Findlay; Ramsey, Gabriel M.;
Chatterjee, I. Neel; Walter Lackey
**Cc:** Randall Garteiser; Chris Honea;

<bluespike@ghiplaw.com>
**Subject:** Blue Spike v. Audible Magic - Case No. 15-584, Preliminary Draft Pretrial Order

Counsel,

Please find attached Blue Spike's preliminary draft of its portion of the joint pretrial order. Once Audible Magic has circulated its draft, the parties can meet and confer to narrow the issues. As discussed in our latest conversation, there are several motions still pending resolution. In light of this, Blue Spike reserves the right to amend its portion of the pretrial order.

Best regards,

Molly Jones
Garteiser Honea
mjones@ghiplaw.com
44 N San Pedro Road
San Rafael, CA 94903
888-908-4400
www.ghiplaw.com

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohi the error by return e-mail and please delete this message from your system. Thank you in advance for your coop

For more information about Orrick, please visit *http://www.orrick.com*.

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communi received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Plea the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

<Mail Attachment.eml>

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication priv... received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify u... the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com.*

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by l... received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immedia... the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com.*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| BLUE SPIKE, LLC, | § | |
| | § | |
| *Plaintiff,* | § | Case No. 6:15-cv-584-MHS |
| | § | |
| v. | § | Lead Case |
| | § | |
| AUDIBLE MAGIC CORPORATION, | § | Jury Trial Demanded |
| | § | |
| *Defendant.* | § | |
| | § | |
| AUDIBLE MAGIC CORPORATION, | § | |
| | § | |
| *Counterclaim Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | |
| BLUE SPIKE, LLC, BLUE SPIKE, INC. | § | |
| and SCOTT A. MOSKOWITZ | § | |
| | § | |
| *Counterclaim Defendants.* | § | |

**PROPOSED JOINT FINAL PRE-TRIAL ORDER**

This cause is scheduled to come before the Court at a pre-trial conference on October 19, 2015 at 10:00 a.m. in Texarkana, Texas, pursuant to Local Rule CV-16 and Rule 16 of the Federal Rules of Civil Procedure. This Proposed Joint Final Pretrial Order relates to issues currently scheduled to be tried in November 15. Plaintiff/Counterclaim Defendant Blue Spike, LLC and Defendant/Counterclaim Plaintiff Audible Magic Corporation submit the following in accordance with the Trial Preparation Order, Dkt. No. 25. The parties will submit additional pretrial orders, if necessary, on other issues as ordered by the Court.

A.    **COUNSEL FOR THE PARTIES**

**Plaintiff and Counterclaim Defendant**:

Randall T. Garteiser (Lead Attorney)
Texas Bar No. 24038912
rgarteiser@ghiplaw.com
Christopher A. Honea

1

Texas Bar No. 24059967
chonea@ghiplaw.com
Christopher S. Johns
Texas Bar No. 24044849
cjohns@jmehlaw.com
Michael I. Burton
California Bar No. 083380
mburton@ghiplaw.com
Ian N. Ramage
California Bar No. 224881
iramage@ghiplaw.com
Kirk J. Anderson
California Bar No. 289043
kanderson@ghiplaw.com
Molly A. Jones
California Bar No. 301419
mjones@ghiplaw.com
GARTEISER HONEA, P.C.
119 W. Ferguson Street
Tyler, Texas 75702
(903) 705-7420
(888) 908-4400 fax

GARTEISER HONEA, P.C.
44 N. San Pedro Ave.
San Rafael, California 94903
(405) 785-3762
(888) 908-4400 fax

**Defendant and Counterclaim Plaintiff**:

Gabriel M. Ramsey (Lead Attorney)
California Bar No. 209218, admitted E.D. Texas
gramsey@orrick.com
I. Neel Chatterjee
California Bar No. 173985, admitted E.D. Texas
nchatterjee@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, California 94025
(650) 614-7400
(650) 614-7401 fax

Alyssa M. Caridis
California Bar No. 260103, admitted E.D. Texas
acaridis@orrick.com

2

ORRICK, HERRINGTON & SUTCLIFFE LLP
777 S. Figueroa St., Suite 3200
Los Angeles, California 90017
(213) 629-2020
(213) 612-2499 fax

Christopher J. Higgins
  Washington D.C. Bar No. 498165, admitted *pro hac vice*
  chiggins@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005-1706
(202) 339-8400
(202) 339-8500

Eric H. Findlay
  Texas Bar No. 00789886
  efindlay@findlaycraft.com
Walter W. Lackey, Jr.
  Texas Bar No. 24050901
  efindlay@findlaycraft.com
FINDLAY CRAFT, P.C.
102 N. College Ave, Suite 900
Tyler, Texas 75702
(903) 534-1100
(903) 534-1137 fax

**B.    JURISDICTION**

Blue Spike contends that this This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this case arises under the patent laws of the United States, including 35 U.S.C. § 271 *et seq.* Audible Magic contends that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 because this case arises under the Lanham Act, 15 U.S.C. § 1125 *et seq.* Audible Magic further challenges Blue Spike's standing to bring this suit, including on that basis that the Patents-in-Suit were derived from the work of improperly omitted co-inventors who Blue Spike failed to join as necessary plaintiffs.  If Blue Spike lacks standing, the Court lacks subject matter jurisdiction over Blue Spike's claims for patent infringement. The Court has personal jurisdiction over the parties and venue is proper in this district. Jurisdiction is

3

~~not disputed.~~

C.    NATURE OF ACTION

Trial in the above-captioned matter is scheduled to commence on November 9, 2015.

This is a patent infringement lawsuit. Plaintiff Blue Spike, LLC ("Blue Spike") alleges that Defendant Audible Magic Corporation ("Audible Magic") ha~~ve~~s literally infringed United States Patent Nos. 7,346,472 ("the '472 Patent"), 7,660,700 ("the '700 Patent"), 7,949,494 ("the '494 Patent"), and 8,214,175 ("the '175 Patent") (collectively, the "Patents-in-Suit"). Blue Spike accuses Audible Magic's content recognition technologies, including Audible Magic's copyright compliance service, CopySense Appliance, custom identification services, and the RepliCheck Appliance. Blue Spike seeks damages based on Audible Magic's alleged past and present acts of infringement. Blue Spike also requests that the Court order Audible Magic to take a compulsory license for the accused products for the remaining life of the Patents-in-Suit.

Audible Magic contends that it does not infringe the Blue Spike Patents-in-Suit and that the Blue Spike Patents-in-Suit are invalid. Audible Magic further alleges that Scott Moskowitz and Blue Spike Inc. committed inequitable conduct by failing to disclose and misrepresenting material information and prior art to the United States Patent and Trademark Office ("USPTO"), including information and prior art of Muscle Fish LLC (which Audible Magic acquired in 2000) and from other sources. On that basis, Audible Magic alleges that the Patents-in-Suit are unenforceable.

Audible Magic further alleges that Scott Moskowitz and Blue Spike, Inc. ~~Blue Spike, LLC, its predecessor company, Blue Spike, Inc., and Scott Moskowitz~~ obtained proprietary information from Muscle Fish (~~which~~ Audible Magic ~~acquired in 2000~~), including from public and confidential sources, and thereafter derived the Patents-in-Suit from such information and

4

failed to name Muscle Fish's principals Erling Wold, Thom Blum, Doug Keislar and Jim Wheaton as co-inventors. Audible Magic asserts that this improper omission of co-inventors renders the Patents-in-Suit invalid under 35 U.S.C. § 102(f), seeks correction of inventorship to add the improperly omitted co-inventors. Audible Magic asserts that it holds an interest in the Patents-in-Suit which entitles it, pursuant to the patent law, the common law of unjust enrichment and the common law of unfair competition, to the proceeds of Scott Moskowitz's, Blue Spike, Inc.'s and Blue Spike LLCs monetization of the Patent-in-Suit.

Audible Magic further alleges that Scott Moskowitz, Blue Spike Inc. and Blue Spike LLC made material false and misleading statements, in commerce, that constitute false advertising and false and misleading representations of fact, which misrepresents the nature, characteristics and qualities of good, services and commercial activities. In particular, Audible Magic alleges that Scott Moskowitz's, Blue Spike Inc.'s and Blue Spike LLC's false and misleading statements include that they had a working product called the "Giovanni Abstraction Machine," that they were the "first to create" content "fingerprinting" technology, that they had such fingerprinting technology and the Giovanni Abstraction Machine since the "turn of the century" and that their products or technology are expressly or impliedly superior for those reasons. failed to disclose the same to the United States Patent and Trademark Office ("USPTO"). Audible Magic contends that these acts violate the Lanham Act (15 U.S.C. § 1125(a)) and the common law of unfair competition.

Audible Magic further alleges that Blue Spike Inc.'s and Blue Spike LLC's offer for sale of the Giovanni Abstraction Machine infringes U.S. Patent No. 6,834,308, and is prepared to demonstrate infringement at trial. However, to streamline the action, Audible Magic has moved to amend the complaint to dismiss this patent counterclaim, without prejudice, and that motion is

currently pending.

Audible Magic's defenses against Blue Spike LLC are Failure to State a Claim, Non-infringement of the Patents-in-Suit, Invalidity of the Patents-in-Suit, Failure to Mark, Prosecution History Estoppel, Laches, Waiver, Acquiescence, Estoppel and Unclean Hands, Limitations on Damages and Remedies under 35 U.S.C. §§ 286, 287 and 288, Unavailability of Injunctive Relief, Lack of Standing and Failure to Join a Necessary Party, the Single Recovery Rule, License, Implied License and Patent Exhaustion and Unenforceability Due to Inequitable Conduct,

Audible Magic's counterclaims against Blue Spike, LLC, Blue Spike, Inc., and Scott Moskowitz for Declaratory Judgment of Non-Infringement of the Patents-in-Suit, Declaratory Judgment of Invalidity of the Patents-in-Suit, Declaratory Judgment of Unenforceability of the Patents-in-Suit Due to Inequitable Conduct, Unjust Enrichment, Violation of the Lanham Act, Infringement of Audible Magic Patent – U.S. Patent No. 6,834,308, and Common Law Unfair Competition. In addition to judgment on each of these counterclaims, Audible Magic seeks compensatory, consequential and incidental damages as well as , disgorgement of economic benefits received by the counterclaim defendants, injunctive relief, and other forms of equitable relief, based upon the foregoing counterclaims for unjust enrichment and violation of the Lanham Act.

D.    CONTENTIONS OF THE PARTIES

**Plaintiff's Contentions**

In addition to the disclosures contained in its Infringement Contentions, Blue Spike contends the following:

1.    This is a patent infringement lawsuit. Blue Spike is suing Audible Magic for

6

infringement of the Patents-in-Suit, which relies on a data-reduced representation of a signal that retains a perceptual relationship with the original signal to identify and differentiate between versions of signals. This technology is commonly known as "fingerprinting" or "signal abstracting" technology.

2.    The signal abstracting technology of the Patents-in-Suit enables content owners to monitor distribution channels such as the Internet, radio broadcasts, television broadcasts, and other media sources, to determine whether any of the monitored source content has the same abstract as their copyrighted catalogued works. Content protection and monetization similarly extends to mobile devices, smartphones, and tablets. As discussed in detail in the patent specification, the Patents-in-Suit provide significant advantages over the prior art, including watermarking technology.

3.    Blue Spike CEO Scott Moskowitz is a prolific inventor of more than 66 U.S. Patents specifically directed to digital content management, including, for example, monetizing copyrighted digital content. Moskowitz's more than twenty years of experience solving issues pertaining to copyright monetization originates from his first-hand knowledge as a U.S. music wholesale employee in Japan. Anticipating how these same copyright monetization issues would translate to the digital distribution world, Moskowitz began developing solutions of adding an identifying digital signal to original digital signals; this technique became known as digital watermarking. Many of his patents are directed to watermarking technology.

4.    In the late 1990s, as Moskowitz worked with Mike Berry, a software engineer, he recognized that digital signals could be compressed in such a way to avoid using a watermark additive signal yet still effect copyright monetization and protection.

5.    The Patents-in-Suit have been rigorously examined by the USPTO, having been

7

found patentable over literally hundreds of prior art patents and publications. The '472 Patent cites more than 100 references; the '700 Patent cites more than 350 references; and the '494 and '175 Patents each cite almost 600 references.

6.      The Patents-in-Suit are valid and enforceable, and Blue Spike, LLC owns all right, title, and interest to the Patents-in-Suit.

7.      Audible Magic provides automated audio and visual content identification products and services. Audible Magic's products and services rely on its content identification databases, which contain tens of millions of titles submitted by music studios and individual content owners. Audible Magic provides tools to "fingerprint" media content and register it in its content databases.

8.      Audible Magic has infringed and continues to infringe the Patents-in-Suit under 35 U.S.C. § 271, literally by using, offering for sale, selling, marketing, and advertising the fingerprinting-enabled content identification products and services (the "Accused Products"). Blue Spike contends that Audible Magic infringes the following claims: Claims 8, 11-13, 15-17 of the 8,214,175 Patent; Claims 3-4, 8, 11 of the 7,346,472 Patent; Claims 1, 4-5, 11, 17-18, 20-22, 29 of the 7,949,494 Patent; and Claims 1, 6-8, 10-11, 40, 49-51 of the 7,660,700 Patent.

9.      The asserted claims of the Patents-in-Suit are valid over Defendant's alleged prior art because the inventions set forth in the asserted claims are novel in view of the asserted prior art.

10.     The asserted claims are enabled by the disclosure of the Patents-in-Suit and are supported by an adequate written description from the point of view of a person of ordinary skill in the art at the time the patent applications were filed.

11.     Audible Magic's infringement has, and will, deprive Blue Spike of royalties and

8

other related revenue, which Blue Spike would have previously made and would have made in the future, has injured Blue Spike in other respects, and will cause Blue Spike added injury and damage, including loss of royalties and other revenue in the future unless Audible Magic is ordered to take a compulsory license on all products they will make, sell, use, offer for sale, distribute, market, advertise, or import until the expiration date of the Patents-in-Suit.

**Defendant's Contentions**

Defendant and Counterclaim Plaintiff Audible Magic contends the following:

**Non-infringement**

1.      Audible Magic does not infringe the Patents-in-Suit.  In this case, the Court bifurcated proceedings such that Audible Magic would first litigate infringement, invalidity and other defenses on behalf of its 24 named customer defendant entities which are accused based on their use of Audible Magic's technology.  Proceedings against the customer defendants have been stayed and would only proceed, if at all, after proceedings against Audible Magic are concluded.  During the course of the instant proceeding, and as directed by the Court's Scheduling and Discovery Order (Dkt. 1332), Blue Spike narrowed the claims asserted against Audible Magic to 16, and ultimately only addressed the following claims in its expert report regarding alleged infringement: '700 patent claims 1, 40; '494 patent claims 1, 11; '175 patent claims 11, 12, 17; '472 patent claims 3, 4, 8.[1]  Given that Blue Spike's initial infringement contentions against Audible Magic and its customers were co-extensive, Audible Magic

---

[1] For this reason, Blue Spike's list of asserted claims against Audible Magic, set forth earlier in this Proposed Pretrial Order, cannot be correct.  There, Blue Spike contends that Audible Magic infringes the following claims: Claims 8, 11-13, 15-17 of the 8,214,175 Patent; Claims 3-4, 8, 11 of the 7,346,472 Patent; Claims 1, 4-5, 11, 17-18, 20-22, 29 of the 7,949,494 Patent; and Claims 1, 6-8, 10-11, 40, 49-51 of the 7,660,700 Patent.  However, most of those claims are not addressed at all in Blue Spike's expert report, and thus it may not attempt to show infringement of those claims at trial.

**Formatted:** Font: 12 pt

9

requested that Blue Spike stipulate that it was limiting its claims asserted against the customers to the subset of claims that it is asserting against Audible Magic in this proceeding. This would be consistent with the fact that the customers are accused based on Audible Magic's technology, would be consistent with the purpose of bifurcation and would streamline the action. Blue Spike refused to so stipulate. Accordingly, because Audible Magic is litigating non-infringement on behalf of its customers, Audible Magic's non-infringement expert report demonstrates non-infringement as to the full set of claims initially asserted against the customers and Audible Magic: '472, Claims 3, 4, 8, 11, '700, Claims 1, 6, 7, 8, 10, 11, 40, 49, 50, 51, '494, Claims 1, 4, 5, 11, 17, 18, 20, 21, 22, 29 and '175, Claims 8, 11, 12, 13, 15, 16, 17. Given Blue Spike's refusal to streamline the case, Audible Magic is prepared to demonstrate non-infringement as to all of these claims at trial.

2.       Audible Magic does not infringe the Patents-in-Suit under 35 U.S.C. § 271 because the products do not meet, either literally or under the doctrine of equivalents, the elements of the asserted claims of the Patents-in-Suit. In particular, and as the Court has already ruled, Audible Magic's products do not contain an "abstract," as construed by the Court, and as claimed in each claim of the Patents-in-Suit. Blue Spike, through the admissions of its principal Scott Moskowitz and its expert Dr. Papakonstantinou, admits that Audible Magic's products do not contain an "abstract" and the absence of this element from Audible Magic's products is set forth in detail in Audible Magic's non-infringement expert report and other disclosures. Audible Magic also does not infringe the Patents-in-Suit on the basis that other elements of the asserted claims are not presence in the accused products, as set forth in Audible Magic's non-infringement expert report and other disclosures.

3.       Audible Magic also does not infringe the Patents-in-Suit because the components

and acts alleged by Blue Spike to meet the asserted elements of the claims are independently controlled and/or carried out entirely independently, by three completely independent parties— Audible Magic, Content Owners and Audible Magic Customers.  Because there is no legally requisite control, direction or vicarious liability between and among these independent parties, which act independently, Blue Spike's theories fail to meet the legal requirements to show "joint direct infringement" and, thus, Audible Magic does not infringe.

4.      Audible Magic also does not infringe the Patents-in-Suit, because the accused products are licensed pursuant to the terms of Blue Spike's license agreement with RPX Corp. ("RPX License").  The RPX License extends a patent license to the Patents-in-Suit to any technology of a third party that is combined with a licensed device (i.e. "Combined Licensed Products and Services").  In the instant case, Blue Spike asserts that Audible Magic software running on licensed Dell servers, licensed Apple iOS devices and licensed Android or Windows devices, such as devices by Samsung, HTC, HP, IBM, LG, Dell, Sony, Nokia, Palm, Seiko Epson, Panasonic, Philips, Sharp and others, allegedly infringe the Patents-in-Suit.  All such combinations are licensed, and therefore Audible Magic does not infringe.  Further, Audible Magic is a third party beneficiary of the RPX License, and as such, Audible Magic does not infringe.  These issues are the subject of a motion for summary judgment by Audible Magic, that is currently pending before the Court.

5.      Audible Magic also does not infringe the Patents-in-Suit, to the extent that Blue Spike attempts to accuse components, acts and customers residing, located or occurring outside of the United States.  Such components, acts and customers cannot be infringing, because such do not practice the claims of the Patents-in-Suit within the United States.

**Invalidity**

11

6.      The Patents-in-Suit are invalid.  As discussed above, the Court bifurcated proceedings such that Audible Magic would first litigate invalidity on behalf of its 24 named customer defendant entities which are accused based on their use of Audible Magic's technology.  Audible Magic requested that Blue Spike stipulate that it was limiting its claims asserted against the customers to the subset of claims that it is asserting against Audible Magic in this proceeding. Blue Spike refused to so stipulate.  Accordingly, because Audible Magic is litigating invalidity on behalf of its customers, Audible Magic's invalidity expert report demonstrates invalidity as to the full set of claims initially asserted against the customers and Audible Magic: '472, Claims 3, 4, 8, 11, '700, Claims 1, 6, 7, 8, 10, 11, 40, 49, 50, 51, '494, Claims 1, 4, 5, 11, 17, 18, 20, 21, 22, 29 and '175, Claims 8, 11, 12, 13, 15, 16, 17.  Given Blue Spike's refusal to streamline the case, Audible Magic is prepared to demonstrate invalidity as to all of these claims at trial.

7.      The Patents-in-Suit are invalid because the asserted claims of the Patents-in-Suit are invalid as embodying an unpatentable "abstract idea" under Section 101 of the Patent Act. The United States District Court for the Northern District of California, recently held that many claims of the Patents-in-Suit are invalid under Section 101.  *See Blue Spike LLC v. Google Inc.*, Case No. 14-cv-01650-YGR (N.D. Cal. 9/8/2015), Dkt. 75.  There is substantial overlap in the claims asserted in that case and the claims asserted in the instant case.  The only claims asserted in this case against Audible Magic or its customers that were not asserted or expressly addressed in the California case are:  '700, Claims 6, 7 8, 49; '494, Claims 1, 4, 5, 18, 20, 21, 22; and '175, Claims 13, 15.  However, the substance of the claims asserted here is not distinct from the claims invalidated in the California action.  All of the asserted claims of the Patents-in-Suit are invalid as embodying an unpatentable "abstract idea" and under principles of *res judicata* and collateral

estoppel.  If the patent portion of this case proceeds to trial, Audible Magic will seek leave to file an expedited motion for summary judgment or a motion for judgment as a matter of law on these bases.

8.      The Patents-in-Suit are invalid because each element of each asserted claim is either anticipated or rendered obvious by the prior art, as set forth in detail in Audible Magic's invalidity expert report and other disclosures.

9.      The Patents-in-Suit are invalid because they fail to satisfy the statutory requirements of enablement and written description under Section 112 of the Patent Act.  In particular, the patents are invalid for failure to enable a person of ordinary skill in the art to make and use an "abstract," "abstract of a signal using selectable criteria," "the comparing device identifies … an index of relatedness to said at least one query signal for each of said at least two matching abstracts," differentiation between "versions" of a reference signal, a "hashed abstract and/or digitally signed abstract," a "psycho-acoustic model and a psycho-visual model," without undue experimentation.  There is no disclosure in the specification of the Patents-in-Suit how to create or generate such elements, nor is there any example, process, flowchart, algorithm, or any other procedure that would have enabled a person of ordinary skill in the art, as of the claimed priority date of September 7, 2000, to make and use such elements without undue experimentation.  Instead, the specification provides only high-level descriptions regarding the intended use of such elements in the context of claimed inventions.  It is undisputed that Blue Spike and the inventors never made a working system embodying the claimed inventions.  The technical co-inventor of the Patents-in-Suit, Michael Berry, admitted in deposition that the Patents-in-Suit do not contain sufficient description to enable the claimed inventions or meet the written description requirements, and the same is supported by the opinions set forth in detail in

13

Audible Magic's invalidity expert report.

10.     The Patents-in-Suit are invalid because the claims of the asserted patents do not point out and distinctly claim the subject matter that is regarded as the invention, because a person of ordinary skill in the art would not understand what is claimed in light of the specification.  In particular, the terms "abstract," "similar to," "index of relatedness," and "data describing a portion of the characteristics of its associated reference signal," "programmed or structured to use an/said algorithm…" are terms whose meaning cannot be ascertained, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention, are not amenable to construction, and are insolubly ambiguous.  The same is supported by the opinions set forth in detail in Audible Magic's invalidity expert report.

**Invalidity And Correction of Inventorship/Unjust Enrichment Under The Patent Act**

11.     The Patents-in-Suit are invalid pursuant to 35 U.S.C. § 102(f) due to the prior invention of Thom Blum, Erling Wold, Douglas Keislar and Jim Wheaton, and on the basis that the applicants improperly failed to name and omitted these co-inventors of the Patents-in-Suit. Audible Magic will prove that these inventors made "not insubstantial" contributions to the inventions of the Patents-in-Suit, were improperly omitted as co-inventors and that the omitted co-inventors did not act with deceptive intent, but were instead omitted solely through the fault of Moskowitz. After inventorship is established, the Court can correct inventorship pursuant to 35 U.S.C. §256.  After the trial on inventorship, Audible Magic will file a post-trial motion to correct inventorship under 35 U.S.C. § 256.  Such co-inventors (who have assigned their patent rights to Audible Magic), are equitable title holders of the Patents-in-Suit, under patent law principles, and are entitled to federal equitable remedies, including disgorgement of wrongfully obtained profits.  Given the common facts underlying the §102(f) theory and Audible Magic's

14

common law unjust enrichment and unfair competition claims, the jury will hear the facts regarding inventorship and the Court will ultimately rule on the equitable claim for correction of inventorship and disgorgement of profits under the patent law.

12.     Muscle Fish was founded in Berkeley, California, in 1992, by engineers, mathematicians and musicians Erling Wold, Doug Keislar, Thom Blum and Jim Wheaton. These were some of the most experienced and brightest audio technologists in the world.  They had worked with signal processing and sound technologies from the late 1970s through the early 1990s.  By 1992, these gentlemen had advanced degrees in electrical engineering, computer science and computer applications to music synthesis.  They had extensive experience with acoustic models, signal processing, parameter estimation, non-linear and applied mathematics, software engineering, computer architecture, circuit design and computer music.  One co-founded the Computer Music Association.  Another conducted psycho-acoustical research at Stanford's Center for Computer Research in Music and Acoustics ("CCRMA").  All had been engineers for years at a variety of companies, including Yamaha Music Technologies, developing new music analysis and synthesis techniques.

13.     Beginning in 1992, the Muscle Fish engineers worked on systems for analyzing content and signals.  By 1994, the Muscle Fish engineers had conceived and reduced to practice methodologies for taking an "audio object," "segmenting" it, analyzing "perceptual features," "perceptual attributes" or "subjective features" of the audio (such as pitch or brightness), and then "reduce the sound to a small set of parameters" that represent it.  This small set of parameters acted as a fingerprint and these fingerprints were compared by various Muscle Fish systems to determine how similar or dissimilar two sounds were, and whether or not there was an exact or relative "match."

15

14.     In 1997, Moskowitz learned about Muscle Fish's content-based recognition technology, in the context of work concerning a product called "DataBlade" that added functionality to Informix brand databases.  In June 1997, Muscle Fish released "AIR DataBlade" that implemented its content fingerprinting and recognition technology in Informix databases. The AIR DataBlade created and saved fingerprints of audio files that reflected: "Perceptual attributes, such as pitch or loudness" and could "[a]nalyze and store acoustic and perceptual features of a sound…"

15.     Moskowitz learned about the AIR DataBlade, from press releases, the AIR DataBlade product documentation and from exchanges with the engineers at Muscle Fish. Moskowitz also participated in the Audio Engineering Society in 1996 and 1997, where the Muscle Fish technology was publicized.  Moskowitz was also aware of a 1996 Muscle Fish IEEE article entitled, "Content-Based Classification, Search and Retrieval of Audio," and that the same inventors had created the AIR DataBlade, and that the article described the work of Muscle Fish.

16.     On June 30, 1997, just weeks after an Audio Engineering Society publication describing Muscle Fish technology was sent to members and weeks after release of AIR DataBlade, Moskowitz contacted Muscle Fish.  He suggested that he wanted to work with Muscle Fish to create a CODEC for his digital watermarking product and asked about a "DataBlade" product.  Muscle Fish confirmed that it offered the AIR DataBlade.  Moskowitz repeatedly talked on the telephone and exchanged email with Muscle Fish throughout the summer of 1997 and thereafter, about Muscle Fish's technology.

17.     During these exchanges, Muscle Fish detailed the techniques and operation of AIR DataBlade, which analyzed "perceptual features" of audio, such as pitch, brightness and loudness, and created representations reflecting those features.  Moskowitz created the

16

appearance that the exchanges were confidential, including marking their exchanges as "CONFIDENTIAL."  Muscle Fish had conducted research comparing the benefits of content-based fingerprinting over digital watermarking, as a technology for content recognition.  Muscle Fish disclosed to Moskowitz their confidential and proprietary ideas concerning why Muscle Fish's content-recognition technology was superior to and solved the limitations presented by digital watermarking technology.

18.     Moskowitz communicated to Muscle Fish that he wanted to work with Muscle Fish's content-based fingerprinting technology, in particular the AIR DataBlade, By August 1997, Moskowitz communicated to Muscle Fish that he did not want to engage them at that time, but that he wished to work with them on "a number of extension-projects" and "porting with your own proprietary database technology."  Moskowitz was referring to porting his technology with the AIR DataBlade technology.  Muscle Fish at no time gave consent or license to Moskowitz to use Muscle Fish's ideas as the basis for any later patent application.

19.     In August 1997, Moskowitz instead hired Michael Berry, a contractor also working for Muscle Fish.  Moskowitz was aware of this fact.  Berry discussed Muscle Fish with Moskowitz.  Muscle Fish engineers testified that they had communicated to Berry the types of technology made by Muscle Fish.  In November 1997, Moskowitz formed Blue Spike Inc.

20.     Moskowitz continued to receive information about Muscle Fish's technology, including a May 1998 multimedia technology newsletter describing Muscle Fish's technology. Moskowitz had a business plan to use Muscle Fish's content recognition technology in conjunction with or as an alternative to Blue Spike's watermarking technology.  In December 1998 and January 1999, Blue Spike licensed the resample code and algorithm used by Muscle Fish's fingerprinting algorithms, which changes the resolution of sample audio, i.e. creating

17

numbers which represent a segment of sound compactly, but still preserves the basic sound. Moskowitz instructed Berry to ask for that code, but not to disclose to Muscle Fish what it is for. Moskowitz urged Berry to try to improperly exert ownership over Muscle Fish's intellectual property.  Berry communicated to Moskowitz that "Musclefish has the code we need already written.  It would just take a small amount of alteration on their part." Despite Blue Spike's use of this key portion of Muscle Fish's recognition library, Muscle Fish did not grant a license to Blue Spike to use its fingerprinting algorithms.

21.     In April and May 2000, just four months before Moskowitz filed for the asserted patents, Blue Spike again asked Muscle Fish for technical assistance.  That agreement was not completed, however, because Moskowitz again attempted to exert ownership over Muscle Fish's work and intellectual property.  The draft agreement in Muscle Fish's files bore the notation: "Never signed (no agreement on NDA/IP issues)."

22.     On September 7, 2000, Moskowitz filed the application that led to the Patents-in-Suit.  Blue Spike has stipulated that September 7, 2000 is the date of conception and reduction to practice of the Patents-in-Suit.  Moskowitz derived his patents from the early Muscle Fish work. First, in his patent specifications, Moskowitz appropriated Muscle Fish's ideas regarding the benefits of using the perceptual features of a signal as an identifier, rather than inserting a digital watermark.  Moskowitz successfully argued to the Patent Office that the point of novelty was the ability to identify a signal without having to insert data, precisely as disclosed to him by Muscle Fish.  The Patent Office accepted these arguments and allowed the claims on the basis that the prior art before it "do not teach … creating an abstract of the … signal using perceptual qualities of the … signal such that the abstract retains a perceptual relationship to the … signal from which it is derived."  In the specification and claims of the asserted patents, Moskowitz

18

incorporated fundamental Muscle Fish ideas of taking an "audio object," "segmenting" it, analyzing "perceptual features," "perceptual attributes" or "subjective features" of the audio, and then "reduce the sound to a small set of parameters" that represent it. Audible Magic's expert will opine that it is unusual to find this specific combination of terms, nomenclature and concepts in both the Patents-in-Suit and in the early Muscle Fish work, unless the authors of the Patents-in-Suit had adopted some of the Muscle Fish terms, nomenclature and principles in the Patents-in-Suit.

23.     After filing the Patents-in-Suit, Moskowitz and Blue Spike described in documents their business plan to obtain and use the fingerprinting technology of a third party company. Muscle Fish was the first on the list of potential partners and Blue Spike approached Muscle Fish asking to combine Muscle Fish's content-based fingerprinting technology with Blue Spike's watermarking technology. Moskowitz and Blue Spike never created any technology claimed in the Patents-in-Suit.

24.     At no point during Moskowitz's and Blue Spike's interactions with Muscle Fish, did Moskowitz communicate to Muscle Fish that he believed he or anyone else at Blue Spike had invented the ideas that they were discussing. After interacting with Muscle Fish and during the period that Blue Spike was using parts of Muscle Fish's content recognition libraries, and attempting to license the fingerprinting technology itself, Moskowitz filed the Patents-in-Suit which claim identification of content based on the content itself, and claim that this is a benefit over digital watermarking, as had been described to Moskowitz by Muscle Fish. Moskowitz did not inform the Muscle Fish inventors of his intention to seek patents. Moskowitz secretly proceeded to file a patent application claiming that he and Michael Berry alone, conceived of all of the Muscle Fish ideas relating to the technology of taking an "audio object," "segmenting" it,

19

analyzing "perceptual features," "perceptual attributes" or "subjective features" of the audio, and then "reduce the sound to a small set of parameters" that represent it, and using and comparing such representations to find matching and similar sounds, as an improvement over digital watermarking. Pursuant to this plan, Moskowitz did not inform Muscle Fish that he had filed such an application. Nor did Moskowitz inform the PTO of the contributions of Erling Wold, Thom Blum, Douglas Keislar and Jim Wheaton. Moskowitz repeated this deception in filing subsequent patent applications. Moskowitz never informed Muscle Fish that he had filed the patent applications, nor did he inform them that patents had issued on the content-based recognition ideas that Muscle Fish had shared with Moskowitz.

25.     The Muscle Fish inventors patent rights related to the technology at issue were assigned to Audible Magic Corp. in 2000.

26.     U.S. Patent No. 7,346,472 was assigned by the named inventors to Blue Spike Inc. on November 22, 2000, and Blue Spike Inc. assigned the patent to Blue Spike LLC on August 4, 2012.

27.     U.S. Patent No. 7,660,700 was assigned by the named inventors to Blue Spike Inc. on November 20, 2000, and Blue Spike Inc. assigned the patent to Blue Spike LLC on August 4, 2012.

28.     U.S. Patent No. 7,949,494 was assigned by the named inventors to Blue Spike Inc. on December 20, 2007, and Blue Spike Inc. assigned the patent to Blue Spike LLC on August 4, 2012.

29.     U.S. Patent No. 8,214,175 was assigned by the named inventors to Blue Spike Inc. on December 20, 2007, and Blue Spike Inc. assigned the patent to Blue Spike LLC on August 4, 2012.

20

**Unenforceability And Inequitable Conduct**

30.     The Patents-in-Suit are unenforceable on the grounds that Scott Moskowitz and Blue Spike Inc. committed inequitable conduct.  During prosecution of the Patents-in-Suit, Moskowitz and Blue Spike Inc. failed to disclose, withheld, concealed and/or mischaracterized to the United States Patent and Trademark Office ("PTO") prior art that was highly material to the patentability of the claims of Patents-in-Suit under prosecution, and which they knew or should have known would have been important to a reasonable examiner.  Moskowitz and Blue Spike Inc. failed to disclose and mischaracterized the prior art with an intent to deceive the PTO. Moskowitz and Blue Spike Inc. knew about the following prior art (1) the prior art of Muscle Fish LLC, including Muscle Fish's MFCBR technology and documents describing that technology, and products such as AIR DataBlade and SoundFisher, (2) the prior art Tuneprint technology, documents and system, (3) the prior art RCS technology, documents and system, (4) the prior art BDS technology, documents and system, (5) the prior art Digital Hanse technology, documents and system, (6) the prior art Imagelock technology, documents and system, and (7) the prior art APIS system.  Moskowitz investigated products and services that carried out the monitoring, analysis and recognition of digital information and signals, including products and services that used content-based fingerprints in order to identify content or signals.  He was highly aware of developments and prior art publications and systems in this regard, prior to the stipulated date of conception of the Patents-in-Suit.  He did not disclose this information to the PTO and mischaracterized the prior art during prosecution and in the specification of the Patents-in-Suit.  But for withholding and mischaracterization of this prior art, the claims of the Patents-in-Suit would not have issued.

**Unjust Enrichment And Unfair Competition**

21

31.     Muscle Fish expended tremendous resources to cultivate and develop valuable information and intellectual property, including its proprietary source code and documentation embodying its content-based fingerprinting technology, its confidential research into the benefits of content-based fingerprinting over digital watermarking and it confidential ideas regarding applications of content-based fingerprinting as a substitute for and improvement over digital watermarking.  The development and use of such information enabled Muscle Fish and its successor Audible Magic to succeed in a competitive industry.

32.     During interactions with Muscle Fish in the summer of 1997, Scott Moskowitz informed Muscle Fish that their interactions were confidential

**Lanham Act And Unfair Competition**

33.     Scott Moskowitz, Blue Spike Inc. and Blue Spike LLC made material false and misleading statements, in commerce, that constitute false advertising and false and misleading representations of fact, which misrepresents the nature, characteristics and qualities of good, services and commercial activities.  In particular, Audible Magic alleges that Scott Moskowitz's, Blue Spike Inc.'s and Blue Spike LLC's false and misleading statements include that they had a working product called the "Giovanni Abstraction Machine," that they were the "first to create" content "fingerprinting" technology, that they had such fingerprinting technology and the Giovanni Abstraction Machine since the "turn of the century" and that their products or technology are expressly or impliedly superior for those reasons.  These literally false and misleading statements, made in interstate commerce, were material and had the potential to deceive a substantial segment of consumers, and potential licensees and defendants, and to unfairly and deceptively maximize Blue Spike's bargaining power.  These acts violate the Lanham Act (15 U.S.C. § 1125(a)) and the common law of unfair competition.

22

**Infringement of U.S. Patent No. 6,834,308**

34.    Blue Spike Inc.'s and Blue Spike LLC's offer for sale of the Giovanni Abstraction Machine infringes Audible Magic's U.S. Patent No. 6,834,308, on the bases set forth in Audible Magic's unrebutted expert report addressing infringement of this patent.  If this claim proceeds to trial, Audible Magic will seek an injunction against Blue Spike's infringing offer for sale of the Giovanni Abstraction Machine.

E.    **STIPULATIONS AND UNCONTESTED FACTS**

1.    Plaintiff Blue Spike, LLC is a limited liability company organized and existing under the laws of the State of Texas with a principal place of business at 1820 Shiloh Road, Tyler, Texas 75703.

2.    Counterclaim Defendant Blue Spike, Inc. is a corporation organized and existing under the laws of the State of Florida with a principal place of business at 20191 East Country Club Drive, #4, Aventura, Florida 33180.

3.    Counterclaim dDefendant Scott Moskowitz is an individual residing at all relevant times at 411 N. New River Drive East, Apt. 2204, Fort Lauderdale, FL 33301 and 16711 Collins Ave., Apt. 2505, Sunny Isles Beach, FL 33160-4262.

3.4.    Defendant and counterclaim plaintiff Audible Magic Corporation is a corporation organized and existing under the laws of the State of California with a principal place of business at 985 University Avenue, Suite 35, Los Gatos, California 95032.

4.5.    Blue Spike, LLC owns all right, title, and interest to the Patents-in-Suit.

5.6.    The Patents-in-Suit claim a priority date of September 7, 2000. Blue Spike has stipulated that the date of conception and reduction to practice of the inventions in

23

the Patents-in-Suit is September 7, 2000.

6.7.    U.S. Patent No. 8,214,175 is titled "Method and Device for Monitoring and Analyzing Signals."  The application for the '175 patent was filed on February 26, 2011 the patent issued on July 3, 2012.

7.8.    U.S. Patent No. 7,346,472 is titled "Method and Device for Monitoring and Analyzing Signals."  The application for the '472 patent was filed on September 7, 2000 and the patent issued on March 18, 2008.

8.9.    U.S. Patent No. 7,949,494 is titled "Method and Device for Monitoring and Analyzing Signals."  The application for the '494 patent was filed on December 22, 2009 and the patent issued on May 24, 2011.

9.10.   U.S. Patent No. 7,660,700 is titled "Method and Device for Monitoring and Analyzing Signals."  The application for the '700 patent was filed on December 26, 2007 and the patent issued on February 9, 2010.

10.11.  The asserted claims of U.S. Patent No. 8,214,175 are Claims 8, 11-13, 15-17 11, 12, 17.

11.12.  The asserted claims of U.S. Patent No. 7,346,472 are Claims 3-4, 8, 11 3, 4, 8.

12.13.  The asserted claims of U.S. Patent No. 7,949,494 are Claims 1, 11 1, 4-5, 11, 17-18, 20-22, 29.

13.14.  The asserted claims of U.S. Patent No. 7,660,700 are Claims 1, 40 1, 6-8, 10-11, 40, 49-51.

The Patents-in-Suit generally claim methods and systems for monitoring and analyzing a signal, creating a data-reduced digital representation that maintains a perceptual relationship with the original signal ("abstract") of reference and query

24

signals, and comparing the abstracts to those contained within a database for the purpose of matching and/or differentiating between versions of data signals.

15.    Blue Spike Inc., Blue Spike LLC, Scott Moskowitz, and Mike Berry did not ever create any product embodying the inventions claimed in the Patents-in-Suit.

14.16.  Blue Spike Inc., Blue Spike LLC, Scott Moskowitz, and Mike Berry did not ever create the "Giovanni Abstraction Machine."

**F.**    **CONTESTED ISSUES OF FACT AND LAW**

**Plaintiff's Contested Facts and Law**

1.    Whether Blue Spike has proven by a preponderance of the evidence that Audible Magic has directly infringed at least one of the asserted claims of the Patents-in-Suit by offering for sale, selling, using, and importing the Accused Products.

2.    Whether all of the Accused Products rely on the creation of signal abstracts or "fingerprints" and the comparing and differentiation of query abstracts with the reference abstracts contained in the Audible Magic content identification databases.

3.    Whether the Audible Magic core technology employs an "abstract" within the narrow definition of the asserted claims.

4.    Which of the Accused Products offered for sale, sold, used, or imported infringe the Patents-in-Suit.

5.    When did the Defendant learn of the Patents-in-Suit.

6.    Whether Audible Magic has shown by clear and convincing evidence that prior art existed as of the priority date of the Patents-in-Suit that would invalidate the patent.

7.      Whether Audible Magic has shown by clear and convincing evidence that the Patents-in-Suit did not describe each limitation of the asserted claims.

8.      Whether Audible Magic has shown by clear and convincing evidence that the disclosure of the inventions contained in the Patents-in-Suit was not sufficient to enable a person of ordinary skill in the art to make and use the claimed inventions as of the date of filing of the patent applications.

9.      What dollar amount is adequate to compensate Blue Spike as damages for any infringement found, said amount not being less than a reasonable royalty.

10.     What is the reasonable royalty rate that Audible Magic would pay and that Blue Spike would accept had they known that the Patents-in-Suit was valid and infringed had they engaged in an arms length negotiation on the eve of first infringement of the Patents-in-Suit.

11.     What is a reasonable royalty rate for a compulsory license running from the date of the jury's verdict through the expiration of the Patents-in-Suit.

12.     What is the appropriate amount of prejudgment and post-judgment interest to be added to any damages awarded to Blue Spike.

**Defendant's Contested Facts and Law**

1.      Whether Audible Magic has shown that Erling Wold, Thom Blum, Douglas Keislar and Jim Wheaton made a "not insubstantial" contribution to the inventions of the Patents-in-Suit and were improperly omitted by Moskowitz, Blue Spike Inc. and Blue Spike LLC as co-inventors.

2.      Whether the improperly omitted co-inventors did not act with deceptive intent, but were instead omitted solely through the fault of Moskowitz.

26

3.      Whether the Court should correct inventorship pursuant to 35 U.S.C. § 256.

4.      Whether the Patents-in-Suit are invalid pursuant to 35 U.S.C. § 102(f) due to the prior invention of Thom Blum, Erling Wold, Douglas Keislar and Jim Wheaton, and on the basis that the applicants improperly failed to name and omitted these co-inventors of the Patents-in-Suit.

5.      Whether Audible Magic is an equitable title holder of the Patents-in-Suit, under patent law principles, and is entitled to federal equitable remedies, including disgorgement of wrongfully obtained profits.

6.      Whether Audible Magic has shown that the Muscle Fish inventors disclosed confidential information to Moskowitz under an express or implied duty of confidence, and that Moskowitz, Blue Spike Inc. and Blue Spike LLC have taken and used without authorization or licensing such proprietary and confidential information, by wrongfully deriving the Patents-in-Suit from such information, such that such acts constitute common law unjust enrichment.

7.      Whether Audible Magic is entitled to disgorgement of wrongfully obtained profits as a remedy for the unjust enrichment.

8.      Whether Audible Magic has shown that the Muscle Fish inventors disclosed confidential information to Moskowitz under an express or implied duty of confidence, and that Moskowitz, Blue Spike Inc. and Blue Spike LLC have taken and used without authorization or licensing such proprietary and confidential information, by wrongfully deriving the Patents-in-Suit from such information, thereby gaining a special advantage in competition, and at the expense of Audible Magic, such that such acts constitute common law unfair competition.

27

9.    Whether Audible Magic is entitled to disgorgement of wrongfully obtained profits as a remedy for the unfair competition.

10.   Whether Audible Magic has shown that Scott Moskowitz, Blue Spike Inc. and Blue Spike LLC violated the Lanham Act by making material false and misleading statements, regarding the Giovanni Abstraction Machine, whether they were "first to create" content "fingerprinting" technology and whether they had such technology and product since the "turn of the century," in commerce, that constitute false advertising and false and misleading representations of fact, which misrepresents the nature, characteristics and qualities of good, services and commercial activities, were material, and had the potential to deceive a substantial segment of consumers, and potential licensees and defendants, and to unfairly and deceptively maximize Blue Spike's bargaining power.

11.   Whether Audible Magic has shown that Scott Moskowitz, Blue Spike Inc. and Blue Spike LLC violated the common law of unfair competition by making material false and misleading statements, regarding the Giovanni Abstraction Machine, whether they were "first to create" content "fingerprinting" technology and whether they had such technology and product since the "turn of the century," in commerce, that constitute false advertising and false and misleading representations of fact, which misrepresents the nature, characteristics and qualities of good, services and commercial activities, were material, and had the potential to deceive a substantial segment of consumers, and potential licensees and defendants, and to unfairly and deceptively maximize Blue Spike's bargaining power.

28

12.    Whether Blue Spike Inc.'s and Blue Spike LLC's offer for sale of the Giovanni Abstraction Machine infringes Audible Magic's U.S. Patent No. 6,834,308.

13.    Whether Audible Magic is entitled to permanent injunction enjoining and restraining Blue Spike, Inc., Blue Spike LLC and Scott Moskowitz, their directors, officers, agents, servants, employees, and those acting in privity or concert with them, and their subsidiaries, divisions, successors, and assigns, from further acts of unjust enrichment, violation of the Lanham Act, unfair competition and from infringing offers for sale of the Giovanni Abstraction Machine.

14.    Whether Audible Magic is entitled to damages, including compensatory, consequential and incidental damages, for unjust enrichment, violation of the Lanham Act and unfair competition.

15.    Whether Audible Magic is entitled to an award of punitive damages due to Scott Moskowitz's, Blue Spike LLC's and Blue Spike Inc.'s acts of fraud, malice and/or gross negligence, in engaging in unfair competition.

16.    Whether Audible Magic is entitled to any amount of pre-judgment or post-judgment interest.

17.    Whether Audible Magic is entitled to attorneys fees and costs under the Lanham Act, on the basis that this is an "exceptional" case and Scott Moskowitz's, Blue Spike LLC's and Blue Spike, Inc.'s acts are willful, wanton and calculated to deceive, and are undertaken in bad faith.

18.    Whether Audible Magic's accused products are licensed, as to the Patents-in-Suit, pursuant to the terms of the RPX License, and whether Audible Magic is a third party beneficiary of the RPX License, such that the benefit of the RPX License

29

should extend to Audible Magic's accused products.

19.  Whether Claims 3, 4, 8, 11, '700 patent, Claims 1, 6, 7, 8, 10, 11, 40, 49, 50, 51, '494 patent, Claims 1, 4, 5, 11, 17, 18, 20, 21, 22, 29 and '175 patent, Claims 8, 11, 12, 13, 15, 16, 17 are invalid under 35 U.S.C. §§ 101, 102 and/or 103.

20.  Whether the Patents-in-Suit are invalid because they fail to satisfy the statutory requirements of enablement and written description under Section 112 of the Patent Act, on the basis that the patents' specification and claims fail to enable a person of ordinary skill in the art to make and use the claimed inventions without undue experimentation and do not contain sufficient description to enable the claimed inventions or meet the written description requirements.

21.  Whether the Patents-in-Suit are invalid because they fail to point out and distinctly claim the subject matter that is regarded as the invention, on that basis that a person of ordinary skill in the art would not understand what is claimed in light of the specification and on the basis that and that the claims meaning cannot be ascertained, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention, are not amenable to construction, and are insolubly ambiguous.

22.  Whether the Patents-in-Suit are unenforceable because of Scott Moskowitz's and Blue Spike, Inc.'s inequitable conduct during prosecution of the Patents-in-Suit, by failing to disclose and mischaracterizing highly material prior art, with the intent to deceive the PTO, and which, but for the failure to disclose and mischaracterization, the Patents-in-Suit would not have issued.

23.  Whether the Patents-in-Suit are unenforceable because of Blue Spike's unclean

hands resulting from and during its efforts to license the Patents-in-Suit.

24.  Whether Blue Spike is estopped from enforcing the Patents-in-Suit because of misleading conduct and/or silence by Blue Spike upon which Audible Magic relied and has been prejudiced.

25.  Whether the doctrine of waiver bars Blue Spike's claims, or at least limits any damages available to Blue Spike.

26.  Whether the doctrine of equitable estoppel bars Blue Spike's claims, or at least limits any damages available to Blue Spike.

27.  Whether the doctrine of laches bars Blue Spike from recovering damages, if any, for the period of time before Blue Spike asserted infringement claims against Audible Magic in this case.

28.  Whether Audible Magic is entitled to a finding that the Patents-in-Suit are not infringed.

29.  Whether Audible Magic is entitled to a finding that the Patents-in-Suit are invalid.

30.  Whether Audible Magic is entitled to a finding that Patents-in-Suit are unenforceable.

31.  Whether Audible Magic is entitled to an award of attorneys fees and costs under the Patent laws, on the basis that this is an "exceptional case" pursuant to 35 U.S.C. §§ 285 and 288, and any other relief deemed appropriate by the Court.

32.  Whether Blue Spike has proven by a preponderance of the evidence that Audible Magic has directly infringed any asserted claim of the Patents-in-Suit, through a showing by a preponderance of the evidence that each accused Audible Magic product separately meets each element of each asserted claim of the Patents-in-

31

Suit.

33.    Whether Blue Spike has proven by a preponderance of the evidence that there is legally sufficient control, direction or vicarious liability between Audible Magic, Content Owners and Audible Magic Customers, which are accused under Blue Spike's theory of alleged "joint direct infringement" and accused of controlling components or carrying out acts alleged by Blue Spike to meet the elements of the asserted claims.

34.    Whether Blue Spike has proven by a preponderance of the evidence that the components and acts that it alleges as to Audible Magic practice the claims of the Patents-in-Suit within the United States.

35.    Whether the doctrine of prosecution history estoppel precludes Blue Spike from recovering against Audible Magic.

36.    Whether Blue Spike has proven by a preponderance of the evidence that it is entitled to any damages, including any reasonable royalty.

37.    Whether Blue Spike has proven by a preponderance of the evidence that it is entitled to any damages any greater than a fraction of the sales price of the accused products when Blue Spike has not established, and cannot establish, that the alleged patented feature is the basis for consumer demand of the accused products and has failed to apportion damages.

38.    Whether Blue Spike has proven by a preponderance of the evidence the starting date of any damages period, the damages base and any royalty rate.

39.    Whether Blue Spike has proven by a preponderance of the evidence that it marked or required others to mark, such that the running of any damages period began.

32

40.    Whether Blue Spike would be entitled to a permanent injunction or any other equitable relief.

41.    Whether Blue Spike would be entitled to any amount of pre-judgment or post-judgment interest.

42.    Whether Blue Spike has met its burden of proof on any additional contested issues of fact that Blue Spike raises above.

**G.    STRUCTURE OF TRIAL**

Audible Magic contends that all claims and defenses should be tried to the jury in a single proceeding, and that the Court should decide the equitable claims and affirmative defenses with, if necessary, the aid of special/advisory verdict findings of the jury.  Audible Magic contends that the following are equitable issues for the Court to decide and wholly matters of law appropriate for eventual disposition on motion.

1.    The jury will make factual determinations whether the Muscle Fish inventors contributed to the inventions of the Patents-in-Suit and were improperly omitted co-inventors of the Patents-in-Suit.  The Court will thereafter decide the legal and equitable issues of correction of inventorship, pursuant to 35 U.S.C. § 256 and whether federal equitable remedies, including disgorgement of wrongfully obtained profits is warranted.

2.    The Court will decide whether Blue Spike lacks standing to assert the Patents-in-Suit and failed to join necessary parties, i.e. the Muscle Fish inventors, due to their wrongful omission as named co-inventors.

3.    The Court will decide whether Moskowitz engaged in inequitable conduct.

4.    The Court will decide the affirmative defenses of laches, waiver, acquiescence,

33

equitable estoppel, unclean hands and implied license.

5.    The Court will decide whether any injunctive relief or other equitable remedies are appropriate on Audible Magic's counterclaims or Blue Spike's claims.

6.    The Court will decide whether attorneys fees or costs are warranted.

**H.    EXHIBIT LIST**

Blue Spike and Audible Magic's exhibits are listed in the Joint Trial Exhibit List, attached hereto as Exhibit A.  Pursuant to the Trial Preparation Order, the parties' respective exhibit lists in the Joint Trial Exhibit List will not include exhibits used solely for the purpose of impeachment.

**I.    WITNESS LIST**

**Plaintiff**

Blue Spike's Witness List is attached hereto as Exhibit B. In the event there are any other witnesses to be called at the trial, their names, address, and the subject matter of their testimony shall be reported to opposing counsel as soon as they are known. This restriction shall not apply to rebuttal or impeachment witnesses, the necessity of whose testimony cannot reasonably be anticipated before the time of trial.

**Defendant**

Audible Magic's Witness List is attached hereto as Exhibit C. Exhibit C is a list of the witnesses and rebuttal witnesses that Audible Magic presently expects that it will call, may call, or will provide testimony through deposition designations.  It is Audible Magic's position that Blue Spike must disclose now all witnesses that it may or will call at trial, and there are not any reasonably unanticipated witnesses, whether for affirmative testimony, rebuttal or impeachment. Blue Spike's proposal suggests that Blue Spike may attempt to call late-disclosed witnesses.

Audible Magic will oppose any such attempt by Blue Spike. Audible Magic reserves its rights to object to any late disclosed witness, and reserves its rights under Paragraph 19 of the Trial Preparation Order to call rebuttal or impeachment witnesses, the necessity of whose testimony cannot reasonably be anticipated before the time of trial.

**J.**    **DEPOSITION DESIGNATIONS**

Pursuant to the Court's Trial Preparation Order (Dkt. 25), Audible Magic has provided deposition designations. Blue Spike did not provide any affirmative deposition designations. Blue Spike has exchanged rebuttal designations and objections. Audible Magic's deposition designations are attached as Exhibit D. Blue Spike's rebuttal designations are attached as Exhibit E.

**K.**    **LIST OF PENDING MOTIONS**

1.    Defendant Audible Magic's Motion for Voluntary Dismissal Without Prejudice of Its Patent Infringement Counterclaim (Dkt. No. 12);

2.    Defendant Audible Magic's Motion for Summary Judgment of Non-Infringement (Dkt. No. 13) – Magistrate Judge Craven has issued a Report and Recommendation to grant Audible Magic's motion. Blue Spike intends to object to the findings by the deadline, September 25, 2015, if not earlier;

3.    Plaintiff Blue Spike's Motion for Summary Judgment on Counterclaims 9-13 (Dkt. No. 14);

4.    Defendant Audible Magic's Motion to Exclude the Opinions of Blue Spike's Damages Expert, Rodney Bosco (Dkt. No. 31);

5.    Defendant Audible Magic's Motion to Exclude Certain Opinions of Blue Spike's

35

Invalidity Expert (Dkt. No. 49).

**L.    MOTIONS IN LIMINE**

The parties have met and conferred to narrow the issues and are at an impasse regarding the following Motions in Limine:

**Plaintiff and Counterclaim Defendants**

1.    Use of the Term "Patent Troll" or Disparaging Use of "NPE" or "Non-practicing Entity"

2.    Suggestion of Blue Spike, LLC as an "Ephemeral Entity"

3.    Discussion of Mr. Moskowitz's Illness

4.    Discussion of Order of Invalidity from the District Court for the Northern District of California

5.    Discussion of the Cooperman Litigation

6.    Certain Correspondence Casting Aspersions on Mr. Moskowitz

7.    Discussion of Audible Magic's Allegations of Sanctionable Conduct\

5. 8.    Eliciting Expert Opinion from Fact Witnesses

**Defendant and Counterclaim Plaintiff**

1.    Preclude Dr. Papakonstantinou or any other witness from referring to the "Null case," "intended matches" or "differentiating between versions" as a basis for claiming that the asserted patents are valid.

2.    Preclude Scott Moskowitz from testifying about the scope and meaning of the asserted patents, beyond what was stated during his deposition.

3.    Preclude Blue Spike from claiming $6.5 million in debt of other parties and from questioning Audible Magic's estimates of Blue Spike's business expenses.

36

4.  Preclude Blue Spike or any other witness from commenting on or testifying about any alleged medical conditions of parties or witnesses.

5.  Preclude Blue Spike from testifying, through any witness, about alleged Blue Spike inventive activities prior to September 7, 2000 (the Stipulated Priority Date).

6.  Preclude Mr. Bosco from testifying that there is an "established" royalty rate for the Patents-in-Suit.

7.  Preclude Blue Spike from challenging the prior art status of Audible Magic's prior art.

8.  Preclude discussion or any mention, by any counsel or witness, about the personal background of any attorney.

9.  Preclude Blue Spike from relying on any "lump sum" agreements to hypothesize a running royalty percentage.

10. Preclude Scott Moskowitz from claiming that he resides in Texas.

**M.  SETTLEMENT**

Settlement negotiations have stagnated. Blue Spike remains open to settlement; the parties have not yet exhausted all settlement efforts.  Audible Magic remains open to settlement; the parties have not yet exhausted all settlement efforts.  Audible Magic is in communication with Special Master McGovern about the possibility of further settlement efforts.

**N.  JURY TRIAL REQUESTED**

(a) Probable Length of Trial

The parties Blue Spike estimates that the probable length of trial is [10] days, not including jury selection. Audible estimates that the probably length of trial is 7 days, not

37

<u>including jury selection.</u>

(b) Availability of Witnesses

The parties do not anticipate any issues regarding the availability of witnesses.

(c) Any Foreseeable Logistical Problems

Due to Mr. Moskowitz's medical condition, Blue Spike may require a reasonable accommodation such as occasional recesses for pain management purposes. Given Mr. Moskowitz's role as principal of Blue Spike, LLC and co-inventor of the Patents-in-Suit, it is essential that he not miss substantial portions of the proceedings.

**O.** **CERTIFICATIONS**[2]

The undersigned counsel for each of the parties in this action does hereby certify and acknowledge the following:

1.    Full and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders;

2.    Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders have been complied with and not altered by agreement or otherwise; and

3.    Each exhibit in the Joint Trial Exhibits List herein:

(a)    is in existence;

(b)    is numbered; and

(c)    has been disclosed and shown to opposing counsel.

Approved as to form and substance:

---

[2] The parties understand that this certification is being made by each party as to its own conduct and is not intended as a certification or stipulation of the other party's compliance.

__/s/ Randall Garteiser__
Randall T. Garteiser
 Lead Attorney
 Texas Bar No. 24038912
 rgarteiser@ghiplaw.com
Christopher A. Honea
 Texas Bar No. 24059967
 chonea@ghiplaw.com
Christopher S. Johns
 Texas Bar No. 24044849
Kirk J. Anderson
 California Bar No. 289043
Molly A. Jones
 California Bar No. 301419
GARTEISER HONEA, P.C.
119 W. Ferguson Street
Tyler, Texas 75702
(903) 705-7420
(888) 908-4400 fax

*Attorneys for Plaintiff*
*Blue Spike, LLC*

__/s/ Gabriel M. Ramsey__
Gabriel M. Ramsey
 Lead Attorney
 California Bar No. 209218, admitted E.D. Texas
 gramsey@orrick.com
I. Neel Chatterjee
 California Bar No. 173985, admitted E.D. Texas
 nchatterjee@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, California 94025
(650) 614-7400
(650) 614-7401 fax

Alyssa M. Caridis
 California Bar No. 260103, admitted E.D. Texas
 acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 S. Figueroa St., Suite 3200
Los Angeles, California 90017
(213) 629-2020
(213) 612-2499 fax

Christopher J. Higgins
   Washington D.C. Bar No. 498165, admitted *pro hac vice*
   chiggins@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005-1706
(202) 339-8400
(202) 339-8500

Eric H. Findlay
   Texas Bar No. 00789886
   efindlay@findlaycraft.com
Walter W. Lackey, Jr.
   Texas Bar No. 24050901
   efindlay@findlaycraft.com
FINDLAY CRAFT, P.C.
102 N. College Ave, Suite 900
Tyler, Texas 75702
(903) 534-1100
(903) 534-1137 fax

40

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email.

/s/ Randall Garteiser
Randall T. Garteiser
