**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| BLUE SPIKE, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>AUDIBLE MAGIC CORPORATION,<br><br>*Defendant*.<br><br>AUDIBLE MAGIC CORPORATION,<br><br>*Counterclaim Plaintiff*<br><br>v.<br><br>BLUE SPIKE, LLC, BLUE SPIKE, INC. and SCOTT A. MOSKOWITZ<br><br>*Counterclaim Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 6:15-cv-584-MHS<br><br>Jury Trial Demanded |

**AUDIBLE MAGIC CORPORATION'S MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)**

# TABLE OF CONTENTS

**Page**

**I. INTRODUCTION** .......... 1
**II. STATEMENT OF FACTS** .......... 4
**A. Blue Spike and Its Litigation Campaign** .......... 4
**B. The Patents-in-Suit and Asserted Claims** .......... 5
**C. The Written Description** .......... 6
**D. The Asserted Claims** .......... 9
**III. ARGUMENT** .......... 11
**A. The Claims At Issue Are Invalid Under Section 101 Pursuant To Principles Of Collateral Estoppel** .......... 11
**B. Legal Standards Regarding 35 U.S.C. § 101** .......... 15
**C. The Asserted Claims Are Directed to An Abstract Idea** .......... 16
**D. The Claims Are Not Patent-Eligible Applications of the Abstract Idea** .......... 20
**IV. CONCLUSION** .......... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*

134 S. Ct. 2347 (2014) ....................1, 2, 3, 15, 16, 18, 20, 25

*Allen v. McCurry*

449 U.S. 90 (1980)....................13

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*

2014 WL 5430956 (E.D. Va. 2014)....................22, 23

*BASCOM Glob. Inter. Servs. v. AT&T Mobility LLC*

2016 U.S. App. LEXIS 11687 (Fed. Cir. 2016) ....................24

*Bascom Research LLC v. LinkedIn, Inc.*

2015 WL 149480 (N.D. Cal. Jan. 5, 2015)....................15, 16, 18, 23

*Bilski v. Kappos*

561 U.S. 593 (2010)....................15, 16

*Blue Spike, LLC v. Facebook Inc.*

Case No. 4:15-cv-04185-YGR (N.D. Cal. 2015)....................14

*Blue Spike, LLC v. Google Inc.*

2015 U.S. Dist. LEXIS 119382 (N.D. Cal. Sept. 8, 2015) ....................1, 2, 12, 16, 20

*Blue Spike, LLC v. Google Inc.*

Case No. 16-1054 (Fed. Cir)....................12, 24

*BuySafe, Inc. v. Google, Inc.*,

765 F.3d 1350 (Fed. Cir. 2014)....................15

*Cogent Medicine, Inc. v. Elsevier Inc.*

2014 WL 4966326 (N.D. Cal. Sept. 30, 2014) ....................15

*Cooper v. Pfizer, Inc.*

2015 U.S. Dist. LEXIS 62398 (S.D. Tex. May 13, 2015) ....................1

*CyberSource Corp. v. Retail Decisions, Inc.*

654 F.3d 1366 (Fed. Cir. 2011)....................18

*Dana v. E.S. Originals, Inc.*

342 F.3d 1320 (Fed. Cir. 2003)....................13

*Dana Corp. v. NOK, Inc.*

882 F.2d 505 (Fed. Cir. 1989)....................14

*Diamond v. Diehr*

101 S. Ct. 1048 (1981)....................17

*DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc.*

70 F. Supp. 3d 808 (E.D. Tex. 2014)....................14

*DietGotal Innovations LLC v. Bravo Media LLC*

33 F. Supp. 3d 271 (S.D.N.Y. 2014)....................19

*Eclipse IP LLC v. McKinley Equip. Corp.*

2014WL 4407592 (C.D. Cal. Sept. 4, 2014) ....................16

*Enfish, LLC v. Microsoft Corp.*

2016 U.S. App. LEXIS 8699 (Fed. Cir. 2016) ....................16, 17

*Gametek LLC v. Zynga, Inc.*

2014 WL 1665090 (N.D. Cal. 2014) ....................24

*Gottschalk v. Benson*

409 U.S. 63 (1972)....................18

*Hicks v. Quaker Oats Co.*

662 F.2d 1158 (5th Cir. 1981) ....................13

*IpLearn LLC v. K12 Inc.*

2014 WL 7206380 (D. Del. 2014) ....................19

*Mayer/Berkshire Corp. v. Berkshire Fashions, Inc.*

424 F.3d 1229 (Fed. Cir. 2005)....................13

*Montana v. United States*

440 U.S. 147 (1979)....................13

*Motio Inc. v. BSP Software LLC*

2016 U.S. Dist. LEXIS 2686 (E.D. Tex. Jan. 8, 2016)....................1

*Open Text v. Alfresco*

2014 WL 4684429 (N.D. Cal. 2014) ....................15, 16, 18, 19, 24

*Open Text v. Box*

2015 WL 269036 (N.D. Cal. 2015) ....................16, 18, 23

*OpenTV, Inc. v. Netflix, Inc.*

2014 WL 7185921(N.D. Cal. 2014) ....................18, 23

*Parker v. Flook*

437 U.S. 584 (1978)....................15

*Pharmacia & Upjohn Co. v. Mylan Pharms, Inc.*

170 F.3d 1373 (Fed. Cir. 1999)....................13

*Prager v. El Paso Nat'l Bank*

417 F.2d 1111 (5th Cir. 1969) ....................13

*Pres. Wellness Techs. LLC v. Allscripts Healthcare Solutions*

2016 U.S. Dist. LEXIS 61841 (E.D. Tex. May 9, 2016)....................1

*Rice v. Dep't of the Treasury*

998 F.2d 997 (Fed. Cir. 1993)....................13

*SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*

718 F.2d 365 (Fed. Cir. 1983)....................13

*The Money Suite Co. v. 21st Century Ins. and Fin. Servs., Inc.*

2015 WL 436160 (D. Del. 2015)....................19

*Wolf v. Captstone Photography, Inc.*

2014 WL 7639820 (C.D. Cal. 2014)....................19

**Statutes**

35 U.S.C. § 101....................1, 2, 11, 12, 14, 15, 16, 17, 18, 21

35 U.S.C. § 102....................21

**Rules**

Federal Rule of Civil Procedure 12(c)....................1

**Other**

Restatement (Second) of Judgments § 27....................13

## I. INTRODUCTION

Audible Magic moves under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings that the Patents-in-Suit are invalid under 35 U.S.C. § 101 as claiming non-patentable subject matter.[1] "[A]bstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (citations omitted). The U.S. District Court for the Northern District of California held that nearly all of the claims at issue in this case are invalid as abstract ideas and entered final judgment on that basis. *See Blue Spike, LLC v. Google Inc.*, 2015 U.S. Dist. LEXIS 119382 (N.D. Cal. Sept. 8, 2015). Accordingly, Blue Spike is collaterally estopped from challenging the invalidity of the patents and judgment of invalidity should be entered. The Court should also, in the interests of judicial economy and comity toward towards other federal courts, defer to the California court's judgment on the Section 101 issue. Considering that the Federal Circuit is only months away from deciding the appeal in the *Google* case, it would be a waste of judicial resources for the court to decide the Section 101 issue anew.

If the Court independently addresses the merits of the Section 101 issue, it should find that the California court correctly applied the two-part test of *Alice*. Blue Spike's patents are directed to an abstract idea of comparing two works (*e.g.*, songs, images or videos) by using "qualities" of the work (*i.e.*, features that humans recognize). Human beings have been performing this "comparison" for as long as images, songs and videos have existed. The asserted claims add no "inventive concept" to this abstract idea; they merely take the abstract

[1] Challenges to patentability under § 101 may be brought as a motion for judgment on the pleadings. *Pres. Wellness Techs. LLC v. Allscripts Healthcare Solutions*, 2016 U.S. Dist. LEXIS 61841 (E.D. Tex. May 9, 2016) (granting 12(c) motion based on 35 U.S.C. § 101). Patent eligibility is a "pure question of law." *Id.* at *18. Courts should accept as true all factual allegations, but need not accept mere conclusory statements or threadbare recitals of the elements of a cause of action. *Motio, Inc. v. BSP Software LLC*, 2016 U.S. Dist. LEXIS 2686, 4-5 (E.D. Tex. Jan. 8, 2016). The court may consider exhibits submitted with or alleged in the complaint, as well as matters than may be judicially noticed pursuant to Federal Rule of Evidence 201. *Cooper v. Pfizer, Inc.*, 2015 U.S. Dist. LEXIS 62398 (S.D. Tex. May 13, 2015)

idea and apply it on a generic and conventional computer – which is *not* a patentable invention. It is merely an attempt to monopolize human activity by implementing an abstract idea in a known computer environment. The patent claims fail under 35 U.S.C. § 101.

Representative claim 1 of the ’472 patent proves the point. It claims:

| Claim Language | Non-Eligible Concept |
|---|---|
| A method for monitoring and analyzing at least one signal comprising: | |
| receiving at least one reference signal to be monitored; | Receiving a signal (purportedly, of anything) |
| creating an abstract of said at least one reference signal wherein the step of creating an abstract of said at least one reference signal comprises:<br><br>inputting the reference signal to a processor;<br><br>creating an abstract of the reference signal using perceptual qualities of the reference signal such that the abstract retains a perceptual relationship to the reference signal from which it is derived; | Creating an “abstract” of the signal using “perceptual” qualities with a generic “processor” |
| storing the abstract of said at least one reference signal in a reference database; | Storing the “abstract” in a generic “reference database” |
| receiving at least one query signal to be analyzed; | Receiving another signal |
| creating an abstract of said at least one query signal wherein the step of creating an abstract of said at least one query signal comprises:<br><br>inputting the at least one query signal to the processor;<br><br>creating an abstract of the at least one query signal using perceptual qualities of the at least one query signal such that the abstract retains a perceptual relationship to the at least one query signal from which it is derived; and | Creating another “abstract” with the generic “processor” |
| comparing the abstract of said at least one query signal to the abstract of said at least one reference signal to determine if the abstract of said at least one query signal matches the abstract of said at feast [sic] one reference signal. | Comparing the two “abstracts” |

As illustrated, claim 1 recites nothing more than the idea of creating some type of "abstract" from "signals" and comparing them, using a generic "processor" and a "database." But, as the Supreme Court has explained, "transformation [of an abstract idea] into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Alice*, 134 S. Ct. at 2357. And, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id*. at 2358. Because the claims of the Patents-in-Suit claim nothing more than a bare idea without sufficient limitations for patent eligibility, the claims at issue are invalid under § 101.

The patent specifications further confirm that the claims seek to monopolize the use of an abstract idea. With respect to the so-called "abstract" recited in the claims, the only alleged point of novelty identified by Blue Spike, the specifications provide no algorithm, formula or specific method for creating one. The patents instead describe the claimed "abstract" in terms of its aspirational functional qualities without ever describing how to actually make it. For example, the patents explain that a so-called "abstract" can be used to find "paintings of sunsets or sunrises" by somehow creating an abstract out of "those perceptual characteristics related to the sun." This is no different than what a human being would do in looking at a picture or hearing a song – they would categorize their impressions of the work by what it contained based on their mental impressions from experience. *See e.g. Blue Spike*, 2015 U.S. Dist. LEXIS 119382 at *15-16 (noting human determinations such as color of sunset, position etc.).

The claims attempt to monopolize use of this process on a computer. For example, the specification suggests that existing "digital signal processing techniques" may be useful for abstracts (Ex. 3 at col. 6:61-7:3); some of the existing "large number of approaches to compressing a signal" could be relevant to abstracts (*id*. at col. 7:35-65); and that existing "hash

or signature" techniques may be helpful for abstracts. (*Id.* at col. 10:50-55). But, the specification never actually sets forth a process of how to create something that would qualify as an "abstract"; instead, it essentially seeks to claim almost anything that anyone else could come up with later to actually implement the abstract idea of comparing works using a computer – an intent borne out by the fact that Blue Spike has sued over one hundred technology companies in wide ranging fields, asserting that all of them somehow use something that would qualify as the claimed "abstract" of the asserted patents.

Setting aside for now the fatal defects in these patents with respect to lack of written description, lack of enablement and indefiniteness, these claims are exactly what the Supreme Court was cautioning against in *Alice*: a broad set of claims purporting to cover a normal human function (comparing two things), but using generic computer components, without any "practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Alice*, 134 S. Ct. at 2358. For this reason, these claims are invalid.

## II. STATEMENT OF FACTS

### A. Blue Spike and Its Litigation Campaign

Blue Spike purports to be the current assignee of U.S. Patent Nos. 7,346,472 ("'472 patent"), 7,660,700 ("'700 patent"), 7,949,494 ("'494 patent") and 8,214,175 ("'175 patent") (collectively, the "Patents-in-Suit"), and to have obtained its ownership interest from Blue Spike, Inc., a related business. (Dkt. 2 ¶ 2.) Blue Spike did not exist until May 11, 2012 when it was organized in Tyler, Texas. It was not assigned the Patents-in-Suit until August 4, 2012 (*i.e.*, five days before filing its first lawsuit). (*See* Ex. 1; Ex. 2; Ramsey Decl. ¶ 2.) Since then, Blue Spike has filed more than one hundred separate patent infringement actions in the Eastern District of Texas against Audible Magic and other companies that actually "design and develop software, applications, websites, systems and technology." (*See, e.g.*, Dkt. 2 ¶ 51.) Blue Spike

has voluntarily dismissed or settled more than eighty of the cases it filed. (Ramsey Decl. ¶ 2.)

**B. The Patents-in-Suit and Asserted Claims**

The '472 patent, entitled "Method and Device for Monitoring and Analyzing Signals," was filed on September 7, 2000 and issued on March 18, 2008. (Ex. 3.) The other three Patents-in-Suit (filed between 2007-2011 and issued between 2010-2012) all claim priority to the '472 patent application and share the same title and specification. (*See* Ex. 4 through Ex. 6.)

Blue Spike alleges that Audible Magic and its customers directly infringe the following claims of the four Patents-in-Suit: claims 1, 3-4, 8, 11 of the '472 patent; claims 1, 6-8, 10-11, 40, 49-51 of U.S. Patent No. 7,660,700 ("'700 patent"); claims 1, 4-5, 11, 17-18, 20-22, 29 of U.S. Patent No. 7,949,494 ("'494 patent") and claims 8, 11-13, 15-17 of U.S. Patent No. 8,214,175 ("'175 patent"). (Ramsey Decl. ¶¶ 5-9.)

According to Blue Spike, the supposedly inventive aspect of the Patents-in-Suit is the claimed "abstract," which is recited in every asserted claim:

> Moskowitz ... filed his first patent application related to signal recognition technology, which issued as the '472 Patent. In describing this pioneering technology, ***Moskowitz coined the term "signal abstracting,"*** which enhanced the ability to ***catalogue, archive, identify, authorize, transact, and monitor the use and/or application of signals, such as images*** (for example, photographs, paintings, and scanned fingerprints), ***audio*** (for example, songs, jingles, commercials, movies soundtracks, and their versions), ***video*** (for example, videos, television shows, commercials, and movies), ***and multimedia works***. ***This revolutionary technology greatly improves the efficiency and speed of monitoring, analyzing, and identifying signals as perceived***, as well as enabling the optimal compression of the signals and their associated signal abstracts for memory accommodation.

(Dkt. 2 ¶ 35 (emphasis added); *see also id*. ¶ 45 ("The Patents-in-Suit comprise, in part, what Moskowitz has coined 'signal abstracting,' which encompasses techniques, among others, also known as 'signal fingerprinting,' 'acoustic fingerprinting,' or 'robust hash functions.'"); *id*. ¶ 23 ("Broadly speaking, 'signal abstracting' identifies digital information and material—including

video, audio, graphics, multimedia, and text—based solely on the perceptual characteristics of the material itself."); *id*. ¶ 26 ("This idea of 'signal abstracting' applies equally to biometric identification and today's security systems, such as fingerprint, facial, and optic systems that analyze, catalogue, monitor, and identify a person's biometric features."). Each asserted claim requires at least one "abstract." (*See* n. 5 & n. 7, *infra*.)

### C. <u>The Written Description</u>

The Patents-in-Suit purport to cover methods and apparatus for identifying, monitoring and analyzing signals (*e.g.*, images, audio and video) for virtually any conceivable application. (*See, e.g.* Ex. 3 at col. 1:56-59 ("The invention relates to the monitoring and analysis of digital information...."), 4:42-43 ("The present invention relates to identification of digitally-sampled information, such as images, audio and video."), 4:56-59 (present invention "is directed to the identification of a digital signal—whether text, audio, or video—using only the digital signal itself"), 4:19-20 (leaving it to skilled artisan to "determin[e] particular applications of the present invention"), 6:64-7:9 ("... useful means for signal analysis in a wide variety of applications"), 13:31-38 (a "variety of purposes").) Specifically, the Summary of the Invention describes the methods and systems for "monitoring and analyzing" as requiring a reference signal, creating and storing an "abstract" for the reference signal, receiving a query signal, creating an "abstract" for the query signal, and then comparing the abstract of the query signal to the stored abstract(s) of the reference signal(s) to determine if they match. (*Id*. at Abstract & col. 2:64-3:47.)

The specification acknowledges that the invention accomplishes the same identification, monitoring and analysis of content that humans have been performing since the dawn of time. For example, the invention may be used to find images of a sunset or sunrise that are stored in a database. (Ex. 3 at col. 14:56-15:11; *see also id*. at 13:31-38 (draw comparisons between

technique, compositions, or color schemes between beginner and great artists).) While one "traditional approach might involve a textual search involving a database wherein the works of other artists have been described in writing" (*id.* at 14:56-15:11), another traditional approach might be for a human to simply look through a physical archive that contains various paintings, photos, images, etc. to locate those that include a sunset, sunrise or other desired feature.

Similarly, the specification claims that the invention may be used to identify songs or the number of times they are played on a radio station (Ex. 3 at col. 13:54-14:2, 13:31-38), but admits that a "traditional analysis is performed by actual persons who use play lists ...." (*Id.* at 13:54-14:2.) An even more conventional approach is to simply listen to the radio and write down the names of songs and the number of times they are played. (*Id.* ("manual (i.e., by persons) monitoring ...").)

In fact, the specification requires that the purportedly inventive "abstract" (*see* Dkt. # 2 ¶¶ 12, 23) be a substitute for human observation, *i.e.*, the signal abstracts differentiate what humans would perceive (without the aid of technology) as non-identical content:

- The specification recognizes that humans have a "highly effective ability [ ] to identify and recognize a signal" (Ex. 3 at col. 4:32-41);
- The signal is compressed "to its essence" while still "preserv[ing] some underlying 'aesthetic quality' of the signal" (*id.* at col. 7:3-7);
- The "abstracts" should distinguish between Billy Joel's recording and Barbara Streisand's recordings of "I'm in a New York State of Mind" (*id.* at col. 7:14-20);
- The signal is compressed "to retain what is 'humanly-perceptible'" and "the compression successfully mimics human perception" (*id.* at col. 7:36-38);
- The database should be "recalibrated" if it fails to recognize and differentiate different versions of a song, *e.g.*, an artist's first and second performances of a song that are similar but not identical (*id.* at col. 11:13-23);
- The invention should capture "humanly-perceptible observation" and "experience-based criteria," such as the use or application of a "complete song" versus "a short 3 second

segment of a commercially available and recognizable song which is used for commercials ... of goods or services being marketed" (*id*. at col. 11:31-45); and

- The invention should recognize and distinguish "perceptual differences" such as those that "exist between a song and its reproduction from a CD, an AM radio, and an Internet broadcast" that are differentiable by either the creator or consumers (*id*. at col. 13:13-22).

Signal comparison using signal "abstracts" as described in the specification merely takes the place of manual comparison of signals (*e.g.*, images, audio or video) that humans routinely perform. (*See id*. at col. 7:57-64 ("abstract" should sufficiently represent "a painting, a song, a TV commercial, a dialect, etc." so that "no independent cataloging is necessary"), 10:4-5 ("benefit" of invention is a more open means to uniformly catalog, analyze, and monitor signals).)

However, the specification is devoid of even one example of an actual "abstract." Instead, it defines an abstract by its aspirational function, stating that an "abstract" is something that "mimics human perception" (*see id*. at col. 7:38). The specification goes on to recognize all sorts of prior art techniques for manipulating digital signals that existed as of the time of the alleged invention. (*See, e.g.*, Ex. 3 at col. 1:61-64 ("[m]any methods and protocols are known for transmitting data in digital form ..."), 2:4-6 (compression and transmission of digitized information is known), 4:23-26 (increasingly, information such as music, photos and motion pictures is created and stored in digital format), 4:32-41 (analog signals should be digitized before being "analyzed by perceptually-based or perceptually limited analysis" that "model[s] the processes of the highly effective ability of humans to identify and recognize a signal").) Then, the specification attempts to sweep in any work that anyone might do to compare digital signals using known digital signal handling techniques by stating that any of these techniques may be useful for creating a so-called "abstract." For example, the specification identifies data compression and other techniques from the prior art as possibly being "appropriate tools to

measure signal characteristics" (*id*. at col. 4:8-11, 4:15-17) or, alternatively, asserts that other undisclosed approaches to data reduction can used to practice the invention.[2] (*Id*. at col. 3:52-56 ("there are many approaches to data reduction that can be utilized"); *see also id*. at col. 4:17-18 ("other approaches or combinations of signal characteristic analysis are contemplated"); *id*. at col. 4:20-22 ("a generalized approach to signal recognition is necessary to optimize the deployment and use of the present invention").) The "abstract"—the alleged invention—is nothing more than an open-ended theoretical concept, waiting for someone else to come along and implement this idea using known (or yet-to-be-developed by others) digital signal handling techniques. The patents attempt to sweep within their scope (i) comparisons that humans and other then-existing technology admittedly were capable of performing, (ii) using ***any*** technology that might be used to create the "abstract," (iii) for ***any*** application. (*See, e.g.*, Ex. 3 at col. 6:54-7:2 (relying on known and then-unknown "computationally inexpensive ways of identifying an entire signal with some fractional representation or relationship with the original signal, or its perceptually observable representation," and envisioning "a useful means for signal analysis in a wide variety of applications").)

**D. <u>The Asserted Claims</u>**

Blue Spike asserts independent claims, which recite nothing more than comparing one signal to another using a signal representation ("abstract") based on qualities that a human can perceive. Like the generic methods and systems described in the Summary of the Invention (Ex. 3 at col. 2:64-3:47), the independent claims require a reference signal,[3] creating and storing an

---

[2] These vague disclosures do not provide adequate written support for or fully enable the claimed invention under § 112 (issues that Audible Magic will address at trial), let alone transform the abstract idea into a patentable invention (*see* Section III).

[3] (*See* Ex. 3 at col. 15:35, 16:5, 17:13-14, 18:12; Ex. 4 at col. 15:11-12, 16:15, 18:1; Ex. 5 at col. 15:17, 16:11, 18:21-22; Ex. 6 at col. 15:23, 16:31, 17:25, 17:66.)

"abstract" for the reference signal based on "perceptual" qualities,[4] a query signal,[5] creating an "abstract" for the query signal,[6] and then comparing the abstract of the query signal to the stored abstract(s) of the reference signal(s) to determine if they match.[7] Claim 1 of the '472 patent is representative. It provides:

> A method for monitoring and analyzing at least one signal comprising:
>
> receiving at least one reference signal to be monitored;
>
> creating an abstract of said at least one reference signal wherein the step of creating an abstract of said at least one reference signal comprises:
>
> inputting the reference signal to a processor;
>
> creating an abstract of the reference signal using perceptual qualities of the reference signal such that the abstract retains a perceptual relationship to the reference signal from which it is derived;
>
> storing the abstract of said at least one reference signal in a reference database; receiving at least one query signal to be analyzed;
>
> creating an abstract of said at least one query signal wherein the step of creating an abstract of said at least one query signal comprises:
>
> inputting the at least one query signal to the processor;
>
> creating an abstract of the at least one query signal using perceptual qualities of the at least one query signal such that the abstract retains a perceptual relationship to the at least one query signal from which it is derived; and
>
> comparing the abstract of said at least one query signal to the abstract of said at least one reference signal to determine if the abstract of said at least one query signal matches the abstract of said at feast [sic] one reference signal.

---

[4] (*See* Ex. 3 at col. 15:36-45, 16:6-8, 17:13-15, 18:10-18; Ex. 4 at col. 15:13-17, 15:23-24, 16:15-20, 18:2-7; Ex. 5 at col. 15:19-25, 16:11-16, 18:21-28; Ex. 6 at col. 15:18-29, 16:25-46, 17:21-31, 17:61-18:11.)

[5] (*See* Ex. 3 at col. 15:46, 16:9, 17:16, 18:19; Ex. 4 at col. 15:18-19, 16:21, 18:8; Ex. 5 at col. 15:26, 16:17, 18:29.) Claim 1 of the '175 patent recites a second abstract for the reference signal rather than a "query signal" and query signal abstract. (Ex. 6 at col. 15:30-45.) Claims 8 and 17 of the '175 patent recite only one reference signal abstract (*see* n. 3).

[6] (*See* Ex. 3 at col. 15:47-55, 16:10, 17:17-18,18:19-22; Ex. 4 at col. 15:20-22, 16:22-23, 18:9-10; Ex. 5 at col. 15:27-29, 16:17-19, 18:31; Ex. 6 at col. 17:33.

[7] (*See* Ex. 3 at col. 15:56-60, 16:11-15, 17:19-20, 18:23-32; Ex. 4 at col. 15:25-30, 16:24-25, 18:1114; Ex. 5 at col. 15:30-36, 16:19-22, 18:29-33; Ex. 6 at col. 17:32-35.) Claims 8 and 17 of the '175 patent are even more generic than the rest in that they recite a reference signal abstract (*see* n. 3), but no compare step.

(Ex. 3 at col. 15:33-60.) For purposes of the Section 101 analysis, the asserted independent claims are not meaningfully distinguishable from one another, and there is little difference between the method and system claims. The latter (like claim 1 above) recite generic computer components (*e.g.*, processor, input, receiver, database, comparing device, counter) to practice the same idea of "comparing" using the "abstract" of the method claims. (*See, e.g.*, Ex. 3 at col. 15:39, 15:45, 15:50, 16:8, 16:16, 17:15, 17:24, 18:10, 18:12, 18:17, 18:19, 18:23; *see also* n. 3 through n. 7.)

The dependent claims are directed generally to creating the "abstract" (Ex. 4 at col. 15:41-52 ('700 claims 6, 7, 8); Ex. 5 at col. 15:47-52, 16:36-43 ('494 claims, 4, 5, 17, 18); Ex. 6 at col. 17:54-59 ('175 claim 16)); further processing the "abstract" using techniques in the prior art (Ex. 4 at col. 15:56-63, 18:39-46 ('700 claims 10, 11, 49, 50), Ex. 5 at col. 16:47-54 ('494 claims 20, 21)); "comparing" and "matching" (Ex. 3 at col. 16:26-33, 18:23-32 ('472 claims 4, 11); Ex. 6 at col. 17:36-39 ('175 claim 12)); embedding information into the signal itself (Ex. 4 at col. 15:64-67 ('700 claim 12)); counting or reporting "matches" (Ex. 3 at col. 16:17-33, 17:21-33 ('472 claims 3, 4, 8); Ex. 6 at col. 17:36-43, 17:49-53 ('175 claims 12, 13, 15)), or other activity that is common in computer environments such as authorizing or distributing (Ex. 4 at col. 16:65-67 ('700 claim 27), 18:47-48 ('700 claim 51), Ex. 5 at col. 16:55-57 ('494 claim 22)). No dependent claim adds anything inventive to the abstract ideas in the independent claims.

## III. ARGUMENT

### A. The Claims At Issue Are Invalid Under Section 101 Pursuant To Principles Of Collateral Estoppel

On September 8, 2015, the U.S. District Court for the Northern District of California, held that nearly all of the claims of the Patents-in-Suit are invalid under 35 U.S.C. § 101, as embodying an unpatentable "abstract idea," including in particular the concept of the "abstract"

and comparison of abstracts which appears in every asserted claim of the Patents-in-Suit. *See Blue Spike, LLC v. Google Inc.*, 2015 U.S. Dist. LEXIS 119382 (N.D. Cal. Sept. 8, 2015). The Court did so expressly adopting this Court's claim construction of the Patents-in-Suit for purposes of deciding that motion. *Id.* at *6-8. Blue Spike appealed and the matter is currently fully briefed and pending oral argument before the Federal Circuit. *See Blue Spike, LLC v. Google Inc.*, Case No. 16-1054 (Fed. Cir.).

There is substantial overlap in the claims asserted in the California case and the claims asserted here, and to the extent the asserted claims do not identically match, they present no material distinction.[8] Each of the asserted claims here includes the "abstract" and comparison of abstracts limitations upon which the Section 101 ruling was based, and as such, are invalid for the reasons articulated by the California court.

The Court should defer to the California court judgment under principles of collateral estoppel and comity, and find all asserted claims invalid as lacking patentable subject matter. This is the most efficient way to resolve the Section 101 issue and, given that the Federal Circuit is only months way from deciding the issue finally, it would be a waste of judicial resources for

---

[8] The California action involved claims 1, 2, 3, 4, 8 and 11 of the '472 patent; claims 1, 10, 11, 12, 18, 21, 27, 40 and 51 of the '700 patent; claims 11, 15, 17 and 29 of the '494 patent; claims 1, 8, 11, 12, 16 and 17 of the '175 patent. The instant case also involves:

(A) '700, claims 6, 7 and 8 and '494, claims 4, 5 and 18, which merely make general statements about creation of abstracts based on human perceptible attributes (versions, data describing signals, or similar characteristics or attributes), as were found invalid in California. *See Blue Spike, Inc.*, 2015 U.S. Dist. LEXIS 119382 at *13-17, 19.

(B)'700, claims 49 and 50 and '494, claims 20 and 21, which have nearly identical language as '700, claims 10 and 11 which were held invalid in California, *Id.* at *21-22.

(C) '494, claim 1, which is the same general elements as '472, claim 1 and the rest of the independent claim held invalid in California, *Id.* at *13-17.

(D) '175 patent claims 13 and 15 which have nearly identical language as claims 3 and 4 of the '472 patent held invalid in California. *Id.* at *19-20.

Each of these claims is addressed in the argument below, on precisely the same bases that the California court found the claims patent ineligible.

the court to decide the Section 101 issues wholly anew. *Allen v. McCurry*, 449 U.S. 90, 95-96 (1980) ("Res judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system.").

Collateral estoppel applies if (1) the issue sought to be precluded from relitigation is identical to the issue decided in the earlier proceeding; (2) the issue was actually litigated in the former proceeding; (3) the determination on the issue in the prior action was necessary to the resulting judgment in that case; and (4) the person against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action. *Mayer/Berkshire Corp. v. Berkshire Fashions, Inc.*, 424 F.3d 1229, 1232 (Fed. Cir. 2005); *Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003); *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1166 (5th Cir. 1981); *see Montana v. United States*, 440 U.S. 147, 153, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979) ("Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."); Restatement (Second) of Judgments § 27 (1980).

The collateral estoppel effect of a prior district court decision is not affected by the fact that an appeal has been taken from the decision. *See Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1380-81 (Fed. Cir. 1999); *Rice v. Dep't of the Treasury*, 998 F.2d 997, 999 (Fed. Cir. 1993); *SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 370 (Fed. Cir. 1983); *Prager v. El Paso Nat'l Bank*, 417 F.2d 1111, 1112 (5th Cir. 1969).

Here, the asserted claims at issue overlap substantially between the California action and the instant action and there are no relevant substantive distinctions between the claims for the

purposes of the court's Section 101 analysis. Indeed, in Blue Spike's separate case in California against "customer defendant" Facebook, Inc., Blue Spike agreed (and the district court ordered) that "the Google judgment of invalidity and its subsequent affirmance will collaterally estop Blue Spike from disputing the invalidity of the five asserted patents or asserting these patents against Facebook, including for patent claims not expressly recited in the Google judgment." *Blue Spike, LLC v. Facebook, Inc.*, No. 4:15-cv-04185-YGR (N.D. Cal.) (Dkt. 60 at 2). The claims asserted against Facebook in the separate California action not only include ***all*** of the asserted claims here, but dozens of other claims and a fifth patent not asserted here. Blue Spike has therefore agreed that even patent claims beyond those specifically addressed in the *Google* matter, including all of the claims asserted here, stand or fall with the outcome of that appeal. Blue Spike's stipulation to the wide reaching collateral estoppel effect of the California judgment now binds Blue Spike in all cases including the present one.

There can be no dispute that unpatentability was actually, fully and fairly litigated in the California action. Indeed, in that case Blue Spike was represented by the same counsel as this case and, after extensive briefing and hearing, Blue Spike litigated and was fully heard on the issue of validity of the Patents-in-Suit. The California court's determination of the issue of lack of patentable subject matter under 35 U.S.C. § 101 was necessary to the court's judgment in that case (indeed it was the sole basis for the judgment).

Accordingly, in addition to the independent substantive bases set forth below, and as an alternative basis of relief, the Court should enter judgment of invalidity of the asserted claims based on the collateral estoppel effect of the California judgment. *See DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc.*, 70 F. Supp. 3d 808, 811-816 (E.D. Tex. 2014) (entering judgment of invalidity under Section 101 based on judgment by district court); *see also Dana*

*Corp. v. NOK, Inc.*, 882 F.2d 505, 507 (Fed. Cir. 1989) (the defense of collateral estoppel based on a final judgment of patent invalidity in another suit can "be timely made at any stage of the affected proceedings.")

**B. Legal Standards Regarding 35 U.S.C. § 101**

Section 101 of the Patent Act defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. For more than 150 years, courts have recognized an important implicit exception: laws of nature, natural phenomena and abstract ideas are not patentable. *Alice*, 134 S. Ct. at 2354 (citation omitted); *Mayo*, 132 S. Ct. at 1293 (2012) (citations omitted); *BuySafe, Inc. v. Google, Inc.*, 765 F.3d 1350, 1352 (Fed. Cir. 2014); *Bascom Research, LLC v. LinkedIn, Inc.*, Case No. 12-cv-06293-SI, 2015 WL 149480, *5 (N.D. Cal. Jan. 5, 2015); *Cogent Medicine, Inc. v. Elsevier Inc.*, Case No. C-13-4479-RMW et al., 2014 WL 4966326, *3 (N.D. Cal. Sept. 30, 2014). These three concepts are "basic tools of scientific and technological work" and "building blocks of human ingenuity" that are "free to all men and reserved exclusively to none." *Alice*, 134 S. Ct. at 2354 (citations omitted); *Mayo*, 132 S. Ct. at 1293 (citation omitted).

Subject matter eligibility under § 101 is a threshold inquiry that courts determine as a matter of law. *Bilski v. Kappos*, 561 U.S. 593, 602, 130 S. Ct. 3218, 3225 (2010) ("threshold test"); *Parker v. Flook*, 437 U.S. 584, 593, 98 S. Ct. 2522 (1978) ("[t]he obligation to determine what type of discovery is sought to be patented must precede the determination of whether that discovery is, in fact, new or obvious"); *Open Text v. Alfresco*, 2014 WL 4684429 at *3 (citing *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013)) (§ 101 presents an issue of law). Courts have "broad discretion concerning the appropriate time to address § 101." *Eclipse IP LLC. v. McKinley Equip. Corp.*, Case No. 14-742,

2014 WL 4407592, *5 (C.D. Cal. Sept. 4, 2014) (broad discretion as to timing). Resolution of this issue on the pleadings is appropriate. *Open Text v. Alfresco*, 2014 WL 4684429 at *3 (citations omitted); *Bascom*, 2015 WL 149480 at *4 (citing *Microsoft Corp. v. i4i L.P.*, 131 S. Ct. 2238, 2242 (2011)).

To determine whether a claim is patent-ineligible under § 101, the Supreme Court has articulated a two-part test. *First*, courts must determine whether the claims at issue are directed to one of the three patent-ineligible concepts. *Second*, if they are, courts must search the claims for an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355; *Mayo*, 132 S. Ct. at 1294, 1297. As explained below, the asserted claims of the Patents-in-Suit meet the first part of this test and fail the second, and are thus patent-ineligible.

### C. <u>The Asserted Claims Are Directed to an Abstract Idea</u>

The first step of the *Mayo/Alice* test requires the Court to evaluate the asserted patent claims "on their face" to determine if the claims are drawn to an abstract idea. *Alice*, 134 S. Ct. at 2355; *Bascom Research*, 2015 WL 149480 at *6. The Court must consider of the claims whether "their character as a whole is directed to excluded subject matter." *Enfish, LLC v. Microsoft Corp.*, 2016 U.S. App. LEXIS 8699, *12-13 (Fed. Cir. May 12, 2016). For example, the court must consider whether claims are merely on a "process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool. *Id.* at *13; *see also Open Text v. Box*, 2015 WL 269036 at *2 (court must "distill[] the gist of the claim"). This inquiry should focus on the "core concept" of the claim. *Open Text v. Box*, 2015 WL 269036 at *1 (for first part of test, distinguishing between the "core concept" of the claim and its "implementation").

The asserted claims of the Patents-in-Suit "are generally directed to the abstract concept

of comparing one thing to another."[9] *Blue Spike, LLC v. Google Inc.*, 2015 U.S. Dist. LEXIS 119382 (N.D. Cal. Sept. 8, 2015.[10] (*See* Section II.D, *supra*.) Consider claim 1 of the '472 patent, which recites the steps of (i) receiving a reference signal, (ii) creating an abstract of the reference signal, (iii) storing the abstract, (iv) receiving a query signal, (v) creating an abstract for the query signal, and (vi) comparing the abstracts to determine if they match.[11] (Ex. 3 at col. 15:33-60.) Beyond the basic comparison required in the last limitation, the claim has no "purpose" whatsoever. It does not recite any practical use or application, *i.e.*, the "comparing" step is performed solely for the sake of "comparing." (*Id.*) This is the very definition of an "abstract idea" that is patent-ineligible. *See* 35 U.S.C. § 101 (invention must be "new and ***useful***") (emphasis added); *Bilski*, 561 U.S. at 602 (exceptions to patentability "are consistent with the notion that a patentable process must be 'new and useful'"); *Alice*, 134 S. Ct. at 2354 (exclusions to patentability are driven by concern that patent monopoly would pre-empt use of

[9] Absolutely nothing in the claims recite any "improvement in the functioning of a computer" itself. *Cf. Enfish, LLC*, 2016 U.S. App. LEXIS 8699 at *11, 18. Further, Blue Spike cannot take credit for improving processing of signals, as suggested in its appeal, because Blue Spike cannot identify any disclosure in the patents that explains how an abstract should be created, other than by mimicking mental processes. *See Blue Spike*, U.S. Court of Appeals for the Federal Circuit, Case No. 16-1054 at Dkt. 40. To the extent Blue Spike attempts frame what the patents are "directed to," those arguments must focus on the claims and not immaterial other locations in the patent, as Blue Spike attempted to do in the Federal Circuit. *See Blue Spike* at Dkt. 12, 33, 40.

[10] The only exceptions are claims 1, 8 and 17 of the '175 patent, which, at most, require only creating and storing a reference signal "abstract" but do not identify any application for the "abstract" (*e.g.*, to compare one signal to another). (Ex. 6 at col. 15:17-45 (claim 1), 16:2446 (claim 8), 17:60-18:11 (claim 17).) The claims require creating an abstract solely for the sake of creating an abstract. Despite this difference (which, if it is even possible, makes these claims ***more*** abstract), claims 1, 8 and 17 also should be found to be unpatentable under § 101 for at least the same reasons as discussed for the other asserted claims.

[11] The "abstract" recited in claim 1 is how the "purpose" of the claim (*i.e.*, comparing one signal to another) is implemented. *Open Text v. Box*, 2015 WL 269036 at *1 ("general idea" of the claim is considered in part 1 of the *Alice/Mayo* test, and "implementation" is considered in part 2). It is also the alleged point of novelty (Dkt. 2 ¶ 35), and should not be considered in determining the "purpose" of the claims. *Diamond v. Diehr*, 101 S. Ct. 1048, 1058-59 (1981) (novelty falls under § 102 and "is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories ..."); *Enfish*, 2014 WL 5661456 at *4 (citing *Diamond*) (in first part of test, the "correct approach" is asking what the claim is trying to achieve instead of examining the point of novelty).

the approach in all fields).

In addition to having no claimed "usefulness," the purpose of the asserted claims (*i.e.*, comparing one signal to another) is an idea that even the specification recognizes is a computerized substitute for human observation and signal analysis. (*See* Section II.C, *supra*.) This is precisely the type of subject matter that the Supreme Court and Federal Circuit have excluded from patent eligibility under § 101. *Alice*, 134 S. Ct. at 2356 (claims directed to "organizing human activity" are abstract ideas and not patentable); *Gottschalk v. Benson*, 409 U.S. 63, 67, 93 S. Ct. 253 (1972) (method that can be "done mentally" without a computer is an abstract idea and not patentable); *Planet Bingo*, 576 Fed. Appx. at 1006-7 (method encompassing abstract idea of managing and playing Bingo consists of mental steps that can be carried out by a human using pen and paper); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011) (following the Supreme Court, "we have similarly held that mental processes are not patent-eligible subject matter ...").

Applying this guidance, recent decisions of numerous district courts have rejected claim after claim on § 101 grounds because they describe patent-ineligible "abstract ideas." *See Open Text v. Box*, 2015 WL 269036 at *1, 3 ("[s]horn of its implementation-specific fleece, the claim is directed at providing a method for people to collaborate and share information"); *Bascom Research*, 2015 WL 149480 at *2, 6, 8, 9 (claim reciting "link relationships" between document objects "simply describes the abstract idea of creating, storing and using relationships between objects"); *OpenTV, Inc. v. Netflix Inc.*, Case No. 14-cv-01525-RS, 2014 WL 7185921, *5-6 (N.D. Cal. Dec. 16, 2014) (claims directed to allowing advertisers to gather data and direct customized ads to individuals are abstract ideas "as old as the saying, 'know your audience'"); *id*. at *7 (claims for delivery of customized advertising do not describe anything more than the

abstract idea of attempting to provide appropriately selected content to users); *Cogent*, 2014 WL 4966326 at *3-4 (a database of information, cataloging the information, and setting aside particular information that may be relevant to a particular user "claims the abstract idea of maintaining and searching a library of information"); *Open Text v. Alfresco*, 2014 WL 4684429 at *1, 4 (claim describes "a very simple computer-driven method to engage in the commonplace and time-honored practice of interacting with customers to promote marketing and sales"); *see also IpLearn, LLC v. K12 Inc.*, Case No. 111026, 2014 WL 7206380, *6 (D. Del. Dec. 17, 2014) (claims covering abstract idea of educational instruction, evaluation and review address "fundamental human behavior" and "conventional everyday teaching that happens in schools across the country"); *Wolf v. Capstone Photography, Inc.*, Case No. 2:13-CV-09573, 2014 WL 7639820, *10 (C.D. Cal. Oct. 28, 2014) (claims "merely implement basic computer technology to perform the same process [matching photographs to participant and making them available for ordering], with computer systems automating much of the work previously done manually"); *DietGoal Innovations LLC v. Bravo Media LLC*, 33 F. Supp. 3d 271, 283-84 (S.D.N.Y. 2014) (claims are drawn to the abstract concept of meal planning to meet nutritional goals, which is a "long prevalent" practice that humans have engaged in for millennia).

The asserted claims here should fare no better. "Comparing" one signal (*e.g.*, images, audio and video) using the humanly perceivable parts of the signal is, by definition, an activity that humans can perform manually without a computer.[12] These claims seek coverage of an

[12] The act of "comparing" one thing to another also is a "fundamental, long-standing, well-known concept" with limitless potential uses. The specification recognizes this. (*See, e.g.*, Ex. 3 at col. 6:64-7:9 (wide variety of applications), 13:31-38 (variety of purposes).) Recent cases have held claims unpatentable for this reason as well. *See, e.g., The Money Suite Co. v. 21st Century Ins. and Fin. Servs., Inc.*, Case No. 13-984 et al., 2015 WL 436160, *3 (D. Del. Jan. 27, 2015) (method of "conduct[ing] a search of multiple financial products for efficient quoting" is a fundamental economic or business practice and therefore an abstract idea); *Morsa*, 2014 WL 761155 at *6 (claims directed to targeted advertising on the internet is a patent-ineligible abstract

abstract idea. (*See* Sections II.C & II.D, *supra*.)

**D. The Claims Are Not Patent-Eligible Applications of the Abstract Idea**

Once it has been determined that a claim is directed to an abstract idea, the second step of the *Mayo/Alice* test requires the Court to search for an inventive concept—*i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1294). The limitations of the asserted claims, either individually or collectively, do not contain an inventive step sufficient to transform the claimed abstract idea into patent-eligible subject matter. *Blue Spike, LLC v. Google Inc.*, 2015 U.S. Dist. LEXIS 119382, 17-19 (N.D. Cal. Sept. 8, 2015) (holding that Patents-in-Suit claim abstract idea but without any "inventive concept," but rather merely discuss using routine computer components and methods to accomplish a task of the "human mind"; such general purpose computer components does not constitute an inventive concept)

The claims here lack any "inventive concept." They instead attempt to monopolize every possible field and application in which the abstract idea of comparing one signal to another may be used. (Ex. 3 at col. 15:33-60 (reciting no steps beyond "comparing" and no practical application).); *see Blue Spike, LLC*, 2015 U.S. Dist. LEXIS at *18 (Patents-in-Suit "preempt a wide range of comparisons that humans can and, indeed, have undertaken from time immemorial."). Indeed, Blue Spike interprets the asserted claims as covering a vast array of technology fields and applications not recited in the claims themselves and never contemplated by the specification. (*See, e.g.*, Dkt. 2 ¶¶ 47-49 (contending that technology of Patents-in-Suit cover everything from "develop[ing] better intelligence about content markets" to "biometric

idea because it is a fundamental, long-standing, well-known concept).

identification" to "security systems").) There is no claim limitation that cures this problem. Even the creation or use of the claimed "abstract," which Blue Spike contends is the point of novelty (*see* Section II.B, *supra*; Dkt. 2 ¶¶ 35, 45, 23, 26),[13] adds nothing inventive or limiting to the abstract idea of comparing one signal to another. In claim 1 of the '472 patent, the reference signal "abstract" is created by "inputting the reference signal to a processor" and the query signal "abstract" is created by "inputting the at least one query signal to the processor." The processor creates the abstract "using perceptual qualities of the [] signal such that the abstract retains a perceptual relationship" to the signal from which it is derived.[14] (Ex. 3 at col. 15:26-42, 15:48-55.) The claim provides no detail how to do this and gives no bounds that add technical, "inventive" features to the claim.

The specification provides no help either. It confirms that the claimed "abstract" is itself merely an abstract idea. Except for prior art "data reduction technologies" that might (or might not) be useful,[15] there is no disclosure of how to create an "abstract." There are no figures, examples, processes, flowcharts, algorithms, source code, or other procedures. There are only

---

[13] And, in its appeal, Blue Spike concedes that the only alleged point of novelty in its claims is the "abstract." *See Blue Spike* at Dkt. 12, 33.

[14] Other claims are even barer, reciting "creating an abstract" for the reference signal. (*See, e.g.*, Ex. 3 at col. 16:6, 17:13-14). Even without the additional language of '472 claim 1 reciting "perceptual qualities," the specification teaches that the "abstract" is a substitute for human perception, as described previously.

[15] For purposes of this motion, it is not necessary to determine one way or the other whether the prior art listed in the specification may be used to create an "abstract." On the one hand, the specification suggests prior art techniques "may be appropriate tools" (Ex. 3 at col. 4:18-16; *see also id*. at col. 7:34-40), but on the other hand downplays the prior art's usefulness in comparing signals as contemplated. (*Id*. at col. 6:64-7:11 (lossy or lossless compression and perceptual coding techniques are "not strictly equivalent to" massively compressing a signal to its essence while still preserving some underlying "aesthetic quality" of the signal), 7:40-43 (psychoacoustic and psychovisual compression "has some relevance to the present invention" but additional data reduction or massive compression is anticipated).) Regardless, the prior art does not supply an "inventive concept" required in part two of the *Alice/Mayo* test. *See* 35 U.S.C. § 101 ("Whoever invents or discovers any ***new*** and useful ...") (emphasis added); *see also* 35 U.S.C. § 102 (novelty requirement); *Mayo*, 132 S. Ct. at 1298 ("well-understood, routine, conventional activity" does not transform an unpatentable exception into patent-eligible application).

vague directions to use some unidentified technology, which will depend on the specific application, to ensure that the "abstract" "retain[s] what is 'humanly-perceptible'" and "successfully mimics human perception." (*Id*. at col. 7:29-48; *see also id*. at 4:7-18 ("other approaches or combinations of signal characteristic analysis are contemplated"), 4:20-22 ("a generalized approach to signal recognition is necessary to optimize the deployment and use of the present invention"), 6:64-67 ("[s]o long as there exist computationally inexpensive ways to identifying an entire signal ..."), 7:25-27 (the present invention "aims to maintain some level of perceptual quality").) Creation of the "abstract" depends entirely on the innovation of someone other than the named inventors of the Patents-in-Suit.

The claimed "abstract" cannot provide the "inventive concept" that is necessary under *Alice* and *Mayo*. At best, the Patents-in-Suit fail to disclose, describe and enable something that the named inventors actually did invent, *i.e.*, technology to create an "abstract." At worst (and in fact the case), the Patents-in-Suit describe an "abstract" only in the most general terms to intentionally pre-empt the creativity and innovation of others who perform research, develop technology and achieve actual solutions. The exceptions to § 101 exist to foreclose this abuse. As recently explained:

> In *Alice*, the Supreme Court articulated concerns that claims to abstract ideas would preempt the "building blocks" of research—in essence, that ***people who merely had the idea of how to solve a problem, but did not actually know how to solve the problem, would prevent others from performing research and achieving actual solutions***.... [I]f the patent claims sweep too broadly, or only claim the idea that was achieved rather than implementation of the idea, § 101 directs that the patent [claim] is invalid.

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, Case No. 1:10cv910, 2014 WL 5430956, *11 (E.D. Va. Oct. 24, 2014) (emphasis added). The "abstract" limitations of the asserted claims sweep too broadly by claiming another abstract idea, not an actual implementation. They do no

more than state, "create an abstract" using humanly-perceptible qualities in order to mimic human perception. (Ex. 3 at col. 15:36-44, 15:47-55.) In other words, they recite an idea and say, "apply it." This does not transform the asserted claims into a patent-eligible concept. *Alice*, 134 S. Ct. at 2357 (to transform an abstract idea into a patent-eligible application, the additional claim elements must do more than simply state the abstract idea while adding the words "apply it"); *Bascom Research*, 2015 WL 149480 at *10 (claims reciting the creation of "link directories" to store "link relationships" amount to instructions to apply the abstract idea of "establishing relationships between documents and making those relationships accessible to other users"); *Amdocs*, 2014 WL 5430956 at *5, 6 (despite claims reciting "computer code" for receiving and correlating network accounting records, court concluded "it is difficult to conceive of broader terms with which the idea of correlating two records could be described").

There is nothing inventive about any of the remaining claim limitations. They recite routine computer-implemented activity (*e.g.*, receiving, inputting, creating, storing, counting, comparing, recording, distributing) using standard computer components (*e.g.*, receiver, input, processor, database, memory, counter, index). (*See* Ex. 3 through Ex. 6 at Claims; *see also* Ex. 3 at col. 7:65-9:39 (the abstract idea is implemented using generic processors or software that runs on the processors).) These recitations are nothing more than a collection of well-known ideas for conducting any computerized function. They cannot transform the patent-ineligible abstract idea into a patent-eligible invention. *Mayo*, 132 S. Ct. at 1294 (well-understood, routine, conventional activity does not transform an abstract idea into an "inventive concept"); *Alice*, 134 S. Ct. at 2358 (same); *Open Text v. Box*, 2015 WL 269036 at *1, 3 (implementation consisting of "standard technology like browsers, servers, and networks, has nothing inventive whatsoever about it"); *OpenTV*, 2014 WL 7185921 at *7 ("use of general purpose computers

and/or the internet does not suffice" to transform abstract idea into patent-eligible subject matter); *Cogent*, 2014 WL 4966326 at *6 ("Alice makes clear that ... system and computer component claims rise and fall with the method claims" where none of the hardware recited by the system claims offers meaningful limitation beyond generally implementing the use of the method via computers); *Open Text v. Alfresco*, 2014 WL 4684429 at *5 (implementing basic marketing scheme on a generic computer system without any meaningful limitations is not patent-eligible); *Gametek LLC v. Zynga, Inc.*, Case No. CV 13-2546, 2014 WL 1665090, *7 (N.D. Cal. Apr. 25, 2014) (generic network is "merely the environment in which the abstract idea is practiced").[16]

The claim elements, taken individually and collectively, do not establish the asserted claims as including any "inventive concept." Beyond reciting a "comparing" step, the claims are not limited to any practical application but are drafted to cover every conceivable application (as the specification acknowledges). The "abstract" limitations are claimed so broadly as to cover both the prior art and all innovation by others (as the specification acknowledges). And, although the "abstract" is described in the specification as a substitute for what humans perceive and it is alleged by Blue Spike to be the inventive aspect of the claims, neither the claims nor the specification recite any actual implementation or disclose how to create the abstract. In short, the "abstract" is itself an abstract idea that purports to "mimic human perception" and the claims as a whole purport to be a substitute for signal comparisons

[16] In its appeal, Blue Spike does not contest either that the recited computer components are all generic or that the combinations of such components are generic. *See Blue Spike* at Dkt. 12, 33. Further, the recited combinations are wholly conventional and the heart of the claims is still simply the mental process of creating the abstract and mimicking human perception—this is the only allegedly inventive step even suggested by Blue Spike. The rest of the steps and components are merely insignificant pre- or post-solution activities. *Cf. BASCOM Glob. Inter. Servs. v. AT&T Mobil. LLC*, 2016 U.S. App. LEXIS 11687 (Fed. Cir. June 27, 2016)

that humans can perform. There is nothing in the asserted claims that ensures that the "patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1294).

## IV. CONCLUSION

For the foregoing reasons, Audible Magic requests that the Court find that the asserted claims are unpatentable under 35 U.S.C. § 101 and enter judgment on the pleadings in Audible Magic's favor.

DATED: June 30, 2016

Respectfully submitted,

By: */s/ Eric H. Findlay*
Eric H. Findlay
Texas Bar No. 00789886
efindlay@findlaycraft.com
Walter W. Lackey, Jr.
Texas Bar No. 24050901
wlackey@findlaycraft.com
Findlay Craft, P.C.
102 N. College Ave, Suite 900
Tyler, Texas 75702
(903) 534-1100
(903) 534-1137 fax

Gabriel M. Ramsey
Lead Attorney
California Bar No. 209218, admitted E.D. Texas
gramsey@orrick.com
I. Neel Chatterjee
California Bar No. 173985, admitted E.D. Texas
nchatterjee@orrick.com
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, California 94025
(650) 614-7400
(650) 614-7401 fax

Alyssa M. Caridis
California Bar No. 260103, admitted E.D. Texas
acaridis@orrick.com
Orrick, Herrington & Sutcliffe LLP
777 S. Figueroa St., Suite 3200
Los Angeles, California 90017
(213) 629-2020
(213) 612-2499 fax

Christopher J. Higgins

Washington D.C. Bar No. 498165, admitted pro hac vice
chiggins@orrick.com
Orrick, Herrington & Sutcliffe LLP
1152 15th Street, N.W.
Washington, D.C. 20005-1706
(202) 339-8400
(202) 339-8500

*Attorneys for Audible Magic Corp.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served electronically on opposing counsel pursuant to Local Rule CV-5(a)(7)(C) on June 30, 2016.

*/s/ Eric H. Findlay*
Eric H. Findlay

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| BLUE SPIKE, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>AUDIBLE MAGIC CORPORATION,<br><br>*Defendant*.<br><br>AUDIBLE MAGIC CORPORATION,<br>*Counterclaim Plaintiff*<br><br>v.<br><br>BLUE SPIKE, LLC, BLUE SPIKE, INC. and SCOTT A. MOSKOWITZ<br><br>*Counterclaim Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 6:15-cv-584-MHS<br><br><br>Jury Trial Demanded |

**ORDER**

The Court, having reviewed Defendant Audible Magic Corp.'s Motion for Judgment on the Pleadings Pursuant To Fed. R. Civ. P. 12(c), finds that the Motion is well taken and should be, and hereby is, GRANTED in all respects. It is, therefore:

ORDERED that the Defendant Audible Magic Corp.'s Motion for Judgment on the Pleadings Pursuant To Fed. R. Civ. P. 12(c), is hereby granted.