# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | | |
|---|---|---|
| BLUE SPIKE, LLC, | § § § | |
| *Plaintiff,* | § § | Case No. 6:15-cv-584-RWS-CMC |
| v. | § § § | |
| AUDIBLE MAGIC CORPORATION, | § § § | Jury Trial Demanded |
| *Defendant.* | § § | |
| AUDIBLE MAGIC CORPORATION, | § § § | **FILED UNDER SEAL** |
| *Counterclaim Plaintiff* | § § | |
| v. | § § § | |
| BLUE SPIKE, LLC, BLUE SPIKE, INC. and SCOTT A. MOSKOWITZ | § § § § | |
| *Counterclaim Defendants.* | § § | |

## PROPOSED JOINT FINAL PRE-TRIAL ORDER

This cause is scheduled to come before the Court at a pre-trial conference on July 6, 2016 at 10:00 a.m. in Texarkana, Texas, pursuant to Local Rule CV-16 and Rule 16 of the Federal Rules of Civil Procedure. This Proposed Joint Final Pretrial Order relates to issues currently scheduled to be tried on July 18, 2016.  Counterclaim Plaintiff Audible Magic Corporation and Counterclaim Defendants Blue Spike, LLC, Blue Spike, Inc. and Scott A. Moskowitz submit the following in accordance with the Order Regarding Amended Pretrial Deadlines, Dkt. No. 76. The parties will submit additional pretrial orders, if necessary, on other issues as ordered by the Court.

## A.    COUNSEL FOR THE PARTIES

**Counterclaim Plaintiff**:

> Gabriel M. Ramsey (Lead Attorney)
>   California Bar No. 209218, admitted E.D. Texas

1

gramsey@orrick.com
I. Neel Chatterjee
   California Bar No. 173985, admitted E.D. Texas
   nchatterjee@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, California 94025
(650) 614-7400
(650) 614-7401 fax

Alyssa M. Caridis
   California Bar No. 260103, admitted E.D. Texas
   acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 S. Figueroa St., Suite 3200
Los Angeles, California 90017
(213) 629-2020
(213) 612-2499 fax

Christopher J. Higgins
   Washington D.C. Bar No. 498165, admitted *pro hac vice*
   chiggins@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005-1706
(202) 339-8400
(202) 339-8500

Eric H. Findlay
   Texas Bar No. 00789886
   efindlay@findlaycraft.com
Walter W. Lackey, Jr.
   Texas Bar No. 24050901
   efindlay@findlaycraft.com
FINDLAY CRAFT, P.C.
102 N. College Ave, Suite 900
Tyler, Texas 75702
(903) 534-1100
(903) 534-1137 fax

**Counterclaim Defendants**:

Randall T. Garteiser (Lead Attorney)
   Texas Bar No. 24038912
   rgarteiser@ghiplaw.com
Christopher A. Honea

Texas Bar No. 24059967
chonea@ghiplaw.com
GARTEISER HONEA, P.C.
119 W. Ferguson Street
Tyler, Texas 75702
(903) 705-7420
(888) 908-4400 fax

Kirk J. Anderson
  California Bar No. 289043
  kanderson@ghiplaw.com
GARTEISER HONEA, P.C.
44 N. San Pedro Ave.
San Rafael, California 94903
(405) 785-3762
(888) 908-4400 fax

**B.**     **JURISDICTION**

Audible Magic contends that this Court has subject matter jurisdiction pursuant to 28

U.S.C. §§ 1331 and 1338(a) because this case arises under the patent laws of the United States.

Audible Magic contends that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§

1331 because this case arises under the Lanham Act, 15 U.S.C. § 1125 *et seq.*  Audible Magic

further contends that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 2201(a).

**C.**     **NATURE OF ACTION**

**<u>Audible Magic's Position</u>**

Trial in the above-captioned matter is scheduled to commence on July 18, 2016.  This is a

case brought by Audible Magic Corporation ("Audible Magic") against Blue Spike, LLC, Blue

Spike, Inc. and Scott A. Moskowitz (collectively "Blue Spike") regarding ownership, invalidity

and enforceability of United States Patent Nos. 7,346,472 ("the '472 Patent"), 7,660,700 ("the

'700 Patent"), 7,949,494 ("the '494 Patent"), and 8,214,175 ("the '175 Patent") (collectively, the

"Patents-in-Suit") and regarding certain actions and representations by Blue Spike.  This is a

case for a declaratory judgment of invalidity of the Patents-in-Suit, declaratory judgment of

unenforceability of the Patents-in-Suit due to inequitable conduct, correction of inventorship of the Patents-in-Suit, common law unjust enrichment, common law unfair competition and violation of the Lanham Act.  Audible Magic seeks damages in the form of disgorgement of proceeds received by Blue Spike from licensing the Patents-in-Suit.

Audible Magic further alleges that Scott Moskowitz and Blue Spike, Inc. obtained proprietary information from Muscle Fish (later acquired by Audible Magic), including from public and confidential sources, and thereafter derived the Patents-in-Suit from such information and failed to name Muscle Fish's principals Erling Wold, Thom Blum, Doug Keislar, or Jim Wheaton as co-inventors.  Audible Magic asserts that this improper omission of co-inventors renders the Patents-in-Suit invalid under 35 U.S.C. § 102(f) and seeks correction of inventorship to add the improperly omitted co-inventors.  Audible Magic asserts that it holds an interest in the Patents-in-Suit which entitles it, pursuant to the patent laws, the common law of unjust enrichment, and the common law of unfair competition, to the proceeds of Scott Moskowitz's, Blue Spike, Inc.'s and Blue Spike, LLC's monetization of the Patents-in-Suit.

Audible Magic further alleges that Scott Moskowitz and Blue Spike, Inc. committed inequitable conduct by failing to disclose and by misrepresenting material information and prior art to the United States Patent and Trademark Office ("USPTO"), including information and prior art of Muscle Fish LLC (which Audible Magic acquired in 2000) and from other sources.  On that basis, Audible Magic alleges that the Patents-in-Suit are unenforceable.

Audible Magic further alleges that Scott Moskowitz, Blue Spike, Inc. and Blue Spike, LLC made material false and misleading statements, in commerce, that constitute false advertising and false and misleading representations of fact, which misrepresents the nature, characteristics and qualities of goods, services and commercial activities.  In particular, Audible

4

Magic alleges that Scott Moskowitz's, Blue Spike, Inc.'s and Blue Spike, LLC's false and misleading statements include that they had a working product called the "Giovanni Abstraction Machine," that they were the "first to create" content "fingerprinting" technology, that they had such fingerprinting technology and the Giovanni Abstraction Machine since the "turn of the century" and that their products or technology are expressly or impliedly superior for those reasons.  Audible Magic contends that these acts violate the Lanham Act (15 U.S.C. § 1125(a)) and the common law of unfair competition.

In addition to judgment on each of Audible Magic's counterclaims of invalidity, unenforceability, unjust enrichment, unfair competition and violation of the Lanham Act, Audible Magic seeks correction of inventorship of the Patents-in-Suit, compensatory, consequential and incidental damages, disgorgement of economic benefits received by the counterclaim defendants, injunctive relief, and other forms of equitable relief, based upon the foregoing counterclaims.

Contrary to the position of the Blue Spike defendants, the theory of improper inventorship and derivation under 102(f) was pled in detail in Audible Magic's counterclaims, raised throughout the entire case and litigated extensively by both Audible Magic and the defendants.  First, the improper omission of the co-inventors and derivation of inventions were set forth in detail in Audible Magic's answer and counterclaims.  (Dkt. 1404, Case No. 6:12-cv-00499)  For example, Audible Magic alleged that the Blue Spike defendants "obtained and used Muscle Fish's information regarding its content based recognition technology and ideas" in the patents-in-suit, their "use of the Muscle Fish information, technology and ideas was without Muscle Fish's or Audible Magic's authorization or consent," and that such used has caused defendants to "profited unfairly from their unauthorized use of Muscle Fish's and Audible

Magic's proprietary information, technology and ideas."  (*Id.* at ¶ 27)  The improper omission of the Audible Magic co-inventors was explicitly pled:  "Moskowitz and Blue Spike, Inc. took ideas from Muscle Fish's old and pre-existing content-based recognition technology, claimed them as their own and the applicants derived ideas in their patent application from that prior art technology."  (*Id.* at ¶ 28)  In particular, omission of the co-inventors was was alleged as to Muscle Fish's early "SoundFisher and the AIR DataBlade" technology which identified sound based on perceptual features.  (*Id.*)  Audible Magic pled that omission of the Muscle Fish co-inventors caused damage:  "Filing of patent applications including ideas derived from the undisclosed Muscle Fish prior art was carried out to the benefit of Counter-Defendants and to the injury of Muscle Fish and Audible Magic."  (*Id.* at ¶ 29)  All of these facts were incorporated into Audible Magic's 35 U.S.C. § 102 counterclaims, which includes § 102(f).  (*Id.* at ¶¶ 19-21, 26-28, 33-35, 40-42)

The theory was also discussed extensively in Audible Magic's discovery responses.  The 102(f) bases were asserted in Audible Magic's invalidity contentions and claim charts.  The Section 102(f) derivation and improper omission of co-inventors was addressed explicitly in the expert report of Dr. Quackenbush, Audible Magic's expert and in the responsive report of Dr. Papakonstantinou, Blue Spike's expert.  Obviously, it has been litigated extensively.  The 102(f) derivation theory upon which improper inventorship is based was also expressly and extensively addressed in the summary judgment briefing as a theory that Blue Spike did not challenge on summary judgment (as was the alternate state law unjust enrichment theory, that leads to the same conclusion).

Determining whether there is improper inventorship and improperly omitted co-inventors is part and parcel of the determination under 35 U.S.C. § 102(f).  *See e,g, Pannu v. Iolab Corp.*,

155 F.3d 1344, 1350-51 (Fed. Cir. 1998); *Auxilium Pharmaceuticals, Inc. v. Watson Laboratories, Inc.*, 2014 U.S. Dist. LEXIS 184032, *86-99 (D. N.J. 2014).  It is unnecessary to plead correction of inventorship under 35 U.S.C. § 256.  *See Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998) (correction of inventorship on motion); *Pannu*, 155 F.3d at 1350 (district courts must consider correction of inventorship under § 256 before invalidating the patent under § 102(f)).  Courts have expressly found that there is no need to embody a request for correction of inventorship in any answer or counterclaim, but instead that may be done on motion in the course of the case.  *See Illumina, Inc. v. Affymetrics, Inc.*, 09-cv-277-bbc, 09-cv-665-bbc (W.D. Wis. November 23, 2010, Crabb, J.) at pp. 9-10 (attached as Exhibit N) ("plaintiff says that defendant waived its right to request a correction under § 256 because it did not include such a claim in its counterclaim and answer.  However, plaintiff cites no language from the statute or any case law that supports the proposition that a request for correction is a "claim" that must be pleaded. Rather, in Ethicon, the defendant simply filed a motion for correction. In Pannu, 155 F.3d at 1350, the court stated that district courts must consider whether a patent may be corrected under § 256 before invalidating the patent under § 102(f).")  As is set forth more fully below in Audible Magic's position on the structure of trial, it is common to consider correction of inventorship on a post-trial motion, following a trial on the § 102(f) issues.

### The Position Of Blue Spike, Inc., Blue Spike, LLC And Moskowitz

Counterclaim Defendants contend that Audible Magic is attempting to improperly bring a cause of action, a count to correct inventorship under Title 35 U.S.C. Section 116 or 256 into the case without amending its counterclaims.  This is improper and should not be allowed at this stage of the case due to the extreme prejudice to Counter Defendants and failure of Audible Magic to previously move to amend its Counterclaims (Dkt. 1404, Case No. 6:12-cv-00499).

Furthermore, the cases that Audible Magic now cite to the Court after the Court ruled on its Motions for Summary Judgment, *Pannu*, 155 F.3d 1344 (Fed. Cir. 1998); *Auxilium Pharmaceuticals*, 2014 U.S. Dist. LEXIS 184032 (D. N.J. 2014); *Ethicon, Inc.*, 135 F.3d 1456 (Fed. Cir. 1998) are improperly cited by Audible Magic, distinguishable and ignore of case law from the Federal Circuit and other Districts, including the USPTO with respect to correcting inventorship.  Blue Spike will further explain to the Court at the pre-trial conference with exemplars.  Audible Magic may go to the USPTO to correct inventorship.  At this stage of the proceedings before the Court, Audible Magic's motion to correct inventorship is untimely, and highly prejudicial to Blue Spike.  After all, Audible Magic had over 4 years to plead co-inventorship but never did so.

**D.**     **CONTENTIONS OF THE PARTIES**

     **<u>Audible Magic's Contentions</u>**

     Counterclaim Plaintiff Audible Magic contends the following:

**Invalidity And Correction of Inventorship/Unjust Enrichment Under The Patent Act**

     1.     The Patents-in-Suit are invalid pursuant to 35 U.S.C. § 102(f) due to the prior invention of Thom Blum, Erling Wold, Douglas Keislar, or Jim Wheaton, and on the basis that the applicants improperly failed to name and omitted these co-inventors of the Patents-in-Suit. Audible Magic will prove that these inventors made "not insubstantial" contributions to the inventions of the Patents-in-Suit, were improperly omitted as co-inventors and that the omitted co-inventors did not act with deceptive intent, but were instead omitted solely through the fault of Mr. Moskowitz.  After inventorship is established, the Court can correct inventorship pursuant to 35 U.S.C. § 256.  Co-inventors (who have assigned their patent rights to Audible Magic), are equitable title holders of the Patents-in-Suit, under patent law principles, and are entitled to

federal equitable remedies, including disgorgement of wrongfully obtained profits.  Given the common facts underlying the § 102(f) theory and Audible Magic's common law unjust enrichment and unfair competition claims, the jury will hear the facts regarding inventorship and the Court will ultimately rule on the equitable claim for correction of inventorship and disgorgement of profits under the patent law.

2.      After Audible Magic puts in its case regarding derivation and joint inventorship, but before the case is submitted to the jury, Audible Magic will file a post-trial motion to correct inventorship under 35 U.S.C. § 256, which would save the patent from an invalidity verdict under § 102(f).  If the jury finds derivation and joint inventorship, the patent will be invalid, unless inventorship is ordered corrected on the post-trial motion and the jury's invalidity verdict set aside.  *See Pannu v. Iolab Corp.*, 155 F.3d 1344, 1347-50 (Fed. Cir. 1998) (finding that court should have sent inventorship issue to the jury, and thereafter considered whether to correct inventorship, considering 35 U.S.C. § 256 issues in the context of Rule 50 motions; "When a party asserts invalidity under § 102(f) due to nonjoinder, a district court should first determine whether there exists clear and convincing proof that the alleged unnamed inventor was in fact a co-inventor.  Upon such a finding of incorrect inventorship, a patentee may invoke section 256 to save the patent from invalidity.  Accordingly, the patentee must then be given an opportunity to correct inventorship pursuant to that section."); *Ethicon, Inc. v. United States Surgical Corp.*, 921 F. Supp. 901, 905 (D. Conn. 1995) (finding it appropriate to consider 35 U.S.C. § 256 motion to correct inventorship after trial to develop full record regarding inventorship and whether correction of inventorship is appropriate); *Jumpsport, Inc. v. Jumpking, Inc.*, 2004 U.S. Dist. LEXIS 29963, 10-26 (N.D. Cal. Mar. 18, 2004) (court determined correction of inventorship on motion under 35 U.S.C. § 256, in the context of Rule 50 motions; "The court

9

issues findings of fact in its capacity as the trier of fact on the correction of inventorship motion, intending these findings to be consistent with the jury's findings" and "the jury served as the trier of fact on the invalidity issues.")

3.     Muscle Fish was founded in Berkeley, California, in 1992, by engineers, mathematicians, and musicians Erling Wold, Doug Keislar, Thom Blum and Jim Wheaton. These were some of the most experienced and brightest audio technologists in the world.  They had worked with signal processing and sound technologies from the late 1970s through the early 1990s.  By 1992, these gentlemen had advanced degrees in electrical engineering, computer science and computer applications to music synthesis.  They had extensive experience with acoustic models, signal processing, parameter estimation, non-linear and applied mathematics, software engineering, computer architecture, circuit design and computer music.  One co-founded the Computer Music Association.  Another conducted psycho-acoustical research at Stanford's Center for Computer Research in Music and Acoustics ("CCRMA").  All had been engineers for years at a variety of companies, including Yamaha Music Technologies, developing new music analysis and synthesis techniques.

4.     Beginning in 1992, the Muscle Fish engineers worked on systems for analyzing content and signals.  By 1994, the Muscle Fish engineers had conceived and reduced to practice methodologies for taking an "audio object," "segmenting" it, analyzing "perceptual features," "perceptual attributes" or "subjective features" of the audio (such as pitch, brightness or loudness), and then "reduce the sound to a small set of parameters" that represent it.  This small set of parameters acted as a fingerprint and these fingerprints were compared by various Muscle Fish systems to determine how similar or dissimilar two sounds were, and whether or not there was an exact or relative "match."

5.       In 1997, Mr. Moskowitz learned about Muscle Fish's content-based recognition technology based on pitch, brightness or loudness, in the context of work concerning a product called "DataBlade" that added functionality to Informix brand databases.  In June 1997, Muscle Fish released "AIR DataBlade" ("Audio Information Retrieval") that implemented its content fingerprinting and recognition technology in Informix databases.  The AIR DataBlade created and saved fingerprints of audio files that reflected: "Perceptual attributes, such as pitch or loudness" and could "[a]nalyze and store acoustic and perceptual features of a sound…"

6.       Mr. Moskowitz learned about the AIR DataBlade, from press releases, the AIR DataBlade product documentation, and from exchanges with the engineers at Muscle Fish.  Mr. Moskowitz also participated in the Audio Engineering Society in 1996 and 1997, where the Muscle Fish technology was publicized.  Mr. Moskowitz was also aware of a 1996 Muscle Fish IEEE article entitled, "Content-Based Classification, Search and Retrieval of Audio," and that the same inventors had created the AIR DataBlade, and that the article described the work of Muscle Fish.

7.       On June 30, 1997, just weeks after an Audio Engineering Society publication describing Muscle Fish technology was sent to members and weeks after release of AIR DataBlade, Mr. Moskowitz contacted Muscle Fish.  He suggested that he wanted to work with Muscle Fish to create a CODEC for his digital watermarking product and asked about Muscle Fish's work with a multimedia database product offered by Informix.  Muscle Fish confirmed that it offered the AIR DataBlade.  Mr. Moskowitz repeatedly talked on the telephone and exchanged email with Muscle Fish throughout the summer of 1997 and thereafter, about Muscle Fish's technology.

8.       During these exchanges, Muscle Fish detailed the techniques and operation of

AIR DataBlade, which analyzed "perceptual features" of audio, such as pitch, brightness and loudness, and created representations reflecting those features.  Mr. Moskowitz and Muscle Fish communicated on the basis that the exchanges were confidential, including marking their exchanges as "CONFIDENTIAL."  Muscle Fish had conducted research comparing the benefits of content-based fingerprinting over digital watermarking, as a technology for content recognition.  Muscle Fish disclosed to Mr. Moskowitz their confidential and proprietary ideas concerning why Muscle Fish's content-recognition technology was superior to and solved the limitations presented by digital watermarking technology.

9.      Mr. Moskowitz communicated to Muscle Fish that he wanted to work with Muscle Fish's content-based fingerprinting technology, in particular the AIR DataBlade.  In August 1997, Mr. Moskowitz communicated to Muscle Fish that while he did not want to engage them at that time, he wished to work with them on "a number of extension-projects" and "porting with your own proprietary database technology."  Mr. Moskowitz was referring to porting his technology with the AIR DataBlade technology.  Muscle Fish at no time gave consent or license to Mr. Moskowitz to use Muscle Fish's ideas as the basis for any later patent application.

10.     In August 1997, Mr. Moskowitz instead hired Michael Berry, a contractor also working for Muscle Fish.  Mr. Moskowitz was aware of this fact.  Mr. Berry discussed Muscle Fish with Mr. Moskowitz.  Muscle Fish engineers testified that they had communicated to Mr. Berry the types of technology made by Muscle Fish.  In November 1997, Mr. Moskowitz formed Blue Spike, Inc.

11.     Mr. Moskowitz continued to receive information about Muscle Fish's technology, including a May 1998 multimedia technology newsletter describing Muscle Fish's technology. Mr. Moskowitz had a business plan to use Muscle Fish's content recognition technology in

conjunction with or as an alternative to Blue Spike's watermarking technology.  In December 1998 and January 1999, Blue Spike licensed the resample code and algorithm used by Muscle Fish's fingerprinting algorithms, which changes the resolution of sample audio, i.e. creating numbers which represent a segment of sound compactly, but still preserves the basic sound.  Mr. Moskowitz instructed Mr. Berry to ask for that code, but not to disclose to Muscle Fish what it was for.  Mr. Moskowitz urged Mr. Berry to try to improperly exert ownership over Muscle Fish's intellectual property.  Mr. Berry communicated to Mr. Moskowitz that "Musclefish has the code we need already written.  It would just take a small amount of alteration on their part." Despite Blue Spike's use of this key portion of Muscle Fish's recognition library, Muscle Fish did not grant a license to Blue Spike to use its fingerprinting algorithms.

12.     In April and May 2000, just four months before Mr. Moskowitz filed for the asserted patents, Blue Spike again asked Muscle Fish for technical assistance.  That agreement was not completed, however, because Mr. Moskowitz again attempted to exert ownership over Muscle Fish's work and intellectual property.  The draft agreement in Muscle Fish's files bore the notation:  "Never signed (no agreement on NDA/IP issues)."

13.     On September 7, 2000, Mr. Moskowitz filed the application that led to the Patents-in-Suit.  Blue Spike has stipulated that September 7, 2000 is the date of conception and reduction to practice of the Patents-in-Suit.  Mr. Moskowitz derived his patents from the early Muscle Fish work regarding use of perceptual features, such as pitch, brightness and loudness. First, in his patent specifications, Mr. Moskowitz appropriated these ideas regarding the benefits of using the perceptual features of a signal as an identifier, rather than inserting a digital watermark.  Mr. Moskowitz successfully argued to the Patent Office that the point of novelty was the ability to identify a signal without having to insert data, precisely as had been disclosed

to him.  The Patent Office accepted these arguments and allowed the claims on the basis that the prior art before it "do not teach … creating an abstract of the … signal using perceptual qualities of the … signal such that the abstract retains a perceptual relationship to the … signal from which it is derived."  In the specification and claims of the asserted patents, Mr. Moskowitz incorporated fundamental ideas of taking an "audio object," "segmenting" it, analyzing "perceptual features," "perceptual attributes" or "subjective features" of the audio, and then "reduce the sound to a small set of parameters" that represent it.  For example, Claim 1 of the '472 Patent claims:  "creating an abstract of the reference signal using perceptual qualities of the reference signal such that the abstract retains a perceptual relationship to the reference signal from which it is derived."  Audible Magic's expert will opine that it is unusual to find this specific combination of terms, nomenclature and concepts in both the Patents-in-Suit and in the early Muscle Fish work based on pitch, brightness and loudness, unless the authors of the Patents-in-Suit had adopted some of the early Muscle Fish terms, nomenclature, and principles in the Patents-in-Suit.

14.     After filing the Patents-in-Suit, Mr. Moskowitz and Blue Spike described in documents their business plan to obtain and use the fingerprinting technology of a third party company.  Muscle Fish was the first on the list of potential partners and Blue Spike approached Muscle Fish asking to combine Muscle Fish's content-based fingerprinting technology with Blue Spike's watermarking technology.  Mr. Moskowitz and Blue Spike never created any technology claimed in the Patents-in-Suit.

15.     At no point during Mr. Moskowitz's and Blue Spike's interactions with Muscle Fish, did Mr. Moskowitz communicate to Muscle Fish that he believed he or anyone else at Blue Spike had invented the ideas that they were discussing.  After interacting with Muscle Fish, and

during the period that Blue Spike was using Muscle Fish's resampling code and attempting to license the fingerprinting technology itself, Mr. Moskowitz filed the Patents-in-Suit which claim identification of content based on the content itself.  The Patents-in-Suit also claim that this is a benefit over digital watermarking, as had been described to Mr. Moskowitz by Muscle Fish regarding its early work based on pitch, brightness and loudness.  Mr. Moskowitz did not inform the Muscle Fish inventors of his intention to seek patents.  Mr. Moskowitz secretly proceeded to file a patent application claiming that he and Michael Berry alone, conceived of all of the ideas relating to the technology of taking an "audio object," "segmenting" it, analyzing "perceptual features," "perceptual attributes" or "subjective features" of the audio, and then "reduce the sound to a small set of parameters" that represent it, and using and comparing such representations to find matching and similar sounds, as an improvement over digital watermarking.  Pursuant to this plan, Mr. Moskowitz did not inform Muscle Fish that he had filed such an application.  Nor did Mr. Moskowitz inform the PTO of the contributions of Erling Wold, Thom Blum, Douglas Keislar, or Jim Wheaton.  Mr. Moskowitz repeated this deception in filing subsequent patent applications.  Mr. Moskowitz never informed Muscle Fish that he had filed the patent applications, nor did he inform them that patents had issued on the content-based recognition ideas based on pitch, brightness and loudness that Muscle Fish had shared with Mr. Moskowitz.

16.    The Muscle Fish inventors' patent rights related to the technology at issue were assigned to Audible Magic Corp. in 2000.

17.    U.S. Patent No. 7,346,472 was assigned by the named inventors to Blue Spike, Inc. on November 22, 2000, and Blue Spike, Inc. assigned the patent to Blue Spike, LLC on August 4, 2012.

18.     U.S. Patent No. 7,660,700 was assigned by the named inventors to Blue Spike, Inc. on November 20, 2000, and Blue Spike, Inc. assigned the patent to Blue Spike, LLC on August 4, 2012.

19.     U.S. Patent No. 7,949,494 was assigned by the named inventors to Blue Spike, Inc. on December 20, 2007, and Blue Spike, Inc. assigned the patent to Blue Spike, LLC on August 4, 2012.

20.     U.S. Patent No. 8,214,175 was assigned by the named inventors to Blue Spike, Inc. on December 20, 2007, and Blue Spike, Inc. assigned the patent to Blue Spike, LLC on August 4, 2012.

## Invalidity

21.     The Patents-in-Suit are invalid under 35 U.S.C. §§ 101,[1] 102(a), (b), (e) and (g), 103 and 112.  The claims that were asserted against Audible Magic and its customers, and therefore subject to Audible Magic's counterclaims, are: '472, Claims 1, 3, 4, 8, 11, '700, Claims 1, 6, 7, 8, 10, 11, 40, 49, 50, 51, '494, Claims 1, 4, 5, 11, 17, 18, 20, 21, 22, 29 and '175, Claims 8, 11, 12, 13, 15, 16, 17.  Audible Magic has proposed to Blue Spike that, given the current posture of the case, where Audible Magic's accused products have been found not to infringe,

---

[1] The Patents-in-Suit are invalid because the asserted claims of the Patents-in-Suit are invalid as embodying an unpatentable "abstract idea" under Section 101 of the Patent Act.  The United States District Court for the Northern District of California held that many claims of the Patents-in-Suit are invalid under Section 101.  *See Blue Spike LLC v. Google Inc.*, Case No. 14-cv-01650-YGR (N.D. Cal. 9/8/2015), Dkt. 75.  There is substantial overlap in the claims asserted in that case and the claims at issue in Audible Magic's counterclaims in the instant case.  The only claims asserted in this case against Audible Magic or its customers that were not asserted or expressly addressed in the California case are:  '700, Claims 6, 7 8, 49; '494, Claims 1, 4, 5, 18, 20, 21, 22; and '175, Claims 13, 15.  However, the substance of the claims asserted here is not distinct from the claims invalidated in the California action.  All of the asserted claims of the Patents-in-Suit are invalid as embodying an unpatentable "abstract idea" and under principles of res judicata and collateral estoppel.  Audible Magic reserves its right to challenge the Patents-in-Suit on this basis, pending the outcome of the current appeal of that issue to the Court of Appeals for the Federal Circuit.

that the parties stipulate to narrow the current trial to omit these theories, and to only try the 102(f) theory discussed above, the state law claims, and the Lanham Act claim.  Audible Magic has proposed to Blue Spike to stipulate that the parties will preserve their rights to argue invalidity or validity under these additional invalidity theories after any appeal of the judgment of non-infringement to the Federal Circuit Court of Appeals that may result in a remand.  Blue Spike has refused to stipulate in this regard.

22.     Audible Magic is prepared to demonstrate invalidity under the full scope of the foregoing theories at trial.  However, Audible Magic requests that the Court take up this issue as part of the pretrial proceedings and requests that the Court issue an order narrowing the trial in this manner, to Audible Magic's 102(f) theory, but preserving the parties' rights and positions with respect to the full scope of invalidity theories upon any appeal and remand.  *See Pacific Indem. Co. v. Broward County*, 465 F.2d 99, 103 (5th Cir. 1972) (Fed. R. Civ. P. 16 "gives the trial court broad discretion in conducting pre-trial procedures in order to narrow the issues, reduce the field of fact controversy for resolution, and to simplify the mechanics of the offer and receipt of evidence."); *Hodges v. United States*, 597 F.2d 1014, 1017 (5th Cir. 1979) (holding that pretrial order is part of mechanism that enables trial court to expedite just disposition of cases and reduce litigation costs through pretrial conference designed to restrict scope of trial by defining and limiting the issues involved); Fed. R. Civ. P. 16(c) (part of the purpose of pretrial conference is to "make stipulations," "simplifying the issues," "adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions...")

23.     The Patents-in-Suit are invalid because each element of each asserted claim is either anticipated or rendered obvious by the prior art, as set forth in detail in Audible Magic's

invalidity expert report and other disclosures.

24.     The Patents-in-Suit are invalid because they fail to satisfy the statutory requirements of enablement and written description under Section 112 of the Patent Act.  In particular, the patents are invalid for failure to enable a person of ordinary skill in the art to make and use an "abstract," "abstract of a signal using selectable criteria," "the comparing device identifies … an index of relatedness to said at least one query signal for each of said at least two matching abstracts," differentiation between "versions" of a reference signal, a "hashed abstract and/or digitally signed abstract," a "psycho-acoustic model and a psycho-visual model," without undue experimentation,  There is no disclosure in the specification of the Patents-in-Suit how to create or generate such elements, nor is there any example, process, flowchart, algorithm, or any other procedure that would have enabled a person of ordinary skill in the art, as of the claimed priority date of September 7, 2000, to make and use such elements without undue experimentation.  Instead, the specification provides only high-level descriptions regarding the intended use of such elements in the context of claimed inventions.  It is undisputed that Blue Spike and the inventors never made a working system embodying the claimed inventions.  The technical co-inventor of the Patents-in-Suit, Michael Berry, admitted in deposition that the Patents-in-Suit do not contain sufficient description to enable the claimed inventions or meet the written description requirements, and the same is supported by the opinions set forth in detail in Audible Magic's invalidity expert report.

25.     The Patents-in-Suit are invalid because the claims of the asserted patents do not point out and distinctly claim the subject matter that is regarded as the invention, because a person of ordinary skill in the art would not understand what is claimed in light of the specification.  In particular, the terms "abstract," "similar to," "index of relatedness," and "data

describing a portion of the characteristics of its associated reference signal," "programmed or structured to use an/said algorithm…" are terms whose meaning cannot be ascertained, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention, are not amenable to construction, and are insolubly ambiguous. The same is supported by the opinions set forth in detail in Audible Magic's invalidity expert report.

### Unenforceability And Inequitable Conduct

26. Audible Magic has proposed to Blue Spike that, given the current posture of the case, where Audible Magic's accused products have been found not to infringe, that the parties stipulate to narrow the current trial to only try the 102(f) theory discussed above, the state law claims, and the Lanham Act claim. Audible Magic has proposed to Blue Spike to stipulate to dismissal without prejudice of Audible Magic's counterclaim for inequitable conduct, preserving the parties rights under that theory after any appeal of the judgment of non-infringement to the Federal Circuit Court of Appeals and any remand. Blue Spike has refused to stipulate in this regard.

27. Audible Magic is prepared to demonstrate unenforceability based on inequitable conduct at trial. However, Audible Magic requests that the Court take up this issue as part of the pretrial proceedings and requests the Court issue an order dismissing without prejudice Audible Magic's counterclaim for unenforceability based on inequitable conduct, narrowing the trial in this manner. *See Pacific Indem. Co. v. Broward County*, 465 F.2d 99, 103 (5th Cir. 1972) (Fed. R. Civ. P. 16 "gives the trial court broad discretion in conducting pre-trial procedures in order to narrow the issues, reduce the field of fact controversy for resolution, and to simplify the mechanics of the offer and receipt of evidence."); *Hodges v. United States*, 597 F.2d 1014, 1017 (5th Cir. 1979) (holding that pretrial order is part of mechanism that enables trial court to

expedite just disposition of cases and reduce litigation costs through pretrial conference designed to restrict scope of trial by defining and limiting the issues involved); Fed. R. Civ. P. 16(c) (part of the purpose of pretrial conference is to "make stipulations," "simplifying the issues," "adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions...")

28.     The Patents-in-Suit are unenforceable on the grounds that Scott Moskowitz and Blue Spike, Inc. committed inequitable conduct.  During prosecution of the Patents-in-Suit, Moskowitz and Blue Spike, Inc. failed to disclose, withheld, concealed and/or mischaracterized to the United States Patent and Trademark Office ("PTO") prior art that was highly material to the patentability of the claims of Patents-in-Suit under prosecution, and which they knew or should have known would have been important to a reasonable examiner.  Mr. Moskowitz and Blue Spike, Inc. failed to disclose and mischaracterized the prior art with an intent to deceive the PTO.  Mr. Moskowitz and Blue Spike, Inc. knew about the following prior art: (1) the AIR DataBlade and SoundFisher prior art of Muscle Fish LLC, including technology and documents describing that technology, (2) the prior art Tuneprint technology, documents and system, (3) the prior art RCS technology, documents and system, (4) the prior art BDS technology, documents and system, (5) the prior art Digital Hanse technology, documents and system, (6) the prior art Imagelock technology, documents and system, and (7) the prior art APIS system.  Mr. Moskowitz investigated products and services that carried out the monitoring, analysis and recognition of digital information and signals, including products and services that used content-based fingerprints in order to identify content or signals.  He was highly aware of developments and prior art publications and systems in this regard, prior to the stipulated date of conception of the Patents-in-Suit.  He did not disclose this information to the PTO and mischaracterized the

20

prior art during prosecution and in the specification of the Patents-in-Suit.  But for withholding and mischaracterization of this prior art, the claims of the Patents-in-Suit would not have issued.

**Unjust Enrichment And Unfair Competition**

29.     Muscle Fish expended tremendous resources to cultivate and develop valuable information and intellectual property, including its proprietary source code and documentation embodying its fingerprinting technology, based on perceptual features such as pitch, brightness and loudness, its confidential research into the benefits of such fingerprinting over digital watermarking and it confidential ideas regarding applications of such fingerprinting as a substitute for and improvement over digital watermarking.  The development and use of such information enabled Muscle Fish and its successor Audible Magic to succeed in a competitive industry.

30.     During interactions with Muscle Fish in the summer of 1997, Scott Moskowitz informed Muscle Fish that their interactions were confidential.

**Lanham Act And Unfair Competition**

31.     Scott Moskowitz, Blue Spike, Inc. and Blue Spike, LLC made material false and misleading statements, in commerce, that constitute false advertising and false and misleading representations of fact, which misrepresent the nature, characteristics and qualities of good, services and commercial activities.  In particular, Audible Magic alleges that Scott Moskowitz's, Blue Spike, Inc.'s and Blue Spike, LLC's false and misleading statements include that they had a working product called the "Giovanni Abstraction Machine," that they were the "first to create" content "fingerprinting" technology, that they had such fingerprinting technology and the Giovanni Abstraction Machine since the "turn of the century" and that their products or technology are expressly or impliedly superior for those reasons.  These literally false and

misleading statements, made in interstate commerce, were material and had the potential to deceive a substantial segment of consumers, and potential licensees and defendants, and to unfairly and deceptively maximize Blue Spike's bargaining power.  These acts violate the Lanham Act (15 U.S.C. § 1125(a)) and the common law of unfair competition.

**Blue Spike's Contentions**

1.      Audible Magic is limited to the causes of action stated in its counterclaim.  Case 6:12-cv-00499, Dkt. 1404.  After the Court ruled Audible Magic does not infringe the patents-in-suit and its Common Law Unjust Enrichment Claim is not precluded by Federal Law, now Audible Magic has essentially amended its counterclaims to add a count to correct inventorship under Title 35 U.S.C. Section 256.  Audible Magic claims it can do this at anytime.  Blue Spike disagrees and is at a severe disadvantage and prejudice by Audible Magic never mentioning Section 256 and the inventorship dispute in any of its counterclaims submitted to the Court.  It was not raised in Audible Magic's expert reports.  It is improper for Audible Magic to present evidence related to inventorship of the patents-in-suit at trial.

2.      The Counterclaims elements are laid out in Blue Spike's Proposed Jury Instructions, attached hereto.

**E.      STIPULATIONS AND UNCONTESTED FACTS**

1.      Counterclaim Defendant Blue Spike, LLC is a limited liability company organized and existing under the laws of the State of Texas with a principal place of business at 1820 Shiloh Road, Tyler, Texas 75703.

2.      Counterclaim Defendant Blue Spike, Inc. is a corporation organized and existing under the laws of the State of Florida with a principal place of business at 20191 East Country Club Drive, #4, Aventura, Florida 33180.

3.      Counterclaim Defendant Scott A. Moskowitz is an individual residing in the State of Florida.

4.      Counterclaim Plaintiff Audible Magic Corporation is a corporation organized and existing under the laws of the State of California with a principal place of business at 985 University Avenue, Suite 35, Los Gatos, California 95032.

5.      U.S. Patent No. 8,214,175 is titled "Method and Device for Monitoring and Analyzing Signals."  The application for the '175 patent was filed on February 26, 2011 and the patent issued on July 3, 2012.

6.      U.S. Patent No. 7,346,472 is titled "Method and Device for Monitoring and Analyzing Signals."  The application for the '472 patent was filed on September 7, 2000 and the patent issued on March 18, 2008.

7.      U.S. Patent No. 7,949,494 is titled "Method and Device for Monitoring and Analyzing Signals."  The application for the '494 patent was filed on December 22, 2009 and the patent issued on May 24, 2011.

8.      U.S. Patent No. 7,660,700 is titled "Method and Device for Monitoring and Analyzing Signals."  The application for the '700 patent was filed on December 26, 2007 and the patent issued on February 9, 2010.

F.    CONTESTED ISSUES OF FACT AND LAW

**Audible Magic's Contested Facts and Law**

1.      Whether Audible Magic has shown that Erling Wold, Thom Blum, Douglas Keislar, or Jim Wheaton made a "not insubstantial" contribution to the inventions of the Patents-in-Suit and were improperly omitted by Mr. Moskowitz, Blue Spike, Inc. and Blue Spike, LLC as co-inventors.

2.      Whether the improperly omitted co-inventors did not act with deceptive intent, but were instead omitted solely through the fault of Mr. Moskowitz.

3.      Whether the Court should correct inventorship pursuant to 35 U.S.C. § 256.

4.      Whether the Patents-in-Suit are invalid pursuant to 35 U.S.C. § 102(f) due to the prior invention of Thom Blum, Erling Wold, Douglas Keislar or Jim Wheaton, and on the basis that the applicants improperly failed to name and omitted these co-inventors of the Patents-in-Suit.

5.      Whether Audible Magic is an equitable title holder of the Patents-in-Suit, under patent law principles, and is entitled to federal equitable remedies, including disgorgement of wrongfully obtained profits.

6.      Whether Audible Magic has shown that the Muscle Fish inventors disclosed confidential information to Mr. Moskowitz under an express or implied duty of confidence, and that Mr. Moskowitz, Blue Spike, Inc. and Blue Spike, LLC have taken and used without authorization or licensing such proprietary and confidential information, by wrongfully deriving the Patents-in-Suit from such information and improper failing to name the Muscle Fish inventors as co-inventors, such that such acts constitute common law unjust enrichment.

7.      Whether Audible Magic is entitled to disgorgement of wrongfully obtained profits as a remedy for the unjust enrichment.

8.      Whether Audible Magic has shown that the Muscle Fish inventors disclosed confidential information to Mr. Moskowitz under an express or implied duty of confidence, and that Mr. Moskowitz, Blue Spike, Inc. or Blue Spike, LLC have taken and used without authorization or licensing such proprietary and

confidential information, by wrongfully deriving the Patents-in-Suit from such information and improperly failing to name the Muscle Fish inventors as co-inventors, thereby gaining a special advantage in competition, and at the expense of Audible Magic, such that such acts constitute common law unfair competition.

9.    Whether Audible Magic is entitled to disgorgement of wrongfully obtained profits as a remedy for the unfair competition.

10.   Whether Audible Magic has shown that Scott Moskowitz, Blue Spike, Inc. or Blue Spike, LLC violated the Lanham Act by making material false and misleading statements, regarding the Giovanni Abstraction Machine, whether they were "first to create" content "fingerprinting" technology and whether they had such technology and products since the "turn of the century," in commerce, that constitute false advertising and false and misleading representations of fact, which misrepresents the nature, characteristics and qualities of goods, services and commercial activities, were material, and had the potential to deceive a substantial segment of consumers, and potential licensees and defendants, and to unfairly and deceptively maximize Blue Spike's bargaining power.

11.   Whether Audible Magic has shown that Scott Moskowitz, Blue Spike, Inc. and Blue Spike, LLC violated the common law of unfair competition by making material false and misleading statements, regarding the Giovanni Abstraction Machine, whether they were "first to create" content "fingerprinting" technology and whether they had such technology and product since the "turn of the century," in commerce, that constitute false advertising and false and misleading representations of fact, which misrepresents the nature, characteristics and

qualities of goods, services and commercial activities, were material, and had the potential to deceive a substantial segment of consumers, and potential licensees and defendants, and to unfairly and deceptively maximize Blue Spike's bargaining power.

12.    Whether Audible Magic is entitled to permanent injunction enjoining and restraining Blue Spike, Inc., Blue Spike, LLC or Scott Moskowitz, their directors, officers, agents, servants, employees, and those acting in privity or concert with them, and their subsidiaries, divisions, successors, and assigns, from further acts of unjust enrichment, violation of the Lanham Act, and unfair competition.

13.    Whether Audible Magic is entitled to damages, including compensatory, consequential and incidental damages, for unjust enrichment, violation of the Lanham Act and unfair competition.

14.    Whether Audible Magic is entitled to an award of punitive damages due to Scott Moskowitz's, Blue Spike, LLC's or Blue Spike, Inc.'s acts of fraud, malice and/or gross negligence, in engaging in unfair competition.

15.    Whether Audible Magic is entitled to any amount of pre-judgment or post-judgment interest.

16.    Whether Audible Magic is entitled to attorney's fees and costs under the Lanham Act, on the basis that this is an "exceptional" case and Scott Moskowitz's, Blue Spike, LLC's or Blue Spike, Inc.'s acts are willful, wanton and calculated to deceive, and are undertaken in bad faith.

17.    Whether '472 patent Claims 1, 3, 4, 8, 11; '700 patent, Claims 1, 6, 7, 8, 10, 11, 40, 49, 50, 51; '494 patent, Claims 1, 4, 5, 11, 17, 18, 20, 21, 22, 29; and '175

patent, Claims 8, 11, 12, 13, 15, 16, 17 are invalid under 35 U.S.C. §§ 101, 102 and/or 103.

18.     Whether the Patents-in-Suit are invalid because they fail to satisfy the statutory requirements of enablement and written description under Section 112 of the Patent Act, on the basis that the patents' specification and claims fail to enable a person of ordinary skill in the art to make and use the claimed inventions without undue experimentation and do not contain sufficient description to enable the claimed inventions or meet the written description requirements.

19.     Whether the Patents-in-Suit are invalid because they fail to point out and distinctly claim the subject matter that is regarded as the invention, on that basis that a person of ordinary skill in the art would not understand what is claimed in light of the specification and on the basis that and that the claims meaning cannot be ascertained, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention, are not amenable to construction, and are insolubly ambiguous.

20.     Whether the Patents-in-Suit are unenforceable because of Scott Moskowitz's or Blue Spike, Inc.'s inequitable conduct during prosecution of the Patents-in-Suit, by failing to disclose and mischaracterizing highly material prior art, with the intent to deceive the PTO, and which, but for the failure to disclose and mischaracterization, the Patents-in-Suit would not have issued.

21.     Whether Audible Magic is entitled to a finding that the Patents-in-Suit are invalid.

22.     Whether Audible Magic is entitled to a finding that the Patents-in-Suit are not unenforceable.

23.     Whether Audible Magic is entitled to an award of attorney's fees and costs under the Patent laws, on the basis that this is an "exceptional case" pursuant to 35 U.S.C. §§ 285 and 288, and any other relief deemed appropriate by the Court.

**Blue Spike's Contested Facts and Law**

1.     Blue Spike contests all of the issues Audible Magic mentions above.  Since Blue Spike does not bear the burden of proof, the contested facts of Blue Spike relate more to whether Audible Magic is precluded from presenting its argument related to inventorship to the jury.

G.     STRUCTURE OF TRIAL

**Audible Magic's Position**

Audible Magic contends that all claims and defenses should be tried to the jury in a single proceeding, and that the Court should decide the equitable claims and remedies with, if necessary, the aid of special/advisory verdict findings of the jury.  Audible Magic contends that the following are equitable issues for the Court to decide, with the assistance of an advisory jury, and wholly matters of law appropriate for eventual disposition on motion.

1.     The jury will make factual determinations whether the Muscle Fish inventors contributed to the inventions of the Patents-in-Suit and were improperly omitted co-inventors of the Patents-in-Suit and/or whether the Patents-in-Suit are invalid due to the prior invention of the Muscle Fish inventors.  The Court will thereafter decide the legal and equitable issues of correction of inventorship, pursuant to 35 U.S.C. § 256 and whether federal equitable remedies, including disgorgement of wrongfully obtained profits is warranted.

2.     The jury will sit as an advisory jury and make factual determinations regarding

whether Mr. Moskowitz or Blue Spike, Inc. engaged in inequitable conduct. The Court will decide whether Mr. Moskowitz or Blue Spike, Inc. engaged in inequitable conduct.

3.      The Court will decide whether any injunctive relief or other equitable remedies are appropriate on Audible Magic's counterclaims.

4.      The Court will decide whether attorney's fees or costs are warranted.

**<u>Counterclaim Defendants' Position</u>**

1.      The trial should be postponed until a ruling is made on the motions in limine and whether the patent claims involved are invalid already under Section 101. The latter issues is presently on appeal before the United States Court of Appeals for the Federal Circuit.

## H.      EXHIBIT LIST

Audible Magic's exhibits are listed in the Audible Magic Trial Exhibit List, attached hereto as Exhibit A-1. Blue Spike's objections to Audible Magic's Exhibit List are attached hereto as Exhibit A-2.

Audible Magic's position is as follows. It is Audible Magic's position that Blue Spike did not timely serve objections to Audible Magic's Exhibit List. Audible Magic's position is that Blue Spike's objections to Audible Magic's Exhibits are waived. Objections were due on June 1, 2016. Blue Spike did not serve its objections on June 1. Audible Magic gave Blue Spike an extension to June 8 and drafted a Joint Motion to extend the deadlines. Blue Spike refused to join the filing of the motion. Blue Spike did not serve its objections on June 8. Rather, Blue Spike failed to serve its objections to Audible Magic's Exhibit List until June 15, 2016 – only three days before the Joint Proposed Pretrial Order was due. Blue Spike refused to meet and

confer regarding the pretrial submissions and the parties' objections.  *See* Exhibit M.  On June 17, 2016, Blue Spike joined a meet and confer regarding some issues in this Pretrial Order, but had no position on objections.  Blue Spike's objections provide a single objection to Exhibits 26-250, which summarily lists multiple Federal Rules of Evidence for this broad range of documents without any explanation or specificity.  Should the Court not find Blue Spike's objections waived, Audible Magic's position is that these are improper objections and that they should be disregarded.

Blue Spike's exhibits are listed in the Blue Spike Trial Exhibit List, attached hereto as Exhibit B-1.  Audible Magic's objections to Blue Spike's Exhibit List are attached hereto as Exhibit B-2.

Pursuant to the Order Regarding Amended Pretrial Deadlines, the parties' respective exhibit lists will not include exhibits used solely for the purpose of impeachment.

## I. WITNESS LIST

### Audible Magic

Audible Magic's Witness List is attached hereto as Exhibit C.  Exhibit C is a list of the witnesses and rebuttal witnesses that Audible Magic presently expects that it will call, may call, or will provide testimony through deposition designations.  It is Audible Magic's position that Blue Spike must disclose now all witnesses that it may or will call at trial, and there are not any reasonably unanticipated witnesses, whether for affirmative testimony, rebuttal or impeachment. Blue Spike's proposal suggests that Blue Spike may attempt to call late-disclosed witnesses. Audible Magic will oppose any such attempt by Blue Spike.  Audible Magic reserves its rights to object to any late disclosed witness, and reserves its rights to call rebuttal or impeachment witnesses, the necessity of whose testimony cannot reasonably be anticipated before the time of

trial.

**Blue Spike**

Blue Spike's Witness List is attached hereto as Exhibit D.  In the event there are any other witnesses to be called at the trial, their names, address, and the subject matter of their testimony shall be reported to opposing counsel as soon as they are known.  This restriction shall not apply to rebuttal or impeachment witnesses, the necessity of whose testimony cannot reasonably be anticipated before the time of trial.

**J.**     **DEPOSITION DESIGNATIONS**

Pursuant to the Order Regarding Amended Pretrial Deadlines, Dkt. No. 76, the parties have provided deposition designations, rebuttal designations and objections.

1.  Attached at Exhibit E-1 are marked transcripts of Audible Magic's deposition designations (highlighted in yellow) and Blue Spike's rebuttal designations (highlighted in blue).

2.  Attached at Exhibit E-2 are Blue Spike's objections to Audible Magic's deposition designations.

3.  It is Audible Magic's position that Blue Spike did not serve rebuttal designations until June 15, 2016 when it belatedly served its objections to Audible Magic's Exhibit List. For the same reasons explained above with respect to Blue Spike's objections to Audible Magic's Exhibit List, it is Audible Magic's position that Blue Spike's rebuttal deposition designations are waived.  It is Audible Magic's position that Blue Spike did not provide objections to Audible Magic's deposition designations until June 15, 2016 when it belatedly served its objections to Audible Magic's Exhibit List.  For the same reasons explained above with respect to Blue Spike's objections to Audible Magic's Exhibit List,

it is Audible Magic's position that Blue Spike's objections to Audible Magic's deposition designations are waived.

4.  Attached at Exhibit F-1 are marked transcripts of Blue Spike's deposition designations (highlighted in yellow) and Audible Magic's rebuttal designations (highlighted in green).

5.  Attached at Exhibit F-2 are Audible Magic's objections to Blue Spike's deposition designations.

6.  Blue Spike did not provide objections to Audible Magic's rebuttal deposition designations.

**K.    Verdict Form**

Audible Magic's proposed Verdict Form is attached hereto as Exhibit G.

Counterclaim Defendants' proposed Verdict Form is attached hereto as Exhibit H.

**L.    Jury Questionnaire**

Audible Magic's proposed Jury Questionnaire is attached hereto as Exhibit I.

Blue Spike further states that it requests that the Court use the Jury Questionnaire already vetted and used in the matter *NobleBiz v. TCN*.

**M.    *Voir Dire* Questions**

Audible Magic's proposed list of *voir dire* questions is attached hereto as Exhibit J.

Blue Spike further states that it requests that the Court use the *voir dire* questions already vetted and used in the matter *NobleBiz v. TCN*.

**N.    Jury Instructions**

Audible Magic's proposed Jury Instructions are attached hereto as Exhibit K.

Counterclaim Defendants' proposed Jury Instructions are attached hereto as Exhibit L.

**P.    LIST OF PENDING MOTIONS**

The pending motions are set forth below.  On June 2, 2016, at Dkt. 112, the Court entered an order directing the parties to file a joint notice stating their positions on the necessity of ruling on these motions.  On June 7, 2016 at Dkt. No. 114, the parties set forth their respective positions on these motions:

1.      Audible Magic's Motion for Summary Judgment Based on License (Dkt. No. 53);

2.      Audible Magic's Motion to Exclude the Opinions of Blue Spike's Damages Expert, Rodney Bosco (Dkt. No. 31);

3.      Audible Magic's Motion to Exclude Certain Opinions of Blue Spike's Invalidity Expert (Dkt. No. 49).

**Q.   MOTIONS IN LIMINE**

The parties met and conferred, to narrow the issues, and agreed to the following:

1.      Neither party nor witness shall comment on or testify about the medical conditions of any party or witness.

2.      Blue Spike shall refrain from referring to itself as "plaintiff" or referring to Audible Magic as "defendant."  Rather, the parties will refer to Audible Magic as the "plaintiff" and the parties will refer to Mr. Moskowitz, Blue Spike, LLC and Blue Spike, Inc. as "defendants."

3.      Mr. Moskowitz shall refrain from testifying about the scope and meaning of the asserted patents beyond what was stated during his deposition.

4.      Blue Spike shall refrain from claiming, through testimony of any witness or otherwise, that Mr. Moskowitz resides in Texas.

The parties have met and conferred to narrow the issues and are at an impasse regarding the following Motions in Limine:

**Audible Magic's Motions**

1.      Motion in Limine No. 1:  Preclude Blue Spike from testifying, through any witness, about alleged Blue Spike inventive activities prior to September 7, 2000 (the Stipulated Conception Date).

2.      Motion in Limine No. 2:  Preclude Blue Spike from claiming $6.5 million in debt of other parties and preclude Blue Spike from disputing Audible Magic's estimates of Blue Spike's business expenses.

3.      Motion in Limine No. 3:  Preclude Dr. Papakonstantinou or any other witness from referring to the "Null case," "intended matches" or "differentiating between versions" as a basis for claiming that the asserted patents are valid.

4.      Motion in Limine No. 4:  Preclude Blue Spike from challenging the prior art status of Audible Magic's prior art.

5.      Motion in Limine No. 5:  Preclude Blue Spike from commenting on the residence of any attorney, party or witness.

6.      Motion in Limine No. 6:  Preclude discussion or any mention, by any counsel or witness, about irrelevant personal background or attributes of any attorney or witness.

**Blue Spike's Motions**

1.      Motion in Limine No. 1:  Audible Magic is excluded from discussing Joint Inventorship under Title 35 U.S.C. § 116 or Co-Inventorship under Title 35 U.S.C. § 256.

2.      Motion in Limine No. 2:  Audible Magic's experts, technical and, or alternatively, damages, on the amount of contribution to the patents-in-suit by the four Muscle

Fish Employees.

3.       Motion in Limine No. 3:  Audible Magic is not to refer to Scott Moskowitz, Blue

Spike, Inc., Dice Inc., or Blue Spike LLC as a "troll" or "Non-Practicing Entity."

**R.    S**ETTLEMENT

The parties are currently engaged in settlement discussions.  The parties remain open to

settlement.

**S.    J**URY **T**RIAL **R**EQUESTED

(a) Probable Length of Trial

Audible Magic estimates that the probable length of trial is 4 days, not including jury

selection.

(b) Availability of Witnesses

Audible Magic anticipates that witnesses Michael Berry, Peter Cassidy, Gregg

Moskowitz and Matt Ingalls will be unavailable, and therefore their testimony will be presented

through deposition designations.

(c) Any Foreseeable Logistical Problems

Audible Magic does not foresee any logistical problems.

**T.    C**ERTIFICATIONS[2]

The undersigned counsel for each of the parties in this action does hereby certify and

acknowledge the following:

1.       Full and complete disclosure has been made in accordance with the Federal Rules

of Civil Procedure and the Court's orders;

2.       Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local

---

[2] The parties understand that this certification is being made by each party as to its own conduct and is not intended as a certification or stipulation of the other party's compliance.

Rules, and the Court's orders have been complied with and not altered by agreement or

otherwise; and

3.      Each exhibit in the parties' Trial Exhibits Lists herein:

(a)      is in existence;

(b)      is numbered; and

(c)      has been disclosed and shown to opposing counsel.

Approved as to form and substance:

   */s/ Randall Garteiser*
Randall T. Garteiser
 Lead Attorney
 Texas Bar No. 24038912
 rgarteiser@ghiplaw.com
Christopher A. Honea
 Texas Bar No. 24059967
 chonea@ghiplaw.com
Kirk J. Anderson
 California Bar No. 289043
GARTEISER HONEA, P.C.
119 W. Ferguson Street
Tyler, Texas 75702
(903) 705-7420
(888) 908-4400 fax

*Attorneys for Plaintiff*
*Blue Spike, LLC*

   */s/ Eric H. Findlay*
Eric H. Findlay
   Texas Bar No. 00789886
   efindlay@findlaycraft.com
Walter W. Lackey, Jr.
   Texas Bar No. 24050901
   efindlay@findlaycraft.com
FINDLAY CRAFT, P.C.
102 N. College Ave, Suite 900
Tyler, Texas 75702
(903) 534-1100

(903) 534-1137 fax

Gabriel M. Ramsey
   Lead Attorney
   California Bar No. 209218, admitted E.D. Texas
   gramsey@orrick.com
I. Neel Chatterjee
   California Bar No. 173985, admitted E.D. Texas
   nchatterjee@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, California 94025
(650) 614-7400
(650) 614-7401 fax

Alyssa M. Caridis
   California Bar No. 260103, admitted E.D. Texas
   acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 S. Figueroa St., Suite 3200
Los Angeles, California 90017
(213) 629-2020
(213) 612-2499 fax

Christopher J. Higgins
   Washington D.C. Bar No. 498165, admitted *pro hac vice*
   chiggins@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005-1706
(202) 339-8400
(202) 339-8500

*Attorneys for Defendant Audible Magic Corp.*

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email.

  */s/ Eric H. Findlay*
  Eric H. Findlay

### CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I hereby certify that authorization to file this document under seal was provided by the Protective Order entered in the previously consolidated action 6:12-cv-499.

  */s/ Eric H. Findlay*
  Eric H. Findlay