# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS – TYLER DIVISION

| | |
|---|---|
| AUDIBLE MAGIC CORPORATION  ) <br> ) <br> Counterclaim Plaintiff,  ) <br> ) <br> v.  ) <br> ) <br> BLUE SPIKE, LLC, BLUE SPIKE, INC.  ) <br> and SCOTT A. MOSKOWITZ  ) <br> ) <br> Counterclaim Defendants.  ) <br> ) | No. 12-CV-499-MHS |

# REBUTTAL REPORT OF RODNEY J. BOSCO, MAFF, CVA, CFE

May 11, 2015

_____
Rodney J. Bosco

## I. Expert Qualifications

1. I am a Director with Gnarus Advisors LLC ("Gnarus"). I graduated Magna Cum Laude from Boston College and earned a Master of Arts in Economics from The University of Michigan. I am a Master Analyst in Financial Forensics (MAFF), a Certified Valuation Analyst (CVA) and a Certified Fraud Examiner (CFE).

2. I have provided economic, quantitative and related consulting services to businesses, government entities, attorneys and individuals for over 30 years. I have conducted or evaluated economic impact assessments or their underlying causes pursuant to disputes, investigations, business valuation, regulatory impact assessments, and other settings. I have also conducted assignments involving the design or interpretation of statistical analyses and simulations. My work has been used to provide or support expert testimony in federal/state court and in arbitrations.

3. A copy of my curriculum vitae, including a listing of prior testimony and publications, is attached as Appendix A.

4. Gnarus is a group of highly-experienced professionals who are recognized as leaders in their fields of practice and bring years of academic, governmental and corporate experience to every client we advise. Our more than 40 experts and consultants combine economic analysis and advanced financial modeling with scientific and technical expertise to provide clients with the resources and support they need across a wide range of industries and disciplines. We are adept at solving complex business problems, identifying and mitigating risk, and supporting litigation efforts.

## II. Scope of Engagement, Information Considered and Compensation

5. Gnarus was retained by Garteiser Honea, P.C. ("Garteiser Honea"), who is serving as counsel for Plaintiff and Counterclaim Defendants Blue Spike, LLC, Blue Spike, Inc. (collectively, "Blue Spike") and Scott A. Moskowitz in this matter. I was asked to undertake the following tasks:

   - Review the document titled *Rule 26 Expert Report of Alan Ratliff on Behalf of Counterclaim Plaintiff Audible Magic Corporation* (the "Ratliff Report"), which sets forth opinions of unjust enrichment damages pursuant to the Counterclaim filed in this matter by Defendant and Counterclaim Plaintiff Audible Magic;

   - Prepare this rebuttal report, pursuant to Federal Rules of Civil Procedure 26(A)(2)(b), which sets forth my opinions and findings resulting from my review of the Ratliff Report; and

   - Provide, if required, deposition and trial testimony.

6. I have had discussions with attorneys from Garteiser Honea. These discussions have helped me gain a high-level understanding of the intended applications of the Patents-in-Suit by companies who have entered into Settlement Agreements and License Agreements with Blue Spike; the nature of the claims set forth in certain Audible Magic patents; and the extent of financial disclosures required to be made by Blue Spike pursuant to discovery in this matter.

7. Marc Scoppettone, a Principal with Gnarus, assisted me in this effort. He is proficient in damages analysis in general and IP damages analysis in particular. I worked closely with him to understand the content of the document production and to undertake research deemed relevant to this assignment. However, I take responsibility for the contents of this report.

8. I have not been asked to examine liability issues raised in the Counterclaim. I express no opinion as to whether Counterclaim plaintiff is entitled to damages under the law. Rather, my report and testimony are intended only to assist the trier of fact in determining how much compensation may be owed by a party should liability be found by the Court.

9. Gnarus is being compensated for services rendered on an hourly basis with rates ranging from ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ The compensation to be received by Gnarus is not dependent on the outcome of this litigation.

10. I have reviewed the Counterclaim, the Ratliff Report and the documents relied upon for the statements and opinions expressed therein, data and information provided by the parties, and deposition transcripts. I have also gathered information through independent research. A list of information considered is attached as Appendix B.

11. In preparing the Figures and Exhibits contained herein I have considered and evaluated the information listed in Appendix B in light of my experience in damages analysis and related disciplines. I describe working assumptions and judgments as required in the text of this report. Except as noted, I have assumed that the information that has been provided to us, either through conversations or documents, are accurate and complete. Should such information be found to be incomplete or inaccurate, the findings presented in this report may change.

12. Should I receive additional requests from Counsel, I may supplement or amend this report. Further, subject to court approval, I may amend or supplement my opinions based on any new facts, information, or reports of other experts in this matter. I also reserve the right to respond to any arguments that may be advanced relating to the subject matter of my opinions. I expect to prepare exhibits and/or demonstratives based on my work and the information in this report for use at trial, including figures and exhibits included herein as well as different permutations of the scenarios described herein.

4

### III. Summary of Findings and Conclusions

13. Based on the research, consultations and analyses set forth in Sections IV through VIII, I have reached the findings and conclusions summarized below. My analyses and calculations are restricted to the data made available to me and may be amended to the extent additional or revised data are furnished and analyzed.

14. The analyses and resulting opinions of Mr. Ratliff pertaining to allegations of unjust enrichment, as set forth in the Ratliff Report, 

---

[1] Ratliff Report, paragraph 38.
[2] Mr. Ratliff refers to these as the "Abstract Patents."

The following included excerpt pages 6 and 13, are omitted due to containing confidential information.



### A.  Alabama Law Review

42. One source Mr. Ratliff relied on for his cost analysis was an Alabama Law Review article titled, "The Rise of Contingent Fee Representation in Patent Litigation." The author, David Schwartz, is a professor of law and co-director of the Center for Empirical Studies of Intellectual Property at Illinois Institute of Technology Chicago-Kent College of Law. Professor Schwartz conducted a study in which he interviewed lawyers involved in contingent representation in patent litigation and reviewed a collection of contingent fee agreements mostly provided by the interviewees. The aim of the study was to "discuss how and why attorney-client contingent relationships established in the nascent marketplace of patent contingent litigation differ from other types of contingent litigation" such as medical malpractice, personal injury and products liability litigation.

43. 

- "There are two main ways of setting the fees for the contingent fee lawyer: a graduated rate and a flat rate. Of the agreements using a flat fee reviewed for

14

- "The graduated rates typically set milestones such as 'through close of fact discovery,' 'through trial,' and 'through appeal,' and tied rates to recovery dates. As the case continued, the lawyer's percentage increased. Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%." █████████
█████████████████████████████████████████

44. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

45. Second, Mr. Ratliff does not address the fact that, as noted by Professor Schwartz, "the market for contingent fee patent litigators is diverse." Professor Schwartz defines four types of firms he encountered in his research and discusses each type's distinct case selectivity and litigation strategy and philosophy in the article. The summary statistics ████████████████████████████████████████
████████████████████████████████████████

46. Third, Professor Schwartz states that the study was qualitative in nature, rather than quantitative. It was intended to provide insights into the various types of contingent ████████████████████████████████████████
████████████████████████████████████ As Professor Schwartz notes in the section titled, *Study Design and Methodology*:

> "In addition to the qualitative interviews, I obtained copies of forty-two contingent fee agreements. Most of these agreements were obtained from the interview subjects or directly from others who have litigated on a contingent fee basis in the patent field. A small number of the agreements were located in court files via Pacer. While some descriptive information about these agreements is provided in this Article, a caveat is appropriate: <u>the contingent agreements studied in this Article are also not a random sample of the population of contingent fee agreements.</u>" [emphasis added; footnotes excluded]

15

47. On the basis of the above, I conclude that the information contained in Professor Schwartz' article lacks sufficient statistical reliability for adoption in a damages ▮

### B. *Washington Lawyers for the Arts*

48. Another source relied upon by Mr. Ratliff for his cost analysis was an Internet post titled, "Contingency Fee Lawyers in Intellectual Property." It was published by *Washington Lawyers for the Arts (WLA)* – a nonprofit service organization dedicated to supporting the arts in Washington state by creating alliances and making legal resources accessible to artists and arts organizations – on its blog page. WLA includes a biography of the author of the blog post, Tim Billick:

    > "Tim is a freshly minted attorney in Seattle currently working at Mann Law Group. Previously Tim worked on an IP policy project for the University of Washington. He has interned in U.S. District Court, at Robert Friedman & Associates, the Federal Trade Commission, and the Snohomish County Prosecutor's Office. He was an editor on UW Law's *Journal of Environmental Law & Policy* and he's written on clean energy issues and cap and trade. He has also presented on clean energy issues for the Washington State Legislature."

49. I have included the entirety of the blog post in Exhibit 1. The information Mr. Ratliff appears to rely upon for his analysis includes the following:

    - "How much does a contingency fee lawyer earn on a case? Well, that depends. The baseline payout to a lawyer is 1/3 of whatever you collect in a dispute or a ▮

    - "Example #1: Litigation. You want to sue someone for trademark infringement. Your attorney files a lawsuit to help put some urgency in settlement discussions. Ultimately the case settles out of court and your attorney conveniently earns you a $100,500 check. WOOHOO!.... (This was a decently complex case and your ▮

50. This piece of third-party research has no statistical validity and should not be considered an authoritative source for any damages analysis. Mr. Ratliff's inclusion of

information from this source in the work papers that support his cost analysis render his conclusions unsupported.

### C. Acacia Research Corporation

51. Mr. Ratliff uses cost and revenue information reported to the U.S. Securities and Exchange Commission ("SEC") by Acacia Research Corporation ("Acacia"), a company engaged as "an intermediary in the patent marketplace, bridging the gap between invention and application, facilitating efficiency and delivering monetary rewards to patent owners." As of early December 31, 2014, Acacia had executed over 1,430 license agreements across 181 patent portfolio and licensing programs.

52. 

**Figure 3: Derivation of Cost Factors Utilized by Mr. Ratliff Based on Information Contained in Acacia Research Corporation's 2013 Form 10-K SEC Filing**



54.  This is shown in Figure 4.

17

Figure 4: Derivation of Cost Factors Utilized by Mr. Ratliff Based on Information Contained in Acacia Research Corporation's 2014 Form 10-K SEC Filing



55.



56.

---

[10] Upfront acquisition costs may also be capitalized and accounted for through amortization expense. The cost is real; the accounting treatment works to dampen the variability of cash flows over time.



57. As shown in Figure 5, if Mr. Ratliff were to incorporate a more complete direct cost analysis of Acacia using the three-year period consistent ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

58. Even with that adjustment, it leaves unresolved the apparent aberrant performance of Acacia in 2012 relative to the surrounding years. Mr. Ratliff does not explain what happened in 2012 that was different but, nonetheless, justifies its application to the Blue Spike situation. In the absence of such an explanation, I am left to conclude that Mr. Ratliff's reliance on Acacia's financial performance, as he has employed it in his cost analysis, lacks sufficient economic support to yield a defensible conclusion as to the cost factor to apply to Blue Spike's revenues.



Pages 20-26 are omitted due to them containing confidential financial information.

19