UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| BLUE SPIKE, LLC, | § § § | |
| *Plaintiff*, | § § | Case No. 6:15-cv-584-RWS-CMC |
| v. | § § § | |
| AUDIBLE MAGIC CORPORATION, | § § | Jury Trial Demanded |
| *Defendant.* | § § § | |
| AUDIBLE MAGIC CORPORATION, | § § § | |
| *Counterclaim Plaintiff* | § § | |
| v. | § § § | |
| BLUE SPIKE, LLC, BLUE SPIKE, INC. and SCOTT A. MOSKOWITZ | § § § | |
| *Counterclaim Defendants.* | § § § | |

**BLUE SPIKE, LLC'S RESPONSE TO AUDIBLE MAGIC'S MOTION IN LIMINE**

Each of Audible Magic's Motions in Limine must be denied—

First, Blue Spike cannot be precluded from demonstrating inventive activity because the date of conception of its Patents-in-Suit was necessarily preceded by significant inventive activities that are highly relevant to this case;

Second, Blue Spike cannot be precluded from relying on financial data Audible Magic agreed was sufficient discovery because Audible Magic cannot rescind its stipulation, Blue Spike relied on Audible Magic's assurance, and Blue Spike cannot now provide a remedy;

Third, Blue Spike cannot be precluded from referring to the "null case," "intended matches," or "differentiating between versions" because these concepts are present in the claims and relevant to the issue of validity;

Fourth, Blue Spike cannot be precluded from challenging Audible Magic's prior art by

relying on opinions provided by its experts or on discovery disclosures;

Fifth, Blue Spike cannot be precluded from merely commenting on the residency of parties or attorneys because they are facts devoid of an impassioned plea; and

Sixth, Blue Spike cannot be precluded from mentioning "irrelevant personal background or attributes of any attorney or witness" because the request is too broad, too vague, and not grounded in specific evidence.

### I.  Response to Motion in Limine No. 1: Blue Spike should *not* be precluded from testifying about inventive activities prior to September 7, 2000.

Blue Spike should not be precluded from testifying about inventive activities. Blue Spike has previously identified the date of conception as September 7, 2000, the date the first patent (the '472 Patent) of the patents-in-suit was filed. To the extent Audible Magic's concern is truly that Blue Spike will attempt to alter the date of conception, Blue Spike avers it will not. *See* Audible Magic's Motion in Limine ("MIL"), Dkt. No. 118. Thus there is no reason why Audible Magic should be "concerned that Blue Spike will now attempt to argue that it conceived of the inventions at an earlier date." *Contra* MIL at 3. On this point alone Audible Magic's Motion in Limine No. 1 is moot.

But Audible Magic is not really concerned that Blue Spike will alter the date of conception; Audible Magic is concerned about the mountain of evidence indicating the Blue Spike inventors originated the patents-in-suit rather than misappropriated the technology from the Muscle Fish inventors. Audible Magic thus seeks to preclude Blue Spike "from testifying about alleged Blue Spike **inventive activities** prior to September 7, 2000." MIL at 3. Audible Magic's request is unsupported by case law, enormously prejudicial to Blue Spike, and merely designed to prevent the jury from deciding this case on its merits. For these reasons, Audible Magic's Motion in Limine No. 1 must be denied.

Audible Magic's position rests on erroneously conflating two concepts: the **date of conception** and **inventive activities**. These concepts are distinct. The date of conception is not the beginning of the inventive process but rather the point at which "all that remains to be accomplished, in order to perfect the art or instrument, belongs to the department of construction, not creation." *Dawson v. Dawson*, 710 F.3d 1347, 1352 (Fed. Cir. 2013). It is the date "of a definite permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Id.* Conversely, inventive activities lead up to the date of conception. For instance, 37 C.F.R. § 1.623 identifies a number of inventive steps that precede conception such as: the first drawing of the invention, the date the first written description of the invention, the date the invention was first disclosed to another person, the date the invention was reduced to practice. *See also* Credle v. Bond, 25 F.3d 1566, 1568, n.7 (Fed. Cir. 1994). Audible Magic must not be allowed to muddle these distinct concepts. *See Dawson* at 1356 (highlighting the difference between inventive activity and date of conception by stating "there is a critical difference between conceiving a way to make an idea operative and knowing that a completed invention will work for its intended purpose.").

Audible Magic's position that Blue Spike should be excluded from discussing inventive activities prior to the date of conception is unreasonable, especially if Audible Magic is implying the date of conception is never preceded by inventive activities. By way of illustration, this position requires a conclusion that the inventors had a spark of an idea, discussed the idea between themselves and others, deliberated on how to put the idea into action, reasoned the pros and cons of the idea, imagined the idea's various applications and embodiments, determined the various nuances of its use (such as exact (or "intended") matches, similarity comparisons, differentiating between versions, accounting for collisions, and so on), drafted the specification,

labored over the claims, and proofread their work ***all on the day the patent was filed.*** This conclusion is absurd.

In support of its position, Audible Magic misinforms the Court that "[i]n its discovery responses, Blue Spike never provided any evidence of any other alleged activity regarding conception." MIL at 3. This is untrue. To the extent Audible Magic's ambiguous phrasing of "alleged activity regarding conception" refers to the inventive activity leading up to conception, Blue Spike provided substantial evidence of inventive activity. For instance, Blue Spike's invalidity expert Dr. Papakonstantinou wrote at length regarding inventive activity that undermines Audible Magic's misappropriation theory. Excerpt from Dr. Papakonstantinou's Invalidity Report, *attached as* Ex. A. Also, Blue Spike produced an email from co-inventor Michael Berry discussing the "abstract" technology that would eventually become the patents-in-suit; the email is dated more than a year prior to the date of conception. Ex. B. These inventive activities predate the date of conception and are critical to Blue Spike's case.

Similarly, Audible Magic has sought substantial discovery—by way of document requests and extensive deposition questioning—related to Blue Spike's endeavors in the related field of digital watermarking technology. This watermarking production all serves as potential inventive activity, much of which predates the date of conception. For instance, Michael Berry has related the genesis of the signal abstracting technology to watermarking technology. When asked how the "germ of the idea of abstracting" came to be, Mr. Berry said it was in response "to aid in decoding the watermark by identifying an original." Deposition of Michael Berry ("Berry Depo."), at 18:19-19:1, *attached as* Ex. C. Audible Magic cannot be allowed to excise all relevant inventive activity from the case merely to improve its own attenuated theories.

Audible Magic's case law (mostly from the 9th circuit) is inapposite.[1] Audible Magic's cases focus on the date of conception, not inventive activity that is truly the heart of this Motion in Limine. Blue Spike will not alter the date of conception absent guidance from the Court, but neither should Blue Spike be precluded from relying on the voluminous evidence of inventive activity that predated the conception of the patents-in-suit. For these reasons, Audible Magic's Motion in Limine No. 1 must be denied.

**II.     Response to Motion in Limine No. 2: Blue Spike should not be precluded from relying on its ▮▮▮▮▮▮ and should not be precluded from challenging the cost estimates of Audible Magic's damages expert.**

Blue Spike should be allowed to rely on its ▮▮▮▮▮▮ as well as challenge Audible Magic's damages report. Contrary to Audible Magic's characterization, Blue Spike has been responsive to its disclosure duties as well as to this Court's orders. At one point, Audible Magic criticized Blue Spike's discovery as being deficient in nine separate areas. (September Discovery Order, Case No. 6:12-cv-499, Dkt. No. 1754.) Blue Spike responded by producing additional documents until Audible Magic only complained about deficiencies in two areas. (Audible Magic's Emergency Motion for Sanctions ("AM's Emergency Motion"), Dkt. No. 1827, at 2)). Again, Blue Spike produced more documents until the parties agreed, after a discussion with the special master, that there were no longer any outstanding discovery issues. (MIL at 5 ("[Audible Magic] would agree to accept a summary of financial information.").) Audible Magic cannot in good faith revive this discovery issue and now seek to preclude Blue Spike from relying on the financial data it produced.

---

[1] By Audible Magic's own admission, its case law relates to changes to the date of conception and/or inconsistent positions. MIL at 4 (citing *Bolden v. Amtrak*, 2005 U.S. Dist. LEXIS 11987, 6-7 (E.D. La. June 14, 2005) as relating to "excluding evidence *that was inconsistent with, unnecessary and not probative to issue to be decided by jury*" (emphasis added); *Orange Shaw Lincoln Mercury v. San Bernadino*, 1992 U.S. App. LEXIS 29921, *2-3 (9th Cir. 1992) as relating to "presentation at trial of any *contradictory evidence*" (emphasis added)).

      **A.     Blue Spike has shown a willingness to address Audible Magic's discovery concerns.**

From the outset of the discovery phase, Audible Magic has insisted on receiving all that Blue Spike has its possession, asking to "drink from a fire hose" of discovery, despite Blue Spike's protestations that not all documents in Blue Spike's possession are relevant to this case. When the matter came before this Court, it was decided that Blue Spike would produce documents responsive to "nine general categories." September Discovery Order, Case No. 6:12-cv-499, Dkt. No. 1754. Blue Spike fulfilled this obligation, providing responsive documents on three separate occasions the following month: 80,000 pages on 10/1; 7,300 pages on 10/6; and finally 19,000 more pages on 10/13. AM's Emergency Motion, Dkt. No. 1827, at 2.

Implicitly conceding that Blue Spike's October production satisfied seven of the nine categories listed in the Court's September order, Audible Magic filed another discovery motion and claimed two categories remained underrepresented: the Giovanni Abstraction Machine and financial data (although Audible Magic admitted it had been given tax returns). AM's Emergency Motion, Dkt. No. 1827, at 2-3. It was ordered that "if it has not already done so" Blue Spike was to continue producing non-privileged documents. November Discovery Order, Dkt. No. 1870. The Court further indicated that Audible Magic could seek information by deposition and implied Audible Magic would be given extra time to do so if necessary. *Id.*

Two days after the November Discovery Order, Blue Spike produced an additional 194,063 pages (BLU0250279-BLU0444341). In the following two months, Audible Magic deposed Blue Spike's Scott Moskowitz on six separate days on a variety of topics including financials. *See, e.g.,* Excerpts from Depositions of Scott Moskowitz, *attached as* Exs. D, E. Still dissatisfied with Blue Spike's financial production, Audible Magic and Blue Spike conferenced with the Special Master. Audible Magic agreed that it would no longer pursue the issue if Blue

Spike produced a financial summary, which Blue Spike produced. *See* MIL at 5; Ex. F.[2] Thus, the issue was laid to rest.

### B. Audible Magic cannot rescind its assurance that Blue Spike's financial summary was sufficient.

Audible Magic cannot now in good faith revisit a discovery issue that was resolved many months ago. Not only does Audible Magic's Motion in Limine No. 2 prejudice Blue Spike by revisiting an issue Blue Spike had relied on as being settled, Audible Magic's position also contradicts its stipulation to the special master. *See U.S. v. State of Tex.*, 523 F. Supp. 703, 712 (E.D. Tex. 1981) ("Courts must be able to rely upon attorneys to represent the interests of their clients."). This Court has held that the "burden on a party seeking relief from a stipulation freely entered into before or during trial is a heavy one." *Id.* "As a general rule, such stipulations are controlling and conclusive, resolving all factual issues according to their contents and framing those issues remaining to be tried." *Id.* By stipulating that Blue Spike's financial summary would serve as sufficient financial production, Audible Magic also stipulated that the issue was resolved. Audible Magic's Motion in Limine No. 2 must be denied to prevent prejudice to Blue Spike for its reliance on Audible Magic's assurances.

Similarly, Audible Magic's request must be denied because it is untimely and precludes constructive resolution. After it stipulated to conclude financial discovery upon receipt of Blue Spike's financial summary, Audible Magic made no effort to challenge the sufficiency of that financial summary. By waiting until the eve of trial to ask this Court to disregard Blue Spike's financial data while simultaneously prohibiting Blue Spike from questioning Audible Magic's financial analysis, Audible Magic has prevented Blue Spike from providing an alternative remedy. Rather than timely seeking equitable resolution between the parties, Audible Magic

---

[2] Blue Spike also produced a " ███████████████████████████████████ " internal Blue Spike, Inc. document providing additional financial information, *attached as* Ex. G.

gambled in hopes of having its cake and eating it, too—by precluding Blue Spike from relying on its financial data and yet allowing Audible Magic to rely on the same without objection. Audible Magic's gamesmanship should not be rewarded, and thus its Motion in Limine No. 2 must be denied.

At issue is a document vetted during the deposition of Mr. Moskowitz and produced during his deposition. Again, this was part of the stipulation with the Special Master. Under FRE 402 and 403, the summary financials would be highly prejudicial to be excluded from the trial as Blue Spike's Damages Expert relied upon them and Audible Magic had the opportunity to question him about them. Audible Magic chose not to focus on its counterclaims at all during the deposition of Mr. Bosco, and only asked about a lead hypothetical question, to which Mr. Bosco answered subject to Blue Spike's objections. Now, in attempt to increase damages, Audible Magic seeks to exclude ▓▓▓▓▓▓▓▓▓ of Blue Spike should it prevail at trial.

Audible Magic MIL No. 2 goes more to the weight of the evidence and should not be excluded. Audible Magic will have the opportunity on cross and direct examination to attack the summary financials. The jury will decide who is telling the truth.

**III.   Response to Motion in Limine No. 3: Blue Spike witnesses should not be precluded from testifying about the "null case," "intended matches," or "differentiating between versions."**

Audible Magic's Motion in Limine No. 3 is another attempt to improperly prevent Blue Spike from relying on evidence that clearly shows the Blue Spike inventors did not misappropriate the patents-in-suit. Audible Magic asks the Court to preclude Blue Spike from testifying about the "null case," "intended matches," or "differentiating between versions." Audible Magic's position is founded on a faulty premise that the terms "null case," "intended matches," and "differentiating between versions" are "concepts that are not present in the claims of the patents-in-suit or in the Court's claim construction." MIL at 10-11. This is wholly

incorrect.

The term "differentiating between versions" was mentioned specifically in the Court's Claim Construction Order. *See* Case No. 12-cv-499, Dkt. No. 1831 at 51. ("To be sure, each 'reference signal' has a corresponding 'abstract', and each abstract provides differentiating between a plurality of versions of *the* reference signal."). And "differentiating between versions" is also prominent in many of the asserted claims in this case. *See* '494 Patent, claims 1, 11, 29; '700 Patent, claims 1, 40; '175 Patent, claim 8. The term "null case" is also present in multiple patent claims. *See* '494 Patent, claim 9; '700 Patent, claim 26.[3] Moreover, the "null case" and its relation to collisions is described in depth throughout the patent specification. *See* '472 Patent at 4:5-7, 10:34-54, 11:7-23.

Finally, the concept of the "intended match" is prevalent in the asserted claims. In his invalidity report, Dr. Papakonstantinou merely used the phrase "intended match" to refer to claims, such as claim 1 of the '472 Patent, in which "the matched signal is the signal the copyright owner intended to be matched." Ex. H, Papakonstantinou Invalidity Report at 20-21, ¶ 54; *see also* Blue Spike's Sur-reply to Audible Magic's Daubert Motion ("Daubert Sur-reply"), Dkt. No. 74, at 3. Reviving its attack on Dr. Papakonstantinou's use of the "intended match" label from its Daubert Motion, Audible Magic once again cites the inapposite *DataQuill v. Huawei* case. MIL at 10 (citing *DataQuill Ltd. v. Huawei Tech. Co. Ltd. et al*, No. 13-cv-633, Dkt. No 146 (June 11, 2015)). As Blue Spike has already pointed out, the *DataQuill* Court took issue with an expert basing his opinions on embodiments instead of claims. (Daubert Sur-reply,

---

[3] While specific claims describing the null case are not asserted, the null case relates to asserted claims that describe the use of cryptography, as cryptography can provide greater accuracy and fewer collisions that result in null case scenarios. (*See* '472 Patent at 10:34-54.) Moreover, the null case remains highly relevant to the discussion of whether the Blue Spike inventors misappropriated signal abstracting from the Muscle Fish inventors. Audible Magic has provided no evidence that the Muscle Fish inventors anticipated null case scenarios, and thus the patent's ample description of the null case is additional evidence that Blue Spike inventors originated the patents-in-suit.

Dkt. No. 74, at 4.) This is a far cry from Dr. Papakonstantinou's use of descriptive labels as shorthand to refer to specific claim language.

The concepts of the "null case," "intended matches" and "differentiating between versions" must not be excluded because they occur throughout the patents-in-suit and are foundational elements of Blue Spike's case. Audible Magic's attempt to exclude these elements is unsupported and highly prejudicial to Blue Spike. Thus, Audible Magic's Motion in Limine No. 3 must be denied.

### IV.     Response to Motion in Limine No 4: Blue Spike should not be precluded from challenging Audible Magic's prior art.

Audible Magic premises its argument that "Blue Spike should be precluded from challenging the prior art status of Audible Magic's asserted prior art" on the faulty assumption that Blue Spike's invalidity expert did not opine on matters relevant to prior art status. *Contra* MIL at 11. On the contrary, as described in section I above, Dr. Papakonstantinou provided a number of examples proving the Blue Spike inventors were the originators of the patents-in-suit. *See* Ex. A. Moreover, Dr. Papakonstantinou provided information that may undermine certain alleged prior art. *See, e.g.,* Ex. A at 80, ¶ 224. If Audible Magic's complaint is really that Dr. Papakonstantinou should be limited to what he has written in his report, as indicated in Audible Magic's case law[4], then there is no dispute here. However, it appears Audible Magic is again taking a narrow concept (here, an expert should be confined to his or her report) and expanding that position to preclude (1) all of Blue Spike from (2) challenging Audible Magic's prior art altogether regardless of evidence existing in the expert report. Blue Spike has a right to rely on its expert report in full, and thus Audible Magic's overreaching Motion in Limine No. 4 must be

---

[4] Audible Magic cites to a number of cases for the proposition "this Court has consistently limited experts' testimony to the opinions and bases disclosed in their expert report." MIL at 11 (citing *Witt v. Chesapeake Exploration, L.L.C.*, 2011 U.S. Dist. LEXIS 76033, at *5-6 (E.D. Tex. July 13, 2011). Thus, Audible Magic essentially concedes that Blue Spike's expert should be allowed to rely on all data in his invalidity report.

denied.

## V. Response to Motion in Limine No 5: Blue Spike should not be precluded from commenting on residence.

Blue Spike should not be precluded from commenting on the residency of any witness, party, or attorney. Audible Magic's proposition that "[t]he residence of any of the parties is not relevant to any matter in this action" is incorrect. *Contra* MIL at 12. *See Allure Energy, Inc. v. Nest Labs, Inc., et al.*, Case No. 9:13-cv-102, Dkt. No. 281, at *8 (E.D. Tex. May 18, 2015) (denying defendant's motion in limine to exclude "a party's corporate status, residency, or operational location" because "[g]eneral background information regarding a company is admissible" and "[s]uch general background is contained in Defendants' exhibits"). Contrary to Audible Magic's parenthetical, *Learmonth v. Sears* does not stand for the proposition that arguments which merely "appeal to geographical location are intended to prejudice the jury against an out-of-state corporation." *Contra* MIL at 12 (citing *Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 732-33 (5th Cir. 2011)). Rather, *Learmonth* took issue with a "conscience-of-the-community" argument, defined as "any impassioned and prejudicial plea intended to evoke a sense of community loyalty, duty and expectation." *Learmonth*, 631 F.3d at 732. Similarly, *ContentGuard Holdings v. Amazon* did not preclude all comments about residency, but only those that were "denigrating, disparaging, touting, exalting or commenting unnecessarily on the nationality or place of residence of a party or witness." *Contra* MIL at 12 (*citing ContentGuard Holdings, Inc. v. Amazon.com, Inc.*, 2015 U.S. Dist. LEXIS 176753, at *9 (E.D. Tex. Sept. 3, 2015)). Thus, while impassioned pleas may be out of bounds, mere comments about residency certainly are not. *See SimpleAir, Inc. v. Google, Inc., et al.*, Case No. 2:14-cv-00011, Dkt. No. 325, at *4-5 (E.D. Tex. Oct. 5, 2015) (granting motion in limine to exclude "pejorative argument or testimony regarding corporate residency" but denying exclusion of "clear factual introduction

of the identity of the parties and the locations of their residences and places of conducting businesses."). Therefore, Blue Spike should not be precluded from commenting on residency.

In the alternative, if the Court believes Blue Spike should be precluded from commenting on residency, Audible Magic should similarly be precluded by the same reasoning.

**VI.     Response to Motion in Limine No 6: Blue Spike should not be precluded from discussing or mentioning personal background or personal characteristics.**

Audible Magic's Motion in Limine No. 6 must be denied because it is far too broad. *See Baxter Diagnostics, Inc*. v. Novatek Medical, Inc., No. 94 Civ. 5220, 1998 WL 665138 at *3 (S.D.N.Y. Sept. 25, 1998) ("A motion in limine may properly be denied where it is too sweeping in scope."). Audible Magic seeks to preclude Blue Spike "from discussing or mentioning the personal background or irrelevant personal characteristics of any attorney or witness." MIL at 12. As stated, this request is so broad that it includes expert witnesses, whose background is not only relevant but essential to proving their reliability. *See* Fed. R. Civ. P. 702.

Additionally, Audible Magic's requests are too vague. Audible Magic asks the Court to exclude "irrelevant personal characteristics" and "irrelevant personal beliefs." These ambiguous terms are far too vague to be allowed. *See CardSoft, Inc. v. Verifone Sys., Inc.*, 2:08-CV-98-RSP, 2012 WL 1995302, at *1 (E.D. Tex. June 4, 2012) (denying motion in limine seeking to exclude, for example, "Any Attempts to Contradict the Court's Claim Constructions" because the motion "does not identify any evidence in particular that should be excluded and therefore would be impractical to enforce as a motion in limine.").

Even if Audible Magic's request were not overly broad and ambiguous, it would be improper to exclude mere facts rather than pejorative or disparaging use of those facts as explained in Section V above. *See SimpleAir, Inc.*, Case No. 2:14-cv-00011, Dkt. No. 325, at *4-5. Similarly, personal beliefs and attitudes are very relevant to this case. Audible Magic's

strategy has shifted from the realm of the technical to one of theft and deceit. Because Audible Magic has made this case a question of character, Audible Magic cannot reasonably expect to preclude matters of personal beliefs and attributes. Audible Magic will have every opportunity during trial to object to questions or comments it finds irrelevant.

In the alternative, if the Court believes Blue Spike should be precluded from discussing or mentioning the personal background of attorneys or witnesses, Audible Magic must be similarly precluded by the same reasoning.

## CONCLUSION

For the foregoing reasons, Blue Spike respectfully requests that Audible Magic's motions in limine be denied. Blue Spike also cautions the Court to pay special attention to the disjunct between Audible Magic's headings and arguments, as most or all of the headings are much broader than their respective arguments. Further, Blue Spike asks that if the Court grants any of Audible Magic's motions in limine, that it also grant the same in Blue Spike's favor if applicable.

Garteiser Honea PLLC

　/s/ Randall Garteiser
Randall T. Garteiser
Lead Attorney
Texas Bar No. 24038912
rgarteiser@ghiplaw.com
Christopher A. Honea
Texas Bar No. 24059967
chonea@ghiplaw.com

Kirk J. Anderson
 California Bar No. 289043
GARTEISER HONEA, PLLC
119 W. Ferguson Street
Tyler, Texas 75702
(903) 705-7420
(888) 908-4400 fax

*Attorneys for Plaintiff*
*Blue Spike, LLC*

*Attorneys for Counterclaim Defendants*
*Blue Spike, LLC*
*Blue Spike, Inc.*
*Scott Moskowitz*

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email.

   /s/ Randall Garteiser
Randall Garteiser